# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## SEATTLE DIVISION

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

    v.

ISHAN WAHI, NIKHIL WAHI, AND SAMEER RAMANI,

      Defendants.

Civil Action No. 22-CV-01009

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff United States Securities and Exchange Commission (the "Commission"), for its Complaint against Defendants Ishan Wahi, Nikhil Wahi, and Sameer Ramani, alleges as follows:

## SUMMARY

1.      This case involves insider trading in certain crypto asset securities that Coinbase Global, Inc. ("Coinbase") announced would be "listed," or made available to trade, on its crypto asset trading platform.  From at least June 2021 through April 2022, Ishan Wahi ("Ishan"), a manager in Coinbase's Assets and Investing Products group, repeatedly tipped material, nonpublic information about the timing and content of Coinbase's "listing announcements" – in which Coinbase announced that crypto assets would be listed on its trading platform – to his brother Nikhil Wahi ("Nikhil") as well as his close friend Sameer Ramani ("Ramani").  Nikhil and Ramani used this information to trade ahead of dozens of listing announcements, earning at least $1.1 million in illicit profits.

2.      Ishan violated the duty of trust and confidence he owed to Coinbase when he repeatedly tipped Nikhil and Ramani.  In turn, Nikhil and Ramani each repeatedly traded on the

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

1 basis of material, nonpublic information that they knew, were reckless in not knowing, or

2 consciously avoided knowing that Ishan had provided them in breach of his duty to Coinbase and

3 for a personal benefit.  Ishan benefitted from his tip because he bestowed gifts of valuable material,

4 nonpublic information on a trading relative and a close friend.

5　　　　3.　　　　Coinbase is one of the largest crypto asset trading platforms in the U.S., with more

6 than 98 million registered users.  Coinbase has had a practice, since at least May 2020, of publicly

7 announcing on its blog or Twitter feed when it will begin listing certain crypto assets on its trading

8 platform.  The prices of crypto assets identified in these listing announcements, including crypto

9 asset securities, typically appreciate quickly and significantly.  (As used in this complaint, "crypto

10 asset security" refers to an asset that is issued and/or transferred using distributed ledger or

11 blockchain technology – including, but not limited to, so-called "digital assets," "virtual

12 currencies," "coins," and "tokens" – and that meets the definition of "security" under the federal

13 securities laws.)  The trading volume also multiplies, sometimes exponentially.

14

15

16　　　　4.　　　　At all relevant times, Coinbase's employee policies stated that "material nonpublic

17 information" included "information about a decision by Coinbase to list, not list, or add features to a

18 Digital Asset [separately defined to include tokens]."  The policies further emphasized that

19 Coinbase employees should never disclose material, nonpublic information to any other person,

20 including family and friends, or tip others who might make a trading decision using that material,

21 nonpublic information.

22

23　　　　5.　　　　As a manager in Coinbase's Assets and Investing Products group, Ishan – who had

24 expressly acknowledged his duty to keep listings information confidential – was entrusted with

25 first-hand knowledge of what crypto assets Coinbase planned to support and when Coinbase

26 planned to make listing announcements.  He also knew that conversations about this confidential

- 2 -

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

information needed to be limited, even within Coinbase, to – as Ishan himself once noted – a "tighter circle."

6.     Nevertheless, ahead of dozens of listing announcements in 2021 and 2022, and in breach of the duty he owed to Coinbase, Ishan repeatedly tipped his brother, Nikhil, and his close friend, Ramani, with material, nonpublic information about those listings' timing and content. Ishan communicated by phone and text with both Nikhil and Ramani during 2021 and 2022, including exchanging phone calls and messages with both that would not be captured in U.S. phone company records because, among other things, Ishan was using a phone with a non-U.S. phone number (the "Foreign Phone").  For example, on October 20, 2021, the same day as a Coinbase listing announcement, Nikhil messaged Ishan's Foreign Phone a dollar sign and the eyes emoji: "$ 👀."

7.     Nikhil and Ramani, who knew, consciously avoided knowing, or were reckless in not knowing that Ishan was breaching a duty by providing them with this listing information, repeatedly purchased the crypto assets Coinbase planned to list ahead of these announcements.  Between at least June 2021 and April 2022, blockchain addresses and accounts on trading platforms linked to Nikhil and Ramani traded ahead of – sometimes just minutes before – dozens of such announcements, trading in more than 60 crypto assets.  To conceal their misconduct, Nikhil and Ramani frequently used nominee accounts and anonymous wallets both to conduct the trading and to transfer and receive illicit proceeds.  In at least one situation, Nikhil and Ramani arranged to transfer illicit proceeds between accounts they controlled by jointly using an anonymous pass-through wallet, a transfer they discussed in a WhatsApp chat exchange.

8.     As alleged in this Complaint, this repeated pattern of Ishan tipping Nikhil and Ramani with inside information, followed by Nikhil and Ramani trading on that information,

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

included trading in at least nine crypto asset securities, which were listed in seven of these announcements.

9.      For example, in November 2021, Ishan learned that Coinbase would soon announce the listing of the crypto asset POWR.  As alleged further below, POWR was a crypto asset security. Beginning at 3:52 am ET on November 15, 2021, an account controlled by Nikhil at a foreign crypto trading platform purchased approximately $75,286 worth of POWR.  Then, just minutes after receiving confirmation that POWR would be listed later that day, Ishan called Nikhil.  At 2:52 pm ET – just two minutes before the Coinbase listing announcement – a blockchain address Nikhil controlled purchased another approximately $7,000 worth of POWR.  Almost immediately after the announcement, Nikhil sold $105,737 worth of POWR tokens from his foreign crypto trading platform account, for a profit of approximately $30,450, and exchanged the POWR in his blockchain address for another crypto asset, for a profit of approximately $3,050.  As a result, Nikhil realized total illicit proceeds of approximately $33,500.

10.      Nikhil's and Ramani's suspicious trading drew attention.  On May 11, 2022, Coinbase's Director of Security Operations emailed Ishan to schedule an interview with Coinbase's Legal Department in connection with an "ongoing company investigation into Coinbase's asset listing process."  Ishan – using the Foreign Phone – then sent a screen shot of the interview request to both Nikhil and Ramani, and stated that he needed to speak with them urgently.  On Monday, May 16 – the day of his scheduled interview – Ishan emailed coworkers that he would be "out indefinitely" because he "had to fly back to India overnight."  Ishan did not appear for his scheduled interview, but was prevented from leaving the country by law enforcement.  Using the Foreign Phone, Ishan tried to call both Nikhil and Ramani several times on May 16.

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

## NATURE OF PROCEEDING AND RELIEF SOUGHT

11.     The Commission brings this action against Ishan Wahi, Nikhil Wahi, and Ramani pursuant to Sections 21(d), 21A, and 27 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78u, 78u-l, and 78aa ("Exchange Act") to enjoin the transactions, acts, practices, and courses of business alleged in this Complaint and to seek disgorgement, prejudgment interest, civil penalties, and such further relief that the Court may deem appropriate.

## JURISDICTION AND VENUE

12.     The federal securities laws define what a security is.  That definition includes "investment contracts."  Section 2(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77b(a)(1); Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10); *see also SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946) (interpreting "investment contract").  The law vests the Commission with broad jurisdiction to regulate the securities markets and to bring actions for violations of the federal securities laws, including fraud and insider trading.  *See* Sections 10(b), 21, 21A, and 27 of the Exchange Act, 15 U.S.C. §§ 78j(b), 78u, 78u-1, and 78aa; *see also* Commodity Exchange Act Sections 1(a)(41) and 2(a)(1)(A), 7 U.S.C. §§ 1(a)(41), 2(a)(1)(A) (preserving the SEC's jurisdiction and confirming that the federal securities laws apply to securities).

13.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A, and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa.

14.     Venue in this district is proper pursuant to Section 27(a) of the Exchange Act, 15 U.S.C. §§ 78aa(a).  Certain of the purchases and sales of securities and acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred within the Western District of Washington, and were effected, directly or indirectly, by making use of the means, instruments, or instrumentalities of transportation or communication in interstate commerce.

- 5 -

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

In particular, many of the communications and trades described herein originated in, or were ordered from, this District.  Moreover, during the relevant period, Defendants Ishan and Nikhil resided in this District.

## DEFENDANTS

15.     **Ishan Wahi**, 32, is a citizen of India, residing in Seattle, Washington on a work visa. From October 2020 to late May 2022, when he was placed on administrative leave, Ishan was a manager in Coinbase's Assets and Investing Products group.  In response to an SEC subpoena for documents, Ishan asserted his Fifth Amendment right against self-incrimination.

16.     **Nikhil Wahi**, 26, is a citizen of India, residing in Seattle, Washington, where he also resided from July 2021 to May 2022.  Nikhil is a senior product manager at Salesforce, Inc., a cloud-based U.S. software company, where he has been employed since 2017.  Nikhil is Ishan's brother.  Nikhil has refused to respond to an SEC subpoena for documents.  On September 12, 2022, Nikhil entered a guilty plea to charges that he conspired to commit wire fraud in the case of *United States v. Wahi, et al.*, No. 1:22-cr-392, before the United States District Court for the Southern District of New York.

17.     **Sameer Ramani**, 33, is a resident of Houston, Texas, and a citizen of the U.S. Ramani is believed to currently be in India.  Ramani and Ishan attended the University of Texas at Austin at the same time and remain close friends.

## RELEVANT ENTITY

18.     **Coinbase Global, Inc.,** incorporated in Delaware and, during the relevant period, headquartered in San Francisco, California, operates one of the largest crypto asset trading platforms in the United States.  Coinbase's common stock is registered with the Commission under

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

Section 12(b) of the Exchange Act, and its securities are traded publicly on the Nasdaq Stock Market under the ticker symbol COIN.

**FACTS**

**Blockchains and Crypto Assets**

19.     A blockchain is a type of distributed ledger or peer-to-peer database that is spread across a network and keeps track of all transactions in the network in theoretically unchangeable, digitally-recorded data packages called "blocks."  Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, so that the blocks together form a chain.  A blockchain can be shared and accessed by anyone with appropriate permissions.  The Ethereum blockchain is a well-known blockchain.

20.     Crypto assets are unique digital assets maintained on a cryptographically-secured blockchain.  One type of crypto asset – the kind at issue in this case – is known as a "token."  Enormous numbers of tokens can be created at once or over time.  The blockchain records the creation (or "minting") of the tokens and then keeps track of the blockchain address that controls the tokens.

21.     The crypto asset securities purchased and sold in the transactions at issue in the transactions described below were created using the "ERC-20" protocol on the Ethereum blockchain.

**Ownership of Crypto Assets**

22.     People own crypto assets, such as the crypto asset securities traded in the transactions at issue in this matter, and hold them within a blockchain address under their control.  Often, someone controls an address—and the crypto assets held therein—through holding a private key for that address.  Anyone with that private key can submit a transaction to the blockchain that

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

will transfer the crypto assets at that address to another address.  In a single blockchain address, people can hold multiple types of crypto assets.

23.     People often control multiple blockchain addresses.  They often store their private keys for those addresses in software called a "wallet" that allows them to submit transactions using the software rather than directly sending orders to a blockchain.

24.     People can also own crypto assets by opening an account with Coinbase or other crypto asset trading platforms, sometimes also referred to herein as secondary trading platforms, and then transferring their crypto assets from their personal blockchain address to an address controlled by the trading platform.  In a secondary trading platform account, people can hold multiple types of crypto assets, along with currency such as U.S. dollars or Euros.

## Crypto Asset Securities

25.     A digital token or crypto asset is a crypto asset security if it meets the definition of a security, which the Securities Act defines to include "investment contract," *i.e.*, if it constitutes an investment of money, in a common enterprise, with a reasonable expectation of profit derived from the efforts of others.  During the relevant period, Ishan provided material, nonpublic information about, and Nikhil and Ramani traded in, multiple crypto asset securities that meet this definition. Set forth in greater detail below are seven episodes of trading that Nikhil and Ramani conducted, based upon material, nonpublic information provided by Ishan, relating to nine crypto asset securities.

