# Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 22 MAG 9491

UNITED STATES OF AMERICA

     -v.-

The 324,165.60 USDC contained in the virtual currency address:
0x44b3d59fe4dA798a43De3689bE0a2Ab508Bc0067 ("Target Asset-1"); and
All monies, assets, and funds contained in the Kucoin account associated with the following identifiers: email: biimbam23@gmail.com, telephone number: 1-5127171238, parent_uid: 69250369, and sub_uid: 69250369 ("Target Asset-2").

               Defendant-in-rem.

**TO BE FILED UNDER SEAL**

**Affidavit in Support of Seizure Warrant**

**Pursuant to 18 U.S.C. §§ 981 and 984**

SOUTHERN DISTRICT OF NEW YORK) ss.:

     GURDEEP SINGH, Special Agent, Federal Bureau of Investigation, being duly sworn, deposes and says:

## I. Introduction

     1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI" or "Investigating Agency"). I have been a Special Agent with the FBI since in or about 2020. Since in or about 2021, I have been assigned to an FBI squad involved in investigating violations of the securities laws, mail and wire fraud statutes, and money laundering statutes, among other crimes. In the course of my work for the FBI, I have received training regarding the securities industry and financial fraud, as well as training regarding the means by which proceeds of such fraud may be laundered to conceal its origins and to recycle those proceeds in such a way as to continue the fraudulent activities that generated them. I have participated in multiple financial fraud investigations. In addition, based on my participation in investigations involving cryptocurrencies and my discussions with other FBI agents with expertise and training regarding

investigations involving cryptocurrencies, I am familiar with how to trace virtual currency transactions between virtual currency wallets and accounts at centralized cryptocurrency exchanges, as well as the best practices for the seizure of virtual currency assets.

2.      This affidavit is submitted in support of the United States of America's Application for the issuance of a seizure warrant, pursuant to 18 U.S.C. §§ 981 and 984, with respect to the following assets:

a.      The 324,165.60 USD Coin ("USDC")[1] contained within the following unhosted virtual currency wallet: 0x44b3d59fe4dA798a43De3689bE0a2Ab508Bc0067 (the "**0x44b3d5 Wallet**") (collectively, "Target Asset-1")[2]; and

b.      The monies, assets, and funds contained in the Kucoin account associated with the following user: parent_uid: 69250369;sub_uid: 69250369; email: biimbam23@gmail.com, telephone number: 1-5127171238 (the "Biimbam23 Kucoin Account" or "Target Asset-2," and, collectively, with "Target Asset-1," the "Target Assets").

3.      The Target Assets constitute the proceeds of violations of 18 U.S.C. § 1343 (wire fraud); and/or as property involved in violations of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h) (money laundering and conspiracy to commit money laundering) (together, the "Target Offenses"), as described below.

---

[1] USDC is a digital currency backed by the U.S. dollar (i.e. a "stablecoin").  Stablecoins may be pegged to a currency like the U.S. dollar or to a commodity's price, such as gold. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivative.

[2] Target Asset-1 consists of USDC, which is a token centrally managed by a token manager known as Centre Consortium.  While Centre Consortium manages the token contract, the treasury for USDC is managed by a separate virtual currency exchange (Circle).  This application is filed in support of one warrant directed at Centre Consortium and one warrant directed at Circle. Should this warrant be authorized, Centre Consortium will freeze the USDC in place and then Circle will facilitate sending seized tokens, or an equivalent value of U.S. dollars, to a government-controlled account.

4.      This affidavit is based on, among other sources of information: (i) my personal knowledge; (ii) information provided by personnel at the U.S. Securities & Exchange Commission ("SEC") participating in a parallel investigation; (iii) my review of records obtained pursuant to subpoenas and voluntary records requests; (iv) my participation in witness interviews; (v) my review of electronic evidence obtained pursuant to judicially authorized search warrants; (vi) the review and analysis of records provided by cryptocurrency exchanges and publicly available data from the Ethereum blockchain, as well as an analysis prepared by an expert consulting firm retained by the United States Attorney's Office for the Southern District of New York in connection with this investigation; (vii) my conversations with other law enforcement officers; (viii) my training and experience concerning the commission of financial crimes and crimes involving digital assets.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where dates, figures, and calculations are set forth herein, they are approximate. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

5.      As set forth below, there is probable cause to believe that the Target Assets subject to seizure and forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) & (D), and 981(b) as property involved in violations of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h) and/or the proceeds of violations of 18 U.S.C. § 1343, or property traceable thereto. In summary, the evidence establishes that ISHAN WAHI, NIKHIL WAHI, and SAMEER RAMANI, and others known and unknown, engaged in a scheme to misappropriate confidential business information belonging to Coinbase Global Inc. ("Coinbase") and profitably trade in crypto assets based on this confidential Coinbase business information. ISHAN WAHI, NIKHIL WAHI, SAMEER

RAMANI, and others known and unknown, thereafter laundered the proceeds of the scheme through multiple anonymous Ethereum wallets and multiple centralized cryptocurrency exchange accounts held in the names of other individuals and under pseudonyms, in order to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds.

6.      This application seeks a seizure warrant under civil authority because the property to be seized could easily be placed beyond process if not seized by warrant, as virtual currency is fungible and easily dissipated at any time day or night. Further, the movement of virtual currency funds may be near instantaneous, unlike the traditional fiat financial system that may take several days to process transactions.

7.      As is described below, with the assistance of an expert consulting firm retained by the United States Attorney's Office for the Southern District of New York in connection with this investigation, the Government and the FBI has traced the flow of certain of the proceeds of the Target Offenses to the Target Assets, and, moreover, the Target Assets were transferred in connection with the commission of concealment money laundering and conspiracy to commit the same.

## II.  Statutory Basis for Forfeiture

8.      The statutory provisions pursuant to which the Target Assets are subject to civil seizure and forfeiture are as follows:

<em><u>Money Laundering Offenses</u></em>

9.      Title 18, United States Code, Section 981(a)(1)(A), subjects to civil forfeiture:

Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property.

10.      18 U.S.C. § 1956(a)(1)(B)(i) provides that any person who:

knowing that the property involved in a financial transaction involves the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –

(B)    knowing that the transaction is designed in whole or in part—

(i)  to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity [shall be guilty of a crime.]

11.    18 U.S.C. § 1956(h) further provides that "[a]ny person who conspires to commit any offense defined in [Section 1956] shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

12.    Forfeiture pursuant to violations of the above money laundering statutes (*i.e.*, 18 U.S.C. §§ 1956(h), 1956(a)(1)(B)(i)) is not limited to proceeds of the crimes being committed. Rather, forfeiture based on money laundering violations includes all property "involved in" the crime or the attempted crime, which can include "clean" or "legitimate" money that is commingled with "tainted" money derived from illicit sources. This commingling is a laundering technique that facilitates the scheme because it obfuscates the trail of the illicit funds. *See, e.g., United States v. Huber*, 404 F.3d 1047, 1058 (8th Cir. 2005) (the presence of legitimate funds does not make a money laundering transaction lawful; it is only necessary to show that the transaction involves criminal proceeds).[3]

---

[3] Property "involved in" a money laundering offense includes not only the illegal proceeds themselves, but also any property used to facilitate the laundering of such proceeds, such as business, business premises, untainted funds comingled with criminal proceeds, and bank accounts of corrupt businesses.  *See United States v. All Assets of G.P.S. Auto. Corp.*, 66 F.3d 483, 486 (2d Cir. 1995) (affirming forfeiture of all assets of corporation that "served as a conduit for the proceeds of the illegal transactions"); *United States v. Schlesinger*, 261 F. App'x 355, 361 (2d Cir. 2008) (summary order) (same); *In re 650 Fifth Ave.*, 777 F. Supp. 2d 529, 567 (S.D.N.Y. 2011) ("The ability to forfeit a business entity which is used to facilitate the offense of money

*Wire Fraud Offenses*

13.     For purposes of Section 1956, "specified unlawful activity," defined in 18 U.S.C. § 1956(c)(7), includes, among other things, violations of 18 U.S.C. § 1343.  *See* 18 U.S.C. §§ 1956(c)(7) and 1961(1).

14.     Title 18, United States Code, Section 981(a)(1)(C), subjects to civil forfeiture any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

*Seizure Warrants*

15.     The Court is empowered by 18 U.S.C. § 981(b) to issue a seizure warrant for any property subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) & (C).  Section 981(b)(2) provides that such a seizure may be made "pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure."  In addition, Section 981(b)(3) provides that, notwithstanding the provisions of Federal Rule of Criminal Procedure 41(a), a seizure warrant may be issued pursuant to Section 981(b) by a judicial officer in any district in which a forfeiture action against the property may be filed under Title 28, United States Code, Section 1355(b).  Under Section 1355(b)(1)(A), a forfeiture action or proceeding may be brought in the district in which any of the acts or omissions giving rise to the forfeiture occurred.  As set forth below, the wire fraud offenses underlying the requested seizure

---

laundering is well established." (internal quotation marks omitted)); *United States* v. *Certain Funds on Deposit in Account No. 01-0-71417, Located at the Bank of New York*, 769 F. Supp. 80, 84 (E.D.N.Y. 1991) ("[18 U.S.C. § 981(a)(1)(A)] has been construed by the district courts as authorizing the forfeiture of an entire bank account or business which was used to 'facilitate' the laundering of money in violation of 18 U.S.C. § 1956." (citing cases)).

warrant are the subject of an Indictment filed in the Southern District of New York and include

acts or omissions occurring in the Southern District of New York.  Moreover, pursuant to 18

U.S.C. § 1956(i)(1), venue for a money laundering charge is proper either in "any district in

which the financial or monetary transaction is conducted" or in "any district where a prosecution

for the underlying specified unlawful activity could be brought, if the defendant participated in

the transfer of proceeds of the specified unlawful activity from that district to the district where

the financial or monetary transaction is conducted." 18 U.S.C. § 1956(i)(1).  With respect to a

money laundering conspiracy count, "a prosecution for an attempt or conspiracy offense under

[section 1956] may be brought in the district where venue would lie for the completed offense

under [18 U.S.C. § 1956(i)(1)], or in any other district where an act in furtherance of the attempt

or conspiracy took place." 18 U.S.C. § 1956(i)(2).

    16.    With respect to fungible property, including cash and funds deposited in a

financial institution, 18 U.S.C. § 984 provides, in relevant part, that:

> (a)(1)  In any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution . . . , or precious metals:
>
> > (A)    it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and
> >
> > (B)    it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.
>
>   (2)  Except as provided in subsection (b), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.
>
> (b)    No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense.

**III. Probable Cause**

**A. Probable Cause Regarding Commission of the Subject Offenses**

17.     On July 19, 2022, a grand jury sitting in the Southern District of New York returned a four-count indictment ("the Indictment") charging ISHAN WAHI, NIKHIL WAHI, and SAMEER RAMANI with wire fraud and conspiracy to commit wire fraud for their participation in a scheme to engage in insider trading in crypto assets that were listed or under consideration for listing on Coinbase, a major online cryptocurrency exchange platform.  A copy of the Indictment is annexed to this Affidavit as **Exhibit A**.  As part of the insider trading scheme, as alleged in the Indictment, ISHAN WAHI violated his duties of trust and confidence to Coinbase by providing confidential business information that he learned in connection with his employment at Coinbase to NIKHIL WAHI and SAMEER RAMANI so that they could secretly engage in profitable trades around public announcements by Coinbase that it would be listing certain crypto assets on Coinbase's exchanges.