26.     After the initial sale by the issuer, crypto assets are often traded on secondary trading platforms, such as Coinbase.  Crypto asset issuers may apply to these trading platforms to have crypto assets listed and made available for trading; the trading platforms select what crypto assets may be bought and sold on their systems.  The existence of the secondary trading market offered by

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

platforms such as Coinbase allows market participants to buy and sell crypto assets, including

crypto asset securities.  Secondary market trading in crypto assets has grown exponentially, and the

announcement of the listing of a crypto asset, including a crypto asset security, on Coinbase

typically causes that asset's price and trading volume to rise dramatically.

**Ishan Was Entrusted With Material, Nonpublic Information and Had a Duty to Keep That Information Confidential and Not Disclose It to Other Persons**

27.      In October 2020, Coinbase hired Ishan as a manager in its Assets and Investing

Products group, which was responsible for supporting and coordinating the Coinbase listing

announcements described herein.  Coinbase determined that because Ishan was regularly entrusted

with material, nonpublic information, he was a "Covered Person" under its Global Trading Policy

and Digital Asset Trading Policy (the "Policies").

28.      During the relevant period, the Policies stated that "You may disclose Material

Nonpublic Information ONLY to Personnel designated by your manager.  You should never

disclose Material Nonpublic Information to any other person, even co-workers, family or friends."

The Policies expressly defined "material nonpublic information" to include "information about a

decision by Coinbase to list, not list, or add features to a Digital Asset [separately defined to include

tokens]."  The Policies specifically emphasized that Coinbase employees should not disclose

material, nonpublic information, and included examples of activities that were "Not OK," including

trading in advance of the listing of new digital assets on its trading platform:

> *Coinbase publicly announces that it will support a new digital asset in the coming year.  You are an engineer that is helping to implement support of the new asset and you know that Coinbase plans a surprise early launch next week, so you buy the token.*

> *You are involved with a fund which invests in digital assets. You are involved in deciding when the fund buys and sells digital assets, and you advise the fund to buy a particular asset because you know Coinbase is going to start trading the asset.*

- 9 -

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

> *You buy a digital asset which you know is or may be part of Coinbase's non-public product roadmap or launch plans.*

29.     On or around the day he joined Coinbase, Ishan signed an acknowledgement that he had read and understood the Policies.

30.     By virtue of his position as a Product Manager in Coinbase's Assets and Investing Products group, Ishan was directly involved in the asset listing process.  He had first-hand knowledge of what crypto assets Coinbase planned to list and when Coinbase planned to announce an asset listing.

31.     Ishan also understood the need to keep this information confidential, and that access to it was restricted even within Coinbase.  In August 2021, Coinbase's Assets and Investing Products group created an internal Slack channel, of which Ishan was an original participant, as "a safe place to discuss details around asset launches that we are trying not to share anymore in the broader listings channels (*e.g.*, exact announcement / launch dates + timelines)."  In an August 19, 2021 message to the group, which included Ishan, an employee suggested changing the asset listing process so that fewer employees would have advance knowledge "[a]s we are trying to protect MNPI [material nonpublic information]."  In a February 2, 2022 message, Ishan's colleague reminded the Assets and Investing Products group that anyone on the Slack channel "must be on the Enhanced Trading Policy (Covered Persons) as the information discussed here is MNPI."

32.     Ishan recognized the importance of keeping listings information confidential, later instructing everyone:  "Please do not add anyone else to this channel."  Indeed, when asked if engineers could be added to the Slack channel, Ishan suggested keeping the Asset Listing Group's channel limited to "a tighter circle."

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

**Ishan Had a Close Relationship with Nikhil and Ramani and Communicated With Them Frequently Throughout the Relevant Period**

33.     Ishan and Nikhil have a close relationship.  For example, between June 2021 and April 2022, they typically communicated by text and phone multiple times a day.

34.     The brothers also have a history of financial transactions with each other:  for example, on February 11, 2021, Nikhil deposited a $20,000 check from Ishan, purportedly a "loan"; on March 1, 2021, Nikhil transferred $2,000 to Ishan.  On April 17, 2022, Nikhil transferred crypto assets valued at $19,500 from his Coinbase account to Ishan's Coinbase account.

35.     Ramani and Ishan have known each other since at least 2013.  They attended the University of Texas at Austin at the same time.  They follow each other on social media, including Soundcloud.  The friends exchanged phone calls and text messages in 2021 and 2022.

36.     At least by July 2021, Ishan possessed the Foreign Phone, a cell phone with a non-U.S. phone number.  Ishan used the Foreign Phone to communicate with Nikhil and Ramani, particularly in April and May 2022.  In his communications with Nikhil and Ramani using the Foreign Phone, Ishan used communications methods that would not be logged by a U.S. phone company, including by using applications such as WhatsApp to communicate with his brother and friend.

**Defendants Repeatedly Engaged in Insider Trading in Crypto Asset Securities in Advance of Coinbase Listing Announcements, Which They Took Steps To Conceal**

37.     As set forth in more detail below, between at least June 2021 and April 2022, Defendants engaged in a scheme – carried out over multiple months, involving multiple Coinbase listing announcements – to trade on inside information regarding crypto asset securities.

38.     Ishan repeatedly tipped Nikhil and Ramani with material, nonpublic information in advance of Coinbase's listing announcements of certain crypto asset securities.  While residing in

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

the United States, Ishan misappropriated this material, nonpublic information from Coinbase, a company incorporated and headquartered in the United States throughout the relevant period.

39.     Nikhil and Ramani, who knew, consciously avoided knowing, or were reckless in not knowing that Ishan was providing this material, nonpublic information in breach of his duty to Coinbase and for a personal benefit, repeatedly traded using that information, reaping substantial profits.

40.     Nikhil and Ramani were aware of each other's illegal trading and communicated regarding the transfer of assets among accounts and wallets they controlled.

41.     Because all of the Defendants understood that Ishan was providing material, nonpublic information in breach of his duty to Coinbase, the Defendants took steps to conceal their communications and trading, including by utilizing multiple accounts, wallets, and addresses across multiple platforms, including foreign trading platforms, in carrying out their trading in advance of Coinbase's listing announcements.

**A.   *The June 8, 2021 Listing Announcement – AMP***

42.     By virtue of his position at Coinbase, on or before June 6, 2021, Ishan learned that Coinbase planned to announce the listing of crypto asset AMP on its platform.  As alleged further below, AMP was a crypto asset security.

43.     On June 7, 2021, a blockchain address that has directly or indirectly sent funds to, and received funds from, Ramani (the "Ramani AMP Trading Address A") bought nearly 700,000 AMP tokens at a cost of approximately $30,650.

44.     On the morning of June 8, 2021, a second address (the "Ramani AMP Trading Address B"), which, directly or indirectly, has sent funds to Ramani, purchased approximately 1,165,000 AMP tokens, at a cost of approximately $49,000.

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

45.     On June 8, 2021, at 1:00 pm ET, Coinbase announced that it was listing AMP. AMP's price quickly rose more than 11%, while its trading volume more than tripled.

46.     On June 10 and June 11, 2021, the two Ramani AMP Trading Addresses sold nearly all of the AMP tokens they had purchased for Ethereum tokens ("ETH," a widely used cryptocurrency) valued at approximately $97,600, representing profits of approximately $17,950.

47.     Ramani AMP Trading Addresses A and B then transferred the ETH to a deposit blockchain address held by Ramani at a foreign trading platform on June 10 and 11, 2021.

### B. *The July 14, 2021 Listing Announcement – RLY*

48.     By virtue of his position at Coinbase, on or around July 12, 2021, Ishan learned that Coinbase intended to announce on July 14 that the RLY token would be listed on its platform.  As alleged further below, RLY was a crypto asset security.  The next day, on July 13, 2021, Ishan and Nikhil called each other several times.

49.     On July 13, 2021, at 4:45 am ET, a blockchain address that has received funds from Nikhil (the "Nikhil RLY Trading Address"), funneled through two intermediary addresses in a series of transactions, began trading in RLY tokens.  Before Coinbase's RLY listing announcement the next day, the Nikhil RLY Trading Address had a net accumulation of approximately 34,000 tokens, at a cost of approximately $14,500.

50.     On July 14, 2021, Coinbase announced RLY's listing.  As the day progressed, RLY's price rose approximately 20%, while its trading volume increased by nearly 60%.

51.     Over the next two days, the Nikhil RLY Trading Address sold the approximately 34,000 RLY tokens for approximately $16,200, earning an approximate profit of $1,700.  While engaging in this activity, Nikhil also accessed other online accounts from an IP address associated with his home in this district.

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

52.     On July 19, 2021, the RLY Trading Address transferred the equivalent of approximately $34,750 to a deposit address at a foreign trading platform that was controlled by Nikhil using a pseudonymous email address.

**C.   _The August 31, 2021 Listing Announcement -- DDX_**

53.     On August 19, 2021, participants in a private Coinbase Slack channel for "@asset-listings" – a group that included Ishan – discussed Coinbase's plan to list crypto asset DDX, among others, on August 24, 2021.  Another participant in that discussion proposed changes to pre-listing activities because "we are trying to protect MNPI [material nonpublic information]."  As alleged further below, DDX was a crypto asset security.

54.     Coinbase initially slated the announcement of DDX's listing for August 24, 2021, but then rescheduled it to August 31, 2021.

55.     On August 25, 2021, a blockchain address that had sent funds, directly or indirectly, to Ramani (the "Ramani DDX Trading Address A") began trading in DDX tokens, accumulating a total of approximately 3,450 tokens by August 29, for a cost of approximately $18,700.

56.     On August 31, 2021, a second address that has also previously sent funds, directly or indirectly, to Ramani (the "Ramani DDX Trading Address B") purchased approximately 3,670 DDX tokens at a cost of approximately $30,000 in 10 separate transactions between 8:20 am ET and 12:58 pm ET.

57.     Approximately two hours later, Coinbase announced that DDX would be made available for trading.  Following the announcement, the market price for DDX spiked approximately 145% in a little more than an hour, while trading volume increased over 470% from the previous day's trading.

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

58.     Later in the day on August 31, 2021, the Ramani DDX Trading Addresses A and B sold their DDX in exchange for another crypto asset, for a combined profit of approximately $37,000.

59.     On September 1, 2021, the Ramani DDX Addresses A and B sent the equivalent of approximately $102,384 to the same deposit address on a foreign trading platform.  This deposit address has, directly or indirectly, sent funds to Ramani.

**D.**   **_The September 8, 2021 Listing Announcement – XYO and RGT_**

60.     On August 30, 2021, participants in the private Coinbase Slack channel "@asset-listings" – a group that included Ishan – discussed "tomorrow's announcement" that Coinbase planned to list the XYO and RGT tokens.  As set forth further below, XYO and RGT were both crypto asset securities.

**(1) Ramani's Trading in XYO**

61.     On August 31, eight blockchain addresses, each of which has sent funds, directly or indirectly, to Ramani, began buying XYO.

62.     Later on the afternoon of August 31, a manager in Coinbase's Assets and Investing Products group informed the group, including Ishan, that Coinbase would not announce its planned listing of RGT and XYO on August 31.  Instead, the listing "will be pushed out to next week."  On September 1, though, at 10:44 am ET, there was another discussion on the @asset-listing Slack channel about announcing the listing of XYO later that day.  Shortly thereafter, at 11:21 am ET, a blockchain address that, directly or indirectly, has sent funds to Ramani began buying XYO.  The XYO listing announcement was later pushed again, to September 8.

63.     Between September 1 and 8, 2021, an additional six blockchain addresses, each of which, directly or indirectly, has sent funds to or received funds from Ramani, bought XYO.  In

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

total, 15 blockchain addresses linked to Ramani (the "Ramani XYO Buying Addresses") bought

approximately 38 million XYO tokens, valued at $600,000, before Coinbase announced, on

September 8, 2021, that it would list XYO and RGT.

64.     Within minutes of the listing announcement, the price of XYO increased more than

20%, while trading volume increased 263% the day of the announcement, and then more than

quadrupled again the next trading day.

65.     Between September 8 and 12, 2021, each of the 15 Ramani XYO Buying Addresses

transferred their XYO tokens to the same address (the "Ramani XYO Selling Address"), which,

directly or indirectly, had also previously received funds from, and sent funds to, Ramani.  Between

September 9 and 12, 2021, the Ramani XYO Selling Address transferred the approximately 38

million XYO tokens to a blockchain address on a foreign trading platform.