18.     Specifically, the Indictment alleges, among other things, the following:

a.     Coinbase is one of the largest cryptocurrency exchanges in the world. Coinbase allowed users to acquire, exchange, and sell various crypto assets in online user accounts.  In order to transact in a particular crypto asset on Coinbase, that crypto asset must be listed on Coinbase's exchanges.  Coinbase frequently announces that particular crypto assets will be listed on one of its exchanges or are under consideration for listing.  Coinbase often makes these announcements on Coinbase's publicly available blog or Twitter account.  It is well known that after Coinbase announces that it is going to be listing or is considering listing a particular crypto asset, the market value of that crypto asset typically rises substantially. (Indictment ¶ 5-6)

b.     Coinbase takes steps to guard the confidentiality of information regarding prospective asset listings and to ensure that potential traders do not learn of prospective listings

8

before the company announced them formally to the general public. The company's policies and agreements thus prohibit employees from using confidential information about asset listings, including which crypto assets Coinbase intends to list on its exchanges, except for the benefit of Coinbase. Indeed, Coinbase's policies make clear that employees "helping to implement support of [a] new asset" are prohibited from "buy[ing] the new asset" in advance of an announcement. Coinbase's written policies also prohibit employees from disclosing the confidential information to any person outside of Coinbase, including "family or friends," and expressly bar employees from providing a "tip" to any person who might make a trading decision based on the information. (Indictment ¶ 7)

   c. Beginning in October 2020, ISHAN WAHI was employed by Coinbase as a product manager assigned to an asset listing team.  Pursuant to the policies described above, and by virtue of his employment more generally, ISHAN WAHI was prohibited from sharing confidential business information about Coinbase's asset listings with others and from using that information other than for the benefit of his employer.  Moreover, as a member of Coinbase's asset listing team, ISHAN WAHI was subject to an "enhanced trading policy" that, among other things, required him to report his digital asset holdings and seek preclearance for any digital asset trades conducted by ISHAN WAHI outside of Coinbase's platform.  During the course of his employment at Coinbase, ISHAN WAHI provided Coinbase with a written certification that he had read the company's trading and confidentiality policies, that he understood them, and that he would comply with them. (Indictment ¶ 8)

   d. As a product manager on one of Coinbase's asset listing teams, ISHAN WAHI frequently had advance knowledge of which crypto assets Coinbase planned to announce it was listing or considering listing, and had advanced knowledge of the timing of those announcements.  Indeed, beginning at least in or about August 2021 and continuing until at least

in or about May 2022, ISHAN WAHI was a member of a private messaging channel reserved for a small number of Coinbase employees with direct involvement in the Coinbase asset listing process.  Upon joining the channel, ISHAN WAHI was informed by another Coinbase employee that its purpose was to provide a "safe place to discuss details around asset launches" such as "exact announcement / launch dates + timelines" that the company did not wish to share with all of its employees. (Indictment ¶ 9)[4]

       e.     On numerous occasions beginning at least in or about June 2021 and continuing through in or about April 2022, ISHAN WAHI knew in advance both that Coinbase planned to list particular crypto assets and when Coinbase intended to make its public announcements of those asset listings, and misappropriated this Coinbase confidential information by providing it to either NIKHIL WAHI (his brother) or SAMEER RAMANI (his friend) so that they could place profitable trades in advance of Coinbase's public listing announcements.  Upon learning Coinbase's confidential listing plans, NIKHIL WAHI and SAMEER RAMANI used anonymous Ethereum blockchain wallets to acquire certain crypto assets shortly before Coinbase publicly announced that it was listing or considering listing those same assets on its exchanges. (Indictment ¶ 12)

       f.     Based on confidential information provided by ISHAN WAHI, the defendant, NIKHIL WAHI and SAMEER RAMANI collectively traded shortly in advance of at

---

[4] As is noted in the Indictment, in connection with the scheme, ISHAN WAHI, the defendant, sought to deceive Coinbase and his fellow employees by assuring them – through, among other means, Coinbase's private asset listing messaging channel (including interstate wire communications sent from ISHAN WAHI to a fellow Coinbase employee located in Manhattan, New York) – that he was maintaining the confidentiality of this information.  In truth and in fact, however, ISHAN WAHI repeatedly breached his duty of confidentiality to Coinbase by misappropriating Coinbase's confidential information and providing it to his brother, NIKHIL WAHI, the defendant, and ISHAN WAHI's friend and associate, SAMEER RAMANI, the defendant, so that they could make profitable trades on the basis of that confidential information.

least 14 separate Coinbase public listing announcements concerning at least 25 different crypto assets, and then, in most instances, subsequently sold the crypto assets they had acquired for a profit. These trades collectively led to realized and unrealized gains totaling at least approximately $1.5 million. (Indictment ¶ 13)

        g.     The Indictment then goes on to detail a few examples of NIKHIL WAHI and RAMANI each, respectively, trading in crypto assets based on Coinbase confidential business information provided by ISHAN WAHI. (*See* Indictment ¶ 13(a)-(h))

19.     In addition to the wire fraud charges contained in the Indictment, there is also probable cause that ISHAN WAHI, NIKHIL WAHI, and SAMEER RAMANI engaged in concealment money laundering and conspiracy to commit the same by moving the proceeds of their insider trading scheme through multiple anonymous Ethereum wallets and accounts held at centralized cryptocurrency exchanges in the names of other nominal owners and under pseudonym email accounts.  As is alleged in the Indictment, to conceal their purchases of crypto assets in advance of Coinbase's listing announcements, NIKHIL WAHI and SAMEER RAMANI used accounts at centralized exchanges held in the names of others, and transferred funds, crypto assets, and proceeds of their scheme through multiple anonymous Ethereum blockchain wallets.  NIKHIL WAHI and RAMANI also regularly created and used new Ethereum blockchain wallets without any prior transaction history in order to further conceal their involvement in the scheme. (Indictment ¶ 14).  Certain examples of the movement of proceeds from the insider trading scheme through multiple anonymous Ethereum wallets and centralized exchange accounts held under the names of others in order to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the wire fraud offenses charged in the Indictment are described in further detail below.  A visual depiction

summarizing the flow of proceeds between centralized cryptocurrency exchange accounts and anonymous Ethereum wallets is annexed to this Affidavit as **Exhibit B**.

### B. Probable Cause to Seize the Target Assets

20.　　Based on my participation in this investigation, training, experience, review and analysis of various anonymous Ethereum wallets and accounts with centralized cryptocurrency exchanges, and analyses performed by me and consulting experts retained by the United States Attorney's Office for the Southern District of New York, open-source research that I have conducted on the Internet and on the publicly available Ethereum blockchain, my review of evidence obtained pursuant to subpoenas and judicially authorized search warrants, and my conversations with others, I have learned the following, among other things, establishing probable cause to seize the Target Assets:

*The JStatham Binance Account Controlled by NIKHIL WAHI Engages in Insider Trading Based on Coinbase Confidential Business Information*

21.　　Based on my review of records provided by the cryptocurrency exchange Binance and my review of records provided by other cryptocurrency exchanges, and other internet service providers, I have learned that there is probable cause that NIKHIL WAHI controlled the Binance account associated with the email address: jstatham0719@gmail.com (hereinafter the "JStatham Binance Account").　There is probable cause establishing NIKHIL WAHI controlled the JStatham Binance Account because, among other things, an IP address that was used to create the email address associated with the JStatham Binance Account was registered to NIKHIL WAHI and his home address.　In addition, this same IP address was used to create the email address associated with another Binance Account that was held under NIKHIL WAHI's name.

22.　　NIKHIL WAHI used the JStatham Binance Account to receive and transfer proceeds of the wire fraud offenses charged in the Indictment and described above. In addition,

NIKHIL WAHI used the JStatham Binance Account to engage in the wire fraud offenses by acquiring crypto assets that were going to be imminently listed by Coinbase and then selling those assets for a profit soon after Coinbase's listing announcements.  In particular:

a.      NIKHIL WAHI, among other things, used the JStatham Binance Account to receive proceeds of the insider trading scheme from other anonymous Ethereum wallets subject to NIKHIL WAHI's control and then move those proceeds on to other Ethereum wallets subject to his control.  In total, the JStatham Binance Account received at least approximately $15,229.12   in proceeds of the insider trading scheme from other anonymous Ethereum wallets subject to NIKHIL WAHI's control.  Specifically:

i.      On or about July 19, 2021, the JStatham Binance Account received its first deposits of funds when it received  a transfer of approximately 34,476 USDT stablecoins from the Ethereum wallet with the address:. 0x1319662f9211b21af202179788997e838263c8f5 (the "**0x13196 Wallet**").[5]  At least approximately $1,736 worth of the USDT stablecoins was profits of the insider trading scheme resulting from timely trades in the crypto token RLY surrounding a July 14, 2021 Coinbase listing announcement..

ii.     On or about August 11, 2021, the JStatham Binance Account received a transfer from the Ethereum wallet with the address: 0x16156f4ae4145f427ce0ea5023418831b423bed3 (the "0x16156f4 Wallet") in the amount of approximately 80,000 USDC stablecoins.[6]  At least approximately $6,905 worth of the 80,000

---

[5] 1 USDT stablecoin is worth approximately $1.00.
[6] 1 USDC stablecoin is worth approximately $1.00.

USDC stablecoins was profits of the insider trading scheme resulting from timely trades in the crypto tokens TRIBE surrounding an August 10, 2021 Coinbase listing announcement.[7]

          iii.        On or about November 15, 2021, the JStatham Binance Account received a transfer from the Ethereum wallet with the address: 0x6b49633f6e2dcbd4ef0a60c065e4ed8d88838b38 (“**0x6b4963 Wallet**”) in the amount of 30,565 USDC stablecoins.  At least $565 worth of the 30,565 USDC stablecoins was profits of the insider trading scheme resulting from timely trades in the crypto token ALCX surrounding a November 15, 2021 Coinbase listing announcement.

          iv.        On or about October 18, 2021 and November 25, 2021, the JStatham Binance Account received two transfers from the Ethereum wallet with the address: 0xcf2edad817498606132ff5ac10999a9124d4ddcd (the “**0xcf2eda Wallet**”) in the total amount of 19.69 ETH (worth approximately $74,145).  At least approximately $6,022 worth of the ETH transferred was profits of the insider trading scheme resulting from timely trades in the crypto token RARI surrounding the October 13, 2021 Coinbase listing announcement.

          v.        Thus, in total, the JStatham Binance Account received at least approximately $15,229.12   in proceeds of the insider trading scheme prior to November 29, 2021.

          b.      In addition to its being funded with proceeds of the insider trading scheme, NIKHIL WAHI also used the JStatham Binance Account to profitably trade in numerous crypto assets based on Coinbase confidential business information. NIKHIL WAHI used the JStatham Binance Account to acquire numerous crypto assets shortly before Coinbase

---

[7] The **0x16156f4 Wallet** received proceeds from another Ethereum wallet with the address 0x438f137d98c2624b46f1ed3310600ea5d12b3a18, and then transferred these proceeds on to the JStatham Binance Account.

listing announcements and then sold these crypto assets soon after the Coinbase listing announcements, generating total profits through this trading of approximately $107,834.   In particular:

i.      Between approximately 15:56 and 16:01 UTC on August 10, 2021, the JStatham Binance Account purchased approximately $27,055 worth of the crypto token QUICK.  At approximately 16:04 UTC on August 10, 2021, Coinbase publicly announced that it would be listing the QUICK token on its exchanges.   On August 11, 2021, between approximately 3:31 and 19:33 UTC, the JStatham Binance Account sold $28,033 worth of QUICK tokens, representing profits of approximately $977.

ii.     Between approximately 19:46 and 19:47 UTC on August 11, 2021, the JStatham Binance Account purchased approximately $27,744 worth of the crypto token TRU.  At approximately 19:50 UTC on August 11, 2021, Coinbase publicly announced that it would be listing the TRU token on its exchanges.  Thereafter, between approximately 19:54 UTC on August 11, 2021 and 20:26 UTC on August 12, 2021, the JStatham Binance Account sold approximately $37,453 worth of TRU tokens, representing profits of approximately $9,708.

iii.    Between approximately 17:27 and 18:45 UTC on August 31, 2021, the JStatham Binance Account purchased approximately $171,168 of the crypto token YFII. At approximately 19:01 UTC on August 31, 2021, Coinbase publicly announced that it would be listing the YFII token on its exchanges. Thereafter, between approximately 21:21 and 21:22 UTC on August 31, 2021, the JStatham Binance Account sold approximately $215,991 worth of YFII tokens, representing profits of approximately $44,823.

iv.     Between approximately 15:30 UTC and 16:49 UTC on September 15, 2021, the JStatham Binance Account purchased approximately $145,433 worth of the crypto token ZEN tokens. At approximately 18:49 UTC on September 15, 2021, Coinbase announced

that it would be listing the ZEN token on its exchanges. Thereafter, between 19:03 UTC and 19:18 UTC on September 15, 2021, the JStatham Binance Account sold approximately $168,603 worth of ZEN tokens, representing profits of approximately $23,170.