66.     At the time of these transfers, Ramani's XYO tokens were valued at approximately

$1.5 million, representing a profit of approximately $900,000.

### (2) Ramani's Trading in RGT

67.     Ramani's trading in RGT ahead of the September 8, 2021 announcement also closely

tracked the material, nonpublic information that Coinbase provided Ishan regarding RGT's planned

listing.

68.     On August 31, a blockchain address that has sent funds, directly or indirectly, to

Ramani started trading in RGT (the "Ramani RGT Trading Address A"), accumulating

approximately 2,186 RGT tokens for an approximate cost of $25,700.

69.     On September 1 and 5, 2021, another blockchain address that has sent funds, directly

or indirectly, to Ramani (the "Ramani RGT Trading Address B") purchased approximately 2,884

RGT tokens at an approximate cost of $52,500.

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

70.     On September 2, 2021, Ishan learned from an @asset-listings Slack chat that the listing announcement for RGT had been rescheduled for September 8, 2021.

71.     On September 5, another blockchain address that has sent funds, directly or indirectly, to Ramani (the "Ramani RGT Trading Address C") began purchasing RGT tokens, accumulating 2,927 RGT tokens at a cost of approximately $56,400.

72.     On September 8, 2021, Coinbase announced the listing of RGT.  Within minutes, the price of RGT increased by more than 20%, and trading volume more than doubled.

73.     Following the announcement, the Ramani Trading Address A transferred its RGT tokens to an intermediary address; at the time of the transfer, the 2,186 RGT tokens that Ramani Trading Address A had purchased had an approximate value of $34,400, representing profits of approximately $8,700.  Following the announcement, the Ramani Trading Addresses B and C sold their RGT tokens for ETH for net losses.

### E. *The October 27, 2021 Listing Announcement – LCX*

74.     On October 21, 2021, participants in the private Coinbase Slack channel @asset-listings – a group that included Ishan – discussed Coinbase's plan to list crypto asset LCX "next week."  As set forth in further detail below, LCX was a crypto asset security.

75.     On October 25, 2021, shortly before 10 pm ET, Ishan received confirmation from the same Slack channel that Coinbase's LCX announcement was on track for October 27, 2021.  Beginning the next morning, October 26, one blockchain address, which, directly or indirectly, has received funds from Ramani (the "Ramani LCX Trading Address A") bought approximately 347,700 LCX tokens in four separate transactions at a cost of approximately $96,000.

76.     By 6:45 pm ET on October 26, Ishan received further confirmation that Coinbase would be announcing the LCX listing the next day.  Later that evening, another blockchain address

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

that has sent funds, directly or indirectly, to Ramani (the "Ramani LCX Trading Address B") purchased approximately 668,880 LCX tokens in two transactions, at a total cost of approximately $205,000.  Also on the evening of October 26, a third blockchain address that has sent funds, directly or indirectly, to Ramani (the "Ramani LCX Trading Address C") purchased approximately 356,350 LCX tokens for a cost of approximately $104,200.  Collectively, the three blockchain addresses (the "Ramani LCX Trading Addresses") purchased approximately 1,372,930 LCX tokens, at a total cost of approximately $405,000, on October 26, 2021.

77.     The next day, October 27, Coinbase announced LCX's listing.  Within minutes, LCX's price rose approximately 20%, while its trading volume on the day of the announcement rose nearly 60%.

78.     Between November 2, 2021 and November 6, 2021, the three Ramani LCX Trading Addresses transferred the LCX tokens, or sold the LCX tokens for other crypto assets before transferring those assets, to other blockchain addresses that, directly or indirectly, had received funds from, and/or sent funds to, Ramani.  Specifically, the Ramani LCX Trading Address A sold approximately 347,300 LCX tokens for other crypto assets, valued at approximately $111,000, on November 5, 2021, for profits of approximately $15,000.  On November 6, 2021, the Ramani LCX Trading Address B transferred its approximately 668,880 LCX tokens, valued at approximately $308,000 to a deposit address at a foreign trading platform, representing approximate profits of $103,000.  Ramani and the purported holder of the deposit address have repeatedly used the same IP addresses to access various accounts.  On November 2, 2021, the Ramani LCX Trading Address C sold approximately 356,300 LCX tokens for other crypto assets, valued at approximately $159,200, for profits of approximately $55,000.  In total, at the time of the transfers or sales, the Ramani LCX Trading Addresses generated profits of approximately $173,000.

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

79.     On October 26 and November 2, 2021, during the time Ramani engaged in the LCX trading described above, he accessed other personal financial accounts from IP addresses associated with his U.S. residence and mobile phone.

**F.   The November 15, 2021 Listing Announcement – POWR**

80.     On September 15, 2021, two of Nikhil's Coinbase blockchain addresses transferred approximately 28.4 ETH tokens, valued at approximately $102,670, to a third address ("the Nikhil Funded Address").  Later that same day, the Nikhil Funded Address forwarded the ETH tokens to a deposit address on a foreign trading platform ("the Nikhil Deposit Address").  On September 29, 2021, Nikhil transferred an additional 19.3 ETH tokens, valued at $55,060, from one of his Coinbase addresses to the Nikhil Funded Address, which again forwarded the ETH tokens a few hours later to the Nikhil Deposit Address.

81.     On November 9, 2021, the Nikhil Deposit Address transferred 0.82 ETH tokens to yet another address (the "Nikhil POWR Trading Address"), which also received the equivalent of approximately $141,757 in three separate transactions on November 7 and 8, 2021, from a second blockchain address on the foreign trading platform.

82.     By November 12, 2021, Ishan knew from the Coinbase @asset-listings Slack channel that Coinbase would be announcing the listing of crypto asset POWR.  As set forth further below, POWR was a crypto asset security.

83.     On November 15, 2021, at approximately 3:52 am ET, Nikhil used an account on a crypto trading platform registered under the email address shyam8singh9@gmail.com (the "Shyam8 Account") to purchase approximately $75,286 worth of POWR.  Nikhil is the owner of the Shyam8 Account, and an IP address registered to Nikhil and his home address in this district was used to register the email address associated with the Shyam8 Account.

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

84.     On November 15, 2021, at approximately 10:50 am ET, Ishan received confirmation that POWR would list later that day.  Just minutes later, at 11:04 am ET, Ishan called Nikhil. Beginning at 2:52 pm ET, just two minutes before the Coinbase listing announcement, the Nikhil POWR Trading Address purchased 18,413 POWR for a value of approximately $7,000.  The person making this purchase from the Nikhil POWR Trading Address was using the same IP address that has been used to access a trading account Nikhil controlled at another secondary trading platform.

85.     After the announcement, POWR's price rose 44% almost immediately and over 113% on the day, while its trading volume exploded by over 9,500% from the previous day's trading.

86.     Six minutes after Coinbase announced that it would be listing POWR, the Shyam8 Account sold its POWR, now worth approximately $105,737, for profits of approximately $30,000. Less than two hours later, the Nikhil POWR Trading Address exchanged the 18,413 POWR tokens for the equivalent of approximately $10,050 in another crypto asset, for a profit of approximately $3,050.  On November 23, 2021, the Nikhil POWR Trading Address transferred these funds, with other funds, to the Nikhil Funded Address.

87.     On November 15, 2021, Nikhil accessed other personal accounts from an IP address associated with his residence in this district and from a cellular phone in this district.

### G.   *The April 11, 2022 Listing Announcement – DFX and KROM*

88.     On April 7, 2022, Ishan accessed an internal Coinbase spreadsheet that showed Coinbase intended to list crypto assets DFX and KROM on April 11.  He accessed that spreadsheet again, twice, early on the morning of April 11.  Ishan had access to that spreadsheet by virtue of his position within Coinbase.  That spreadsheet also had columns for price and trading data for trading

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

volume and market cap for each crypto asset.  As alleged further below, DFX and KROM were both crypto asset securities.

89.     On April 11, 2022, a blockchain address, which has sent funds, directly or indirectly, to Ramani (the "Ramani April 11 Trading Address A"), purchased both DFX and KROM. Specifically, on the morning of April 11, the Ramani April 11 Trading Address purchased 113,760 DFX tokens, at a cost of approximately $48,600.  That morning, and continuing into the afternoon, the Ramani April 11 Trading Address purchased 783,309 KROM tokens, at a cost of approximately $72,700.  Also, on April 11, 2021, a second address, which has also sent funds, directly or indirectly, to Ramani (the "Ramani April 11 Trading Address B"), bought approximately 839,430 KROM tokens, at a cost of approximately $77,000.

90.     On April 11, 2022, at 5:05 pm ET, Coinbase announced that it planned to list DFX and KROM on its trading platform.  The price of both DFX and KROM increased slightly shortly after the announcement, followed by substantial increases the next day – more than 50% for KROM, and more than 80% for DFX.  Trading volumes for each also increased significantly, rising 471% for KROM and 818% for DFX.

91.     The Ramani April 11 Trading Address A has retained the DFX and KROM tokens. Had it sold the tokens at their high prices on April 12, the day following the announcement, the Ramani April 11 Trading Address A could have realized combined profits of approximately $69,000.  The Ramani April 11 Trading Address B has also retained its KROM tokens.  Had it sold the tokens at the high price for KROM on April 12, the day following the announcement, the wallet could have realized profits of approximately $35,000.

92.     On April 11, 2022, Nikhil accessed a personal financial account from an IP address associated with a cellular phone in the U.S.

- 21 -

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

**Defendants Traded in Dozens of Additional Crypto Assets Based on Material, Nonpublic Information, Concealing Their Trading Activity and Sharing Profits**

93.     In addition to the trading described above, between July 2021 and April 2022, Defendants repeatedly engaged in a strikingly similar pattern of conduct, with Nikhil trading in dozens of additional crypto assets utilizing material, nonpublic information that he knew, consciously avoided knowing, or was reckless in not knowing, had been provided by his brother, Ishan, in breach of his duty to Coinbase and for a personal benefit.  In carrying out this trading, as with the trading described above, Defendants took steps to conceal their trading, communications, and financial connections.  Specifically, Nikhil employed multiple nominee accounts and anonymous wallets to conceal his trading and illicit profits, and to coordinate the transfer of certain illicit profits with Ramani.

94.     In connection with one of those trading episodes, on February 13, 2022, an anonymous wallet beginning with 0xb7a915 that Ramani had access to (the "0xb7a915 Wallet") made two separate transfers to an anonymous wallet with an address beginning 0xe02a168 (the "0xe02a168 Wallet").  At 2:50 pm EST, it transferred USDC worth approximately $188,695 and, at 2:53, it transferred 1.48 ETH worth approximately $4,300.

95.     Using WhatsApp, Nikhil and Ramani arranged for Ramani to execute the transfers from the 0xb7a915 Wallet to the 0xe02a168 Wallet described in the preceding paragraph.  On February 13, 2022, minutes before the transfers, the following WhatsApp chat exchange took place between a phone number registered to Nikhil and a phone number used by Ramani to make a travel reservation in his name:

Nikhil: Yo are you free now?

Ramani: Yup

Ramani: Call you in 10 mins

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

1

Nikhil: Sounds good!

2

[Missed voice call from Ramani]

3

Nikhil: 0xe02a168d30A4A30Cd95AD709323664d7890e1F43 [the "0xe02a168 Wallet"]

4

Ramani: Leme know once in

5

Nikhil: Got it, thanks!

6

Ramani: Ok there's some balance eth too, same or somewhere else?

7

Nikhil: Same place is good

8

Ramani: Ok sent that too

9

Nikhil: Perfect got that as well

10

11

Nikhil: Thanks a lot bro

12

Ramani: Not a problem at all buddy

13

96.     On February 23, 2022, the 0xe02a168 Wallet transferred its holdings to an account

14

on a foreign crypto trading platform associated with the email address biimbaum23@gmail.com

15

(the "Biimbaum23 Account").  A telephone number registered to Nikhil is associated with the

16

Biimbaum23 Account.  From the time it received the funds from the 0xb7a915 Wallet until it

17

transferred the funds to the Biimbaum23 Account, the 0xe02a168 Wallet did not engage in any

18

other transactions.  Nikhil and Ramani used it only as a pass-through wallet to conceal the origins of

19

Nikhil's trading proceeds.