> v.      Between approximately 15:45 and 15:46 UTC on September 29, 2021, the JStatham Binance Account purchased approximately $87,895 worth of the crypto token AVAX.   At approximately 15:54 UTC on September 29, 2021, Coinbase publicly announced that it would be listing the AVAX token on its exchanges.   Thereafter, at approximately 7:53 UTC on September 30, 2021, the JStatham Binance Account sold approximately $92,869 worth of AVAX tokens, representing profits of approximately $4,974.

> vi.     Between approximately 17:41 UTC and 17:42 UTC on October 13, 2021, the JStatham Binance Account purchased approximately $92,762 worth of the crypto token BADGER. On October 13, 2021, at approximately 20:05 UTC, Coinbase publicly announced that it would be listing the BADGER token on its exchanges. Thereafter, at approximately 20:21 UTC on October 13, 2021, the JStatham Binance Account sold approximately $101,569 worth of BADGER tokens, representing profits of approximately $8,806.

> vii.    Between approximately 6:15 UTC and 6:35 UTC on October 18, 2021, the JStatham Binance Account purchased approximately $234,014 worth of the crypto token PERP.  On October 18, 2021, at approximately 18:51 UTC, Coinbase publicly announced that it would be listing the PERP token on its exchanges. Thereafter, between approximately 18:55 UTC and 18:58 UTC on October 18, 2021, the JStatham Binance Account sold approximately $241,000 worth of PERP tokens, representing profits of approximately $6,985.

> viii.   Between approximately 8:44 and 8:47 UTC on November 15, 2021, the JStatham Binance Account purchased approximately $169,890 worth of the crypto

tokens ENS and GALA.   On November 15, 2021, at approximately 19:54 UTC, Coinbase publicly announced that it would be listing the ENS and GALA tokens on its exchanges. Thereafter, between approximately 20:01 and 20:04 UTC on November 15, 2021, the JStatham Binance Account sold approximately $178,229 worth of ENS and GALA tokens. On November 25, 2021 at approximately 19:56 UTC, the JStatham Binance Account sold an additional $51.71 worth of GALA tokens.  In total,  this trading represented profits of approximately $8,390.

*The JStatham Binance Account Launders Proceeds of the Insider Trading Scheme through Multiple Anonymous Ethereum Wallets and Moves the Proceeds to a Binance Account Held by a Nominee*

23.    In sum, as of November 29, 2021, the JStatham Binance Account controlled by NIKHIL WAHI had received at least $15,229.12   worth of proceeds from the insider trading scheme and had also generated at least approximately $107,834 in profits from directly trading based on Coinbase confidential business information ahead of Coinbase listing announcements.[8] Thus, at least $123,059 of proceeds of the scheme had flowed through the JStatham Binance Account as of November 29, 2021.

24.    Based on my review of records from Binance and publicly available records from the Ethereum blockchain, as well as an analysis prepared by an expert consulting firm retained by the United States Attorney's Office for the Southern District of New York in connection with this investigation, I have learned, among other things, the following:

a.    Between November 29, 2021 and December 6, 2021, the JStatham Binance Account transferred a total of approximately $116,349 worth of proceeds in the form of USDC stablecoins to three anonymous Ethereum wallets.  In particular: (i) on November 29, 2021 at approximately 9:49 UTC, the JStatham Binance Account transferred approximately

---

[8] The JStatham Account engaged in various other transactions and exchanges of different forms of cryptocurrencies that are not described herein.

$26,975 worth of proceeds in the form of USDC stablecoins to the anonymous Ethereum wallet with the address: 0xdfba43747212e3c0d1116776350ea2ae8498ef30 (the "**0xdfba43 Wallet**")[9]; (ii) on November 29, 2021 at approximately 10:25 UTC, the JStatham Binance Account transferred approximately $27,920 worth of proceeds in the form of USDC stablecoins to the anonymous Ethereum wallet with the address: 0x264082bfbcb4bdfb4c88ae275c98896c2ffd3870 (the "**0x264082 Wallet**")[10]; and (iii) on December 6, 2021, at approximately 9:53 UTC, the JStatham Binance Account transferred approximately $61,454 worth of proceeds in the form of USDC stablecoins to the anonymous Ethereum wallet with the address: 0x41aaf145f2162dadf153d431c83a25cfa3925263 (the "**0x41aaf1 Wallet**").[11]

   b.  After the **0x41aaf1 Wallet** received $61,454 worth of USDC stablecoins on December 6, 2021, the wallet proceeded to engage in insider trading by acquiring crypto assets shortly before Coinbase listing announcements and then profitably selling those crypto assets soon after Coinbase listing announcements.  In particular, on December 6, 2021, between approximately 10:08 and 16:58 UTC, the **0x41aaf1 Wallet** purchased approximately 818,697 COVAL tokens worth approximately $17,000 and approximately 4,321,967 SPELL tokens worth approximately $40,000.  Subsequent to these purchases, at approximately 17:03 UTC on December 6, 2021, Coinbase publicly announced that it would be listing the COVAL and SPELL tokens on its exchanges. Thereafter, between December 6, 2021 at approximately 18:57 UTC

---

[9] The **0xdfba43 Wallet** had no balance prior to this incoming transfer from the JStatham Binance Account on November 29, 2021.

[10] The **0x264082 Wallet** had no balance prior to this incoming transfer from the JStatham Binance Account on November 29, 2021.

[11] The **0x41aaf1 Wallet** had no balance prior to this incoming transfer from the JStatham Binance Account on December 6, 2021.y

and December 13, 2021 at approximately 17:02 UTC, the **0x41aaf1 Wallet** sold all of the SPELL tokens and all of COVAL tokens it had acquired in exchange for USDC stablecoins and ETH worth in total approximately $132,147, representing approximately $75,147 in profits.  The **0x41aaf1 Wallet** that had received approximately $61,454 worth of USDC stablecoins on December 6, 2021 and had subsequently engaged in frontrunning trades in COVAL and SPELL that netted approximately $75,147 in profits, thereafter transferred $133,869 USDC to a Binance Account held under the name "NEHRIYA UMESH SURESH"[12] (hereinafter the "Suresh Binance Account") on January 5, 2022.

        c.      The Suresh Binance Account received additional transfers on January 5, 2022.  On January 5, 2022, the **0x264082 Wallet** that had received $27,920 worth of USDC stablecoins on November 29, 2021 from the JStatham Binance Account, transferred this full $27,920 worth of USDC stablecoins to the Suresh Binance Account.  In addition, on January 5, 2022, the **0xdfba43 Wallet** that had received $26,975 worth of USDC stablecoins on November 29, 2021 from the JStatham Binance Account, also transferred this full $26,975 worth of USDC stablecoins to the Suresh Binance Account.  In sum, as a result of these transfers the Suresh Binance Account received total transfers from the **0x264082 Wallet**, the **0xdfba43 Wallet**, and the **0x41aaf1 Wallet** of approximately $188,765 worth of USDC stablecoins, all of which represented proceeds of the insider trading scheme.  Based on my review of records provided by Binance with respect to the Suresh Binance Account, I know that at the time of receiving this

---

[12] I have reviewed records from Binance associated with the Suresh Binance Account and an identification card issued by the "Income Tax Department" of the "Govt. of India" was included in the account documents.  The identification documents included in the Binance account records are in the name "Nehriya Umesh Suresh" but the account name in the Binance records is "Vehriya Umesh Suresh."  This appears to be a typographical error.

$188,764 worth of USDC stablecoins on January 5, 2022, the Suresh Binance Account had no prior balance.

        d.      Furthermore, based on my review of records provided by Binance with respect to the Suresh Binance Account, I know that between on or about January 5, 2022 and on or about February 10, 2022, the Suresh Binance Account did not engage in any other transactions other than the following: the account received approximately .83 ETH worth approximately $2,951 on January 5, 2022 and received USDT stablecoins worth approximately $2,251 on January 5, 2022. The Suresh Binance Account exchanged certain of this USDT for ETH on or about January 12, 2022, but otherwise engaged in no other transactions.

        e.      IP access logs for the Suresh Binance Account demonstrate that although the account was purportedly held for the benefit of Nehriya Umesh Suresh, in reality the account was controlled by NIKHIL WAHI and his co-conspirators, including co-defendant SAMEER RAMANI. For example, an IP address that was used to access the Suresh Binance Account was also used to access the Binance account held under the name NIKHIL WAHI and was used to access an Apple iCloud account held by NIKHIL WAHI. This same IP address was also used to access the JStatham Binance Account, which, as demonstrated above, was also controlled by NIKHIL WAHI. Moreover, the **0x41aaf1 Wallet**, which, as described above, sent a transfer to the Suresh Binance Account on January 5, 2022, was accessed from an IP address that is registered to NIKHIL WAHI and his home address. Finally, an IP address used to access the Suresh Binance Account on or about February 10, 2022 – on which date the Suresh Binance Account transferred approximately 9,965 USDC to another wallet – was also used to access an Apple iCloud account and a Google account associated with co-defendant SAMEER RAMANI.

        f.      On February 10, 2022, the Suresh Binance Account transferred approximately $9,965 of the USDC stablecoin proceeds it had received on January 5, 2022, to an

anonymous Ethereum wallet with the address: 0xb7A9159140e389ef3a0B18a0842Ac96a4231388D (the "**0xb7A915 Wallet**"). On February 10, 2022, the Suresh Binance Account also transferred approximately 1.49 ETH worth approximately $4,594 to the **0xb7A915 Wallet**.[13]  Finally, on February 13, 2022, the Suresh Binance Account transferred approximately $178,730 worth of the USDC stablecoin proceeds it had received on January 5, 2022 to this same **0xb7A915 Wallet**.

*NIKHIL WAHI Instructs SAMEER RAMANI to Funnel the Proceeds to an Anonymous Ethereum Wallet Subject to NIKHIL WAHI's Control*

25.    Based on my review of publicly available records from the Ethereum blockchain, I have learned, among other things, the following: on or about February 13, 2022 at approximately 19:50 UTC, the **0xb7A915 Wallet** transferred approximately 188,695 USDC to an anonymous Ethereum wallet with the address: 0xe02a168d30a4a30cd95ad709323664d7890e1f43 (the "**0xe02a16 Wallet**").[14]  In addition, at approximately 19:53 UTC on February 13, 2022, the **0xb7A915 Wallet** transferred approximately 1.48 ETH (worth approximately $4,286) to the **0xe02a168 Wallet**.

26.    Based on my review of Whatsapp chat messages obtained from the cellular phone of NIKHIL WAHI pursuant to a judicially authorized search and seizure warrant,[15] I have learned that NIKHIL WAHI, using the Whatsapp account associated with the telephone number

---

[13] Prior to these February 10, 2022 incoming transfers, the **0xb7A915 Wallet** had no prior balance.

[14] Prior to this February 13, 2022 incoming transfer, the **0xe02a16 Wallet** had no prior balance.
[15] The search warrant of the relevant device belonging to NIKHIL WAHI was issued by Magistrate Judge S. Kate Vaughn of the United States Court for the Western District of Washington on or about May 26, 2022.