20

21

22

**Ishan, Alerted To an Investigation into His Misconduct, Attempted to Flee the U.S. and Urgently Contacted Nikhil and Ramani**

23

97.     On April 12, 2022, a third party tweeted about suspicious and timely trading by the

24

Ramani April 11 Trading Address A in advance of Coinbase's April 11, 2022 listing announcement.

25

On May 11, 2022, Coinbase's Director of Security Operations emailed Ishan to schedule an

26

interview with "Legal" for May 16, noting the interview was in connection with an "ongoing

- 23 -

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

company investigation into Coinbase's asset listing process."  Ishan – using the Foreign Phone –
then sent a screen shot of the interview request to Ramani and Nikhil, and sent them a message
indicating that they needed to speak urgently.  Ramani did not ask why Legal might want to talk to
Nikhil or why Nikhil might be telling Ramani about Legal's request and instead responded by
saying: "Bro I'm on standby.  Let me know if you need anything."

98.     On Monday, May 16 – the day of his scheduled interview – Ishan emailed coworkers
that he would be "out indefinitely" because he "had to fly back to India overnight."  Ishan did not
appear for his scheduled interview, but was prevented from leaving the country by law enforcement.
Using the Foreign Phone, Ishan tried to call both Nikhil and Ramani several times on May 16.

99.     In response to subpoenas from the SEC, Ishan has invoked his Fifth Amendment
rights, and Nikhil has refused to respond.  Ramani is believed to currently be in India.

## Nikhil and Ramani Purchased and Sold "Securities"

100.     Throughout the relevant period, Nikhil and Ramani repeatedly traded ahead of
Coinbase listing announcements, trading in at least 70 tokens.  At least seven of the listing
announcements described above involved crypto asset securities.  Nikhil and Ramani traded in
securities subject to the federal securities laws because these crypto assets were investment
contracts; they were offered and sold to investors who made an investment of money in a common
enterprise, with a reasonable expectation of profits to be derived from the efforts of others.

101.     As alleged in greater detail below, each of the nine crypto asset securities were
offered and sold by an issuer to raise money that would be used for the issuer's business.  In the
offerings, the issuers directly sold crypto asset securities to investors in return for consideration
(most commonly Bitcoin, ETH, U.S. dollars, or other fiat currency, or processed through the use of

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

smart contracts).  The crypto asset securities then were issued and distributed to the investors'
blockchain addresses.

102.    As alleged in greater detail below for nine of these crypto asset securities, the issuers
and their promoters solicited investors by touting the potential for profits to be earned from
investing in these securities based on the efforts of others.  These statements focused on, among
other things, the value of the token at issue and the ability for investors to engage in secondary
trading of the token, with the success of the investment depending on the efforts of management and
others at the company.  The issuers and their agents used websites, social media, and messaging
systems to make these representations.  Some issuers wrote "white papers" describing the project
and promoting the offering, often in highly technical (or pseudo-technical) terms and jargon.  Many
issuers also made public statements on platforms such as Twitter, Medium (a platform commonly
used by crypto asset industry participants), and YouTube.

103.    In addition, as alleged in the nine examples detailed below, the issuers and promoters
emphasized the ability for investors to resell these tokens in the secondary markets, on platforms
such as Coinbase, which was a crucial inducement to investors and essential to the market for these
crypto assets securities.  Investors were told, explicitly or implicitly, that they could sell their
securities in the secondary markets and that the liquidity available in the secondary markets could
drive up the value of their crypto asset securities.

104.    As alleged in greater detail below, each of the nine companies that offered these
crypto asset securities and their promoters further emphasized, among other things, their efforts to
get their crypto asset securities listed on secondary trading platforms, and the critical role that
executives and others at the company played in turning the company into a success, thereby
increasing the value of the crypto asset security.  In other words, each of the nine companies invited

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

people to invest on the promise that it would expend future efforts to improve the value of their investment.

105.    These hallmarks of the definition of a security continue to be true for the crypto asset securities that are the subject of the trading in this complaint, including continuing representations by issuers and their management teams regarding the investment value of the tokens, the managerial efforts that contribute to the tokens' value, and the availability of secondary markets for trading the tokens.  Thus, at all times relevant to the conduct alleged in this complaint, a reasonable investor in the nine crypto asset securities would continue to look to the efforts of the issuer and its promoters, including their future efforts, to increase the value of their investment.

### A.  AMP

106.    Amp is an Ethereum-based token that was created by Flexa Network, Inc. ("Flexa"), a company incorporated in Delaware with its headquarters in New York, New York.  Flexa operates what it describes as a digital merchant payment network designed to enable rapid, universal, and secure processing of digital asset transactions (the "Flexa network").

107.    According to Flexa, the Flexa network allows consumers to use, and merchants to accept, crypto assets to make everyday purchases.  Customers seeking to use crypto assets link their wallets to Flexa.  When the customer makes a purchase, Flexa states that it will pay the merchant immediately in either fiat or a convertible digital currency of its choice and deducts the equivalent value of crypto assets from the customer's wallet.  Flexa then collects payment processing fees from the merchant.

108.    Flexa states that the Amp token serves as collateral to decentralize risk within the Flexa network.  According to Flexa, this process works as follows: (1) Amp holders stake their Amp tokens in blockchain-based collateral pools, which serve to guarantee transactions taking place

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

on the Flexa network; (2) when a transaction takes place on the Flexa network, Amp tokens equal to the fiat value of the transaction are held in escrow by a collateral manager while Flexa settles the transaction by converting the crypto asset into fiat currency; (3) once the transaction settles, the Amp tokens are released and can be used to collateralize another transaction; and (4) if the transaction fails, the Amp tokens held as collateral are liquidated.  To reward those that stake Amp, Flexa uses the fees it collects from merchants to make open market purchases of Amp and then distributes those Amp tokens based on a pro rata shares of the tokens that were staked in the collateral pool, which can lead to further profit.

109.    Amp is the successor token to Flexacoin, which was first developed by Flexa in February 2018.  Between February 2018 and April 2019, Flexa sold 12 billion Flexacoins in private sales to groups of accredited investors, token funds, and other strategic partners, with over $14 million raised in April 2019 alone.  At the time, the Flexa network was not yet operational.  Flexa has claimed that "[t]he proceeds from this token sale have helped us continue to build out the Flexa network through additional merchant integrations and relationships with critical infrastructure partners."

110.    In April 2019, Flexa announced that the maximum supply of Flexacoins would be 100 billion tokens and that the Flexacoins would ultimately be allocated as follows:  10% to a Network Development Fund; 20% to token sales; 20% to a Founding Team and Employee Pool; 25% to a Merchant Development Fund; and 25% to Developer Grants.  The Flexa network launched in May 2019.

111.    To help collateralize the Flexa network, in November 2019, Flexa announced a plan to distribute a total of 1 billion Flexacoin (2.5 million each day starting on December 16, 2019) from its Network Development Fund in the form of rewards to everyone who provides capacity on

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

the Flexa network.  In January 2020, Flexa began public sales to investors of an additional 4.5 billion Flexacoins.

112.    In September 2020, Flexa announced it was migrating the collateral function on the Flexa network from Flexacoins to the newly developed Amp token, and that Flexacoin holders could exchange their tokens for Amp at a 1:1 ratio.  Flexa's management explained that "because of the nature of the interfaces required to implement the new capabilities of Amp, it wouldn't have been possible to simply upgrade the Flexacoin token."  Flexacoin retained the limit of 100 billion tokens.

113.    On September 30, 2020, Flexa stopped using Flexacoins as collateral for transactions on the Flexa network.

114.    *Purchasers of Flexacoin/Amp tokens invested in a common enterprise*.  In its November 2020 Amp white paper, Flexa explained that "participants stake Amp into pools that secure the network."  These collateral pools, comprised entirely of Amp, are what allow Flexa to operate.  Or, as Flexa put it in the Amp white paper, the "Amp token serves as the singular type of collateral within Flexa to decentralize risk within the network."  If the collateral pools are profitable, investors who stake Amp can share in the profits.

115.    Prior to the Flexacoin offering, Flexa described Flexacoin in the same way, stating in the May 2019 white paper that "Flexacoin is staked to collateralize every payment on the Flexa network."

116.    Amp investors also share a common interest with Flexa's management team.  Flexa explained in an April 2019 Medium post that 20% of the total percentage of Flexacoin was reserved for the Founding Team and Employee Pool to "incentiviz[e] current and future Flexa team members.  All supply from this allocation will be distributed on a four-year vesting schedule."

- 28 -

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

117.   *Investors in Flexacoin/AMP had a reasonable expectation of profits based on the efforts of others.*  From the start, Flexa has regularly emphasized the profit opportunity for Amp holders.  For example:

- In the Amp white paper, Flexa explained that Amp "serves as a medium for accruing value" and "continuously appreciates in value as a direct result of its utility" within the Flexa network.

- The Amp white paper also stated, "Amp token pricing is based on user demand for staking yield, spending utility, and, expectation of future productivity growth."

- The white paper further explained that as Amp's "token price increases, adoption (i.e. staking) increases, and the Amp staking cycle becomes systematic and more correlated to consumption."

- The white paper further claimed that participants that stake Amp into the collateral pools are entitled to receive "network rewards" – more Amp tokens – on a pro-rata basis.  These rewards are derived from the "entirety of network transaction revenue," which includes fees charged to merchants.  This transaction revenue, in turn, "funds the continuous open-market purchase of Amp tokens for redistribution as network rewards."  Therefore, as the total amount and value of transactions on the Flexa network increases, the total transaction revenue similarly increases, resulting in more open-market purchases of Amp to enable distribution of the network rewards.

118.   Flexa's August 2019 description of Flexacoin, Amp's predecessor, also reinforced the potential rewards for investors: "Stakers don't collateralize Flexa payments purely out of the goodness of their hearts.  Rather, as incentive for deploying Flexacoin as collateral – and to compensate the risk they incur when collateralizing unproven apps on the network – stakers earn the

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

network reward generated after every successful payment confirmation." As described below, Flexa's management team maintains these collateral pools.

119.    Flexa has continually promoted the availability of Amp (and previously, Flexacoin) to be bought and sold on secondary trading platforms. For example:

- On July 9, 2019, Flexa posted on its blog that Flexacoin was now available to buy and sell on a secondary market platform, making it "easier than ever for people all over the world to take part in Flexa's vision of mainstream cryptocurrency payments, and soon, to stake those payments themselves while earning rewards for collateralizing every purchase."

- Between January 2021 and June 2022, Flexa made at least six announcements about Amp being listed on additional secondary trading markets and crypto trading platforms. Flexa also sought to facilitate such listings. For example, on April 18, 2019, Flexa applied to have the Flexacoin listed on a U.S.-based secondary trading platform.

120.    The May 2019 Flexacoin white paper devoted an entire section to "Our team," making clear that the co-founders and a small number of employees were responsible for Flexa's administrative, marketing, and technical development. Further, as noted above, Flexa's founders and management team held 20 billion of the total 100 billion Flexacoin (and therefore hold the same number of Amp tokens) to "incentiviz[e] current and future Flexa team members."

121.    Flexa and its founders have continued to emphasize their importance to the future success of the Flexa network and Amp. For example,

- In a September 8, 2020 Medium post, Flexa stated that "we take our responsibility to the Flexa community very seriously," and "we recognize our great fortune in being

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

able to build the future of payments on top of revolutionary software like Bitcoin, Ethereum, and the various platforms that collectively represent DeFi."

- On June 18, 2020, the CEO and co-founder of Flexa stated in a Youtube video, "we [the founders] built this network from the ground up" and "we've created an open network."

- In a January 28, 2021 Flexa blog post, the founders detailed the many improvements they have made to the network, including partnerships and upgrades.

- Throughout 2021 and 2022, Flexa's management has continued to issue blog posts highlighting continued improvements and greater acceptance of the Flexa network and the Amp token.

122.    AMP can be bought and sold for fiat currency or other crypto assets on numerous secondary trading platforms.  Its price has fluctuated from $0.009 at first issuance to as high as $0.011 – approximately a 1000% return – to a current price roughly equal to its starting point.