15127171238,[16] and SAMEER RAMANI, using the Whatsapp account associated with the telephone number 919920625464,[17] had the following chat exchange on February 13, 2022:

NIKHIL: Yo are you free now? [19:16 UTC]

RAMANI: Yup [19:16 UTC]

RAMANI: Call you in 10 mins [19:16 UTC]

NIKHIL: Sounds good! [19:19 UTC]

 [Missed voice call from RAMANI at 19:36pm UTC]

NIKHIL:      0xe02a168d30A4A30Cd95AD709323664d7890e1F43      [the   **0xe02a16 Wallet**][19:41 UTC]

RAMANI: Leme know once in [19:51 UTC]

NIKHIL: Got it, thanks! [19:51 UTC][18]

RAMANI: Ok there's some balance eth too, same or somewhere else? [19:52 UTC]

NIKHIL: Same place is good [19:52 UTC]

RAMANI: Ok sent that too [19:53 UTC][19]

NIKHIL: Perfect got that as well [20:05 UTC]

NIKHIL: Thanks a lot bro [20:05 UTC]

RAMANI: Not a problem at all buddy [20:05 UTC]

27.     Based on my review of publicly available records from the Ethereum blockchain, I have learned, among other things, the following: the **0xe02a16 Wallet** had not engaged in any

---

[16] Records obtained from the telephone provider for the 15127171238 number show that NIKHIL WAHI was the registered user of this telephone number.

[17] Records obtained from Emirates Airlines reflect that this telephone number was associated with a booking made by SAMEER RAMANI.

[18] As is noted above, the transfer of the 188,695 USDC to the **0xe02a16 Wallet** occurred at approximately 19:50 UTC.

[19] As is noted above, the transfer of the 1.4 ETH to the **0xe02a16 Wallet** occurred at approximately 19:53 UTC.

transactions prior to its receipt of the 188,695 USDC and 1.4 ETH on February 13, 2022.  The wallet engaged in no additional transactions until February 23, 2022, when the wallet transferred the full 188,965 USDC and 1.4 ETH on to a Kucoin Account. Based on my review of records from Kucoin, I have learned that the February 23, 2022 transfers were to a Kucoin account associated with the email address: biimbam23@gmail.com (the "Biimbam23 Kucoin Account")(i.e. Target Asset-2).  Thus, the **0xe02a16 Wallet** was used purely as a passthrough wallet to launder the illicit proceeds.

*NIKHIL WAHI Uses the Biimbam23 Kucoin Account to Move Proceeds and Engage in Trades Based on Coinbase Confidential Information*

28.     Based on my review of records provided by the cryptocurrency exchange Kucoin and my review of records provided by other cryptocurrency exchanges, and other internet service providers, as well as an analysis prepared by an expert consulting firm retained by the United States Attorney's Office for the Southern District of New York in connection with this investigation, I have learned, among other things, the following:

a.     There is probable cause establishing NIKHIL WAHI controlled the Biimbam23 Kucoin Account (i.e. Target Asset-2) because, among other things, an IP address registered to NIKHIL WAHI and his home address was used to access the Biimbam23 Kucoin Account.  In addition, multiple IP addresses used to access the Biimbam23 Kucoin Account were also used to access other accounts controlled by NIKHIL WAHI, including, among other accounts, a Google account associated with NIKHIL WAHI and a Coinbase account associated with NIKHIL WAHI.  Finally, the telephone number 15127171238 is associated with the Biimbam23 Kucoin Account.  As is noted above, records produced by the telephone provider for this telephone number reflect that NIKHIL WAHI was the registered user of this telephone number.

b.      As is described above, the Biimbam23 Kucoin Account received approximately 188,965 of USDC representing proceeds of the insider trading scheme on February 23, 2022.   NIKHIL WAHI used the Biimbam23 Kucoin Account to receive and transfer proceeds of the wire fraud offenses charged in the Indictment and described above. In addition, NIKHIL WAHI used the Biimbam23 Kucoin Account to engage in the wire fraud offenses by acquiring crypto assets that were going to be imminently listed on Coinbase's exchanges and then selling those assets for a profit soon after Coinbase's listing announcements. Such trades based on Coinbase's confidential business information occurred both prior to the February 23, 2022 incoming transfer of 188,965 USDC and following that transfer, and generated total profits of approximately $363,047.  In particular:

i.      On September 15, 2021, between approximately 15:44 UTC and 16:51 UTC, the Biimbam23 Kucoin Account purchased approximately $201,770 worth of the crypto token ZEN.   On September 15, at approximately 18:49 UTC, Coinbase publicly announced that it would be listing the ZEN token on its exchanges.  Immediately following the Coinbase listing announcement, between approximately 18:59 UTC and 19:04 UTC on September 15, 2021, the Biimbam23 Kucoin Account sold approximately $320,024 worth of ZEN tokens, representing profits of approximately $118,253.

ii.      Between approximately 19:32 UTC and 19:37 UTC on October 6, 2021, the Biimbam23 Kucoin Account purchased approximately $126,279 worth of the crypto tokens CFG and FX.   On October 6, 2022, at approximately 19:38 UTC, Coinbase publicly announced that it would be listing the FX and WCFG[20] tokens on its exchanges. Immediately

---

[20] Coinbase announced that it was listing Wrapped CFG token rather than CFG token. Based on my review of publicly available sources and the Coinbase website and my discussions with expert consultants retained by the U.S. Attorney's Office for the Southern District of New York

following the Coinbase listing announcement, between approximately 20:03 and 23:24 UTC on October 6, 2021, the 42,616 CFG tokens and 61,612 FX tokens purchased ahead of the listing announcement were sold for approximately $180,507, representing a profit of approximately $54,228.[21]

iii. Beginning on October 13, 2021, and continuing until October 18, 2021 at approximately 6:47 UTC, the Biimbam23 Kucoin Account purchased approximately $300,510 worth of the crypto token ARPA. On October 18, 2021, at approximately 18:51 UTC, Coinbase publicly announced that it would be listing the ARPA token on its exchanges. Immediately following the Coinbase listing announcement, between approximately 18:56 UTC and 19:09 UTC on October 18, 2021, the Biimbam23 Kucoin Account sold approximately $375,901 worth of ARPA tokens, representing profits of approximately $75,390.

c. On October 27, 2021, between approximately 17:20 UTC and 18:52 UTC, the Biimbam23 Kucoin Account collectively purchased approximately $258,002 of the crypto tokens KRL, SUKU, and TRAC. On October 27, 2021, at approximately 18:53 UTC, Coinbase publicly announced that it would be listing the TRAC, KRL, and SUKU tokens on its exchanges. Immediately following the Coinbase listing announcement, between approximately 19:10 and

---

in connection with this investigation, I have learned that Wrapped Centrifuge (WCFG) is an Ethereum token that is intended to represent Centrifuge (CFG) on the Ethereum blockchain. WCFG is not CFG, but rather a separate ERC-20 token that is designed to track CFG's price.

[21] The Biimbam23 Kucoin Account also made purchases and sales of the FX and CFG tokens after the listing announcement. In order to calculate approximate profits of the sales of the tokens acquired prior to the Coinbase listing announcement, with the assistance of an expert consulting firm retained by the U.S. Attorney's Office for the Southern District of New York, I have used a "first in first out" method under which the costs for the tokens that were first acquired were used to calculate the approximate profits.

19:40 UTC on October 27, 2021, the Biimbam23 Kucoin Account sold approximately $272,266 worth of TRAC, KRL and SUKU tokens, representing profits of approximately $14,264.

   d. Between approximately 2:09 UTC and 2:18 UTC on January 17, 2022, the Biimbam23 Account purchased approximately $91,482 worth of the crypto token STX.  On January 18, 2022 at approximately 16:56 UTC, Coinbase publicly announced that it would be listing the STX token on its exchanges.  Immediately following the Coinbase listing announcement, between approximately 17:06 UTC and 17:10 UTC on January 18, 2022, the Biimbam23 Kucoin Account sold approximately $104,128 worth of STX tokens, representing profits of approximately $12,645.

   e. On or about February 23, 2022, between approximately 6:05 UTC and 16:49 UTC, the Biimbam23 Kucoin Account purchased approximately $192,246 worth of the crypto token ALICE.  On February 23, 2022, at approximately 16:53 UTC, Coinbase publicly announced that it would be listing the ALICE token on its exchanges. Immediately following the Coinbase listing announcement, between approximately 16:55 UTC and 17:03 UTC on February 23, 2022, the Biimbam23 Kucoin Account sold approximately $215,363 worth of ALICE tokens, representing profits of approximately $23,116.

   f. Between approximately 18:39 UTC on March 6, 2022 and 3:47 UTC on March 7, 2022, the Biimbam23 Kucoin Account purchased approximately $170,801 worth of the crypto tokens AERGO, AIOZ, and SNT. On March 7, 2022, at approximately 20:15 UTC, Coinbase publicly announced that it was listing the SNT, AERGO and AIOZ tokens on its exchanges.  Immediately following the Coinbase listing announcement, between approximately 20:42 UTC and 20:58 UTC on March 7, 2022, the Biimbam23 Kucoin Account sold collectively approximately $182,768 worth of AERGO, AIOZ, and SNT tokens, representing profits of approximately $11,967.

g.      Between approximately 8:20 UTC and 8:49 UTC on April 25, 2022, the Biimbam23 Kucoin Account purchased approximately $349,766 worth of the crypto token ROSE.  On or about April 25, 2022 at approximately 15:59 UTC, Coinbase announced that it was listing the ROSE token on its exchanges.  Immediately following the Coinbase listing announcement, beginning at approximately 16:01 UTC and continuing until 16:05 UTC, the Biimbam23 Kucoin Account sold approximately $391,592 worth of ROSE tokens, representing profits of approximately $41,826.

h.      Between approximately 8:57 UTC and 9:01 UTC on April 27, 2022, the Biimbam23 Kucoin Account purchased approximately $390,522 worth of the crypto token GMT.  On or about April 27, 2022, at approximately 16:01 UTC, Coinbase announced that it was listing the GMT token on its exchanges.  Immediately following the Coinbase listing announcement, at approximately 16:06 UTC, the Biimbam23 Kucoin Account sold approximately $401,877 of GMT tokens, representing profits of approximately $11,355.

*Proceeds Are Transferred From the Biimbam23 Kucoin Account to the Shyam8Singh Binance Account Controlled by NIKHIL WAHI*

29.      Based on my review of records produced by Binance, records produced by Kucoin and my review of publicly available records from the Ethereum blockchain, I have learned, among other things, the following:

a.      After the Biimbam23 Kucoin Account accumulated substantial proceeds of the insider trading scheme (through both the trading that occurred in the account as described above and the transfer of $188,695 worth of proceeds into the account on or about February 23, 2022 as described above), between on or about March 6, 2022 and on or about April 8, 2022, the Biimbam23 Kucoin Account transferred a total of approximately $133,343 worth of USDT stablecoins and 1 BTC worth approximately $42,882, to a Binance account registered under the

email address shyam8singh9@gmail.com (the "Shyam8Singh Binance Account"). There were four transfers in total from the Biimbam23 Kucoin Account to the Shyam8Singh Binance Account between on or about March 6 and on or about April 8, 2022: a March 6, 2022 transfer of approximately 41,652 USDT, a March 23, 2022 transfer of approximately 1 BTC (worth approximately $42,882), an April 5, 2022 transfer of approximately 46,422 USDT, and an April 8, 2022 transfer of 45,269 USDT.[22]

*NIKHIL WAHI Uses the Shyam8Singh Binance Account to Move Proceeds and Engage in Trades Based on Coinbase Confidential Information*

30.     Based on my review of records provided by the cryptocurrency exchange Binance and my review of records provided by other cryptocurrency exchanges, and other internet service providers, as well as an analysis prepared by an expert consulting firm retained by the United States Attorney's Office for the Southern District of New York in connection with this investigation, I have learned, among other things, the following:

a.     Records produced by Binance for the Shyam8Singh Binance Account reflect that the named owner of the account is NIKHIL WAHI.[23]   In addition, an IP address registered to NIKHIL WAHI and his home address was used to register the email address associated with the Shyam8Singh Binance Account.  In addition, NIKHIL WAHI used this same IP address to approve a withdrawal from the Shyam8Singh Binance Account.