### B. *RLY*

123.    RLY is a token issued on the Ethereum blockchain.  Rally Network, Inc. ("Rally") is a Delaware corporation based in San Francisco, founded in August 2018 as StarCard, Inc., before changing its name first to Forte Labs, Inc., and then to Rally Network on September 9, 2019.  RLY purports to be a "governance token" for the Rally Network.  ("Governance" rights refers to purported voting power that investors have over the development and structure of the business, including the right to propose changes.)  The Rally Network operates a number of projects built on the Rally ecosystem, including Rally.io—a supposed "platform for creators and their communities to build their own independent digital economies by enabling creators, artists, celebrities, communities and brands to launch their own social tokens and NFTs."

- 31 -

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

124.     Between December 31, 2020 and March 18, 2021, the Rally Network began a "community treasury fundraise [sic]" in which it claims to have sold 196,300,538 RLY tokens for total proceeds equaling approximately $34,828,450 in another crypto asset.  Between April 1 and 3, 2021, Rally and a partner conducted a public sale of RLY tokens, which RLY claims were to only non-U.S. persons, with no restrictions on resales to U.S. persons, raising an additional $22 million. In total, according to an April 28, 2021 Medium article, Rally raised $57 million to fund "community driven growth" of the Rally Network.  The Rally Network was operational in a limited form during this offering, and it has grown since then.

125.     *Purchasers of RLY tokens invested in a common enterprise*.  Rally has made clear from the start that funds raised from investors would fund Rally's development, while also ensuring that Rally's management is incentivized to make RLY more valuable.  For example:

- Rally's white paper for RLY stated that token allocation followed a "70% community, 30% team and seed" model.

- An initial supply of 15 billion RLY tokens was minted at launch, with 15.05% allocated to Rally's seed investors and another 13.95% allocated to Rally's management team.  "Team and seed" tokens were subject to a 4-year vesting schedule beginning at launch, with a "1 year cliff so we can't outvote the rest of the community."  The one-year cliff has since expired.

- Rally has represented that all proceeds from RLY token sales were pooled in the "Community Treasury," which "was designed to power the development and realize the potential of the Rally Network. . . [A] larger pool in the treasury will enable the community to significantly scale the Rally Network and empower the community to effectuate even more development and engagement, including, for example,

- 32 -

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

engaging developers to build the never-been-done-before ideas that the community comes up with."

- Rally has stated that the Community Treasury has allocated a portion of the proceeds to funding and expanding the management team.  Rally's white paper advised investors that "the budgets for the RLY Network Association & $RLY Ecosystem DAO will cover the operation costs plus the hiring and onboarding of new team members and experts to achieve their respective end goals."

- In an April 28, 2021 post on Medium, Rally stated that "[p]roceeds from these community-approved sales of RLY flow to the Rally community treasury, which is governed by the community and spent through community-led governance proposals designed to better the Rally Network."

126. *Investors in RLY had a reasonable expectation of profits based on the efforts of others.*  Rally claimed that RLY token holders would necessarily benefit from Rally's growth.  In the RLY white paper, Rally stated: "Tokenomics play a fundamentally important role in the success or failure of a crypto project.  In essence, good tokenomics align the incentives of all participants of a token economy.  These incentives are built into the protocol and will function as such in perpetuity thereby guaranteeing the protocol's future."

127. Rally leadership has also promoted RLY's availability on the secondary market, as well as its liquidity. For example:

- On July 21, 2021, Rally announced that "[o]ver the past two weeks, [multiple secondary trading platforms, including Coinbase] have all enabled $RLY trading." Rally noted that anyone with accounts on these platforms could thus "easily purchase $RLY using either crypto, a credit/debit card, or bank account and begin

- 33 -

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

participating in the $RLY community today," and could "in most jurisdictions …
convert their $RLY to US Dollars."

- On February 1, 2022, Rally said it was "excited to announce that $RLY is now
supported on [a trading platform]," which allowed for "buying, selling, storing, and
earning digital assets."

- Rally also applied to Coinbase to have RLY listed.

128.    Rally promoted its management team's background and qualifications in the RLY
white paper and continues to do so in its Wiki.  Rally also made clear in the white paper that
proceeds from the sale of RLY would be used to expand the centralized management team: "The
budgets for the RLY Network Association & $RLY Ecosystem DAO will cover the operation costs
plus the hiring and onboarding of new team members and experts to achieve their respective end
goals."

129.    Rally has continued to emphasize the central role its management plays in RLY's
success. For example:

- On September 2, 2022, Rally's official blog highlighted additions to the leadership
team and their credentials, including their past positions and expertise.

- Rally management has regularly engaged with industry publications to promote
personnel developments.  For example, in August 2021, a trade publication reported
that Rally had named a CEO and "the project has raised $50 million in a token sale
conducted by its community. . . . Rally also announced other new hires," touting their
experience.

130.    Rally's own statements on its website acknowledge a high degree of centralization:
"At Rally, we do not require or run an open network, meaning only a handful of computers

- 34 -

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

(equivalent to a public cloud) are needed to complete our transactions. . . . The key tradeoff is centralization. . . . While some will argue this does not reflect the fully decentralized mission of true blockchain, we believe that creators and fans are willing to make this tradeoff for an environmentally friendly, regulatorily [sic] compliant, and user-friendly experience."

131.     RLY can be bought and sold for fiat currency or other crypto assets on numerous secondary trading platforms.  Its price has fluctuated from approximately $0.68 in December 2020 to as high as $1.37 in April 2021 – approximately a 100% return.

### C. DDX

132.     DDX is a token issued on the Ethereum blockchain, associated with the DerivaDEX protocol, offered in or about July 2020 by DerivaDEX and its agents (together, "DerivaDEX"). DerivaDEX purports to be an exchange for derivatives contracts.  DerivaDEX claims on its website that the DDX token is a so-called "governance" token for DDX, that is "also used for fee reductions and staking opportunities."

133.     The DerivaDEX protocol is under development by DEX Labs, Inc. (f/k/a DerivaDEX, Inc.), a Delaware corporation purportedly providing software development services, as well as by a Panama-based foundation called the DerivaDEX Foundation and a British Virgin Islands-based operating entity called the DerivaDAO.

134.     The DerivaDEX protocol is not and has never been operational.

135.     According to DerivaDEX, the protocol has a supply of 100 million tokens, half of which are "emitted."  The remaining 50 million tokens serve as the "liquidity mining supply," to be released over the next 10 years.  In or about July 2020, DerivaDEX announced that it had raised $2.7 million over two rounds of fundraising.  Investors received over 15.3 million tokens, representing approximately 30.7% of the initial token supply.  Advisers received 660,000 tokens,

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

representing approximately 1.3% of the initial token supply.  DerivaDEX has retained the remaining 34 million tokens.  In a December 2020 Medium post titled "DerivaDEX Token Economics," DerivaDEX explained that 21 million tokens in DerivaDEX's supply "are unlocked upon network launch" and can be utilized "at any time."

136.    *Purchasers of DDX tokens invested in a common enterprise*.  DerivaDEX has represented that funds raised by token sales would be directed in large part towards making DerivaDEX operational, although it still is not.  For example, in the December 2020 Medium post, DerivaDEX stated that over 34 million DDX are allocated for: "funding for community initiatives, business development and partnerships, marketing, future fundraising rounds, and continued engineering development of the DerivaDEX protocol."

137.    DerivaDEX has also stated that it has allocated another 50 million DDX tokens towards the "liquidity mining" program to facilitate trading on the trading platforms.

138.    DerivaDEX and its management team retain the vast majority of "emitted" DDX tokens, creating a common interest between management and other investors.  Collectively, outside investors hold approximately 30.7% of the initial token supply.

139.    *Investors in DDX had a reasonable expectation of profits based on the efforts of others*.  In July 2020, DerivaDEX touted a "series of incentivized opportunities that will be made available for early partners, including . . . insurance mining, and other opportunities to get early access to the exchange product and affiliate referral program."

140.    DerivaDEX further described the insurance mining program, stating that investors would have the ability to earn more DDX by "staking" DDX to a DerivaDEX "insurance fund."  In other words, investors would essentially contribute their DDX tokens to the fund, creating liquidity that could be used to insure parties if a transaction fails.  As the insurance pool grows and earns

- 36 -

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

fees, participants who staked their DDX may receive additional DDX tokens and thereby greater

opportunities to profit.

141.    DerivaDEX has also sought to attract investors by noting that DDX tokens can soon

be traded on secondary platforms.  For example, in tweets beginning in June 2021, DerivaDEX and

DEX Labs touted when DDX became available for custody at various trading platforms including

Coinbase.  DerivaDEX has also published an article that stated in part "Its been a huge week for

DerivaDEX […] as DDX custody offerings coming live at both [trading platforms]," and retweeting

Coinbase's listing announcement.  DEX Labs also retweeted the announcement, as did

DerivaDEX's product lead, stating, "big hecking week for us @DEXLabs1[.]"  DerivaDEX also

applied for DDX to be listed on Coinbase.

142.    The central management team at DerivaDEX retains most of the DDX tokens for

purposes of "funding for community initiatives, business development and partnerships, marketing,

future fundraising rounds, and continued engineering development of the DerivaDEX protocol."

143.    Indeed, DerivaDex is still not fully operational, and DEX Labs continues to develop

DerivaDEX, which is in beta.  DerivaDEX has posted an audio recording featuring the CEO and the

product lead discussing development plans that have no firm timeline. The product lead has

described the following plans: (1) developing a feature that allows movement from one release

version to another (described as "pretty critical") (2) implementing any recommendations of a third

party software audit; and (3) implementing "fail safe" parameter limitations.

144.    All of the development plans that DerivaDEX has described depend entirely on the

efforts of its management team and the affiliated entities.

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

145.    DDX can be bought and sold for fiat currency or other crypto assets on numerous secondary trading platforms.  Its price has fluctuated from $3.29 in December 2020 to as high as $13.31 in August 2021, approximately a 300% return.

### D.  XYO

146.    XYO is an Ethereum-based token that was created by XY Labs, Inc. ("XY").  XY was originally organized as a Delaware limited liability company in June 2012 under the name Length Degree LLC.  The company became a corporation in May 2016, and underwent several name changes before assuming its current name in May 2021.  XY's Chief Executive Officer has served in that role since June 2012, and has served as Chairman of XY's Board of Directors since May 2016.

147.    XY purports to operate a crypto-location and data blockchain network of devices that anonymously collects and validates geographic data (the "XYO Network").  XYO tokens purportedly can be used to pay for data location queries and to the network participants who answer those queries.  In an online post, XY explained that the tokens "are essentially the gas that allows people or companies to ask the Network queries (like, did my shipment arrive?) and the XYO tokens they pay to ask the question get awarded to those who help create the answer!"

148.    XY and its founders conducted an initial coin offering (ICO) from on or about March 20, 2018 until May 20, 2018, raising approximately $12 million.  The ICO had a tiered pricing structure, with a starting price of approximately $0.005 for 1 XYO token.  XY fixed the supply of XYO tokens and capped the total supply of tokens at 13.96 billion.  XY explained that, after the ICO, it would burn any unsold and unallocated tokens.

149.    *Purchasers of XY tokens invested in a common enterprise*.  XY and its founders described how they would use funds raised during the ICO to build the XYO Network.  While the

- 38 -

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

XYO Network was purportedly operational in a limited form during this offering, it has grown

significantly since then.  In a February 2018 post, shortly before the ICO, XY provided a

"Roadmap" with target dates for XY's plans to develop the business.  For example, one goal

targeted for the latter half of 2018 was for XY to "issue a complete roll out of the XYO Network

…." Another goal, slated for 2019, was for XY to "onboard larger businesses, organizations and

retail companies that have use-cases for location verification."  A third goal, slated for 2020 and

beyond, was for "XY to expand the Global Reach of entire XYO Network."

150.    In a May 2018 update, XY's co-founder and Chief Marketing Officer outlined the

priorities that XY would undertake, following the completed ICO, to "create an ecosystem"

attractive to both those that paid for the data location queries and those that answered the queries.

These priorities included building a team of "blockchain diehards," expanding the XYO network

via major partnerships, and developing an "XYO App."  XY's co-founder emphasized that,

following the ICO, the XY team would "remain laser-focused on developing the technology and

ecosystem of the XYO Network."  The ICO proceeds would supposedly be allocated to further "the

long-term development goals of the XYO Network," with 40% of proceeds to "XYO Network

Growth & Marketing Strategic Partnership," 35% to "Engineering & R&D," and the remaining 15%

to operations, overhead, and supporting platform projects.