---

[22] As of the March 6, 2022 transfer, the Biimbam23 Kucoin Account had generated profits from the insider trading scheme of approximately $297,898 and by that date had also received an incoming transfer of proceeds of the insider trading scheme of approximately $188,695.  After the March 6, 2022 transfer, the Biimbam23 Kucoin Account generated additional profits from the insider trading scheme of approximately $65,148.

[23] Included in the "know your customer" documentation is a photograph that I believe to be a photograph depicting NIKHIL WAHI based on my review of other identified photographs of NIKHIL WAHI during the course of this investigation.

b.      As is noted above, between March 6, 2022 and April 8, 2022, the Shyam8Singh Binance Account received a total of approximately $133,343 worth of USDT stablecoins and 1 BTC worth approximately $42,882, from the Biimbam23 Kucoin Account.

c.      NIKHIL WAHI used the Shyam8Singh Binance Account to receive and transfer proceeds of the wire fraud offenses charged in the Indictment and described above. In addition, NIKHIL WAHI used the Shyam8Singh Binance Account to engage in the wire fraud offenses by acquiring crypto assets that were going to be imminently listed by Coinbase and then selling those assets for a profit soon after Coinbase's listing announcements..  Such trades based on Coinbase confidential business information occurred both prior to the incoming transfers from the Biimbam23 Kucoin Account between on or about March 6 and on or about April 8, 2022 and following those transfers, and generated total profits of approximately $367,520.  In particular:

i.      Between approximately 15:59 UTC and 16:00 UTC on August 10, 2021, the Shyam8Singh Binance Account purchased approximately $99,850 worth of the token ORN.  On August 10, 2021 at approximately 16:04 UTC, Coinbase announced that it was listing the ORN token on its exchanges.  Immediately following the Coinbase listing announcement, beginning at 3:37 UTC and continuing until 19:32 UTC, the Shyam8Singh Binance Account sold approximately $110,717 worth of ORN tokens, representing profits of approximately $10,867.

ii.      At approximately 19:44 UTC on August 11, 2021, the Shyam8Singh Binance Account purchased approximately $110,483 worth of the crypto token LUNA.  On August 11, 2021, at approximately 19:50 UTC, Coinbase publicly announced that it would be listing the WLUNA token.[24]  Immediately following the Coinbase listing

---

[24] Coinbase announced that it was listing Wrapped LUNA token rather than LUNA token. Based on my review of publicly available sources and the Coinbase website and my discussions with expert consultants retained by the U.S. Attorney's Office for the Southern District of New York

announcement, between approximately 20:43 UTC and 20:44 UTC on August 11, 2021, the Shyam8Singh Binance Account sold approximately $112,399 worth of LUNA tokens, representing profits of approximately $1,915.

iii.   Between approximately 17:19 UTC and 17:21 UTC on August 31, 2021, the Shyam8Singh Binance Account purchased approximately $79,906 worth of the crypto token YFII.  On August 31, 2021, at approximately 19:01 UTC, Coinbase publicly announced that it would be listing the YFII token on its exchanges.  Immediately following the Coinbase listing announcement, between approximately 21:23 UTC and 21:24 UTC on August 31, 2021, the Shyam8Singh Binance Account sold approximately $101,400 worth of YFII token, representing profits of approximately $21,493.

iv.   Between approximately 6:40 UTC and 15:17 UTC on September 15, 2021, the Shyam8Singh Binance Account purchased approximately $111,317 worth of the crypto token ZEN.  On September 15, 2021, at approximately 18:49 UTC, Coinbase publicly announced that it would be listing the ZEN token on its exchanges.  Immediately following the Coinbase listing announcement, at 18:55 UTC on September 15, 2021, the Shyam8Singh Binance Account sold approximately $135,376 worth of ZEN, representing profits of approximately $24,059.

v.   At approximately 15:43 UTC on September 29, 2021, the Shyam8Singh Binance Account purchased approximately $129,687 worth of the crypto token AVAX.  On September 29, 2021 at approximately 15:54 UTC, Coinbase publicly announced that

---

in connection with this investigation, I have learned that Wrapped LUNA (WLUNA) is an Ethereum token that is intended to represent LUNA on the Ethereum blockchain. WLUNA is not LUNA, but rather a separate ERC-20 token that is designed to track LUNA's price.

it would be listing the AVAX token on its exchanges.  On September 30, 2021 at approximately 7:51 UTC, the Shyam8Singh Binance Account sold approximately $136,863 worth of AVAX tokens, representing profits of approximately $7,176.

        vi.      Between approximately 6:11 UTC and 6:40 UTC on October 18, 2021, the Shyam8Singh Binance Account purchased approximately $135,955 worth of the crypto token AUCTION.  On October 18, 2021, at approximately 18:51 UTC, Coinbase publicly announced that it would be listing the AUCTION token on its exchanges.  Immediately following the Coinbase listing announcement, at approximately 18:54 UTC on October 18, 2021 the Shyam8Singh Binance Account sold approximately $159,986 worth of AUCTION tokens, representing profits of approximately $24,030.

        vii.      At approximately 8:52 UTC on November 15, 2021, the Shyam8Singh Binance Account purchased approximately $75,286 worth of the crypto token POWR.  On November 15, 2021 at approximately 19:54 UTC, Coinbase publicly announced that it would be listing the POWR token on its exchanges.  Immediately following the Coinbase listing announcement, at approximately 20:00 UTC on November 15, 2021, the Shyam8Singh Binance Account sold approximately $105,737 worth of POWR tokens, representing profits of approximately $30,450.

        viii.      Between approximately 20:38 UTC and 20:40 UTC on November 17, 2021, the Shyam8Singh Binance Account purchased approximately $96,046 worth of the crypto token VGX.  On November 17, 2021 at approximately 20:40 UTC, Coinbase publicly announced that it would be listing the VGX token on its exchanges.  Immediately following the Coinbase listing announcement, at approximately 20:44 UTC on November 17,2021, the Shyam8Singh Binance Account sold approximately $116,946 worth of VGX tokens, representing profits of approximately $20,900.

ix.     At approximately 9:45 UTC on December 6, 2021, the Shyam8Singh Binance Account purchased approximately $47,381 worth of the crypto token SUPER.  On December 6, 2021 at approximately 16:58 UTC, Coinbase publicly announced that it would be listing the SUPER token on its exchanges.  Immediately following the Coinbase listing announcement, at 17:05 UTC on December 6, 2021, the Shyam8Singh Binance Account sold approximately $55,131 worth of SUPER tokens, representing profits of approximately $7,750.

x.     Between approximately 6:46 UTC and 6:48 UTC on January 17, 2022, the Shyam8Singh Binance Account purchased approximately $127,248 worth of the crypto token STX.  On January 18, 2022 at approximately 16:56 UTC, Coinbase publicly announced that it would be listing the STX token on its exchanges.  Immediately following the Coinbase listing announcement, between approximately 17:04 UTC on January 18, 2022, and approximately 9:21 UTC on January 19, 2022, the Shyam8Singh Binance Account sold approximately $147,315 worth of STX tokens, representing profits of approximately $20,106.

xi.     Between approximately 19:01 UTC and 19:06 UTC on January 24, 2022, the Shyam8Singh Binance Account purchased approximately $99,509 worth of the crypto tokens DIA and UNFI.  On January 24, 2022 at approximately 19:12 UTC, Coinbase publicly announced that it would be listing the DIA and UNFI tokens on its exchanges.  Immediately following the Coinbase listing announcement, between approximately 19:13 UTC and 19:15 UTC on January 24, 2022, the Shyam8Singh Binance Account sold approximately $116,487 worth of DIA and UNFI tokens, representing profits of approximately $16,977.

xii.     Between approximately 17:41 UTC and 18:31 UTC on January 26, 2022, the Shyam8Singh Binance Account purchased approximately $183,751 worth of the crypto token FIDA.  On January 31, 2022 at approximately 19:07 UTC, Coinbase publicly

32

announced that it would be listing the FIDA token on its exchanges.  Immediately following the Coinbase listing announcement, between approximately 19:12 UTC and 19:36 UTC on January 31, 2022, the Shyam8Singh Binance Account sold approximately $231,191 worth of FIDA tokens, representing profits of approximately $47,440.

xiii.         Between approximately 6:19 UTC and 6:38 UTC on February 2, 2022, the Shyam8Singh Binance Account purchased approximately $228,158 worth of the crypto tokens RNDR and QSP.  At approximately 20:05 UTC on February 2, 2022, Coinbase publicly announced that it would be listing the RNDR and QSP tokens on its exchanges. Between approximately 20:38 UTC on February 2, 2022 and approximately 16:09 UTC on February 7, 2022, the Shyam8Singh Binance Account sold approximately $232,970 worth of RNDR and QSP tokens, representing profits of approximately $4,812.

xiv.         Between approximately 5:25 UTC and 6:08 UTC on February 23, 2022, the Shyam8Singh Binance Account purchased approximately $263,341 worth of the crypto token ALICE.  At approximately 16:53 UTC on February 23, 2022, Coinbase publicly announced that it would be listing the ALICE token on its exchanges.  Immediately following the Coinbase listing announcement, between approximately 16:56 UTC and 16:59 UTC on February 23, 2022, the Shyam8Singh Binance Account sold approximately $302,748 worth of ALICE tokens, representing profits of approximately $39,407.

xv.         Between approximately 18:40 UTC and 22:56 UTC on March 6, 2022, the Shyam8Singh Binance Account purchased approximately $341,343 worth of the crypto tokens AERGO, HIGH, and SNT.  At approximately 20:15 UTC on March 7, 2022, Coinbase publicly announced that it would be listing the AERGO, HIGH, and SNT tokens on its exchanges.  Immediately following the Coinbase listing announcement, between approximately 20:19 UTC and 20:28 UTC on March 7, 2022, the Shyam8Singh Binance Account sold

approximately $359,787 worth of AERGO, HIGH, and SNT tokens, representing profits of approximately $18,444.

xvi.      Between approximately 5:16 UTC and 7:26 UTC on March 23, 2022, the Shyam8Singh Binance Account purchased approximately $428,276 worth of the crypto token MINA.  At approximately 19:38 UTC on March 23, 2022, Coinbase publicly announced that it would be listing the MINA token on its exchanges.  Immediately following the Coinbase listing announcement, between approximately 19:54 UTC and 19:59 UTC on March 23, 2022, the Shyam8Singh Binance Account sold approximately $458,757 worth of MINA tokens, representing profits of approximately $30,481.

xvii.     Between approximately 8:23 UTC and 8:37 UTC on April 25, 2022, the Shyam8Singh Binance Account purchased approximately $268,602 worth of the crypto token ROSE.  At approximately 15:59 UTC on April 25, 2022, Coinbase publicly announced that it would be listing the ROSE token on its exchanges.  Immediately following the Coinbase listing announcement, between approximately 16:00 UTC and 16:04 UTC on April 25, 2022, the Shyam8Singh Binance Account sold approximately $304,522 worth of ROSE tokens, representing profits of approximately $35,920.

xviii.    Between approximately 9:04 UTC and 9:08 UTC on April 27, 2022, the Shyam8Singh Binance Account purchased approximately $304,211 worth of the crypto token GMT.  At approximately 16:01 UTC on April 27, 2022, Coinbase publicly announced that it would be listing the GMT token on its exchanges. Immediately following the Coinbase listing announcement, at approximately 16:04 UTC on April 27, 2022, the Shyam8Singh Binance Account sold approximately $309,498 worth of GMT tokens, representing profits of approximately $5,286.