151.    *Investors in XY had a reasonable expectation of profits based on the efforts of others*.

XY has repeatedly emphasized to investors the opportunities for profit from XYO, including

highlighting the availability of secondary markets.  For example:

- As XY explained in the XYO white paper and a February 2018 Medium post, to

    increase the value of the XYO token, XY has permanently fixed the number of XYO

    tokens, which are required to use XY's business.  XY claimed that the success of this

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

ecosystem will, in turn, expand XY's user base, thus continuing to create demand for XYO tokens.  XY has consistently touted the growth of its user base.

- In a December 2018 post titled "XYO Token FAQ," XY noted:  "Some folks just want to buy XYO Tokens to see if they can make a profit from trading."  XY claimed that was "not the intended purpose of an XYO token," but immediately followed that claim by stating that trading in the tokens by purchasers hoping to make a profit was "incredibly common" and "you're completely allowed to simply buy XYO Tokens and hope that the price increases, so you can sell for a profit."

- In that same post, XY directed potential investors to an internet site that listed all of the secondary markets on which XYO could be traded.  XY also tried to facilitate those listings.  For example, XY applied twice for XYO to be listed on one U.S.-based secondary trading platform:  first on October 8, 2018, and again on January 5, 2022.  In addition, XY applied for XYO to be listed on Coinbase

- XY and its founders touted that XY would take action to limit XYO availability, announcing in May 2019 that "[u]p to ~ 3.2 Billion of XYO Will Be Burned, Dracarys Style.  Token burning events are typically very good news for current HODL'ers.  It reduces supply; which, in theory, should help create a healthier token economy for XYO."

152.    XY and its founders have continued to promote XYO's value as an investment, both in connection with its role at XY and as a token that can be traded on the secondary markets.  For example:

- XY has obtained listings for XYO on multiple trading platforms and publicized those listings via social media channels. For example, in a November 10, 2021 post, XY

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

publicized new XYO listings on "one of the largest and most prominent cryptocurrency exchanges in the world."

- As recently as March 2022, XY has continued to promote its new listings, posting: "We had several new token listings this month. . . which is pretty cool if you ask us. We're adding new exchanges all the time, so keep an eye out for your favorite exchange as XYO continues to expand with no signs of slowing down."

- In 2021, XY listed on its website the secondary trading platforms where XYO could be traded, and as of July 2022 stated on its front page that, "[i]n 2021 alone, the XYO Token grew in value by over 30,000%."

153.    During the offering, and continuing thereafter, XY and its founders emphasized their own importance to XY's future success and the actions they would take to drive XYO Network and XYO success. For example, in a February 2018 post, just before the ICO, XY touted its team of "seasoned engineers, business development professionals and marketing experts." The post profiled the experience and accomplishments of XY's co-founders. In multiple posts in 2018 and 2019, the founders discussed their work and plans, including the need for a new XYO network version, the development of an app, the listing of XYO on new secondary markets, and partnerships to increase XYO Network offerings.

154.    XY's day-to-day operations and Board of Directors are run by a centralized leadership group that include two of XY's three co-founders. Following the ICO, XY's founders and associated persons held a substantial percentage of circulating XYO tokens. XY has represented that, in April 2019, "15-50% [of the XYO token] is held by the founding team." As of December 31, 2018, XY and its founders maintained control of more than 7.44 billion XYO tokens

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

– more than 50% of the total, fixed supply of XYO tokens.  In April 2019, XY has represented that "15-50% [of the XYO token] is held by the founding team."

155.    XYO can be bought and sold for fiat currency or other crypto assets on numerous secondary trading platforms.  At the end of the ICO in May 2018, the price of XYO was approximately $0.0055.  Before Coinbase's listing announcement on September 8, 2021, the price of XYO was approximately $0.017 – a more than 200% increase.  On the day after Coinbase's announcement, XYO's price rose to approximately $0.033, nearly doubling in one day.

### E.   RGT

156.    RGT is an ERC-20 token issued on the Ethereum blockchain.  In or about July 2020, it was announced and, in December 2020, originally minted by Rari Capital and its agents (together, "Rari").  Rari Capital is incorporated in Delaware and was started in California by two California residents and one Texas resident (the "Rari Founders").  Rari states that it is a "yield-maximizing robo-advisor" that allows users to earn RGT that can be traded on the secondary market, used for fee discounts and to confer governance rights in Rari Capital.

157.    Beginning in or around July 2020, the Rari Founders raised funds via a so-called private sale of RGT in their invite-only "Launch Partner Program," and by providing investors in RGT with the continued ability to purchase or earn RGT through "programs" the Rari Founders offered with various terms.  Investors also earned RGT by providing developmental or other services to Rari.  Rari was not fully operational until December 4, 2020.

158.    From July 2020 through the present, Rari has minted at least 12.5 million RGT worth approximately $100 million, with the intention to mint 7.5 million more RGT in the future.  As of June 2022, 99.8% of all RGT intended for distribution has been claimed.

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

159.    In or around December 17, 2020, Rari's CEO proposed the minting of additional RGT under Rari's Liquidity Initiatives Program.  The proposal, which passed with a majority vote held by the CEO, allocated 2 million RGT to the "Rari Capital team to continue as a lead developer of the protocol," where the "Rari Capital team is expected to continue their work on various fronts: creating new strategies, pushing governance forward and accruing value towards the ecosystem."

160.    *Purchasers of RGT tokens invested in a common enterprise.*  The majority of the funds raised from RGT investors were pooled to raise capital and develop the Rari protocol, including through payments to the Rari Founders and other Rari "contributors" working to improve the protocol, as reflected in the statements described above regarding the July and December 2020 sales.  During late 2020 and early 2021, Rari social media posts and website and a white paper advertised that the funds raised from the liquidity mining program would go towards, among other things, developing additional Rari products and the Rari protocol.

161.    Rari has continued to use funds raised by selling RGT to pay Rari's management team and developers.  For example, Rari's CEO wrote in a July 6, 2021 post on Medium that paying contributors in RGT was Rari's "only way to stay competitive.  Each dollar spent on salary should be providing exponential returns on the product."

162.    Rari has also stated its intent to pool RGT investor assets in liquidity pools, pursuant to its Liquidity Initiatives Program.  For example, as Rari's CEO explained in a December 19, 2020 Medium post, "the [Liquidity Initiatives] program will be built to increase liquidity of the Rari Tokens and further incentivize deposits within the platform."

163.    At the time of the initial offering and December 2020 sales, the Rari business was not fully operational.  Rari repeatedly made clear that funds from RGT investors were Rari's primary source of funding.  For example, on December 20, 2020, Rari's Chief Marketing Officer

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

stated on Rari's governance page, "Most importantly, there is a large portion being given to the developer who creates the strategy as this will help attract the best talent into the protocol, as we are rewarding them the best compensation." In the RGT white paper, Rari also stated: "The [RGT] tokens within the treasury will be used to incentivize future team members with token compensation packages but will also serve to sustain the operations of the Rari Capital organization beyond five years.  These tokens will also support protocol development."

164.    *Investors in RGT had a reasonable expectation of profits based on the efforts of others.*  Among other things, Rari and the Rari Founders specifically pitched the RGT offering by emphasizing the opportunity for buyers to profit.  For example:

- On December 20, 2020, Rari's CMO stated that RGT investor funds will be used to pay developers because "[t]his will create a strong ecosystem around the Rari Protocol that can be later monetized. . . ."

- On December 19, 2020, the Rari CEO stated that the goal of the Liquidity Initiatives Program is to "provide exponential returns to RGT holders through smart investments and by bootstrapping future supplemental protocols."

- Rari's Chief Marketing Officer said in a December 20, 2020 post on Rari's public governance Snapshot page that one goal of Rari's founders is to avoid RGT "price dilution" and to "invest the protocol's holdings in an intelligent way that will be used to indirectly accrue value toward the RGT."

- In its Rari Capital White paper, Rari suggested RGT buyers may eventually earn dividends by "vot[ing] to re-distribute fees to the [RGT] token holders which would allow it to easily accumulate value.  There is a possibility of this happening once the protocol becomes more mature…"

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

- Rari stated on their homepage: "The more money you make, the more money we make.  We want you to win and our algorithms make sure that you do."

- Rari has touted the importance of its decision to limit the number of tokens.  Rari explained in a Medium post in October 2020 that there would be only 10 million RGT tokens – although RGT token holders could vote to expand that number.

- In an October 2020 Medium post, Rari explained that 70% of Rari's profits would be used to "burn" and buyback RGT tokens.

- Rari also highlighted the fact that RGT trades on secondary markets.  Rari informed investors in October 2020 that RGT could be "purchased from several exchanges."

165.    Rari knows that one of the primary attractions of RGT tokens for investors is that their market price may appreciate in value.  For example, in the October 2020 post on Medium, Rari's CEO wrote that RGT's vesting schedule "[e]nsures there is not too much sell-side pressure on the market at any one time."  Further, Rari provides a real-time market and trading value for RGT on its website, while RGT's price is displayed on Rari's dashboard and governance page.  In public posts, Rari ascribes a monetary value to RGT.

166.    Rari has often referred to participation in the RGT buying programs as an "investment" and "fundraising," and RGT holders as "shareholders."  For example, in the October 2020 Medium post, the CEO explained that RGT has a vesting schedule that "ensur[es] shareholder recipients are aligned with the company before receiving shares."  Further, in connection with the program to provide RGT to investors that provide liquidity for Rari's trading pools, Rari's CEO stated in an October 23, 2020 email to a potential venture fund investor, that "[S]ince liquidity mining is difficult to structure in traditional VC, we can connect with you a partner who can delegate capital to, making it an easy investment."

- 45 -

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

167.    Moreover, Rari and the Rari Founders have continued to work to create secondary market trading opportunities for RGT owners.  Rari has stated on its website that RGT are available for purchase on several secondary trading platforms.  From approximately December 2020 through February 2021, Rari submitted listing applications for RGT to multiple secondary trading platforms requesting that the companies list RGT and allow RGT to trade on their systems.  For example, Rari's CEO and CMO sent several communications via Twitter and email to multiple secondary trading platforms including, but not limited to, Coinbase.  Rari also created a an initiative directly with another secondary trading platform, which it called "Pool2" by allowing users to stake both RGT and ETH on that trading platform in an "RGT-ETH" pool.  By doing so, users can earn fees and additional RGT.

168.    Rari and the Rari Founders continue to have controlling roles in the business and to provide work and leadership essential to profitability for investors.  For example:

- The Rari founders refer to themselves as the "lead developer" of the protocol and that they maintain and alter the algorithms that drive the investing services that Rari offers to customers, smart contracts and security keys for the Rari protocol.

- In December 2020, Rari submitted an RGT listing application to a secondary trading platform stating that changes to the Rari protocol cannot be made without the founding team's consent, and that the public views a "single, unified team as in charge" of Rari.

- In a Medium post, the CEO referred to the founders as the "Core Team," and on or around August 2021, Rari created centralized "task forces which created teams focused on improving the Rari protocol . . . responsible for guiding the ship and

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

steering high level objectives on what Rari should prioritize and pursue." Each taskforce had at least one Rari Founding Team member.

- A majority of Rari's managerial and substantive decisions – such as decisions on fees, mergers, and key opportunities for the business – are sought and proposed by the Rari Founders, who typically account for the largest vote.

169.    The Rari Founders continue to exercise practical control of Rari in other ways, as well. For example, on both occasions where Rari has minted RGT tokens, the Rari Founders proposed the minting and represented a majority of the vote.

170.    In communications with secondary trading platforms, the Rari Founders have made clear that they play a central role in deciding governance issues, code updates, and how third parties participate in the validation of transactions that occur via the Rari protocol.  They also determine the trading platforms on which RGT trades.

171.    RGT can be bought and sold for fiat currency or other crypto assets on numerous secondary trading platforms.  Its price has fluctuated from approximately $0.78 in December 2020 to as high as $50.03 in November 2021, approximately a 6,300% return.

### F.   *LCX*

172.    The Liechtenstein Cryptoassets Exchange ("The LCX") operates a number of crypto-related services, including a crypto asset trading platform, and a trading terminal.  The LCX explains on its website that its LCX token is the only way to pay for certain services The LCX offers, such as participating in a token offering event. The LCX offers a discount when using LCX tokens to pay for certain other services that it offers.