*Additional Transfers of Proceeds Between the Shyam8Singh Binance Account and the Biimbam23 Kucoin Account and Transfers of Proceeds to the 0x44b3d5 Wallet*

31.     As is described above, the Shyam8Singh Binance Account received proceeds of approximately $133,343 worth of USDT stablecoins and 1 BTC worth approximately $42,882 from the Biimbam23 Kucoin Account (i.e. Target Asset-2) between on or about March 6, 2022, and on or about April 8, 2022, and further engaged in trades based on Coinbase confidential information that generated profits of approximately $367,520.  Moreover, as is noted above, the Biimbam23 Kucoin Account likewise engaged in trades based on Coinbase confidential information that generated profits of approximately $363,047.

32.     Based on my review of records provided by Binance with respect to the Shyam8Singh Binance Account and records provided by Kucoin with respect to the Biimbam23 Kucoin Account, as well as publicly available records from the Ethereum blockchain, I have learned, among other things, that the Shyam8Singh Binance Account and the Biimbam23 Kucoin Account engaged in various transfers of crypto assets between approximately on or about April 11, 2022 and May 16, 2022, including, in particular, the following transfers:[25]

a.     On or about April 11, 2022, at approximately 6:19 UTC, the Shyam8Singh Binance Account transferred proceeds of the scheme of approximately $359,999 worth of USDT stablecoins to the Biimbam23 Kucoin Account (i.e. Target Asset-2).[26]

---

[25] As of the April 11, 2022 transfers, the Shyam8Singh Binance Account had generated profits from the insider trading scheme of approximately $326,313 and by that date had also received an incoming transfer of proceeds of the insider trading scheme of approximately $176,225.  After the April 11, 2022 transfers, the Shyam8Singh Binance Account generated additional profits from the insider trading scheme of approximately $41,206.

[26] An IP address used to log into the Shyam8Singh Binance Account on April 11, 2022, was based in Manhattan, New York.

b.      On or about April 11, 2022, at approximately 15:15 UTC, the Biimbam23 Kucoin Account (i.e. Target Asset-2) transferred proceeds of the scheme of approximately $43,900 worth of USDT stablecoins to the Shyam8Singh Binance Account.[27]

c.      On or about April 25, 2022, at approximately 8:16 UTC, the Biimbam23 Kucoin Account (i.e. Target Asset-2) transferred proceeds of the scheme of approximately $39,863 worth of USDT stablecoins to the Shyam8Singh Binance Account.

d.      On or about May 16, 2022 at approximately 18:32 UTC, the Shyam8Singh Binance Account transferred approximately $304,665 worth of USDC stablecoins (specifically 304,665.87 USDC stablecoins) and approximately 1.996 ETH worth approximately $4,038 to the **0x44b3d5 Wallet** (i.e. Target Asset-1). Prior to these incoming transfers on May 16, the 0x44b3d5 Wallet had no prior balance.

e.      On or about May 16, 2022 at approximately 18:44 UTC, the Biimbam23 Kucoin Account (i.e. Target Asset-2) transferred approximately $19,499 worth of USDC stablecoins (specifically 19,499.74 USDC stablecoins) and approximately 4.91 ETH worth approximately $9,937 to the **0x44b3d5** Wallet (i.e. Target Asset-1).

33.     Based on my review of publicly available records from the Ethereum blockchain, I have learned that the **0x44b3d5 Wallet** (i.e. Target Asset-1) continues to retain the total of approximately 324,165.60 USDC stablecoins (which are the total proceeds that the wallet received from the Shyam8Singh Binance Account on May 16, 2022 and the Biimbam23 Kucoin Account on May 16, 2022, respectively).

---

[27] As of the April 11, 2022 transfer, the Biimbam23 Kucoin Account had generated profits from the insider trading scheme of approximately $309,865 and by that date had also received an incoming transfers of proceeds of the insider trading scheme.

34.     Based on my review of records obtained from Kucoin, I have learned that as of on or about June 14, 2022, the Biimbam23 Kucoin Account (i.e. Target Asset-2) had a balance of approximately 370,827.25 USDC stablecoins.[28]

## III. Conclusion

35.     Based on the foregoing, I submit that there is probable cause to believe that the Target Assets are subject to forfeiture as proceeds of violations of 18 U.S.C. § 1343 (wire fraud) and/or as property involved in violations of 18 U.S.C. §§ 1956(a)(1)(B)(i), and 1956(h) (concealment money laundering and conspiracy to commit money laundering).

36.     Should seizure warrants directed to Centre Consortium and Circle be granted, law enforcement intends to work with Centre Consortium and Circle to ensure the USDC balance of Target Asset-1 is frozen in place on the Ethereum network.  Law enforcement will then work with Centre Consortium and Circle to transfer the equivalent value of U.S. dollars or USDC to a government-controlled account or wallet.  Should a seizure warrant directed to Kucoin be granted, law enforcement similarly intends to work with Kucoin to ensure that the monies, assets, and funds contained in the Biimbam23 Kucoin Account (Target Asset-2) are frozen in place and transferred to the custody of the U.S. government in a reasonably practicable manner.

37.     The seized currency will remain in the custody of the U.S. government pending transfer of all right, title, and interest in the forfeitable property in the Target Assets to the United States upon completion of forfeiture proceedings, to ensure that access to or manipulation of the

---

[28] A subpoena to Kucoin for updated records is pending.  Because the Biimbam23 Kucoin Account was used to conduct concealment money laundering as described above, the Government is entitled to a seizure warrant with respect to the entire account because forfeiture based on money laundering violations includes all property "involved in" the crime or the attempted crime, which can include "clean" or "legitimate" money that is commingled with "tainted" money derived from illicit sources. *See, e.g., United States v. Huber*, 404 F.3d 1047, 1058 (8th Cir. 2005) (the presence of legitimate funds does not make a money laundering transaction lawful; it is only necessary to show that the transaction involves criminal proceeds).

forfeitable property cannot be made absent court order or, if forfeited to the United States, without prior consultation by the United States.

38.     To minimize the likelihood (1) that NIKHIL WAHI, ISHAN WAHI, or SAMEER RAMANI, or any of their co-conspirators, are notified about the transfer of funds from the Target Assets to government-controlled wallets or accounts, and (2) that NIKHIL WAHI, ISHAN WAHI, or SAMEER RAMANI, or any of their co-conspirators, are able to stop said transfers of funds, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

39.     Request for Sealing:  Because this Affidavit is submitted in connection with seizing assets so that they cannot be dissipated and such ends would be jeopardized by premature disclosure, I request that this Affidavit and all related documents be filed under seal until further notice of the Court, except that copies of this Affidavit and the Seizure Warrants may be served upon Centre Consortium, Circle, and Kucoin, and that the Government may provide copies of this Affidavit and the Seizure Warrants without any further order (i) for the purpose of complying with the Government's discovery obligations in any criminal or civil matter, (ii) to the Securities and Exchange Commission, and (iii) to any foreign law enforcement agency to the extent necessary to enable such agency to assist in the execution of the seizure sought herein.

40.     Accordingly, pursuant to 18 U.S.C. §§ 981 and 984, I respectfully request that the

Court issue a warrant authorizing the seizure of the Target Assets.


/s/ Gurdeep Singh, by SDA with permission
_____
GURDEEP SINGH
Special Agent
Federal Bureau of Investigation


Sworn to me through the transmission of this
Affidavit by reliable electronic means, pursuant to
Federal Rules of Criminal Procedure 41(d)(3) and 4.1, this
28th day of November, 2022


_____
THE HONORABLE STEWART D. AARON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 22 MAG 9491

UNITED STATES OF AMERICA

     -v.-

The 324,165.60 USDC contained in the virtual
currency address:
0x44b3d59fe4dA798a43De3689bE0a2Ab508Bc0067
("Target Asset-1"); and
All monies, assets, and funds contained in the Kucoin
account associated with the following identifiers:
email: biimbam23@gmail.com, telephone number:
1-5127171238, parent_uid: 69250369, and sub_uid:
69250369 ("Target Asset-2").

                  Defendant-in-rem.

## WARRANT OF SEIZURE
## PURSUANT TO 18 U.S.C. §§ 981 AND 984

TO:     ANY DESIGNATED OFFICER OF THE FEDERAL BUREAU OF INVESTIGATION
          AND/OR ANY LAW ENFORCEMENT OFFICER AUTHORIZED BY LAW

     An Affidavit having been made before me by GURDEEP SINGH, a Special Agent with
the Federal Bureau of Investigation, that he has reason to believe the above captioned assets are
subject to seizure and civil forfeiture pursuant to 18 U.S.C. §§ 981 and 984, and as I am satisfied
that there is probable cause to believe that the property so described is subject to seizure and civil
forfeiture pursuant to 18 U.S.C. §§ 981and 984.

     YOU ARE HEREBY COMMANDED AND AUTHORIZED to seize, within fourteen
(14) days of the date of issuance of this warrant, by serving a copy of this warrant of seizure
upon any person presently in possession of the property described as follows:

The 324,165.60 USD Coin (USDC) contained within the following unhosted virtual currency address: 0x44b3d59fe4dA798a43De3689bE0a2Ab508Bc0067 ("Target Asset-1"); and

All monies, assets, and funds contained in the Kucoin account associated with the following identifiers: email: biimbam23@gmail.com, telephone number: 1-5127171238, parent_uid: 69250369, and sub_uid: 69250369 ("Target Asset-2").


   YOU ARE FURTHER COMMANDED AND AUTHORIZED to prepare a written inventory of the property seized and promptly return this warrant and inventory before this Court as required by law.



Dated:  New York, New York
        November 28, 2022

_____
HON. STEWART D. AARON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 22 MAG 9491

UNITED STATES OF AMERICA

    -v.-

The 324,165.60 USDC contained in the virtual
currency address:
0x44b3d59fe4dA798a43De3689bE0a2Ab508Bc0067
("Target Asset-1"); and
All monies, assets, and funds contained in the Kucoin
account associated with the following identifiers:
email: biimbam23@gmail.com, telephone number:
1-5127171238, parent_uid: 69250369, and sub_uid:
69250369 ("Target Asset-2").

                   Defendant-in-rem.

**WARRANT OF SEIZURE
PURSUANT TO 18 U.S.C. §§ 981 AND 984**

TO:    Centre Consortium

An Affidavit having been made before me by GURDEEP SINGH, a Special Agent with
the Federal Bureau of Investigation, that he has reason to believe the above captioned assets are
subject to seizure and civil forfeiture pursuant to 18 U.S.C. §§ 981 and 984, and as I am satisfied
that there is probable cause to believe that the property so described is subject to seizure and civil
forfeiture pursuant to 18 U.S.C. §§ 981 and 984.

CENTRE CONSORTIUM IS HEREBY COMMANDED AND AUTHORIZED to (1) effectuate the freeze and seizure of the USD Coin (USDC) contained within the below-identified virtual currency address, which exists on the Ethereum network, and (2) work to provide the property to the U.S. government in a reasonably practicable manner. Centre Consortium shall provide reasonable assistance in implementing the terms of this seizure warrant and take no unreasonable action to frustrate the implementation of it.

Assets Subject to This Warrant of Seizure:

The 324,165.60 USDC contained within the following unhosted virtual currency address on the Ethereum network: 0x44b3d59fe4dA798a43De3689bE0a2Ab508Bc0067

Dated: New York, New York
        November 28, 2022

_____
HON. STEWART D. AARON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 22 MAG 9491

UNITED STATES OF AMERICA

    -v.-

The 324,165.60 USDC contained in the virtual
currency address:
0x44b3d59fe4dA798a43De3689bE0a2Ab508Bc0067
("Target Asset-1"); and
All monies, assets, and funds contained in the Kucoin
account associated with the following identifiers:
email: biimbam23@gmail.com, telephone number:
1-5127171238, parent_uid: 69250369, and sub_uid:
69250369 ("Target Asset-2").

              Defendant-in-rem.