173.    The LCX held an offering in September 2019 for 100 million tokens, priced at $0.06. (Its price would later rise to $0.48 in November 2021, approximately a 700% return.)  In the period

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

since the offering, LCX has burned 50 million tokens to limit supply.  At the time of the offering,

the trading platform was operational, although management has continued to develop other features.

174.    *Purchasers of LCX tokens invested in a common enterprise.*  The LCX emphasizes

that purchasing LCX is an opportunity to participate in a growing platform.  On October 3, 2019,

The LCX posted interviews of the CEO to Twitter, encouraging users to learn about how The LCX

is "building a #blockchain ecosystem."  The LCX's website states that the "LCX Token is your

chance to be a part of LCX's vision to bridge the gap between traditional finance and the new

monetary world powered by blockchain and cryptocurrencies."  Similarly, in the October 2019

"LCX Vision Paper," The LCX explained that public offerings were a way for new enterprises to

raise money for development: "Initial Coin Offerings . . . are the first hints at this disruption,

providing public market liquidity and democratizing early stage venture capital."

175.    LCX also claims that, through the LCX token, the interests of investors and

management are aligned.  In multiple locations on its website, including postings titled "LCX

Token Key Facts," and "LCX Token – Company Reserve," The LCX explains that it owns 10.5%

of the LCX token supply, and that The LCX "team" and advisors hold tokens as well.  It further

explains that tokens held by the "team" and advisers vested over a 36-month period, and that tokens

in The LCX reserve cannot be accessed until 2023.

176.    *Investors in LCX had a reasonable expectation of profits based on the efforts of*

*others.*  The LCX has emphasized that as its platform expands in terms of both users and services,

LCX will appreciate in value, particularly because there are a finite number of LCX tokens.  For

example, in a September 13, 2019 tweet, The LCX claimed "[t]his could be a once in a lifetime

opportunity to be part of something big, something revolutionary. [rocket emoji]  Don't let this be

the one that gets away. [bullhorn emoji]  Our #IEO is officially live . . ."

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

177.    In a January 24, 2021 posting on the LCX website titled "LCX Token Key Facts," The LCX stated that it had burned 50 million tokens between 2019 and 2020 in five token burns. Elsewhere on its website, The LCX explains that coin burns theoretically increase a token's value because "when the total supply of coins in circulation is intentionally decreased, the prices of tokens and coins are increased and further stabilized." The LCX website page dedicated to the LCX token also shows the token's current secondary market information, including rank, price, and trading volume.

178.    The LCX has also continued to take steps that underscore the profit potential of LCX for investors, particularly in trading on secondary markets. For example:

- The LCX promotes LCX as a way to make outsized returns through trading on secondary markets. For example, on October 26, 2021, in a reference to its own crypto asset security, The LCX tweeted: "Which #crypto will 10x in the next 3-6 months?"

- In June 2022 tweets, The LCX has repeatedly encouraged investors to acquire LCX on secondary platforms because the token is likely to appreciate. The LCX has sought to facilitate that trading by, for example, applying on September 25, 2019 to have LCX listed on a U.S.-based secondary trading platform. The LCX also applied to have LCX listed on Coinbase.

- Between 2019 and 2022, The LCX Insights articles have announced LCX's listing on over 15 secondary trading platforms. For example, after LCX was listed on Coinbase, The LCX posted documents on its website in November and December 2021 that, among other claims, said that LCX "hit an all-time high of $0.7048" and that trading volume grew more than 1000%.

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

- In a May 2022 "Ask Me Anything" posted on its website, The LCX explained that engaging with institutional investors leads to opportunities to expand LCX trading in secondary markets.  It also encouraged participants to contact trading platforms: "Maybe our community wants to ping [a trading platform] on twitter and let them know that you want LCX to be listed . . ."

- In a November 12, 2020 tweet, The LCX promised to honor the market value of LCX, or a minimum value of $.10, whichever is greater.

179.    The LCX has emphasized the role and efforts of its managers and others to the success of the company.  For example:

- The LCX is operated by a central management team that claims to be "building a financial ecosystem for crypto and fiat alike to become the new category leader in the blockchain industry."

- During a July 2022 interview, The LCX's CEO described plans to "revamp" The LCX trading platform to include improved functionality and new features.

- Recent "Roadmaps" on The LCX's website list various improved capabilities and offerings, eventually hoping to have "Billions of Assets under Management."

- The LCX website has a photo of its CEO pointing to an advertisement for LCX.com and LCX tokens that stated in part, "Goodbye Goldman."

### G.  POWR

180.    POWR is a token issued on the Ethereum blockchain, which was announced by Power Ledger Pty. Ltd. and its agents (together, "Power") in or about July 2017, and minted in or about September 2017.  Power is a corporation started in Australia by four co-founders.  Power's

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

stated goal is to allow participants in energy grids to track, trace, and trade energy in real-time through a decentralized protocol.  POWR tokens are required to participate in the Power platform.

181.    Power offered POWR to buyers through an offering that had two phases.  In or about August 2017, Power held a sale of 90 million POWR tokens and raised $17 million Australian dollars.  That fall, during a second "public sale" phase, Power sold an additional 260 million POWR tokens and raised approximately another $17 million Australian dollars.

182.    At the time of the offering, Power claimed that the platform was partially operational but, as described below, the funds raised through token sales were going to enable the company to meet its developmental milestones.

183.    *Purchasers of POWR tokens invested in a common enterprise*.  Since POWR's minting, Power has represented that investors in POWR are investing in a common effort to develop Power's business.  For example:

- In an October 1, 2017 Medium post titled "Why Does Power Ledger Need Tokens?" Power explained that the token offering would accelerate the company's rate of growth: "Token holders create a network which gives the Platform value, and in return, they receive ownership of the network."

- In the same post, Power wrote that the goal of the token sale was to "accelerate our rate of growth" by obtaining "extra liquidity" to "fully take advantage of our first mover advantage."

- In an October 2017 interview, one co-founder stated that POWR investor proceeds would provide a "really solid war chest to build the business" and allow Power to "broaden the applications and really make some solid inroads in peer-to-peer trading."

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

- In the 2017 POWR white paper, Power stated that proceeds from token sales would be used to "accelerate[] platform development" and for "beta testing" of trading applications, among other planned projects.

- In a secondary market listing application submitted in 2017, Power explained that it pooled investor funds received in exchange for POWR tokens to pay for Power's platform development, operations, and marketing.  Power also stated that the order and quantity of the projects Power can develop would directly depend on the amount of funds raised through token sales.

184.   *Investors in POWR had a reasonable expectation of profits based on the efforts of others.*  Among other things, Power has from the start pitched POWR by emphasizing the opportunity for buyers to benefit both directly by receiving a share of POWR's fee revenues, and from trading POWR on secondary markets.  For example:

- In announcing POWR's upcoming token sale on a prominent web forum in July 2017, Power responded to the question "How to buy Power ledger?" by saying: "The Power Ledger Token (POWR) will be available in our token sale that will begin in the next month or so (exact date to be determined).  After that, you will be able to buy POWR tokens at popular exchanges. Stay tuned!"

- In an October 4, 2017 post on Medium, Power advertised a partnership with a crypto trading platform "to maximize the trading liquidity of POWR tokens sold as part of its successful token sale."  In this announcement, Power emphasized its goal of "mak[ing] sure that the trading environment is as attractive as possible for POWR token holders" so that traders can "buy and sell" POWR "whenever they want."

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

- In an "Ask Me Anything" ("AMA") thread on Reddit on October 3, 2017, Power represented that its "users will acquire a unique asset token and they will receive a portion of revenue."

- In the October 1, 2017 "Why Does Power Ledger Need Tokens?" Medium post, Power emphasized the benefits of purchasing POWR during the ICO: "Using a token model, there is now an incentive to be an early adopter or user of the network" because "demand drivers" in the future "may increase the value of POWR" tokens.

- In a post on Medium that referenced "Maximiz[ing] Liquidity of POWR Tokens as Token Sale Concludes" dated October 4, 2017, Power stated that it "wanted to make sure that the trading environment is as attractive as possible for POWR token holders."  The post further noted that POWR's integration with another company's protocol "is the perfect solution because of the capability it provides for token traders to buy and sell them whenever they want."

- To make the "trading environment . . . attractive," Power applied on November 1, 2017 to have the POWR token listed on a U.S.-based secondary trading platform.

185.    As a further incentive to investors, Power has repeatedly stated that POWR investors could receive lucrative energy trading advantages.

186.    Power has continued to market POWR as an investment opportunity.  For example:

- After Coinbase's listing announcement in November 2021, Power publicized on its website: "POWR token skyrockets on Coinbase debut."

- Power has directly linked its potential growth to POWR's value for investors.  On its website, Power explains:  "Basic economics teaches us that the greater the

- 53 -

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

demand we create for POWR tokens, the more benefit accrues for POWR token holders."

- Power also claims that because the number of POWR tokens is finite, as the protocol grows, each token becomes more valuable.  For instance, Power explains on its website that new application users must escrow a certain number of tokens, which further limit supply.  As Power has said, one of its objectives is to "lock-up POWR in smart contracts and remove POWR from the circulating supply.  In theory this will drive the price of POWR up, due to the principals of digital scarcity."

- On July 2, 2021, Power retweeted one investor's tweet: "Held POWR for four years now and I will never sell."

187.    POWR's white paper highlighted from the start how the experience of Power's management team, which was "gained from decades of work in the energy industry and honed by working with our partners throughout our trials," would help Power achieve the goal of "democratising the world's power systems."

188.    The white paper also emphasized that Power's leadership and staff was responsible for the company's development.  For example, Power said that one co-founder "manages the daily operations and commercialization of Power Ledger's technology," while another "provides the strategic direction for conceptual, system and application design and development for Power Ledger," and a third "provides the strategic external relations, risk management, and leadership development for Power Ledger."  The white paper explained further that other employees have various technical or administrative roles.

189.    Power has continued to tout its management's experience and skill in guiding the company.  For example, in an April 2019 Medium post, Power described its management as a

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

"Highly Competent Team" that has "immense energy and blockchain experience" and includes "energy executives," "PhD's in disruptive technology and Systems Theory," and "solid blockchain" developers.  Power continued: "Our most committed investors and contributors very much believe in our vision and have confidence in [Power's] ability to achieve it."

190.    Secondary trading platforms that are available to U.S. residents began listing POWR in October 2017.  POWR tokens are now available on approximately 18 such platforms.

191.    According to Power's August 2017 "Token Generation Paper," it planned to sell POWR tokens for approximately $0.08.  In the beginning of 2021, the market price of POWR was approximately $0.096.  By November 2021, even before being listed on Coinbase, it had increased to approximately $.39, a return of approximately 300%.

192.    On November 16, 2021, following Coinbase's listing announcement on November 15, 2021, the price of POWR rose dramatically to approximately $0.88.

### H.  DFX

193.    DFX is a token issued on the Ethereum blockchain by DFX Finance, an unincorporated business that purportedly operates Ethereum-based decentralized exchange pools for certain foreign crypto assets.

194.    Users earn DFX tokens by adding certain foreign crypto assets to the "liquidity pools" in DFX Finance's currency exchange program.  Once the foreign crypto assets are deposited in the pool, users are awarded a liquidity pool token, which they can stake for a period of time to earn the DFX token.  The DFX token incentivizes users to add foreign crypto assets to the pool, which creates the liquidity needed to facilitate the exchange.

195.    Before commencing public sales of DFX in 2021, DFX Finance represented that it raised $5 million in pre-seed and seed financing, in which it sold 20,000,000 DFX tokens to a small

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

number of "seed" investors for between $0.10 and $0.40 per token, respectively.  Another 15

million DFX were allocated to DFX Finance's founders, with 5% of DFX reserved for a future

token sale.

196.    DFX Finance began to offer and sell the DFX tokens to the public on February 24,

2021.  DFX Finance has stated that it intends to sell the total supply of 100 million DFX tokens by

February 24, 2029.  In its most recent post on "Liquidity Mining," DFX Finance stated on its

website that, so far, it has sold 16.7 million DFX tokens.