**TO BE FILED UNDER SEAL**

**WARRANT OF SEIZURE
PURSUANT TO 18 U.S.C. §§ 981 AND 984**

TO:    Circle

An Affidavit having been made before me by GURDEEP SINGH, a Special Agent with
the Federal Bureau of Investigation, that he has reason to believe the above captioned assets are
subject to seizure and civil forfeiture pursuant to 18 U.S.C. §§ 981 and 984, and as I am satisfied
that there is probable cause to believe that the property so described is subject to seizure and civil
forfeiture pursuant to 18 U.S.C. §§ 981 and 984.

CIRCLE IS HEREBY COMMANDED AND AUTHORIZED to immediately provide the amount of USD Coin (USDC) associated with the below-identified virtual currency address, which exists on the Ethereum network, to the U.S. government in a reasonably practicable manner. Circle shall provide reasonable assistance in implementing the terms of this seizure warrant and take no unreasonable action to frustrate the implementation of it.

Assets Subject to This Warrant of Seizure:

The 324,165.60 USDC contained within the following unhosted virtual currency address on the Ethereum network: 0x44b3d59fe4dA798a43De3689bE0a2Ab508Bc0067

Dated:  New York, New York
        November 28, 2022

_____
HON. STEWART D. AARON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 22 MAG 9491

UNITED STATES OF AMERICA

    -v.-

The 324,165.60 USDC contained in the virtual
currency address:
0x44b3d59fe4dA798a43De3689bE0a2Ab508Bc0067
("Target Asset-1"); and
All monies, assets, and funds contained in the Kucoin
account associated with the following identifiers:
email: biimbam23@gmail.com, telephone number:
1-5127171238, parent_uid: 69250369, and sub_uid:
69250369 ("Target Asset-2").


                 Defendant-in-rem.

**TO BE FILED UNDER SEAL**

## WARRANT OF SEIZURE
## PURSUANT TO 18 U.S.C. §§ 981 AND 984

TO:    Kucoin

      An Affidavit having been made before me by GURDEEP SINGH, a Special Agent with
the Federal Bureau of Investigation, that he has reason to believe the above captioned assets are
subject to seizure and civil forfeiture pursuant to 18 U.S.C. §§ 981 and 984, and as I am satisfied
that there is probable cause to believe that the property so described is subject to seizure and civil
forfeiture pursuant to 18 U.S.C. §§ 981 and 984.

KUCOIN IS HEREBY COMMANDED AND AUTHORIZED to (1) effectuate the freeze and seizure of the monies, assets, and funds contained within the below-identified Kucoin account, and (2) work to provide the property to the U.S. government in a reasonably practicable manner.  Kucoin shall provide reasonable assistance in implementing the terms of this seizure warrant and take no unreasonable action to frustrate the implementation of it.

Assets Subject to This Warrant of Seizure:

The monies, assets, and funds contained in the Kucoin account associated with the following user: email: biimbam23@gmail.com, telephone number: 1-5127171238, parent_uid: 69250369, and sub_uid: 69250369

Dated: New York, New York
         November 28, 2022

_____
HON. STEWART D. AARON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                            :

UNITED STATES OF AMERICA        :

        -v.-                :     **SEALED INDICTMENT**

                            :

ISHAN WAHI,                 :     22 Cr.
NIKHIL WAHI, and
SAMEER RAMANI,           :

                            :

        Defendants.       
-------------------------------------- X

### COUNT ONE
**(Conspiracy to Commit Wire Fraud)**

The Grand Jury charges:

#### Overview of the Charges

1.  From at least in or about June of 2021 through in or

about April of 2022, ISHAN WAHI, NIKHIL WAHI, and SAMEER RAMANI,

the defendants, generated more than a million dollars in illegal

trading profits through their participation in a scheme to

engage in insider trading in crypto assets that were listed or

were under consideration for listing on Coinbase Global, Inc.

("Coinbase"), a major online cryptocurrency exchange platform.

As part of the insider trading scheme, ISHAN WAHI violated his

duties of trust and confidence to Coinbase by providing

confidential business information that he learned in connection

with his employment at Coinbase to NIKHIL WAHI and SAMEER RAMANI

so that they could secretly engage in profitable trades around

public announcements by Coinbase that it would be listing certain crypto assets on Coinbase's exchanges.

2.   ISHAN WAHI, the defendant, was a Coinbase employee involved in the highly confidential process of listing crypto assets on Coinbase's exchanges.  As a result, ISHAN WAHI had detailed and advanced knowledge of which crypto assets Coinbase was planning to list and the timing of public announcements about those listings.  Because the market value of crypto assets typically significantly increased after Coinbase announced that it would be listing a particular asset on its exchanges, Coinbase kept the information strictly confidential and prohibited its employees from sharing that information.  In violation of these policies and his duties of trust and confidence to Coinbase, ISHAN WAHI misappropriated that confidential business information to tip his brother, NIKHIL WAHI, the defendant, and ISHAN WAHI's friend and associate, SAMEER RAMANI, the defendant, so that they could use that confidential information to make well-timed purchases of crypto assets in advance of Coinbase's listing announcements.

3.   After Coinbase's listing decisions became public, and after the crypto assets appreciated due to that announcement, NIKHIL WAHI and SAMEER RAMANI, the defendants, caused the sale of those crypto assets for substantial profits.  In total,

during the course of the scheme, NIKHIL WAHI and RAMANI collectively caused purchases of at least 25 crypto assets in advance of at least 14 separate Coinbase crypto asset listing announcements.  As a result of the insider trading scheme, NIKHIL WAHI and RAMANI collectively generated realized and unrealized gains totaling at least approximately $1.5 million.

4.    The defendants also took numerous steps to evade detection from law enforcement.  Throughout their illegal trading, NIKHIL WAHI and SAMEER RAMANI, the defendants, attempted to conceal their trading by transferring their crypto assets through a web of crypto accounts and anonymous Ethereum blockchain wallets, including through accounts held in others' names.  In or about May 2022, as the illegal insider trading scheme came to light, ISHAN WAHI, the defendant, purchased a one-way airline ticket to a foreign country in an unsuccessful attempt to flee from the United States.

<u>Background</u>

5.    At all times relevant to this Indictment, Coinbase was one of the largest cryptocurrency exchanges in the world. Coinbase allowed users to acquire, exchange, and sell various crypto assets in online user accounts.  In order to transact in a particular crypto asset on Coinbase, that crypto asset must be listed on Coinbase's exchanges.

6.    During the time period relevant to this Indictment, Coinbase frequently announced that particular crypto assets would be listed on one of its exchanges or were under consideration for listing.  Coinbase often made these announcements on Coinbase's publicly available blog or Twitter account.  It was well known that after Coinbase announced that it was going to be listing or was considering listing a particular crypto asset, the market value of that crypto asset typically rose substantially.

7.    Because Coinbase viewed its reputation as a fair forum of exchange as essential to its business success, Coinbase took steps to guard the confidentiality of information regarding prospective asset listings and to ensure that potential traders did not learn of prospective listings before the company announced them formally to the general public. The company's policies and agreements thus prohibited employees from using confidential information about asset listings, including which crypto assets it intended to list on its exchanges, except for the benefit of Coinbase. Indeed, Coinbase's policies made clear that employees "helping to implement support of [a] new asset" were prohibited from "buy[ing] the new asset" in advance of an announcement.  Coinbase's written policies also prohibited employees from disclosing the confidential information to any

4

person outside of Coinbase, including "family or friends," and expressly barred employees from providing a "tip" to any person who might make a trading decision based on the information.

8.    Beginning in or about October 2020, ISHAN WAHI, the defendant, was employed by Coinbase as a product manager assigned to an asset listing team.  Pursuant to the policies described above, and by virtue of his employment more generally, ISHAN WAHI was prohibited from sharing confidential business information about Coinbase's asset listings with others and from using that information other than for the benefit of his employer.  Moreover, as a member of Coinbase's asset listing team, ISHAN WAHI was subject to an "enhanced trading policy" that, among other things, required him to report his digital asset holdings and seek preclearance for any digital asset trades conducted by ISHAN WAHI outside of Coinbase's platform. During the course of his employment at Coinbase, ISHAN WAHI provided Coinbase with a written certification that he had read the company's trading and confidentiality policies, that he understood them, and that he would comply with them.

9.    As a product manager on one of Coinbase's asset listing teams, ISHAN WAHI, the defendant, frequently had advanced knowledge of which crypto assets Coinbase planned to announce it was listing or considering listing, and had advanced

5

knowledge of the timing of those announcements.  Indeed, beginning at least in or about August 2021 and continuing until at least in or about May 2022, ISHAN WAHI was a member of a private messaging channel reserved for a small number of Coinbase employees with direct involvement in the Coinbase asset listing process.  Upon joining the channel, ISHAN WAHI was informed by another Coinbase employee that its purpose was to provide a "safe place to discuss details around asset launches" such as "exact announcement / launch dates + timelines" that the company did not wish to share with all of its employees.

10.   ISHAN WAHI, the defendant, knew that the asset listing information discussed within the messaging channel was highly confidential or "need to know" and not to be shared outside what ISHAN WAHI himself referred to as the "tighter circle" of Coinbase employees involved in the asset listing.  ISHAN WAHI also knew that due to the highly confidential nature of asset listing information, he and other Coinbase employees with access to the information were prohibited from trading in assets under consideration for listing on Coinbase and tipping others so that they could trade on that information, no matter the forum in which the trading took place.

11.   In connection with the scheme, ISHAN WAHI, the defendant, sought to deceive Coinbase and his fellow employees

by assuring them – through, among other means, Coinbase's
private asset listing messaging channel (including interstate
wire communications sent from ISHAN WAHI to a fellow Coinbase
employee located in Manhattan, New York) – that he was
maintaining the confidentiality of this information.  In truth
and in fact, however, ISHAN WAHI repeatedly breached his duty of
confidentiality to Coinbase by misappropriating Coinbase's
confidential information and providing it to his brother, NIKHIL
WAHI, the defendant, and ISHAN WAHI's friend and associate,
SAMEER RAMANI, the defendant, so that they could make profitable
trades on the basis of that confidential information.

The Insider Trading Scheme

12.  On numerous occasions beginning at least in or about
June 2021 and continuing through in or about April 2022, ISHAN
WAHI, the defendant, knew in advance both that Coinbase planned
to list particular crypto assets and when Coinbase intended to
make its public announcements of those asset listings, and
misappropriated this Coinbase confidential information by
providing it to either NIKHIL WAHI or SAMEER RAMANI, the
defendants, so that they could place profitable trades in
advance of Coinbase's public listing announcements.  Upon
learning Coinbase's confidential listing plans, NIKHIL WAHI and
SAMEER RAMANI used anonymous Ethereum blockchain wallets to

7

acquire certain crypto assets shortly before Coinbase publicly announced that it was listing or considering listing those same assets on its exchanges.

13. Based on confidential information provided by ISHAN WAHI, the defendant, NIKHIL WAHI and SAMEER RAMANI, the defendants, collectively traded shortly in advance of at least 14 separate Coinbase public listing announcements concerning at least 25 different crypto assets, and then, in most instances, subsequently sold the crypto assets they had acquired for a profit. These trades collectively led to realized and unrealized gains totaling at least approximately $1.5 million. For example:

<em>Insider Trading in TRIBE</em>

a. In or about August 2021, as a result of his employment at Coinbase, ISHAN WAHI learned of Coinbase's intention to publicly announce that it was listing the crypto asset TRIBE on its exchanges. Because ISHAN WAHI was among a small group of Coinbase employees privy to Coinbase's confidential listing plans, he had access to detailed and specific information regarding when Coinbase's public announcement that it was listing TRIBE would occur. In breach of his duty of confidentiality to Coinbase, ISHAN WAHI tipped his brother, NIKHIL WAHI, about Coinbase's plan to list TRIBE.

b.    With advance knowledge of Coinbase's listing

plans, on or about August 10, 2021, NIKHIL WAHI caused an

anonymous Ethereum blockchain wallet – which has since been

linked to NIKHIL WAHI through internet protocol ("IP") address

records and blockchain analysis – to purchase approximately

$60,000 worth of TRIBE tokens.  NIKHIL WAHI caused these

purchases to be made in an anonymous Ethereum blockchain wallet

mere minutes before Coinbase publicly announced that it would be

listing TRIBE on its exchanges on August 10, 2021.  Following

that announcement, the value of TRIBE increased substantially.