197.    *Purchasers of DFX tokens invested in a common enterprise.*  According to DFX

Finance, the assets staked by DFX token investors are deposited in pools that facilitate the exchange

of the foreign crypto assets.  DFX Finance has emphasized that investors have a common interest in

the liquidity pools that it operates.  For example, as DFX Finance states on its website, for its

exchange to function, "[w]e'll need liquidity providers."  The purpose of the DFX token is to

incentivize "liquidity providers to supply their liquidity to each of the pools powering" the

exchange.  In other words, without the tokens, there will be no exchange.  In turn, DFX stakers can

profit from fees the pool earns.

198.    Similarly, in a July 8, 2021 post on Medium, a DFX Finance co-founder explained

that the DFX token "solves a chicken and egg problem in terms of liquidity," claiming that the

issuance of the DFX token provides liquidity for the exchanges that allow users to get "in and out of

transactions."  In a March 2021 Medium post, DFX Finance stated that without this liquidity, "it

would be impossible to facilitate FX swaps."

199.    DFX Finance's management has also indicated to investors that it has a strong

interest in the DFX token's performance as an investment.  For example, DFX Finance states on its

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

website that its founders are allocated 15% of all DFX tokens, while the "Treasury" receives 20% and the "Dev Fund" 5%.

200.    *Investors in DFX had a reasonable expectation of profits based on the efforts of others.*  DFX Finance tells investors that DFX token holders may receive transaction fees from the exchanges DFX planned to offer.  For example, in a July 2021 interview, a DFX co-founder stated that the transaction fees will eventually be "distributed back to DFX [token] holders."  As a result, the more successful the DFX protocol is, the more fees DFX token holders stand to earn.  In the same interview, the co-founder explained that token holders could lease their tokens for a profit.

201.    DFX Finance also portrays the DFX token as a valuable, liquid investment.  For example, it publishes DFX's price in real time on its website, and in social media posts encourages users to purchase the tokens.  In tweets in November 2021 and January 2022, DFX also explicitly pointed to the token's "upside" and told its followers that buying DFX tokens would help investors "[b]eat the pants off inflation."

202.    DFX Finance has also emphasized management's efforts to enhance the success of DFX Finance and the DFX token.  For example, DFX claimed in a June 30, 2022, Medium post that it's "actively working" to get its lending program off the ground through a partnership with another business.  And DFX Finance has also helped create a secondary trading market for the DFX token. In its 2021 end-of-year remarks posted to Medium on December 30, 2021, DFX Finance management announced that it would focus on, among other things, "working with centralized exchanges in the new year"  to get DFX listed.  In a February 2022 newsletter (posted to Medium), DFX reported that the token could soon be traded on another secondary trading platform.  It advised in the same post that "[u]sers can now start depositing DFX in preparation for trading."

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

203.    On November 27, 2021, DFX Finance retweeted an account that claimed the DFX token had valuable "upside" given market volatility.  On January 17, 2022, DFX Finance retweeted an account that advised buying $250,000 worth of DFX tokens and using additional funds to add liquidity to DFX's pools.

204.    DFX Finance is operated by a central management group, which was responsible for developing and operationalizing DFX's foreign exchange platform.  A DFX co-founder said in an "Ask Me Anything" event, posted to YouTube on July 16, 2021, that token holders can make only "marginal" improvements through governance.

205.    Additionally, while token holders can vote on the crypto assets to be included for exchange in the protocol, DFX management is ultimately responsible for targeting and reviewing potential tokens for onboarding. In a February 2021 post on Medium titled "Introducing DFX," DFX Finance stated that management was responsible for key operational tasks such as ensuring that all on-boarded foreign crypto assets have licenses, banking relationships, and a secure peg to their national currency.

206.    In June 2021 and 2022 Medium posts, DFX Finance referred to its "business development team" and the need to hire additional engineers.  In a June 2022 Medium post, DFX Finance said that the "business development team have been hard at work showing what DFX is constantly/consistently bringing to market and all the massive changes to decentralized forex we can provide!  We are also actively engaged with numerous different exchanges but they come secondary to the core mission and products we are offering. DFX is not a 'to the wayside' protocol, we are here to stay and will continue to build out our ecosystem for the world to use. ⊕"

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

207.     DFX can be bought and sold for fiat currency or other crypto assets on numerous secondary trading platforms.  Its price has fluctuated from approximately $0.31 in August 2021 to as high as approximately $2.71 in April 2022, more than a 700% return.

### I.   *KROM*

208.     KROM is an ERC-20 token issued on the Ethereum blockchain and first offered for sale in late 2021 by Kromatika Finance and its agents (together, "Kromatika").  Kromatika is an unincorporated business started by two developers, identified on Kromatika's website only by one-word pseudonyms, who purportedly continue to manage the project as "core developers."  It purports to operate a platform that allows traders to efficiently trade crypto assets by placing range orders on trading platforms.  Kromatika explains on its website that when "the market conditions match your order, Kromatika DEX will execute the trade automatically."

209.     According to Kromatika, the KROM token is how participants pay the service fee to Kromatika for "all Kromatika DEX swaps."

210.     Kromatika offered 100 million KROM for sale via a purported "fair launch," where the tokens were made available to anyone for the same price.  It offered 60 million KROM on November 15, 2021, for a price of 0.000001 ETH per token via a secondary trading platform.  Twenty million KROM tokens were made available on two other secondary trading platforms shortly thereafter for the same price.

211.     *Purchasers of KROM tokens invested in a common enterprise*.  At the time of the offering, Kromatika explained in its online "Flowchart" that funds raised from KROM sales would be used, in part, to develop and maintain the Kromatika platform, which did not yet exist in a fully functional, publicly available form.  And according to Kromatika, in addition to the tokens offered to investors through the fair launch and via secondary trading platforms, 20 million KROM are held

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

in a safe wallet and used solely for project funding.  Kromatika implies that this aligns the interests of management and investors by securing their commitment to Kromatika's success.

212.     The fortunes of investors and participants that purchased KROM are also linked to KROM's management.  Kromatika has recently announced that it locked 12 million KROM in a crypto storage vault to "show our commitment to the project."

213.     *Investors in KROM had a reasonable expectation of profits based on the efforts of others.*  Kromatika pitched the KROM offering by emphasizing the opportunity for buyers to profit. For example:

- KROM claimed it would enable buyers to increase trading profits by avoiding swap fees, and front-running bots, among other advantages.  For example, in a November 2021 blog post announcing KROM for purchase, Kromatika stated that early investors in KROM would enjoy dramatic savings on service fees, since the price of KROM – which is used to pay the fees – would be expected to increase.

- As it began to sell tokens in November 2021, Kromatika repeatedly tweeted about KROM's investment value, including its "[c]lose to 100% price increase within 24h" and the opportunity to "buy[] when low, paying [fees] when high."  Kromatika also stated in a November 17, 2021, tweet that it "expect[s] the price of $KROM to go up to 1ETH = 850k KROM (the current is 960k KROM), so why not adding [sic] liquidity for $KROM and earn $ETH while the price is rising."

- In a December 19, 2021, tweet, Kromatika stated that platform users "pay[] fees in KROM token, rather than ETH, so there is a saving if the token price rises, since service fee is invers[.]"

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

- A December 2021 tweet from Kromatika's lead developer's account noted that there is "daily [KROM trading] volume of $41M.  Not as much on the mainnet, but it is the trading chance for traders, speculators, crypto lovers etc to profit."

214.    Kromatika has continued to emphasize the profit opportunity for investors in KROM.  For example:

- In April 2022, Kromatika launched a staking program where KROM holders can stake the token and earn a revenue share from the fees that are charged for using the Kromatika platform.  Theoretically, as the platform gains users and more protocol fees are charged, holders who stake the token would earn additional revenue.

- On its website, Kromatika has noted the initial price of a KROM token, as well as KROM's much higher value during a subsequent buyback.  Indeed, on November 18, 2021, KROM cost $0.0082.  By April 22, 2022, it had increased to $0.11, an increase of more than 1200%.

- In a March 2022 tweet, Kromatika emphasized that KROM investors could "buy low, sell high."

215.    Kromatika's founders have repeatedly emphasized their importance to the business and its success.  For example:

- In a video posted to YouTube on November 25, 2021, introducing Kromatika, the founders stated, "Both of us are creators and founders of Kromatika Finance and also the token KROM."

- In a January 2022 "Ask Me Anything" and in subsequent monthly updates, Kromatika described how its management team has a central role in the ongoing development of the protocol, and provided updates on Kromatika's "roadmap."

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

- Kromatika regularly publishes blog posts, including "Dev Diaries," that track Kromatika's development progress.

- Kromatika's core developer team has participated in multiple "Ask Me Anything" sessions with community members online to promote the purported platform's ongoing development.

216.    The main developer's Twitter feed also tweets updates on Kromatika's development that emphasize the founders' central role in Kromatika's business and technical development.

217.    KROM can be bought and sold for fait currency or other crypto assets on numerous trading platforms.

## FIRST CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

1.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 217, inclusive, as if fully set forth herein.

2.    At all relevant times, Coinbase's policies required that company insiders maintain the confidentiality of the company's material, nonpublic information and prohibited them from using such information to trade for their own accounts or disclosing this information to others. Ishan certified his knowledge and understanding of these restrictions on his first day at Coinbase.

3.    Ishan, a Coinbase manager who had advanced knowledge of Coinbase's listing announcements regarding certain crypto asset securities, misappropriated this information from Coinbase by tipping Nikhil and Ramani with material, nonpublic about the timing and content of those announcements, in violation of Coinbase's policies and in breach of the duty of trust and confidence he owed to the company as a source of the information about the planned listings.

4.    Ishan received a personal benefit from repeatedly communicating material, nonpublic information to his brother Nikhil as well as to his close friend Ramani, namely the

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

personal benefit of providing a gift of inside information to a close relative or friend.  Ishan also knew, consciously avoided knowing, or was reckless in not knowing that Nikhil and Ramani would trade on his tips.

5.      Nikhil and Ramani traded in certain crypto asset securities on the basis of the material, nonpublic information Ishan provided—they used the inside information he communicated in conducting their trades, and it was a significant factor in their decisions to trade.  Nikhil and Ramani also knew, consciously avoided knowing, or were reckless in not knowing that the information Ishan communicated to them was both material and nonpublic.  Nikhil and Ramani also knew, consciously avoided knowing, or were reckless in not knowing that the tips they received from Ishan were conveyed in breach of a duty or similar obligation arising from a relationship of trust and confidence and for a personal benefit.  Indeed, both Nikhil and Ramani knew that Ishan worked at Coinbase and obtained the information he communicated to them from Coinbase.  And because Nikhil and Ramani were both Ishan's direct tippees, they were aware of the personal benefit Ishan received from communicating that information to them.

6.      Ishan, Nikhil, and Ramani all acted with an intent to deceive, manipulate, or defraud, and knew or were reckless in not knowing that their conduct was deceptive.

7.      Defendants, with scienter, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, directly or indirectly:

(a)      employed devices, schemes, or artifices to defraud;

(b)      made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

- 63 -

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

(c)      engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

8.      By reason of the actions alleged herein, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b*)*] and Rule 10b-5 thereunder [17 C.F.R.§ 240.10b-5] and unless restrained and enjoined will continue to do so.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter Final Judgment:

### I.

Finding that Defendants violated the provisions of the federal securities laws as alleged herein;

### II.

Permanently restraining and enjoining Defendants from, directly or indirectly, engaging in conduct in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### III.

Ordering Defendants to pay civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

### IV.

Ordering Defendants to disgorge an amount equal to the illicit proceeds they obtained through Nikhil's and Ramani's trading pursuant to Section 21(d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(7)];

### V.

Granting such other and further relief as this Court may deem just, equitable, or necessary.

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**JURY DEMAND**

The Commission demands trial by jury.

Dated:          December 22, 2022

Respectfully submitted,

By: s/Daniel J. Maher
DANIEL J. MAHER
PETER C. LALLAS
(Conditionally Admitted Pursuant to Local Rule 83.1)
maherd@sec.gov
lallasp@sec.gov
(202) 551-4737 (Maher)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F. Street, NE
Washington D.C. 20549

- 65 -

Amended Complaint
SEC v. Wahi, et al.
Case No. 2:22-cv-01009

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4737