The following day, NIKHIL WAHI, through multiple transactions,

exchanged all of the TRIBE tokens for crypto stablecoins (each

equivalent in value to 1 United States dollar) worth

approximately $67,000, resulting in a profit of approximately

$7,000.

## Insider Trading in XYO

c.    In or about August 2021, as a result of his

employment at Coinbase, ISHAN WAHI learned of Coinbase's

intention to publicly announce that it was listing the crypto

asset XYO on its exchanges.  Because ISHAN WAHI was among a

small group of Coinbase employees privy to Coinbase's

confidential listing plans, he had access to detailed and

specific information regarding when Coinbase's public

9

announcement that it was listing XYO would occur.   In breach of
his duty of confidentiality to Coinbase, ISHAN WAHI tipped his
friend and associate, RAMANI, about Coinbase's plan to list XYO.

d.   With advance knowledge of Coinbase's listing
plans, between on or about August 31, 2021 and on or about
September 8, 2021, RAMANI caused a network of approximately 15
separate anonymous Ethereum blockchain wallets – which have
since been linked to RAMANI through either IP address records or
blockchain analysis – to purchase approximately $610,000 worth
of XYO tokens.  Following the September 8, 2021 Coinbase listing
announcement, the value of XYO increased substantially.  SAMEER
RAMANI then caused the XYO tokens that he had acquired to be
transferred to accounts held at a centralized exchange subject
to his control. At the time of those transfers the assets had
risen in value to being worth approximately $1.5 million, and
RAMANI had reaped gains of nearly $900,000.

<u>*Insider Trading in ALCX, GALA, ENS, and POWR*</u>

e.   In or around November 2021, as a result of his
employment at Coinbase, ISHAN WAHI learned of Coinbase's
intention to publicly announce that it was listing the crypto
assets ALCX, GALA, ENS, and POWR on its exchanges.  Because
ISHAN WAHI was among a small group of Coinbase employees privy
to Coinbase's confidential listing plans, he had access to

10

detailed and specific information regarding when Coinbase's
public announcement that it was listing ALCX, GALA, ENS, and
POWR would occur.  In breach of his duty of confidentiality to
Coinbase, ISHAN WAHI tipped his brother, NIKHIL WAHI, about
Coinbase's plan to list ALCX, GALA, ENS, and POWR.

      f.  With advance knowledge of Coinbase's listing
plans, on or about November 15, 2021, NIKHIL WAHI caused
anonymous Ethereum blockchain wallets – which have since been
linked to NIKHIL WAHI through IP address records and blockchain
analysis – to purchase approximately $134,000 worth of ALCX,
GALA, ENS, and POWR tokens.  NIKHIL WAHI caused certain of these
purchases to be made in an anonymous Ethereum blockchain wallet
mere minutes before Coinbase publicly announced that it would be
listing ALCX, GALA, ENS, and POWR on its exchanges on November
15, 2021.  Following that November 15, 2021 announcement, the
value of certain of the tokens that NIKHIL WAHI had acquired
increased substantially.  NIKHIL WAHI then exchanged certain of
the crypto tokens that he had acquired for stablecoins and
transferred the remainder of the tokens and the stablecoin
proceeds to accounts subject to his control.  NIKHIL WAHI's
trading collectively resulted in profits of approximately
$13,000.

*Insider Trading Ahead of the April 2022 Announcement*

g.   In or around April 2022, as a result of his employment at Coinbase, ISHAN WAHI learned of Coinbase's intention to publicly announce that it was considering potentially listing dozens of crypto assets on its exchanges. Because ISHAN WAHI was among a small group of Coinbase employees privy to Coinbase's confidential listing plans, he had access to detailed and specific information regarding when Coinbase's public announcement that it was considering listing these various crypto tokens would occur.  In breach of his duty of confidentiality to Coinbase, ISHAN WAHI tipped his friend and associate, RAMANI, about Coinbase's plan to announce that certain crypto assets were under consideration for listing on Coinbase's exchanges.

h.   With advanced knowledge of Coinbase's listing plans, RAMANI caused multiple anonymous Ethereum blockchain wallets – which have since been linked to RAMANI through IP address records and blockchain analysis – to purchase large quantities of at least six of the crypto assets that were to be included in Coinbase's April 11, 2022 listing announcement. RAMANI spent at least approximately $370,000 to acquire these crypto assets in advance of the April 11, 2022 announcement. Following Coinbase's April 11, 2022 public announcement

12

regarding the crypto assets that were under consideration for listing, the crypto assets purchased by RAMANI quickly thereafter appreciated by over at least over $195,000.

14.   To conceal their purchases of crypto assets in advance of Coinbase's listing announcements, NIKHIL WAHI and SAMEER RAMANI, the defendants, used accounts at centralized exchanges held in the names of others, and transferred funds, crypto assets, and proceeds of their scheme through multiple anonymous Ethereum blockchain wallets.  NIKHIL WAHI and RAMANI also regularly created and used new Ethereum blockchain wallets without any prior transaction history in order to further conceal their involvement in the scheme.

### ISHAN WAHI's Attempt to Flee the United States

15.   Shortly after SAMEER RAMANI, the defendant, traded in advance of Coinbase's listing announcement on April 11, 2022, on or about April 12, 2022, a Twitter account that is well known in the crypto community, with hundreds of thousands of followers, tweeted that it had identified an Ethereum blockchain wallet "that bought hundreds of thousands of dollars of tokens exclusively featured in the Coinbase Asset Listing post about 24 hours before it was published." The trading activity referenced in the April 12, 2022 tweet was the trading caused by RAMANI on or about April 11, 2022.  On April 13, 2022, Coinbase's Chief

Security Officer publicly replied on Twitter to the April 12, 2022 tweet, and stated that Coinbase had already begun investigating the matter.

16.  On or about April 28, 2022, Coinbase's Chief Executive Officer posted on the company's publicly accessible blog that the company was investigating whether "someone inside Coinbase" leaked the company's confidential information "to outsiders engaging in illegal activity," and that any Coinbase employee who engaged in such activity would be "immediately terminated and referred to relevant authorities (potentially for criminal prosecution)."

17.  Less than two weeks later, on May 11, 2022, and in connection with Coinbase's investigation of leaked confidential information, the company's director of security operations emailed ISHAN WAHI, the defendant, to inform him that he should appear for an in-person meeting relating to Coinbase's asset listing process at Coinbase's Seattle, Washington office on May 16, 2022.  ISHAN WAHI confirmed he would attend the meeting.

18.  After learning that he was going to be interviewed as part of Coinbase's investigation, ISHAN WAHI, the defendant, attempted leave the United States and flee to India. Specifically, on the evening of Sunday, May 15, 2022, the night before his meeting with Coinbase was scheduled to occur, ISHAN

WAHI purchased a one-way ticket for a flight to New Delhi, India that was scheduled to depart approximately 11 hours later, shortly before he was supposed to be interviewed by Coinbase. Prior to boarding the flight, ISHAN WAHI falsely told Coinbase employees with whom he worked that he already had departed for India, when in truth and in fact he had not, claiming that he was "out indefinitely" and that his departure was due to a medical emergency involving his father.  Approximately thirty-five minutes before his scheduled departure time, ISHAN WAHI wrote to Coinbase's director of security operations that he "had to fly back home" but that the meeting could be rescheduled to occur later in the week or early the next week.

19.  In the hours between booking the one-way flight to India and his scheduled departure time on May 16, 2022, ISHAN WAHI, the defendant, called and texted NIKHIL WAHI and SAMEER RAMANI, the defendants, about Coinbase's investigation, and sent both of them a photograph of the messages he had received on May 11, 2022 from Coinbase's director of security operations.

20.  Prior to boarding his May 16, 2022, flight to India, ISHAN WAHI, the defendant, was stopped by law enforcement agents and prevented from leaving the country.  Despite his claims to Coinbase's director of security operations that he could reschedule his meeting for later that week or early the next

15

week, ISHAN WAHI was traveling on a one-way ticket to India with

an extensive array of belongings, including, among other items,

three large suitcases, seven electronic devices, two passports,

multiple other forms of identification, hundreds of dollars in

U.S. currency, financial documents, and other personal effects

and items.

<u>Statutory Allegations</u>

21.   From at least in or about July 2021, up to and

including in or about May 2022, in the Southern District of New

York, and elsewhere, ISHAN WAHI and NIKHIL WAHI, the defendants,

and others known and unknown, willfully and knowingly, did

combine, conspire, confederate, and agree together and with each

other to commit wire fraud, in violation of Title 18, United

States Code, Sections 1343.

22.   It was a part and object of the conspiracy that ISHAN

WAHI and NIKHIL WAHI, the defendants, and others known and

unknown, knowingly having devised and intending to devise a

scheme and artifice to defraud and for obtaining money and

property by means of false and fraudulent pretenses,

representations, and promises, would and did transmit and cause

to be transmitted by means of wire and radio communication in

interstate and foreign commerce, writings, signs, signals,

pictures, and sounds for the purpose of executing such scheme

and artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Conspiracy to Commit Wire Fraud)

The Grand Jury further charges:

23.   The allegations contained in paragraphs 1 through 20 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

24.   From at least in or about June 2021, up to and including in or about May 2022, in the Southern District of New York, and elsewhere, ISHAN WAHI and SAMEER RAMANI, the defendants, and others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Sections 1343.

25.   It was a part and object of the conspiracy that ISHAN WAHI and SAMEER RAMANI, the defendants, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals,

pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

### COUNT THREE
### (Wire Fraud)

The Grand Jury further charges:

26.   The allegations contained in paragraphs 1 through 20 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

27.   From at least in or about July 2021 up to and including at least in or about May 2022, in the Southern District of New York and elsewhere, ISHAN WAHI and NIKHIL WAHI, the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, ISHAN WAHI and NIKHIL WAHI participated in a scheme to deprive Coinbase of its exclusive use of confidential business information related to Coinbase's plans to list certain crypto assets on its exchanges by converting that

18

information to their own use and relying on it to engage in profitable trades in crypto assets, in breach of ISHAN WAHI's duties of trust and confidence to Coinbase.

(Title 18, United States Code, Section 1343 and 2.)

## COUNT FOUR
### (Wire Fraud)

The Grand Jury further charges:

28.   The allegations contained in paragraphs 1 through 20 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

29.   From at least in or about June 2021 up to and including at least in or about May 2022, in the Southern District of New York and elsewhere, ISHAN WAHI and SAMEER RAMANI, the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, ISHAN WAHI and SAMEER RAMANI participated in a scheme to deprive Coinbase of its exclusive use of confidential business information related to Coinbase's plans to list certain crypto assets on its exchanges by converting that

19

information to their own use and relying on it to engage in profitable trades in crypto assets, in breach of ISHAN WAHI's duties of trust and confidence to Coinbase.

(Title 18, United States Code, Section 1343 and 2.)

## FORFEITURE ALLEGATION

30.  As a result of committing one or more of the offenses alleged in Counts One through Four of this Indictment, ISHAN WAHI, NIKHIL WAHI, and SAMEER RAMANI, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

### Substitute Assets Provision

31.  If any of the above-described forfeitable property, as a result of any act or omission of ISHAN WAHI, NIKHIL WAHI, and SAMEER RAMANI, the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third person;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be subdivided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461, to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)


FOREPERSON

DAMIAN WILLIAMS
United States Attorney


21

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

ISHAN WAHI,
NIKHIL WAHI, and
SAMEER RAMANI

Defendants.

SEALED INDICTMENT

22 Cr. ___

(18 U.S.C. §§ 1343, 1349, & 2)

DAMIAN WILLIAMS
United States Attorney.

A TRUE BILL

Foreperson.

# EXHIBIT B

