1

2

3

4

5

6

7

8

THE HONORABLE TANA LIN

9

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**SEATTLE DIVISION**

10 | SECURITIES AND EXCHANGE
COMMISSION,

11 | Plaintiff, | No. 2:22-cv-01009

12 | | **DEFENDANTS ISHAN AND NIKHIL**
**WAHI'S MOTION TO DISMISS**

13 | v.

14 | ISHAN WAHI, NIKHIL WAHI, and
SAMEER RAMANI, | NOTE ON MOTION CALENDAR:
**12th** day of May, 2023.

15 | Defendants. | ORAL ARGUMENT REQUESTED

16

17

18

19

20

21

22

23

24

25

26

27

MOTION TO DISMISS
CASE NO. 2:22-CV-01009

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

1

## **TABLE OF CONTENTS**

2

**Page**

3   TABLE OF AUTHORITIES ................................................................................................. iv

4   INTRODUCTION ............................................................................................................... 1

5   BACKGROUND ................................................................................................................. 3

6       A.   Crypto and Blockchain Technology ........................................................... 3

7       B.   Platforms and Blockchain Protocols ......................................................... 5

8       C.   Digital Asset Exchanges ............................................................................ 8

9       D.   The SEC's Action Against Ishan Wahi ..................................................... 8

10  SUMMARY OF ARGUMENT ........................................................................................ 10

11  LEGAL STANDARD ....................................................................................................... 13

12  ARGUMENT ................................................................................................................... 13

13  I.   THE TOKENS ARE NOT "INVESTMENTS CONTRACTS" UNDER THE SECURITIES LAWS ....... 13

14      A.   The Term "Investment Contract" Had a Settled Meaning in 1933

15          That Congress "Crystallized" Within the Securities Laws ..................... 14

16          1.   The phrase "investment contract" is a term of art derived

17              from state "blue sky" laws ............................................................ 15

18          2.   Congress incorporated that term of art into the securities laws ...................... 16

19          3.   The traditional definition of "investment contract" has several

20              "essential ingredients" ................................................................. 17

21              (a)   A Contract ........................................................................ 18

22              (b)   Post-Sale Obligations ...................................................... 18

23              (c)   Right to Share Profits ...................................................... 20

24      B.   None of the Tokens at Issue Fits the Traditional Definition of an

25          "Investment Contract" ............................................................................. 20

26

27

MOTION TO DISMISS - i
CASE NO. 2:22-cv-01009

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

1           1.    None of the tokens involves a contract between the developers

2                  and the token-holder ................................................................... 21

3           2.    None of the tokens comes with post-sale obligations on the part

4                  of the developers ........................................................................ 22

5           3.    None of the tokens furnishes a legal right to share in profits ........................ 24

6      C.    Following the Traditional Definition of "Investment Contract"

7           Makes Sense ....................................................................................... 25

8  II.   BOTH *HOWEY* AND THE MAJOR QUESTIONS DOCTRINE FORECLOSE THE

9      SEC'S ATTEMPT TO SCRAP THE TRADITIONAL DEFINITION OF AN

10     "INVESTMENT CONTRACT" ...................................................................... 27

11     A.    Neither *Howey* Nor Its Progeny Gives the SEC License to Depart

12         From the Traditional Definition of an "Investment Contract" ............................... 28

13         1.    The SEC misreads *Howey* .......................................................... 29

14         2.    The uniform practice of the Supreme Court and the Ninth Circuit

15            confirms the SEC's error ............................................................. 30

16     B.    The Major Questions Doctrine Confirms the SEC May Not Jettison the

17         Traditional Definition of "Investment Contract" Here ......................................... 33

18         1.    How to regulate digital assets is a major question requiring clear

19            congressional authorization before an agency may act ................................ 34

20         2.    The SEC lacks clear congressional authorization to deem the

21            tokens at issue to be "securities" .................................................... 35

22     C.    Due Process Concerns Similarly Militate Against the SEC's Position ................. 39

23  III.  THE TOKENS ARE NOT "INVESTMENT CONTRACTS" UNDER *HOWEY*'S TERMS ALONE ..... 40

24     A.    None of the Tokens Involves a "Common Enterprise" ........................................... 41

25         1.    None of the tokens satisfies horizontal commonality ..................................... 41

26         2.    None of the tokens satisfies strict vertical commonality ............................... 44

27

MOTION TO DISMISS - ii

CASE NO. 2:22-cv-01009

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

| | | | |
|---|---|---|---|
| | 3. | There is no investment *in* any common enterprise | 47 |
| B. | | All Tokens Fail the "Expectation of Profits" Prong | 48 |
| | 1. | All of the tokens are "utility tokens" | 48 |
| | 2. | The value of each token is driven by market forces | 52 |
| C. | | The "Initial Coin Offering" Cases Are Irrelevant Here | 54 |

IV.    THE SEC'S AMENDED COMPLAINT DOES NOT PLAUSIBLY ALLEGE SCIENTER ................ 59

CONCLUSION ................................................................................................ 61

MOTION TO DISMISS - iii
CASE NO. 2:22-cv-01009

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
  141 S. Ct. 2485 (2021) (per curiam)......................................................................39

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...........................................................................................13

*Balestra v. ATBCOIN LLC*,
  380 F. Supp. 3d 340 (S.D.N.Y. 2019) ...................................................54, 56, 58

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...........................................................................................13

*Bobrowski v. Red Door Grp., Inc.*,
  No. CV-09-02077, 2011 WL 3875424 (D. Ariz. Aug. 31, 2011) .......................46

*Brodt v. Bache & Co.*,
  595 F.2d 459 (9th Cir. 1978)........................................................................44, 45

*Bronstein v. Bronstein*,
  407 F. Supp. 925 (E.D. Pa. 1976).......................................................................48

*Chapman v. Rudd Paint & Varnish Co.*,
  409 F.2d 635 (9th Cir. 1969)..............................................................................32

*Continental Marketing Corp. v. SEC*,
  387 F.2d 466 (10th Cir. 1967).................................................................13, 14, 36

*Creasey Corp. v. Enz Bros. Co.*,
  187 N.W. 666 (Wis. 1922) ...........................................................................19, 20

*Daniels-Hall v. Nat'l Educ. Ass'n*,
  629 F.3d 992 (9th Cir. 2010)..............................................................................31

MOTION TO DISMISS - iv
CASE NO. 2:22-cv-01009

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

*Davis v. Metro Prods., Inc.*,
  885 F.2d 515 (9th Cir. 1989) ........................................................................................31

*De Luz Ranchos Inv. Ltd. v. Coldwell Banker & Co.*,
  608 F.2d 1297 (9th Cir. 1979) ...........................................................................23, 24, 32

*Dougherty v. City of Covina*,
  654 F.3d 892 (9th Cir. 2011) ........................................................................................13

*El Khadem v. Equity Sec. Corp.*,
  494 F.2d 1225 (9th Cir. 1974) ......................................................................................32

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976) ......................................................................................................59

*FAA v. Cooper*,
  566 U.S. 284 (2012) ......................................................................................................14

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ................................................................................................34, 36

*Godecke v. Kinetic Concepts, Inc.*,
  937 F.3d 1201 (9th Cir. 2019) ......................................................................................13

*Grenader v. Spitz*,
  537 F.2d 612 (2d Cir. 1976) .........................................................................................53

*Hanneman v. Gratz*,
  170 Minn. 38 (1927) .....................................................................................................19

*Happy Inv. Grp. v. Lakeworld Props., Inc.*,
  396 F. Supp. 175 (N.D. Cal. 1975) ..............................................................................24

*Hocking v. Dubois*,
  839 F.2d 560 (9th Cir. 1988) ...........................................................................41, 42, 43

*Hocking v. Dubois*,
  885 F.2d 1449 (9th Cir. 1989) (en banc) ..........................................................31, 41, 43

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

*Hollinger v. Titan Cap. Corp.,*

    914 F.2d 1564 (9th Cir. 1990) (en banc) ................................................................59

*Int'l Bhd. of Teamsters v. Daniel,*

    439 U.S. 551 (1979) ................................................................13

*Kerst v. Nelson,*

    171 Minn. 191 (1927)................................................................18, 19, 20

*Klatt v. Guaranteed Bond Co.,*

    250 N.W. 825 (Wis. 1933) ................................................................18

*L.A. Tr. Deed & Mortg. Exch. v. SEC,*

    285 F.2d 162 (9th Cir. 1960) ................................................................32

*Lavery v. Kearns,*

    792 F. Supp. 847 (D. Me. 1992)................................................................43

*Lehman Bros. Com. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.,*

    179 F. Supp. 2d 159 (S.D.N.Y. 2001) ................................................................54

*Lewis v. Creasey Corp.,*

    248 S.W. 1046 (Ky. 1923)................................................................16, 19, 20

*Marini v. Adamo,*

    812 F. Supp. 2d 243 (E.D.N.Y. 2011) ................................................................46

*McCormick v. Shively,*

    267 Ill. App. 99 (1932) ................................................................19

*Meyer v. Thomas & McKinnon Auchincloss Kohlmeyer, Inc.,*

    686 F.2d 818 (9th Cir. 1982) ................................................................45

*Mordaunt v. Incomco,*

    686 F.2d 815 (9th Cir. 1982) ................................................................44, 45, 46

*New Prime Inc. v. Oliveira,*

    139 S. Ct. 532 (2019) ................................................................14

**JONES DAY**

51 Louisiana Ave, NW

Washington, D.C., 20001

Tel. 202-879-5429 • jonesday.com

*Noa v. Key Futures, Inc.*,

    638 F.2d 77 (9th Cir. 1980) (per curiam) ........................................................48, 52

*Parvin v. Davis Oil Co.*,

    524 F.2d 112 (9th Cir. 1975) ...................................................................................32

*Penfield Co. of Cal. v. SEC*,

    143 F.2d 746 (9th Cir. 1944) ............................................................................32, 36

*People v. Claggett*,

    19 P.2d 805 (Cal. Ct. App. 1933) ............................................................................20

*People v. White*,

    124 Cal. App. 548 (1932) ..................................................................................16, 19

*Prohaska v. Hemmer-Miller Dev. Co.*,

    256 Ill. App. 331 (1930) ....................................................................................18, 19

*Revak v. SEC Realty Corp.*,

    18 F.3d 81 (2d Cir. 1994) .......................................................................42, 43, 44, 46

*Rice v. Branigar Org., Inc.*,

    922 F.2d 788 (11th Cir. 1991) .................................................................................51

*Rodriguez v. Banko Cent. Corp.*,

    990 F.2d 7 (1st Cir. 1993) .......................................................................................23

*Safeway Portland Emps.' Fed. Credit Union v. C. H. Wagner & Co.*,

    501 F.2d 1120 (9th Cir. 1974) .................................................................................32

*Salameh v. Tarsadia Hotel*,

    726 F.3d 1124 (9th Cir. 2013) ...............................................................32, 47, 48, 51

*SEC v. Bailey*,

    41 F. Supp 647 (S.D. Fla. 1941) .............................................................................31

*SEC v. Belmont Reid & Co., Inc.*,

    794 F.2d 1388 (9th Cir. 1986) .................................................................................52

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

*SEC v. C.M. Joiner Leasing Corp.*,

    320 U.S. 344 (1943) ..............................................................................................31, 36

*SEC v. Commodity Options Int'l, Inc.*,

    553 F.2d 628 (9th Cir. 1977) ...............................................................................32

*SEC v. Edwards*,

    540 U.S. 389 (2004) ......................................................................17, 30, 31, 36

*SEC v. Eurobond Exch., Ltd.*,

    13 F.3d 1334 (9th Cir. 1994) ..............................................................................31, 45

*SEC v. Glenn W. Turner Ents., Inc.*,

    474 F.2d 476 (9th Cir. 1973) ......................................................................32, 52, 53

*SEC v. Goldfield Deep Mines Co. of Nev.*,

    758 F.2d 459 (9th Cir. 1985) ..............................................................................32, 36

*SEC v. Hui Feng*,

    935 F.3d 721 (9th Cir. 2019) ...............................................................................31

*SEC v. Kik Interactive Inc.*,

    492 F. Supp. 3d 169 (S.D.N.Y. 2020) ..............................................54, 56, 57, 58

*SEC v. LBRY, Inc.*,

    No. 21-cv-260, 2022 WL 16744741 (D.N.H. Nov. 7, 2022) ...............................54

*SEC v. Life Partners, Inc.*,

    87 F.3d 536 (D.C. Cir. 1996)...............................................................................26

*SEC v. Murphy*,

    626 F.2d 633 (9th Cir. 1980) ...............................................................................32

*SEC v. Mut. Benefits Corp.*,

    408 F.3d 737 (11th Cir. 2005) .............................................................................53

*SEC v. Obus*,

    693 F.3d 276 (2d Cir. 2012) ................................................................................59

**JONES DAY**

51 Louisiana Ave, NW

Washington, D.C., 20001

Tel. 202-879-5429 • jonesday.com

*SEC v. R.G. Reynolds Enters., Inc.*,

    952 F.2d 1125 (9th Cir. 1991) ................................................................................................31

*SEC v. Rubera*,

    350 F.3d 1084 (9th Cir. 2003) ..............................................................................15, 31, 36

*SEC v. Schooler*,

    905 F.3d 1107 (9th Cir. 2018) ................................................................................................31

*SEC v. SG Ltd.*,

    265 F.3d 42 (1st Cir. 2001) ....................................................................................................43

*SEC v. Telegram Grp. Inc.*,

    448 F. Supp. 3d 352 (S.D.N.Y. 2020) ..............................................................54, 56, 57, 58

*SEC v. Telegram Grp. Inc.*,

    No. 19-cv-9439, 2020 WL 1547383 (S.D.N.Y. Apr. 1, 2020) ..............................................57

*SEC v. United Benefit Life Ins. Co.*,

    387 U.S. 202 (1967) ................................................................................................................31

*SEC v. Variable Annuity Life Ins. Co.*,

    359 U.S. 65 (1959) ..................................................................................................................31

*SEC v. W.J. Howey Co.*,

    328 U.S. 293 (1946) ..................................................................................................... *passim*

*Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*,

    253 F. Supp. 359 (S.D.N.Y. 1966) ........................................................................................52

*Skilling v. United States*,

    561 U.S. 358 (2010) ................................................................................................................40

*Smith v. Gross*,

    604 F.2d 639 (9th Cir. 1979) ................................................................................................32

*Sprewell v. Golden State Warriors*,

    266 F.3d 979 (9th Cir. 2001) ................................................................................................13

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

*State v. Bushard*,

    205 N.W. 370 (Minn. 1925) ............................................................................................19

*State v. Evans*,

    154 Minn. 95 (1922) ..............................................................................................16, 20

*State v. Gopher Tire & Rubber Co.*,

    146 Minn. 52 (1920) ..............................................................................................15, 16

*State v. Heath*,

    153 S.E. 855 (N.C. 1930) ...............................................................................................18

*State v. Ogden*,

    191 N.W. 916 (Minn. 1923) ............................................................................................20

*State v. Robbins*,

    185 Minn. 202 (1932) .....................................................................................................18

*State v. Robbins*,

    240 N.W. 456 (Minn. 1932) ............................................................................................19

*Stevens v. Liberty Packing Corp.*,

    111 N.J. Eq. 61 (1932) ...........................................................................................16, 20

*Taggart v. Lorenzen*,

    139 S. Ct. 1795 (2019) ...................................................................................................17

*Tcherepnin v. Knight*,

    389 U.S. 332 (1967) .......................................................................................................31

*United Hous. Found., Inc. v. Forman*,

    421 U.S. 837 (1975) ................................................................................................48, 52

*United States v. Carman*,

    577 F.2d 556 (9th Cir. 1978) ..........................................................................................32

*United States v. Farris*,

    614 F.2d 634 (9th Cir. 1979) ..........................................................................................32

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

*United States v. Jones,*

    712 F.2d 1316 (9th Cir. 1983) .................................................................32

*United States v. Kessi,*

    868 F.2d 1097 (9th Cir. 1989) .................................................................32

*United States v. Morse,*

    785 F.2d 771 (9th Cir. 1986) ...................................................................32

*United States v. O'Hagan,*

    521 U.S. 642 (1997) ................................................................................61

*United States v. Reese,*

    92 U.S. 214 (1876) ..................................................................................40

*Utility Air Regulatory Grp. v. EPA,*

    573 U.S. 302 (2014) ..........................................................................34, 36

*Wals v. Fox Hills Dev. Corp.,*

    24 F.3d 1016 (7th Cir. 1994) ...................................................................43

*Warfield v. Alaniz,*

    569 F.3d 1015 (9th Cir. 2008) .......................................................31, 41, 48

*Webster v. Omnitrion Int'l, Inc.,*

    79 F.3d 776 (9th Cir. 1996) .....................................................................31

*West Virginia v. EPA,*

    142 S. Ct. 2587 (2022) ...................................................................... *passim*

*Woodward v. Terracor,*

    574 F.2d 1023 (10th Cir. 1978) ...............................................................24

**STATUTES**

15 U.S.C. § 77b ............................................................................................9, 37

15 U.S.C. § 78j ..................................................................................................9

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

**OTHER AUTHORITIES**

Eli Abrams, *How European Countries Are Using Blockchain to Reform the*

    *Land Registration Process*, EMERGING EUROPE (Aug. 17, 2022) ........................................35

*Asset Legal Review*, Coinbase ........................................................60

Sumathi Bala, *Ripple CEO Says the U.S. Lacks Regulatory Clarity on*

    *Cryptocurrency*, CNBC (Apr. 30, 2021) ...............................................40

Juan Batiz-Benet et al., *The SAFT Project: Toward a Compliant Token Sale*

    *Framework,* PROTOCOL LABS (Oct. 2, 2017) ...........................................55

*Blockchain in Financial Services Startups in the United States*,

    TRACXN (Sept. 20, 2022).............................................................34

3 Harold S. Bloomenthal & Samuel Wolff,

    *Securities and Federal Corporate Law* § 2:26 (2d ed.) ...............................42

Chris Brummer, *Disclosure, Dapps and DeFi*,

    5 Stan. J. Blockchain L. & Pol'y 137 (2022) .........................................37

17 C.F.R. § 240.10b-5 .............................................................9, 59

Lewis Renaudo Cohen, *Ain't Misbehavin': An Examination of Broadway Tickets*

    *and Blockchain Tokens*, 65 Wayne L. Rev. 81 (2019)..................................37

Lewis Rinaudo Cohen et al., *The Ineluctable Modality of Securities Law:*

    *Why Fungible Crypto Assets Are Not Securities* (Nov. 10, 2022)...................28, 32

Coinbase, Coin Center, USV & Consensys, *A Securities Law Framework for*

    *Blockchain Tokens* (Dec. 7, 2016)...................................................60

COINMARKETCAP .................................................................28

Commodity Futures Trading Comm'n, *Digital Assets Primer* (2020)...................37

Michael Corkery & Nathaniel Popper, *From Farm to Blockchain: Walmart*

    *Tracks Its Lettuce*, N.Y. TIMES, Sept. 24, 2018 ....................................35

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

Nate Crosser, *Initial Coin Offerings As Investment Contracts: Are Blockchain*

    *Utility Tokens Securities?*, 67 U. Kan. L. Rev. 379 (2018)....................................51

*Crypto Rating Council's Securities Law Framework*, Crypto Rating Council

    (May 10, 2021) ..........................................................................................................60

*De Beers Group Successfully Tracks First Diamonds from Mine to Retail on*

    *Industry Blockchain*, DE BEERS GRP. (May 10, 2018) ............................................35

Fed. R. Civ. P. 12 ..........................................................................................................13, 61

Financial Services GOP (@FinancialCmte),

    TWITTER (Jan. 26, 2023, 1:20 PM)......................................................................38

Fixing Aid, *Can Blockchain Help Fix the I.D. Problem for a Billion People?*,

    NEW HUMANITARIAN (Mar. 31, 2022).....................................................................35

Thomas Franck, *One in Five Adults Has Invested in, Traded or Used*

    *Cryptocurrency*, *NBC News Poll Shows*, CNBC (Mar. 31, 2022) ........................34

Felix Frankfurter, *Some Reflections on the Reading of Statutes*,

    47 Colum. L. Rev. 527 (1947)..................................................................................28

Carol Goforth, *Securities Treatment of Tokenized Offerings Under U.S. Law*,

    46 Pepp. L. Rev. 405 (2019)..............................................................................49, 50

Carol R. Goforth, *Cinderella's Slipper: A Better Approach to Regulating*

    *Cryptoassets as Securities*, 17 Hastings Bus. L.J. 271 (2021) .............................37

James D. Gordon, *Defining a Common Enterprise in Investment Contracts*,

    72 Ohio St. L.J. 59 (2011) .......................................................................................41

Paul Grewal, *Coinbase Does Not List Securities. End of Story.*,

    Coinbase (July 21, 2022)....................................................................................10, 60

Yuliya Guseva, *A Conceptual Framework for Digital-Asset Securities:*

    *Tokens and Coins as Debt and Equity*, 80 Md. L. Rev. 166 (2021)..................55, 56

H.R. 923 (Jan. 30, 2019)...........................................................................................38

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

H.R. 1602 (Mar. 8, 2021) .............................................................................38

H.R. 1628 (Mar. 8, 2021) .............................................................................38

H.R. 4451 (July 16, 2021) ......................................................................38, 39

H.R. 6154 (Mar. 9, 2020) .............................................................................38

H.R. 7614 (Apr. 28, 2022) ............................................................................38

Handbook, *Proceedings of the National Conference of Commissioners on*

    *Uniform State Laws* (1929) .....................................................................15

*Is XRP a Security?  We May Never Know*, COIN TELEGRAPH (Sept. 29, 2019) .........................40

Matt Levine, *The Crypto Story*, BLOOMBERG BUSINESSWEEK, Oct. 31, 2022 .............................3

Jonathan R. Macey & Geoffrey P. Miller, *Origin of the Blue Sky Laws*,

    70 Tex. L. Rev. 347 (1991) .....................................................................15

Scott W. Maughan, *Utility Token Offerings: Can A Security Transform*

    *into A Non-Security?*, 2019 BYU L. Rev. 1113 (2019) ................................................53, 55

Michelle Neal, *Advances in Digital Currency Experimentation*,

    FED. RES. BANK N.Y. (Nov. 4, 2022) .............................................................28

Note, *Legislation: Uniform Sale of Securities Act*,

    30 Colum. L. Rev. 1184 (1930) .................................................................15

Note, *Pension Plans as "Investment Contracts,"*

    96 U. Pa. L. Rev. 553 (1948) ...............................................................15, 16

Michael J. O'Connor, *Overreaching Its Mandate? Considering the*

    *SEC's Authority to Regulate Cryptocurrency Exchanges*,

    11 Drexel L. Rev. 539 (2019) ...............................................................21, 42

Hester M. Peirce, Comm'r, Secs. & Exch. Comm'n, Outdated: Remarks Before

    the Digital Assets at Duke Conference (Jan. 20, 2023) ................................................ *passim*

Petition for Rulemaking – Digital Assets Securities Regulation,

    SECS. & EXCH. COMM'N (July 21, 2022) .............................................................40

MOTION TO DISMISS - xiv
CASE NO. 2:22-cv-01009

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

Cristina Polizu et al., *A Deep Dive Into Crypto Valuation*,

    S&P GLOBAL (Nov. 10, 2022)........................................................................28

Press Release, Fin. Servs. Comm., McHenry Announces Financial Services

    Subcommittee Chairs and Jurisdiction for 118th Congress (Jan. 12, 2023) ........38

*Q2 2022 Cryptocurrency Report*, COIN GECKO (July 13, 2022) .................................34

Recent Guidance, *SEC, Framework for "Investment Contract" Analysis of*

    *Digital Assets*, 132 Harv. L. Rev. 2418 (2019) .......................................................3

Jamie Redman, *Crypto Employment Abounds with More Than 8,000 Jobs in 2020*

    (Jan. 18, 2020) .........................................................................................................34

Remarks by Senator William H. King, 77 Cong. Rec. 2992 (May 8, 1933)...............16

Kate Rooney, *Crypto Industry Leaders Warn Congress: Figure out Regulation,*

    *or Watch Innovation Leave the US*, CNBC (Sept. 25, 2018) .................................40

S. 4356 (June 7, 2022)................................................................................................38

S. 4760 (Aug. 3, 2022)...............................................................................................38

S. 5030 (Sept. 29, 2022).............................................................................................38

Darren J. Sandler, *Citrus Groves in the Cloud: Is Cryptocurrency Cloud Mining*

    *A Security?*, 34 Santa Clara High Tech. L.J. 250 (2018) ........................................5

Statement, Commodity Futures Trading Comm'n, Statement of

    Commissioner Caroline D. Pham on *SEC v. Wahi* (July 21, 2022) ......................37

U.S. Dep't of Justice, *The Role of Law Enforcement in Detecting, Investigating,*

    *and Prosecuting Criminal Activity Related to Digital Assets* (Sept. 2022)............27

Tom Wilson et al., *Cryptoverse: What Crisis? Venture Capitalists*

    *Bet Big on Crypto*, REUTERS (July 26, 2022) ........................................................34

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

1

**INTRODUCTION**

2    This case is about the rule of law and whether the most powerful entity in our society—

3 the United States Government—must abide by the law when it brings its power to bear against a

4 person.  In this case, the Securities and Exchange Commission ("SEC") is trying to seize broad

5 regulatory jurisdiction over a massive new industry via an enforcement action against a 32-year-

6 old former Coinbase employee and his kid brother.  An enforcement action against individual

7 people—particularly ones who are already occupied with federal criminal proceedings at the

8 other end of the country—is not how major questions of law that loom over entire industries

9 should be resolved.  Yet that is how the SEC has chosen to proceed.

10    The legal deficiencies in the SEC's Amended Complaint are serious, and the Court should

11 not allow the Agency's brute-force approach to obscure them.  The linchpin of the Amended

12 Complaint is that the digital assets Ishan Wahi, his brother, and the other defendant traded are

13 "securities" under the Exchange Act.  Specifically, the SEC claims that each of those digital

14 assets constitutes an "investment contract" (and thus a security).  The SEC is wrong.  The term

15 "investment contract" requires—as the statute says—a *contract*.  But here there are no contracts,

16 written or implied.  The developers who created the tokens at issue have no obligations

17 whatsoever to purchasers who later bought those tokens on the secondary market.  And with zero

18 contractual relationship, there cannot be an "investment contract."  It is that simple.

19    But even if there *could* be an "investment contract" absent contractual obligations of any

20 kind, the SEC's Amended Complaint would still fail.  On the SEC's account, there is an

21 "investment contract" whenever a person is "led to invest money in a common enterprise with

22 the expectation that they would earn a profit solely through the efforts of the promoter or of some

23 one other than themselves."  *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946).  But *this* case

24 involves standalone digital tokens purchased over exchanges.  Such token-buyers are not part of

25 any "common enterprise"; they do not pool their assets together as part of some shared endeavor;

26 and their fortunes are not tied to those of the original developers.  In fact, such buyers do not put

27

MOTION TO DISMISS - 1
CASE NO. 2:22-CV-01009

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

their money *in* an enterprise at all; they send their money to unrelated third-parties in exchange for an asset—no different from when someone buys a baseball card on the secondary market. Nor do these token buyers expect the tokens' value to rise "solely" (or even predominantly) "through" the efforts of the original developers.  Rather, as the SEC's Amended Complaint readily accepts, the tokens' value is driven by *market forces*, not *managerial efforts*—as evidenced by the fact that the tokens are almost all functional (*i.e.*, they can operate without any centralized intermediary) and that each experiences wide price fluctuations, regardless of the status of the underlying platform.  Indeed, the SEC's *entire theory* is that the Defendants allegedly got ahead of information about these tokens being listed on an exchange—*not* that they had unique information about the "efforts" of the developers or some other "promoter."

Even if the SEC could show that the tokens at issue satisfy *Howey*'s definition of an investment contract, its Amended Complaint fails to adequately allege scienter.  Nowhere has the SEC alleged that the Defendants traded tokens with the mental state necessary to establish federal securities fraud.  To the contrary, nobody—neither the SEC nor the legion of sophisticated counsel advising Coinbase—considered the tokens at issue to be securities before the SEC filed this suit.  Because the SEC cannot establish that the Wahis had the culpable state of mind necessary to commit securities fraud, the Amended Complaint must be dismissed.

If the SEC really believes digital assets are securities, it should engage in a rulemaking or other public proceeding explicating that view and providing guidance to regulated parties on its implications.  That orderly process—one administrative agencies have dutifully followed for decades—allows the agency to receive public comments and facilitates a deliberative process, ensuring the agency's position is well grounded in fact and law.  Should regulated parties disagree with the agency's views in its final rule, they would have an opportunity to contest those views in court.  This process ensures the law is clear *before* consequences are imposed—rather than leaving people to guess about an agency's intentions, order their affairs based on that guess, and then suffer substantial penalties via *ex post* enforcement actions if they guess wrong.

MOTION TO DISMISS - 2
CASE NO. 2:22-cv-01009

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

The SEC's parade of one-off enforcement actions against the likes of Kim Kardashian, DJ Khaled, Floyd Mayweather Jr., and now Ishan and Nikhil Wahi is—by contrast—a process designed to produce more heat than light.  As one commentator put it, by pursuing only selective enforcement in alleged fraud cases, "which are more likely to settle out of court," the SEC has largely "precluded judges from interpreting how securities regulations apply to digital assets." Recent Guidance, *SEC, Framework for "Investment Contract" Analysis of Digital Assets*, 132 Harv. L. Rev. 2418, 2425 (2019).  The reality is that Congress has never endorsed the SEC's sweeping view of its own authority, and the courts have interacted with it in only a handful of one-off cases carefully curated by the agency.  The SEC should not be permitted to continue that gambit here, and further calcify its capacious view of its own power.  The Court should dismiss the Amended Complaint.

## BACKGROUND

### A.    Crypto and Blockchain Technology

Much of modern life happens online.  When Fred wants to give Betsy $500, he does not hand her cash; he pulls out his phone and "sends" the money.  Most people "send" the money through an intermediary—PayPal, Venmo, Zelle, etc.  Those intermediaries are linked to Fred's bank account (or carry a balance for him) and they handle the details of getting Fred's money to Betsy.  This basic dynamic is ubiquitous.  Almost every financial transaction or data exchange is executed via one of these intermediaries and thus depends on the intermediary being trustworthy.[1]

One of the key features of so-called "cryptocurrency" is that it can operate without these middlemen.  It is *decentralized*.  The system runs on a diffuse network of different people, rather than through a single intermediary that controls everything.  The technology that makes this possible is "blockchain" technology.  At its essence, a blockchain is an encoded online ledger that is viewable by all and that records all transactions on a given network.

---

[1] For a readable, comprehensive background on cryptocurrency, its function, and its history, see generally Matt Levine, *The Crypto Story*, BLOOMBERG BUSINESSWEEK, Oct. 31, 2022, https://tinyurl.com/ye4cfahf.

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

Returning to Fred and Betsy, suppose that instead of $500 in cash, Fred wanted to give Betsy one Bitcoin.  Fred's Bitcoin would be stored on a "wallet," which is really just an identifiable address on the Bitcoin network.  (The addresses are lengthy alphanumeric strings that look like this: 3J98t1WpEZ73CNmQviecrnyiWrnqRhWNLy.  The addresses do not contain personal information, though some people publicly identify their Bitcoin addresses.)  Because every Bitcoin transaction is verified and recorded by the decentralized Bitcoin network, the network will "know" how many Bitcoin are assigned to Fred's wallet.  If Fred wants to send one of his Bitcoins to Betsy, he simply enters her Bitcoin address into his wallet, which then broadcasts the transfer to the Bitcoin network.

That transaction is, in turn, bundled with other transactions into a group called a "block."  Those blocks are then validated by computers that are part of the network—a process where multiple computers otherwise unconnected from each other independently perform a checking-function to reach a consensus on what transactions just occurred.  Once the block is complete, it is added to the end of the public ledger, creating an updated *chain* of *blocks* against which to evaluate the next set of transactions.  And anyone who cares to look would be able to see that one Bitcoin moved from Fred's Bitcoin address to Betsy's Bitcoin address.  Everything is public.

One of the most important issues in blockchain technology is inducing large numbers of unrelated computer operators to verify transactions accurately.  Instead of a trusted bank in the middle of every transaction, there are thousands of diffused "validators" scattered across a blockchain.  (Bitcoin is the most famous blockchain network, but there are many others.)  One validation method is called "proof-of-work" wherein (to oversimplify a bit) validators run specialized software to solve complex math problems and, in doing so, "confirm" that a particular transaction is legitimate—*e.g.*, that Fred really had a Bitcoin to send to Betsy.  Whichever computer solves the math problem and validates the transaction first receives a "reward" in the form of "tokens" that are usually native to that particular blockchain network.  (Validators on the Bitcoin network earn Bitcoin.)  The other validation method is called "proof-of-stake" where (to

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

oversimplify again) validators essentially post tokens as collateral when they validate transactions.  If the validator validates transactions accurately, the parties executing the transactions pay the validator a fee in tokens.  (This is often called a "gas fee.")  If the validator validates transactions inaccurately, though, the validator risks losing some or all of its "stake."  For major blockchain networks, there are scores of validators.  For instance, there are about a million global Bitcoin validators (commonly called "miners," because validating transactions creates or "mines" Bitcoin that the validator then gets to keep).[2]

This Motion turns principally on the legal status of nine tokens on the "Ethereum" blockchain.

### B.     Platforms and Blockchain Protocols

Blockchain is a general technology and there are different "blockchain networks" (*e.g.*, Bitcoin and Ethereum) upon which other programs are built.  Blockchain networks are governed by "blockchain protocols."  "Protocol" just means rules.  So together, a "blockchain protocol" represents the rules that govern how people interact on a "blockchain network" (*i.e.*, a particular blockchain ledger along with all of the people contributing to and using that ledger).

Take a (relatively) simple example.  Under Bitcoin's protocol, transactions are validated using a proof-of-work consensus mechanism (lots of computers performing extremely complex mathematical calculations).  By contrast, for Ethereum, transactions are validated using a proof-of-stake consensus mechanism (far fewer computers posting assets and then checking the transaction at risk of forfeiting those assets).  Consensus mechanisms are just one way "protocols" may differ.  There are many others.

Developers who want to create "platforms" (*i.e.*, crypto projects) using an existing blockchain network have to decide which network to use.  There are not very many popular blockchain networks.  But there *are* many platforms that are built on top of and incorporate those

---

[2]  *See generally, e.g.*, Darren J. Sandler, *Citrus Groves in the Cloud: Is Cryptocurrency Cloud Mining A Security?*, 34 Santa Clara High Tech. L.J. 250, 253-63 (2018).

MOTION TO DISMISS - 5
CASE NO. 2:22-cv-01009

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

networks—akin to how "apps" on mobile phones are built on and use Apple's iOS or Android. For instance, an online computer game may store its users' essential data on a blockchain (*e.g.*, who has the most points) while using an ordinary cloud server to host its website (something like Amazon Web Services).  Developers choose the best blockchain protocol for their projects.

Platforms frequently incorporate "tokens."  There are many types of tokens.  Some are "utility tokens," which enable people to use a platform's goods and services.  Some are "governance tokens" (which usually are also utility tokens), which give holders the ability to weigh in on how a platform operates, such as through voting.  In all events, tokens are simply digital assets that serve some basic purpose on a given platform.

Here is one example.  "Brave" is a privacy-focused web browser that shields users from pop-up ads and tracking cookies.  To compensate content creators and websites in the absence of these traditional sources of revenue, the browser uses the "Basic Attention Token" (BAT). People using Brave can earn BATs by choosing to watch certain ads that are accessible through the browser.  And then people can use their BATs to tip their favorite content creators.  The value of a BAT derives in part from the fact people can trade it over exchanges (more on that below).

As this example suggests, there are many ways people can get tokens—validating (*i.e.*, confirming) transactions is not the only one.  Sometimes, developers create tokens and distribute them for free to promote broad adoption of the underlying platform.  In other instances, developers will sell pre-functional tokens to raise money for building a potential platform—a process sometimes called an "initial coin offering" (or "ICO").  Moreover, developers will quite often provide an incentive to productively use their platforms by rewarding users with tokens for performing certain actions (*e.g.*, choosing to watch ads on Brave).

As noted, this case principally involves nine tokens for nine platforms "built on top" of the Ethereum network.  For reasons not relevant here, Ethereum is very popular among developers because its protocol makes it easy for developers to create tokens for the platforms that ultimately run on the Ethereum network.  For instance, returning to Brave and Basic

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

1  Attention Tokens, if Tom wanted to send Jane 10 BATs because of her funny cat video, that

2  transaction would be packaged into a block on the Ethereum network, and then confirmed by its

3  validators, who in doing so confirm Tom had 10 BATs to give.  The validators would earn a

4  small amount of the token native to Ethereum, Ether, if they did their job correctly.

5       Once launched, platforms running on blockchain networks are often decentralized (much

6  like the networks themselves).  In other words, no person or company controls their day-to-day

7  operations.  People can transact or interact directly with each other, without the involvement of

8  the platform's creator or any other intermediary.  This is, to state the obvious, a very significant

9  difference from traditional websites, platforms, and the like.

10      The Amended Complaint addresses nine tokens, some of which are primarily utility

11  tokens, others of which are primarily governance tokens, and some of which are both.  The utility

12  tokens enable token-holders to partake in a platform's goods and services ranging from receiving

13  discounts and earning transaction fees to obtaining geographic data location queries and trading

14  energy.  *E.g.*, Dkt. #27 ("Am. Compl.") ¶¶ 106-22 (AMP), 146-55 (XYO), 172-79 (LCX), 180-

15  92 (POWR).  The governance tokens allow users to vote on certain governance issues, like what

16  cryptocurrencies a platform will list or how certain funds should be allocated.  *E.g.*, *id.* ¶¶ 123-

17  31(RLY), 132-45 (DDX).  But regardless of their exact form and function, none of these tokens

18  are securities.

19      According to the Amended Complaint, the developers behind these tokens distributed

20  them through a number of means.  Some were sold by developers directly.  *E.g.*, *id.* ¶¶ 124 (RLY),

21  148 (XYO), 173 (LCX), 181 (POWR), 195 (DFX), 210 (KROM).  Some were given to users as

22  rewards for performing certain functions on the platforms.  *E.g.*, *id.* ¶¶ 111 (AMP), 156 (RGT).

23  Others were allocated to the public to promote use of the platform.  *E.g.*, *id.* ¶ 135 (DDX).  But

24  across the board, each token was designed *to be used*.  None of the above tokens was created to

25  be a "share of" the platform or a pure passive investment therein.

26

27

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

1

**C.      Digital Asset Exchanges**

2

As explained above, there are lots of ways to obtain a token from a crypto platform

3

directly.  Another way is to buy the token in a secondary market.

4

"Exchanges" allow customers to buy, sell, and trade cryptocurrencies and other digital

5

assets.  Typically, they can swap one digital asset for another, or buy a digital asset with regular

6

government-backed fiat currency.  For instance, on Coinbase—the largest digital asset exchange

7

in the United States, and Ishan Wahi's former employer—users can (among other things) buy

8

and sell tokens with ease from their phones, using the exchange's mobile app.

9

For present purposes, what matters is that when someone buys a *token* on an exchange,

10

there is no *connection* between the token-buyer and the token's original developer.  An exchange

11

simply matches buy offers with sell offers.  In other words, unlike a developer selling tokens to

12

the public—a direct sales transaction between the developer and the token-buyers—an exchange

13

sale deals only with the underlying *asset*.  When someone buys a standalone token on the

14

secondary market—like with Coinbase—that purchase does not create a direct relationship

15

between the token-holder and the token's original developer.

16

**D.      The SEC's Action Against Ishan Wahi**

17

In 2018, Coinbase hired Ishan Wahi as a manager in its Assets and Investing Products

18

Group.  Am. Compl. ¶¶ 1, 27.  As part of that job, Ishan Wahi was privy to Coinbase's internal

19

deliberations about what tokens the company planned on listing on its exchange.  *Id.* ¶¶ 30-31.

20

Once a token is listed on Coinbase, it can be bought, sold, and traded by the platform's

21

98 million registered users.  *Id.* ¶ 3.  Thus, after a token is listed for purchase on Coinbase, the

22

token's market value typically increases.  *See id.*

23

The thrust of the SEC's Amended Complaint is that Ishan Wahi used information he

24

gained at Coinbase to tip off his brother, Nikhil Wahi, and his college friend, Sameer Ramani,

25

about tokens that were about to be listed on Coinbase.  *Id.* ¶¶ 6, 16-17, 100-01.  The Amended

26

Complaint alleges that Nikhil and Sameer bought these tokens on other exchanges *before*

27

Coinbase announced it was going to list them, enabling them to acquire the tokens before their prices increased. *See id.* ¶¶ 43-45, 49-50, 55-57, 61-63, 68-72, 75-77, 83-85, 89-90. Nikhil and Sameer would then allegedly sell their tokens shortly after Coinbase made its announcements, keeping the differential in value. *Id.* ¶¶ 46, 51, 58, 73, 78, 86.

These activities eventually caught the attention of Coinbase (and the SEC), leading to two parallel proceedings. The first is a criminal indictment against Ishan Wahi, Nikhil Wahi, and Sameer Ramani in the Southern District of New York, charging the three of them with wire fraud and wire fraud conspiracy on the theory that they fraudulently misappropriated Coinbase's "property" in the form of inside knowledge concerning what tokens would be listed and when. The second is this SEC action—filed on the same day at the other end of the country—against Ishan, Nikhil, and Sameer for violating Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. Those provisions outlaw using "any manipulative or deceptive device" "in connection with the purchase or sale of any security"—a prohibition that includes insider trading. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. According to the SEC, each of the nine tokens here is a security because each constitutes an "investment contract." *See, e.g.*, 15 U.S.C. § 77b(a)(1); Am. Compl. ¶ 25. The SEC does not ground its jurisdiction in any other provision.

Specifically, the SEC claims that these nine tokens are "investment contracts" because (i) the tokens' developers initially offered them "to raise money that would be used for [their] business"; (ii) the developers made a series of public statements that each token's value would increase on account of the developer's efforts; and (iii) the tokens are traded on secondary markets. Am. Compl. ¶¶ 101-05. The SEC says each token is a "security" because each token's developers "invited people to invest on the promise" that the developers "would expend future efforts to improve the value of their investment"—in this case, each purchased token. *Id.* ¶ 104.

But the SEC does *not* allege that any of the Defendants purchased any of the tokens at issue from developers directly. To the contrary, the SEC alleges that the Defendants purchased

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

the tokens at issue on the secondary market years after these platforms were founded (and years after the lion's share of statements referenced in the Amended Complaint were made).[3]

Ishan Wahi's former employer Coinbase—a publicly traded company headquartered in the United States—has maintained before, during, and after the alleged events at issue that it has never listed a federal security on its platform (including any of the tokens at issue here).  *See* Paul Grewal, *Coinbase Does Not List Securities. End of Story.*, Coinbase (July 21, 2022), https://tinyurl.com/3rph85vm.  The SEC has not brought an action against Coinbase for being an unregistered exchange.  Only Ishan Wahi, his kid brother, and his college friend have faced the SEC's ire.

## SUMMARY OF ARGUMENT

The SEC wants to broadly regulate digital assets.  But rather than obtain such authority from Congress, the SEC has sought to achieve it through the courts by way of this precedent-setting action against Ishan and Nikhil Wahi.  In so doing, the SEC seeks to distort the federal securities laws beyond all recognition, and win for itself regulatory domain over an entirely new industry.  That gambit is an abuse of power.  Federal law clearly forecloses it.  And this Court should reject it.

The essential legal premise of this action is that something can be an "investment contract" without anything that resembles a contract.  That is wrong, as statutory text, history, and precedent all confirm.  The very heart of an investment contract is—and always has been—the coupling of an asset with a binding promise:  The sale of land *plus* the promise to manage

---

[3] *Compare* Am. Compl. ¶¶ 43-44 (AMP purchases in June 2021), *with* 109 (Flexa founded in 2018), 109 (initial token offerings between February 2019 and April 2019); 115 (token's "white paper" published in 2019); *compare* ¶¶ 48-52 (RLY purchased in July 2021), *with* 123 (Rally founded in 2018), 124 (initial token offerings from December 2020 to March 2021); *compare* ¶¶ 53-59 (DDX purchased in August 2021), *with* 135 (initial token offering in July 2020); *compare* ¶¶ 61-66 (XYO purchased in September 2021), *with* 146 (XY founded in 2012), 148 (initial token offering from March to May 2018), 149-51 (token's "white paper" and posts in 2018 and 2019); *compare* ¶¶ 67-73 (RGT purchased in September 2021), *with* 157 (initial token offering in July 2020), 160 (citing statements from "late 2020 and early 2021"); *compare* ¶¶ 74-79 (LCX purchased in October 2021), *with* 173 (initial token offering in September 2019); *compare* ¶¶ 80-87 (POWR purchased in November 2021), *with* 180-181 (initial token offerings in August and September 2017), 183 (token's "white paper" published in 2017); *compare* ¶¶ 88-92 (DFX purchased in April 2022), *with* 196 (initial token offering in February 2021); *compare* ¶¶ 88-92 (KROM purchased in April 2022), *with* 210 (initial token offering in November 2021).

MOTION TO DISMISS - 10
CASE NO. 2:22-CV-01009

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

orange groves on it; the sale of beavers *plus* the promise to raise them for fur; the sale of vineyards *plus* the promise to develop wine.  But here, there is nothing of the sort.  Each token at issue was sold on the secondary market; each transaction was between a buyer and some third-party seller.  For tokens sold on exchanges, there is no contractual relationship between token-holders and developers, and there are thus no binding promises running from the developers to the token-holders.  There is just a naked asset sale.  And such a sale—decoupled from any post-sale promises on the part of any developer—has never once constituted an "investment contract."

The Major Questions Doctrine along with basic principles of fair notice underscore what text, history, and precedent already make plain.  The SEC may not use the phrase "investment contract" as a blank check to cash whenever it seeks to expand its regulatory ambit.  And it may not lay claim over the novel and far-reaching digital asset industry without clear congressional authorization.  At the least, whatever the federal securities laws provide, they do not provide *that*.

But even setting all that aside, as described below, the SEC cannot prevail even under its own framework—a cribbed and literalistic reading of the Supreme Court's decision in *Howey*, 328 U.S. 293.  As the SEC would have it, there is an "investment contract" whenever a person is "led to invest money in a common enterprise with the expectation that they would earn a profit solely through the efforts of the promoter or of some one other than themselves."  *Id.* at 298.  But here, there is no investment of money *in* anything; again, the only transactions at issue involve tokens sold on the secondary market, where money passes from buyer to third-party seller.  And in any event, there is no "common enterprise" at all.  Namely, token-holders are not part of the same profit-seeking venture with other token-holders or the original developers; rather, they are simply asset holders, whose financial fortunes turn on their own decisions about buying and selling.  Moreover, on the Amended Complaint's own terms, the values of the tokens at issue derive mostly from *market forces*, not *managerial efforts* (the last part of *Howey*).  After all, the SEC's entire theory of the case is that the Defendants here allegedly front-ran the tokens being *listed* (and how the market would then react)—not the announcement of any new policy or

MOTION TO DISMISS - 11
CASE NO. 2:22-CV-01009

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

1   managerial initiative.

2        The SEC's attempt to reinvent the term "investment contract" will have implications far

3   beyond this case.  In addition to holding Ishan and Nikhil Wahi liable for actions nobody could

4   have anticipated would violate the securities laws—indeed, even Ishan's publicly traded

5   employer was convinced these tokens were not securities—it would establish sweeping SEC

6   jurisdiction over an industry without any input from Congress.  And it would, in so doing, subject

7   an industry with tremendous potential to a regulatory apparatus that is an exceedingly poor fit

8   for it.  The securities laws exist to protect people with direct passive investments in ongoing

9   enterprises—not to set the ground rules for blockchain technology, platforms built atop it, utility

10  tokens, nonfungible tokens, decentralized autonomous organizations, or any of the myriad square

11  pegs the SEC has tried to jam into this round hole.

12       There is also no need to stretch securities laws into the digital asset space, as excluding

13  tokens from the SEC's regulatory jurisdiction does not mean digital frauds and abuses will go

14  unregulated.  Countless other regulators already assert that digital assets are subject to the myriad

15  financial regulations that prevent fraud and manipulation in traditional financial markets.  And

16  in addition, Congress and state legislatures are actively debating (and enacting) digital asset

17  regulations that are properly tailored to the unique features of this cutting-edge technology.

18       Finally, the Amended Complaint does not adequately allege scienter.  Scienter is a core

19  protection in our justice system that ensures only the culpable are punished.  As it stands, the

20  SEC has not met its burden on this basic element.  It is both unlawful and deeply unfair to punish

21  Ishan and Nikhil Wahi for federal securities fraud when all available guidance—including

22  Coinbase's elaborate, SEC-approved internal review process—indicated that these tokens are *not*

23  securities.  Nothing in the Amended Complaint demonstrates knowing, willful, or even reckless

24  violation of the federal securities laws.

25       In short, the SEC's attempt to radically expand its regulatory jurisdiction on the backs of

26  Ishan and Nikhil Wahi is unlawful, and there is no reason for this Court to countenance the

27

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

1 agency's zealous attempt at a power grab.  Rather, the Court should dismiss the Amended

2 Complaint.

3 ## LEGAL STANDARD

4 An Amended Complaint must contain "enough facts to state a claim to relief that is

5 plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Dismissal under

6 Rule 12(b)(6) may be based on "the lack of a cognizable legal theory or the absence of sufficient

7 facts alleged under a cognizable legal theory." *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201,

8 1208 (9th Cir. 2019).  A pleading that offers only "labels and conclusions" or "a formulaic

9 recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

10 (2009).  In addition, the Court is not "required to accept as true allegations that are merely

11 conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden*

12 *State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  And "[m]ere legal conclusions are not entitled

13 to the assumption of truth." *Dougherty v. City of Covina*, 654 F.3d 892, 897 (9th Cir. 2011).

14 ## ARGUMENT

15 **I.   THE TOKENS ARE NOT "INVESTMENTS CONTRACTS" UNDER THE SECURITIES LAWS.**

16 The term "investment contract" has a long history.  Even before the federal securities

17 laws—which themselves date to the Great Depression—the phrase "investment contract" was a

18 term of art for financial dealings that differed in some way from traditional securities (like stocks

19 and bonds), but that still had the essential "characteristics of a security." *Int'l Bhd. of Teamsters*

20 *v. Daniel*, 439 U.S. 551, 559 (1979).  In the main, "investment contracts" cover business ventures

21 that involve the sale of some asset (like land or an oil lease) *coupled with* certain legally binding

22 promises by the seller to manage or develop that asset in a profitable manner.  Canonical

23 examples include one-off enterprises like a businessman selling tracts of land upon which he

24 promises to maintain a range of profitable orange groves, *Howey*, 328 U.S. at 299, or beaver-

25 breeders who sell beavers along with a promise to raise the animals for later sale at a profit,

26 *Continental Marketing Corp. v. SEC*, 387 F.2d 466, 468-71 (10th Cir. 1967).

27

MOTION TO DISMISS - 13
CASE NO. 2:22-cv-01009

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

Such ventures vary in the details, but the term "investment contract" has always carried certain core traits—most obvious, *a contract*, and one that captures the post-sale promises that transform an asset sale into something more. In using the phrase "investment contract," Congress codified the term's traditional definition into the federal securities laws. *Howey*, 328 U.S. at 298.

In its desire to seize regulatory control of an enormous (and enormously complex) new industry, the SEC asks this Court to cast all that aside. Rather than confine itself to the authority Congress long ago conferred, the SEC asks this Court to substantially expand its regulatory domain by declaring that at least nine different tokens constitute "investment contracts." The SEC is wrong—and the implications of its position extend well beyond the circumstances here. The nine tokens at issue are no more securities than are baseball cards, beanie babies, gold doubloons, the beavers from *Continental Marketing*, or the oranges from *Howey*. This Court should turn back the SEC's campaign to recast this long-settled term and, in so doing, dismiss its Amended Complaint.

**A.    The Term "Investment Contract" Had a Settled Meaning in 1933 That Congress "Crystallized" Within the Securities Laws.**

The federal securities laws do not specifically define the term "investment contract." The term should accordingly be given its "ordinary meaning at the time Congress enacted the statute." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (quotation marks and alterations omitted).

When Congress passed the Securities Act of 1933 and the Exchange Act of 1934 (both of which use "investment contract" as part of their near-identical definitions of "security"), "investment contract" was a settled term of art from state "blue sky" laws (*i.e.*, state securities laws). And "when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word." *FAA v. Cooper*, 566 U.S. 284, 292 (2012) (quotation marks omitted). The federal securities laws are no exception. As the Supreme Court held in *Howey*, Congress incorporated into the securities laws the definition of "investment contract" that had "crystallized" in the states. 328 U.S. at 298. The Ninth Circuit has confirmed

MOTION TO DISMISS - 14
CASE NO. 2:22-cv-01009

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

as much, reaffirming that "the term 'investment contract' retains the same meaning it possessed under predating state 'blue sky' laws." *SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003).

The definition of "investment contract" under predating state "'blue sky' laws," *Howey*, 328 U.S. at 298, had several "essential ingredients," *id.* at 301. Chief among them: An "investment contract" required a *contract* (written or implicit) that imposed *post-sale obligations* on the promoter, and also gave the investor a *right to receive profits* from the promoter's venture.

### 1. The phrase "investment contract" is a term of art derived from state "blue sky" laws.

At the turn of the twentieth century, the American economy was booming, and entrepreneurs increasingly sought to capitalize on that boom by hawking investment opportunities to members of the country's burgeoning middle class. *See* Jonathan R. Macey & Geoffrey P. Miller, *Origin of the Blue Sky Laws*, 70 Tex. L. Rev. 347, 355 (1991). Many of these schemes were genuine; but many were not. Some ultimately promised nothing more than "so many feet of blue sky." *State v. Gopher Tire & Rubber Co.*, 146 Minn. 52, 55 (1920). And in response to this problematic trend, the states started to adopt new securities laws that were designed "to put a stop to the sale of shares in visionary oil wells, nonexistent gold mines, and other 'get-rich-quick' schemes calculated to despoil credulous individuals of their savings." *Id.*

By 1930, all but two states had adopted some version of a "blue sky" law. *See* Note, *Legislation: Uniform Sale of Securities Act*, 30 Colum. L. Rev. 1184, 1189 (1930). And following Minnesota's lead, these blue sky laws predominantly defined a "security" to include "investment contracts." Note, *Pension Plans as "Investment Contracts,"* 96 U. Pa. L. Rev. 553, 553 (1948). Indeed, when legislators set out to create a uniform state securities code distilled from existing laws, "investment contract" was part of its consensus definition of "security." Handbook, *Proceedings of the National Conference of Commissioners on Uniform State Laws*, at 173 (1929).

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

1   Much as Minnesota was the first state to use the term "investment contract," its courts

2   took the lead in explicating its meaning.  At its essence, an "investment contract" was the

3   "equivalen[t]" of a "contract which is an investment." *Pension Plans*, *supra*, at 553 (citing *State*

4   *v. Evans*, 154 Minn. 95 (1922); *Gopher Tire*, 146 Minn. 52).  As the Minnesota Supreme Court

5   explained in more detail, "[t]he placing of capital or laying out of money in a way intended to

6   secure income or profit from its employment is an *investment* as that word is commonly used and

7   understood." *Gopher Tire*, 146 Minn. at 56 (emphasis added).  And when that investment is

8   folded into some kind of contractual relationship, an "investment contract" is then born. *Evans*,

9   154 Minn. at 99.

10   "This definition was uniformly applied by state courts to a variety of situations where

11   individuals were led to invest money in a common enterprise with the expectation that they would

12   earn a profit solely through the efforts of the promoter or of some one other than themselves."

13   *Howey*, 328 U.S. at 298 & n.4 (collecting cases); *see also, e.g.*, *People v. White*, 124 Cal. App.

14   548, 554-55 (1932) (relying on *Gopher Tire*); *Stevens v. Liberty Packing Corp.*, 111 N.J. Eq. 61,

15   65 (1932) (same); *Lewis v. Creasey Corp.*, 248 S.W. 1046, 1049 (Ky. 1923) (same).  As such,

16   when Congress set out to create its own securities law regime, "investment contract" was thus a

17   clear term of art.

18   **2.      Congress incorporated that term of art into the securities laws.**

19   Following the stock market crash of 1929, Congress began work on a "Federal blue sky

20   law."  Remarks by Senator William H. King, 77 Cong. Rec. 2992 (May 8, 1933).  That effort

21   culminated in the Securities Act of 1933, which incorporated verbatim the definition of "security"

22   that the National Conference of Commissioners on Uniform State Laws had adopted some years

23   prior when drafting its uniform state securities code.  That definition, again, included "investment

24   contracts." *Pension Plans*, *supra*, at 553.  (As does the Exchange Act's definition of "security,"

25   enacted one year later.)

26

27

MOTION TO DISMISS - 16
CASE NO. 2:22-cv-01009

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

1      There is no doubt Congress sought to incorporate the existing definition of "investment

2  contract" into the federal securities laws.  As the *Howey* Court reasoned, "investment contract"

3  had a "common" and "uniformly applied" definition at the time.  328 U.S. at 298.  And by

4  "including an investment contract" within the federal securities laws, Congress "crystallized"

5  that definition within federal law.  *Id.*; *see also SEC v. Edwards*, 540 U.S. 389, 395 (2004)

6  (reiterating importance of state "blue sky law cases").  As the SEC itself explained in *Howey*:

7  "Congress must be deemed to have intended also to adopt that construction of the term which

8  was uniformly followed by the state courts."  Supreme Court Br. for Securities and Exchange

9  Commission at 18, *Howey*, 328 U.S. 293 (No. 843) [hereinafter, "Br. for SEC"].

**3.      The traditional definition of "investment contract" has several "essential ingredients."**

12      "When a statutory term is obviously transplanted from another legal source, it brings the

13  old soil with it."  *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) (quotation marks omitted).

14  Here, that "old soil" includes at least three fundamental characteristics that were "the essential

15  ingredients of an investment contract."  *Howey*, 328 U.S. at 301.  For an "investment contract"

16  to exist, there must be (i) a contract, that (ii) imposes post-sale obligations on the promoter,

17  among which include (iii) giving the investor a legal entitlement to share in the venture's profits.

18      Before *Howey*, no state decision had ever found an "investment contract" without these

19  three characteristics.  *See, e.g.*, *Howey*, 328 U.S. at 298 n.4 (collecting cases).  Same for the lower

20  federal courts.  *See, e.g.*, *id.* at 299 n.5 (same).  And in the many decades since *Howey*, neither

21  the Supreme Court nor the Ninth Circuit has departed from that unbroken practice.  Indeed, when

22  pressed with this argument in the Southern District of New York, the SEC came up empty—

23  unable to cite *any* genuine example of *any* court at *any* time finding an "investment contract"

24  where the instrument did not have these fundamental threshold characteristics.  *Compare*

25  Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment at 19-21,

26  *SEC v. Ripple Labs, Inc.*, No. 20-cv-10832 (S.D.N.Y. Sept. 17, 2022) [hereinafter Ripple Summ.

27

MOTION TO DISMISS - 17
CASE NO. 2:22-cv-01009

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

J. Mot.], *with* Plaintiff Securities and Exchange Commission's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 19-21, *Ripple Labs*, No. 20-cv-10832 (S.D.N.Y. Oct. 21, 2022) [hereinafter SEC Summ. J. Opp'n in *Ripple*]; *see also infra* note 12.

### (a)     A Contract

Most obvious, an "investment contract" requires a "contract"—specifically, a contract between the investor and the promoter.  The SEC itself has historically recognized as much, explaining to the Supreme Court in *Howey* that an "investment contract" is a "contractual arrangement" that possesses certain additional characteristics. Br. for SEC, *supra*, at 9.  Or as one state court put it on the eve of Congress enacting the Securities Act:  "The term [investment contract] is not defined in the act, but it implies the apprehension of an investment as well as of a contract."  *State v. Heath*, 153 S.E. 855, 857 (N.C. 1930).  Indeed, state courts evaluating whether a given venture amounted to an "investment contract" often followed a two-step process, first identifying whether there was a contract at all, and only *then* turning to whether it had the other necessary traits.  *See, e.g.*, *Klatt v. Guaranteed Bond Co.*, 250 N.W. 825, 829 (Wis. 1933).

Counsel has thus far found no example of any state blue sky case finding an "investment contract" in the absence of any contract whatsoever.  In fact, counsel has not found any example of someone even being *accused* of illegally dealing in an "investment contract" where there was not any contractual relationship (written or implicit) between the promoter and the investor at all.

### (b)     Post-Sale Obligations

Nor can just *any* contract constitute an "investment contract."  As touched on above, an "investment contract" is an asset sale *coupled with* legally binding promises by the promoter to manage or develop that asset in a profitable way.  *See, e.g.*, *State v. Robbins*, 185 Minn. 202, 204-05 (1932) (sale of muskrat breeding pairs *plus* promise to rear pairs until later sold for fur); *Prohaska v. Hemmer-Miller Dev. Co.*, 256 Ill. App. 331, 334-35 (1930) (sale of land *plus* promise to harvest crops on it); *Kerst v. Nelson*, 171 Minn. 191, 193-95 (1927) (sale of land *plus* promise

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

to cultivate vineyard, harvest crops, and market wine). Without binding post-sale legal obligations, there is just an asset sale. It is not a muskrat investment; it is a muskrat simpliciter.

In the years before the federal securities laws, state courts consistently treated the absence of such binding post-sale obligations as dispositive. In *Lewis v. Creasey Corp.*, for instance, a wholesale grocery distributor gave a local supermarket the right to purchase groceries at a discount in exchange for a $300 deposit. 248 S.W. 1046, 1047 (Ky. Ct. App. 1923). The court held this contractual arrangement was *not* an investment contract because there were no post-sale obligations on the part of the distributor to use the supermarket's money "in such a manner as to reap a profit to the [investor]." *Id.* at 1049. Rather, the deal was simply a one-off payment for a discount. And the term "investment contract" did not extend to "contracts [only] containing mutual obligations, such as are daily entered into commercial life, and from which a profit can only be reaped by the uses which the investor alone makes of them." *Id.* Otherwise, the term "investment contract" could be manipulated to extend to all "exchange[s] of commodities" and "all [other] sorts and kinds of contracts," contrary to the phrase's well-established meaning. *Id.*

The requirement of post-sale obligations for an "investment contract" runs throughout the state blue sky cases. *See, e.g.*, *McCormick v. Shively*, 267 Ill. App. 99, 103-04 (1932) (no investment contract where land sale involved "no obligation [by promoter] . . . to do anything other than to deliver a deed upon the payment of the purchase price); *Hanneman v. Gratz*, 170 Minn. 38, 41-42 (1927) (same where scheme only involved "purchase of lands"); *Creasey Corp. v. Enz Bros. Co.*, 187 N.W. 666, 667 (Wis. 1922) (holding same grocery contract as above not a security). Here too, counsel has not come across a single counter-example in any blue sky case.[4]

---

[4] *See also, e.g.*, *People v. White*, 124 Cal. App. 548, 550, 554-56 (1932) (investment contract where seller promised to re-invest the funds and return $7,500); *State v. Robbins*, 240 N.W. 456, 457 (Minn. 1932) (investment contract where, in addition to sale contract for fox breeding trios, buyers would enter into a breeding contract where the company would "feed, breed, care for, pelt, and generally supervise and manage the animals to the best interest of the purchaser"); *Prohaska*, 256 Ill. App. at 338 (investment contract where promoter was obligated to "break, seed, cut and thresh" the crops on the sold land); *Kerst*, 171 Minn. at 194 (investment contract where seller of vineyard retained "exclusive control and management of planting, cultivating, and caring for the land"); *State v. Bushard*, 205 N.W. 370 (Minn. 1925) (investment contract where, as part of a bus-operator agreement, company agreed to pay for part of the bus, the bus's maintenance and operating expenses, and indemnify the bus operator).

MOTION TO DISMISS - 19
CASE NO. 2:22-CV-01009

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

1

**(c)     Right to Share Profits**

2       Finally, an "investment contract" must give the investor a right to share in the venture's

3  profits.  To borrow again from *Lewis*, an "investment contract" is a contractual scheme where "a

4  profit is promised and expected without any active efforts on the part of the investor."  248 S.W.

5  at 1049.  Or as the Minnesota Supreme Court put it, an "investment contract[]" is a contract that

6  by definition "entitl[es] the investor to participate in a profit-sharing scheme."  *Kerst*, 171 Minn.

7  at 196; *see also Evans*, 154 Minn. at 99 ("[I]f the defendant issued and sold its certificates to

8  purchasers who paid their money justly expecting to receive an income or profit from the

9  investment, such certificates might properly be regarded as investment contracts[.]").

10      As above, the absence of an entitlement to profit sharing has always been dispositive.  In

11  *Enz Bros.*, for example, the Wisconsin Supreme Court held that a contractual arrangement was

12  not a security because the investor "acquired no rights either in the capital or profits of the

13  company."  187 N.W. at 667.  And here too, counsel has not come across a single example where

14  a court found an "investment contract" *without* this basic characteristic in any blue sky case.[5]

15                                         * * *

16      When Congress passed the federal securities laws, it quite purposefully used a term of art

17  that had a well-established meaning.  In that light, then as now, the definition of "investment

18  contract" is (i) a contract, that (ii) imposes post-sale obligations on the promoter, among which

19  include (iii) giving the investor a legal entitlement to share in the business venture's profits.

20  **B.     None of the Tokens at Issue Fits the Traditional Definition of an "Investment**

21              **Contract."**

22      The nine tokens underlying the SEC's suit uniformly fail this test.  The SEC does not—

23  and cannot—allege that the tokens involve contracts among developers and token-holders.  In

24

25       [5] *See, e.g.*, *People v. Claggett*, 19 P.2d 805, 805 (Cal. Ct. App. 1933) (promising "one-twentieth interest
in all of the gold and other values" recovered from a gold mine, "after operating expenses have been paid"); *Stevens
v. Liberty Packing Corp.*, 111 N.J. Eq. 61, 61-65 (1932) (promising $1 per offspring in a rabbit-breeding contract);
26  *State v. Ogden*, 191 N.W. 916, 917 (Minn. 1923) (promising to pay holders of fractional oil leases profits from oil
drilling "in proportion to their holdings").

27

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

fact, the tokens impose no legal obligations on their developers after the time of sale. And they carry no legal entitlement to share in the developers' profits. In no sense are these nine tokens securities under the "uniformly applied" definition of "investment contract" Congress "crystallized" into the securities laws. *Howey*, 328 U.S. at 298.

### 1.   None of the tokens involves a contract between the developers and the token-holder.

Foremost, there is no "contract" here that could give rise to an "investment contract."

The Amended Complaint concedes that the tokens at issue were purchased in secondary markets through an exchange. *See, e.g.*, Am. Compl. ¶ 7. But when a token is sold on an exchange, there is (by definition) no contract between the buyer and the promoter. *See, e.g.*, Michael J. O'Connor, *Overreaching Its Mandate? Considering the SEC's Authority to Regulate Cryptocurrency Exchanges*, 11 Drexel L. Rev. 539, 582-83 (2019). Secondary sales are one-off transactions between someone who owns the token and someone else who buys the token, facilitated through blind bids done with an exchange. The token's original developer is not a party to the transaction, and does not enter any contract in connection with it. That is dispositive.

In other cases, the SEC has taken the contrary view that if the tokens were initially distributed by way of an investment contract—say, through an ICO where investors bought tokens from the developers directly—then the tokens are securities for time immemorial. But even assuming the premise of that argument is right, the SEC nonetheless conflates here the *investment arrangement* with the *specific object* that underlies it. Suppose investors agreed to give Mr. Howey money in exchange for him periodically sending them bushels of oranges from the groves he promised to manage. That agreement is certainly a contract and may—depending on the details—be an "investment contract." But even if *that* arrangement were an "investment contract," the items exchanged pursuant to it—the *oranges*—would not constitute federal securities, because they carry with them no enforceable rights and obligations running from the orange-holder back to Mr. Howey. Put differently, if Mr. Howey's investors decided to resell

MOTION TO DISMISS - 21
CASE NO. 2:22-cv-01009

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

1    those oranges at a farmers' market, nobody would think they had engaged in some unregistered

2    securities offering.

3         In all material respects, that is the fact pattern here.  Even if the *initial* sale of the relevant

4    tokens by their developers could have been deemed an investment contract—a possibility on

5    which the Defendants take no position—the *tokens themselves* were not.  The resold oranges are

6    not securities for the simple reason that they carry with them no contractual relationship between

7    the orange-buyer and Mr. Howey.  The resold tokens are no different; they lack any contractual

8    relationship connecting the buyer and the promoter.  At bottom, there is a fundamental difference

9    between an investment *transaction* (which may give rise to an "investment contract") and that

10   transaction's *underlying asset* (which cannot).  Here, there is only the latter; a bushel of oranges.

11              **2.      None of the tokens comes with post-sale obligations on the part of the**

12                  **developers.**

13        Next, none of the tokens imposes post-sale legal obligations on the developers for the

14   benefit of token-holders.  To be sure, the Amended Complaint alleges that the developers of the

15   tokens here made public declarations about how they *intended* to develop their platforms and

16   protocols, and how token-holders would *likely* be able to turn a profit by flipping tokens on

17   secondary exchanges.  *See, e.g.*, Am. Compl. ¶¶ 117-21 (AMP); 126-27 (RLY); 141 (DDX); 149-

18   52 (XYO); 160-65 (RGT); 176-78 (LCX); 183-86 (POWR); 201-02 (DFX); 213-14 (KROM).  It

19   alleges, for example, that the developers behind the XYO Network publicized a "'Roadmap' with

20   target dates for [their] plans to develop the business," and touted "opportunities for profit from

21   XYO, including . . . the availability of secondary markets."  *Id.* ¶¶ 149, 151.  But that is not

22   sufficient.

23        Public declarations by token developers about the software they hope to create do not

24   create post-sale *legal* obligations, and cannot convert tokens sold on secondary markets into

25   investment contracts.  Indeed, suppose Mr. Howey adopted a "roadmap" with a plan to heavily

26

27

MOTION TO DISMISS - 22
CASE NO. 2:22-cv-01009

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

market his oranges nationwide, thereby boosting their price.   Nobody would say that pledge transforms the *oranges* into securities, or the above farmers' market into an unlawful exchange.

This is all because there is no "investment contract" absent a *binding promise* running from the developer to the token-holder.   To continue the analogy to *Howey*, if Mr. Howey had suddenly stopped working on his orange groves, his investors could have sued him for breach of contract.   That is because Mr. Howey had entered into an agreement with investors that imposed binding post-sale obligations on him.   But what if the developers behind the XYO Network decided to depart from their "roadmap"?   Someone who had later bought XYO tokens on an exchange in *hopes* that the developers would execute their roadmap would have no legal recourse because they have no contractual relationship with the developers.   Importantly, transferring a token to a third-party is not like assigning a contract; tokens do not inherently confer any legal rights upon the token-holder that are enforceable against the developer (and the SEC alleges nothing to the contrary for the tokens at issue here).[6]   Transferring a token is instead like selling a beanie baby—an asset that can either be played with or stored as an investment, but one that innately carries none of the obligations and rights that were part of any original transaction.   Of course, a token-holder may expect their tokens will "appreciat[e]" due to their "proximity" to the developers' efforts—but that is not enough without an actual obligation on the developers to follow through.   *De Luz Ranchos Inv. Ltd. v. Coldwell Banker & Co.*, 608 F.2d 1297, 1301 (9th Cir. 1979); *see also, e.g.*, *Rodriguez v. Banko Cent. Corp.*, 990 F.2d 7, 11 (1st Cir. 1993) (sellers'

---

[6]   The Amended Complaint does not allege that the four so-called governance tokens—RLY, DDX, RGT, and DFX—provide any *legal* rights enforceable against the developer.   At most, the SEC alleges that the tokens provide users with the limited *technological* ability to participate in how the platform prioritizes funding or lists cryptocurrency.   *E.g.*, Am. Compl. ¶¶ 123 (RLY token-holders can "propose changes" to Rally community); 164 (RGT token-holders can vote on allocation of tokens on the Rari platform); *id.* ¶ 205 (DFX token-holders can "can vote on the crypto assets to be included for exchange in the protocol").   But giving technology users functional tools—no different from enabling social media users to increase visibility of posts by "liking" them or providing tools to edit Wikipedia pages—is fundamentally different from those companies shouldering a *legal* obligation to do anything on behalf of users.

MOTION TO DISMISS - 23
CASE NO. 2:22-CV-01009

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

1  "strong and repeated suggestions" land would be developed did not create security without actual

2  obligation to develop); *Woodward v. Terracor*, 574 F.2d 1023, 1026 (10th Cir. 1978) (similar).[7]

3    To that end, not every promotion creates a binding promise running to all asset-holders.

4  Consider a baseball player who sells autographs while telling buyers he plans to hit more home

5  runs.  Or the musician who sells branded sneakers while promising to put out more hit albums.

6  Or a bit on the nose, an entrepreneur who sells physical tokens as commemorative coins while

7  stressing he will try to get celebrities to endorse them, thereby bumping their market value.  In

8  all of these examples, buyers—whether directly or on the secondary market—might *expect* their

9  purchases to appreciate in value: homers drive autograph prices, platinum records boost the

10  demand for merchandise, and celebrity endorsements enhance market value.  But none of these

11  examples features "actual commitments" on the part of the seller to the buyer of the asset that

12  could transform the asset into a security.  *Happy Inv. Grp. v. Lakeworld Props., Inc.*, 396 F. Supp.

13  175, 181 (N.D. Cal. 1975).  In each instance, the ballplayer, musician, or coin peddler is free to

14  sell the relevant asset and then quit the business.  And without a real "obligation" to "develop,

15  improve, or manage" the underlying asset later on, there is no "investment contract."  *De Luz*

16  *Ranchos*, 608 F.2d at 1301.

17     **3.**  **None of the tokens furnishes a legal right to share in profits.**

18    Finally, none of the relevant tokens comes with a legal right for token-holders to share in

19  their respective ventures' profits.  Again, there is a difference between being able to profit from

20  the *re-sale of an asset* (*e.g.*, an orange), and having an entitlement to share in the *profits from a*

21  *business venture* (*e.g.*, an orange grove).  The latter can give rise to a security; the former cannot.

---

22

23     [7]  What is true for XYO tokens holds true for the whole batch.  For instance, comments from the DerivaDEX
CEO discussing "development plans" that included a new "feature" would not provide a DDX token-holder a right

24  to sue if that feature was not integrated into the platform.  *See* Am. Compl. ¶ 143.  So too for the vague intentions
expressed by Rari's founders that they would, among other things, "create a strong ecosystem around the Rari

25  Protocol," to "avoid RGT 'price dilution,'" and "invest the protocol's holdings in an intelligent way."  *Id.* ¶ 164.
Likewise for LCX's aspirational statements to become a "new category leader in the blockchain industry," "revamp"

26  its trading platform, and challenge mainstream financial firms like Goldman Sachs, *id.* ¶ 179, or Power's abstract
goal of creating an "attractive" trading environment for POWR tokens, *id.* ¶ 181.  Across the board, none of these

27  sorts of statements, nor any other statement proffered by the SEC, create a binding post-sale *obligation* running to
token-holders.

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

None of the tokens here comes with a legal entitlement to share in the platform's profits. At most, for a handful of tokens, the Amended Complaint alleges token-holders can "share in the profits" if they help "stake" the token on its given network. Am. Compl. ¶ 103; *see also, e.g.*, *id.* ¶¶ 140 (DDX), 197 (DFX), 214 (KROM). But this is different in kind. "Staking" is when someone locks up some of their tokens to help support the operation of a platform in exchange for a certain yield or percentage of a transaction fee. (Conceptually, it is not all too different from putting money in a high-yield savings account at a bank and receiving interest payments in return.) The key point, though, is that *staking is optional*. And the *option* to make money with tokens by staking them does not convert the tokens themselves into an *entitlement* to share in the venture's profits. Rather, it is like having the option of picking Mr. Howey's oranges for a wage.

For two of the tokens, the Amended Complaint hints that they come with the right to share in their ventures' profits, akin to a dividend. Of course, having *one* of the *three* essential traits of an "investment contract" is not enough. But even still, the Amended Complaint is deficient. For RGT, the Amended Complaint says the developers "*suggested* RGT buyers *may eventually* earn dividends." *Id.* ¶ 164 (emphases added). And for POWR, the Amended Complaint alleges that on a Reddit thread once, the developers said that token-holders would be able to "receive a portion of revenue." *Id.* ¶ 184. But the SEC conspicuously avoids alleging that RGT or POWR token-holders *actually* have any right—legally enforceable or by operation of the underlying code—to share in the ventures' profits. And that silence is telling, given that such information is by no means a secret: Both tokens are now on the market, and have been sold on a number of exchanges. *Id.* ¶¶ 171, 190.

### C. Following the Traditional Definition of "Investment Contract" Makes Sense.

Rejecting the SEC's claim that the tokens at issue are all "investment contracts" also makes good sense. The purpose of the securities laws (as opposed to laws regulating other asset classes like commodities) is to ensure that investors can make informed judgments before investing money in an *ongoing* enterprise. So for instance, when an investor buys a stock (*i.e.*,

an ownership share of a company run by professional managers), it makes sense to require the company to provide extensive disclosures concerning the company's financial condition.  The investor needs to understand the condition of the ongoing enterprise that he or she is buying into.

The disclosure requirements for "investment contracts" serve the same basic purpose. Individuals who enter investment contracts are effectively purchasing a stake in an ongoing enterprise—raising muskrats for future sale, growing oranges for future harvesting, developing land for future winemaking.  These investors are not purchasing an equity stake in an enterprise managed by corporate executives, but they *are* investing in an ongoing enterprise that someone else will manage.  It makes sense to require detailed disclosures about that enterprise up front.

These disclosures make no sense, however, when there is *not* an ongoing legal relationship between purchaser and promoter.  When the investor is really just a purchaser buying an asset—a token, an orange, a baseball card, a sneaker, or a commemorative coin—the person has no ongoing legal claim to the promoter's efforts (particularly where, as here, the purchase is in a secondary market).  The seller's business operations, risk factors, management, audited financial statements, and the like are beside the point because the purchaser is *not investing in the seller*—the purchaser is merely *buying its asset*.  To be sure, the purchaser might *hope* that the asset goes up in value based on the seller's future behavior; and the seller might encourage people to buy the product by touting plans to enhance its value.  But when the transaction does not include ongoing legal obligations, the buyer is not investing *in* the seller, has no claim over the seller's *future actions*, and thus has no need to know detailed information about the seller's financial condition.  *See SEC v. Life Partners, Inc.*, 87 F.3d 536, 547 (D.C. Cir. 1996) ("[I]f neither the promoter nor anyone else is expected to make further efforts that will affect the outcome of the investment, then the need for federal securities regulation is greatly diminished.").  It should thus be no surprise that all of the digital asset regulation proposals currently being debated in Congress principally treat tokens like the ones here as *commodities*.  *Infra* Section II.B.2.

MOTION TO DISMISS - 26
CASE NO. 2:22-cv-01009

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

Holding that the tokens here are not securities does not mean they would go unregulated. To the contrary, federal and state regulators assert that tokens remain subject to a litany of possible regulations already on the books—including state and federal laws concerning consumer protection, commodities, and fraud.[8]  But the sale of tokens on a secondary market does not—without more—trigger the SEC's elaborate registration and disclosure requirements designed for investments in an ongoing enterprise.

\* \* \*

In short, the Amended Complaint fails in all respects to allege that the tokens at issue satisfy the "uniformly applied" definition of "investment contract" that Congress "crystallized" in the federal securities laws.  *Howey*, 328 U.S. at 298.  They involve no contracts, their sale imposes no ongoing legal obligations on developers, and they provide no entitlement to profit sharing.  They are not "investment contracts" as that term has always been understood.  The Amended Complaint therefore must be dismissed.

## II.    BOTH *HOWEY* AND THE MAJOR QUESTIONS DOCTRINE FORECLOSE THE SEC'S ATTEMPT TO SCRAP THE TRADITIONAL DEFINITION OF AN "INVESTMENT CONTRACT."

Precedent confirms what text and history already make clear:  The federal securities laws use the traditional definition of "investment contract."  Indeed, the Supreme Court held as much in *Howey*, stating in quite plain terms that, "[b]y including an investment contract within the scope of . . . the Securities Act, Congress was using a term the meaning of which had been crystallized by this prior judicial interpretation [in state blue sky cases]."  328 U.S. at 298.

Despite this straightforward sentiment, the SEC appears to contend the *Howey* Court actually *replaced* the traditional definition of "investment contract" with something else—a malleable standard that does not require *any* "contract," much less the *specific sort of contract* uniformly required under the blue sky laws.  The SEC is wrong.  Neither the Supreme Court nor

---

[8]  *See, e.g.*, U.S. Dep't of Justice, *The Role of Law Enforcement in Detecting, Investigating, and Prosecuting Criminal Activity Related to Digital Assets* 14-32 (Sept. 2022).

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

the Ninth Circuit has ever found an "investment contract" where the instrument does not satisfy that term's traditional definition.[9]  This Court should not accept the SEC's invitation to break new ground.

The "Major Questions Doctrine" dispels any doubts.  The Supreme Court has explained that an "[e]xtraordinary grant[] of regulatory authority"—a term that plainly captures a broad power over the new, trillion-dollar digital asset industry[10]—requires "clear congressional authorization."  *West Virginia v. EPA*, 142 S. Ct. 2587, 2614-16 (2022).  The SEC's attempt to wring broad jurisdiction over digital assets from the text of the Depression-era securities laws or the spirit of Justice Murphy's 1946 *Howey* opinion fits that doctrine to a tee.  The SEC needs "clear" statutory authority to regulate digital assets like the ones at issue.  It does not have it here.

**A.    Neither *Howey* Nor Its Progeny Gives the SEC License to Depart From the Traditional Definition of an "Investment Contract."**

Once more, when a statutory term is "obviously transplanted from another legal source" it "brings the old soil with it."  Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947).  The *Howey* Court thus held the term "investment contract" in the federal securities laws carried the "common" and "uniformly applied" definition from the state blue sky laws that preceded the federal securities laws.  *Howey*, 328 U.S. at 298.  Nevertheless, the SEC now claims that *Howey* actually (and covertly) displaced the traditional definition of "investment contract" with a new standard.  That counterintuitive claim is wrong.

---

[9] *See generally* Lewis Rinaudo Cohen et al., *The Ineluctable Modality of Securities Law: Why Fungible Crypto Assets Are Not Securities* 36-72 (Nov. 10, 2022) (discussion draft) (exhaustively surveying federal appellate cases applying *Howey*) (https://tinyurl.com/2s35rtxr).

[10] Michelle Neal, *Advances in Digital Currency Experimentation*, Fed. Res. Bank N.Y. (Nov. 4, 2022), https://tinyurl.com/d4bfkeb4 ("Currently, the total cryptoasset market capitalization rests around $1 trillion[.]"); Cristina Polizu et al., *A Deep Dive Into Crypto Valuation*, S&P Global (Nov. 10, 2022), https://tinyurl.com/yc6h9k79 ("As of August 2022, the total market capitalization of cryptocurrencies stood at $1.1 trillion . . . or about 2.5% of the U.S. equity market capitalization."); CoinMarketCap, https://tinyurl.com/bdkc6dta (last visited Feb. 3, 2023) (valuing the global cryptocurrency market cap at nearly $1.1 trillion).

MOTION TO DISMISS - 28
Case No. 2:22-cv-01009

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

1

### 1.    The SEC misreads *Howey*.

2      The SEC's view is that there is an "investment contract" whenever a person is "led to

3  invest money in a common enterprise with the expectation that they would earn a profit solely

4  through the efforts of the promoter or of some one other than themselves" (a formulation often

5  called the "*Howey* Test").  *Howey*, 328 U.S. at 298; *see also, e.g.*, SEC Summ. J. Opp'n in *Ripple*,

6  *supra*, at 11-12.  The SEC has applied that view here, alleging the tokens at issue are securities

7  under the *Howey* Test alone, *see, e.g.*, Am. Compl. ¶ 105, regardless of whether they have the

8  traditional attributes discussed above.  Relying on stray lines from *Howey* that are stripped from

9  context, the SEC reasoned in another case that the term "investment contract" is not cabined by

10  its historical definition, but is open-ended, embodying "a flexible rather than static principle, one

11  that is capable of adaption to meet the countless and variable schemes devised by those who seek

12  the use of the money of others on the promise of profits."  *Howey* 328 U.S. at 299; SEC Summ.

13  J. Opp'n in *Ripple*, *supra*, at 10, 21.

14      The SEC deeply misunderstands *Howey*.  The opinion is not at war with itself; the Court

15  does not recognize and endorse the uniform state law definition of "investment contract" in one

16  breath, yet silently displace that settled definition in the next for something wholly new.  Rather,

17  the *Howey* Test is an *elaboration upon*—not a *substitute for*—the traditional definition of

18  "investment contract."  In other words, the *Howey* Test captures the extensive array of business

19  ventures that may conceivably fit within the four corners of an "investment contract," but it does

20  not eliminate the basic qualities needed for there to be an "investment contract" *in the first place*.

21      A pie may have any number of fillings.  A term paper may cover any number of subjects.

22  But a pie needs a pastry, and a term paper needs a paper.  So too here.  There is no question an

23  "investment contract" may include "countless and variable schemes"—from orange production

24  to muskrat rearing to real estate.  But for those schemes to become federal securities, the pre-

25  requisites of an "investment contract" still must be present.  There must be a contract that imposes

26  post-sale obligations and carries a right to share in profits.  To be sure, those pre-requisites are

27

MOTION TO DISMISS - 29
CASE NO. 2:22-CV-01009

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

not exceedingly demanding, and allow for broad application.  But they are at the heart of the "uniformly applied" definition that Congress "crystallized" into law.  *Howey*, 328 U.S. at 298.

In arguing in another case that an "investment contract" does not need a contract, the SEC has also latched onto *Howey*'s description of an "investment contract" as "mean[ing] a contract, transaction, or scheme."  SEC Summ. J. Opp'n in *Ripple*, *supra*, at 15-16 (quoting *Howey*, 328 U.S. at 298-99).  That too is mistaken.  *See Edwards*, 540 U.S. at 397 ("We are considering investment *contracts*.").  Rather, the *Howey* Court was simply saying that courts need to look at the full picture, and consider the full "economic reality" of a business venture.  328 U.S. at 298.  Sometimes, the full picture resides within a single contract.  But often it does not, and a court should not disregard "substance" for "[f]orm" in doing its analysis.  *Id.  Howey* itself, for instance, involved two *transactions*—a *sales contract* for the land, and a *management contract* for the citrus groves atop that land.  *Id.* at 295-96.  Neither contract was *alone* an "investment contract"; but in combination, the *overall scheme* was.  The SEC misapprehends *Howey*'s commonsense command to consider context as license for discarding the most elemental trait of an "investment contract"—an actual contract, whether written or implicit.  *See id.* at 300 (investment contracts exist "regardless of the legal terminology in which *such contracts* are clothed" (emphasis added)).

In short, *Howey* elaborated upon the traditional definition of "investment contract."  It did not purport to replace it.  The *Howey* Court meant what it said when it said the very opposite.

## 2.     The uniform practice of the Supreme Court and the Ninth Circuit confirms the SEC's error.

Perhaps the most telling indication of a problem with the SEC's reading of *Howey* is the absence of any precedent to support it.  Indeed, the traditional definition of "investment contract" has brooked no departures.  Neither the Supreme Court nor the Ninth Circuit has *ever* found an "investment contract" where the instrument at issue did not meet the term's traditional definition.

MOTION TO DISMISS - 30
CASE NO. 2:22-cv-01009

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 ● jonesday.com

Even before *Howey*, the traditional definition of "investment contract" had taken hold in the federal courts.  *See, e.g.*, *SEC v. Bailey*, 41 F. Supp 647, 650 (S.D. Fla. 1941) ("investment contract" is "a contract providing for the investment or laying out of capital in a way intended to secure income or profit from its employment, which will arise through the activities and management of others than the owner").  And since *Howey*, the Supreme Court has *never* recognized an "investment contract" that lacks the three defining characteristics described above. *See, e.g.*, *Edwards*, 540 U.S. at 391 (finding payphone sale-and-leaseback arrangement to be investment contract where company contracted to maintain phones and deliver fixed monthly return); *Tcherepnin v. Knight*, 389 U.S. 332, 337 (1967) (same for "withdrawable capital shares" that paid "dividends" from savings and loan association's "profits"); *SEC v. United Benefit Life Ins. Co.*, 387 U.S. 202, 205 (1967) (same for annuity contracts providing right to a "*pro rata* share" of returns from "portfolio of equity interests"); *SEC v. Variable Annuity Life Ins. Co.*, 359 U.S. 65, 71 (1959) (similar); *see also SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 348-49 (1943) (same for oil lease sales conditioned on promoters' contractual agreement to drill wells).

Nor has the Ninth Circuit—in any case of which we are aware—ever deviated from this consistent understanding of the term.  *See, e.g.*, *SEC v. Schooler*, 905 F.3d 1107, 1110-13 (9th Cir. 2018) (finding land sale to be an investment contract where promoter contractually promised to operate development project and return pro rata profits); *Warfield v. Alaniz*, 569 F.3d 1015, 1024 (9th Cir. 2008) (same for charitable gift annuities that promised regular returns); *SEC v. R.G. Reynolds Enters., Inc.*, 952 F.2d 1125, 1131 (9th Cir. 1991) (same for interests in similar investment programs).[11]  Indeed, where an instrument has *lacked* an essential part of the

---

[11]  *See also, e.g.*, *SEC v. Hui Feng*, 935 F.3d 721, 726-27 (9th Cir. 2019) (investments in regional centers that financed construction projects, that promised investors a fixed annual return); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 1006 (9th Cir. 2010) (variable annuities); *Rubera*, 350 F.3d at 1087, 1093 (payphone purchase and service agreements where company agreed to operate the payphones and return at least $58.34 each month, and up to 30% of the phone's monthly revenue); *Webster v. Omnitrion Int'l, Inc.*, 79 F.3d 776, 784 (9th Cir. 1996) (multi-level marketing program); *SEC v. Eurobond Exch., Ltd.*, 13 F.3d 1334, 1338-41 (9th Cir. 1994) (agreement where seller would use investor's money to obtain foreign-currency loans and purchase foreign-treasury bonds, and return to invest "profit . . . derived from the difference" between the loan's and bonds' interest rates); *Hocking v. Dubois*, 885 F.2d 1449, 1455 (9th Cir. 1989) (en banc) (agreement where broker packaged condominium sale with development agreements); *Davis v. Metro Prods., Inc.*, 885 F.2d 515, 517 (9th Cir. 1989) ("production service

MOTION TO DISMISS - 31
CASE NO. 2:22-CV-01009

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

traditional definition of "investment contract," this Circuit has held it is not a security. *See, e.g.*, *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1131-32 (9th Cir. 2013) (finding no investment contract where real estate agreement did not clearly involve post-sale obligations or legal entitlement to share profits); *De Luz Ranchos*, 608 F.2d at 1301 (same where promoter "did not represent that it would develop, improve, or manage" the lands and also "did not promise to distribute profits"); *Chapman v. Rudd Paint & Varnish Co.*, 409 F.2d 635, 640-41 (9th Cir. 1969) (same where product distributorship agreement expressly disclaimed guarantee of any entitlement to regular profits).[12]

---

agreements" where company sold television tapes, advised investor that he must engage a management services group to market the videotapes and thereby make income, and introduced him to the management company that he retained); *United States v. Kessi*, 868 F.2d 1097, 1101, 1103 (9th Cir. 1989) (agreements where investors would receive 50% of the profits from seller's trading); *United States v. Morse*, 785 F.2d 771, 773-74, 776 (9th Cir. 1986) (investments in oil and gas drilling, in video-game placement program, and in heavy-equipment leasing program); *SEC v. Goldfield Deep Mines Co. of Nev.*, 758 F.2d 459, 462-65 (9th Cir. 1985) (ore purchase program where investors would purchase tons of ore dump material, and where seller would by default process, refine, store, and market the ore and return proceeds of ore's sale); *United States v. Jones*, 712 F.2d 1316, 1319, 1322 (9th Cir. 1983) (sale-leaseback arrangements for tractors and trailers); *SEC v. Murphy*, 626 F.2d 633, 640 (9th Cir. 1980) (limited partnership agreement); *United States v. Farris*, 614 F.2d 634, 641 (9th Cir. 1979) (mortgage notes where sellers agreed to collect on notes and pay off the principal if the lot's buyer defaulted); *Smith v. Gross*, 604 F.2d 639, 641-43 (9th Cir. 1979) (earthworm purchase agreement where seller promised to buy back the worm offspring at $2.25 per pound); *United States v. Carman*, 577 F.2d 556, 559, 564 (9th Cir. 1978) (federally insured student loan "packages" that included, among other things, a "contract" where a company agreed to service the loan, an agreement to repurchase any defaulted loans, and a buy-back agreement); *SEC v. Commodity Options Int'l, Inc.*, 553 F.2d 628, 632-33 (9th Cir. 1977) (double-options contract where seller would reinvest money and return to buyer a share of the profits); *Safeway Portland Emps.' Fed. Credit Union v. C. H. Wagner & Co.*, 501 F.2d 1120, 1122-24 (9th Cir. 1974) (sale of certificates of deposit coupled with a promise to pay bonus interest on the certificates); *Parvin v. Davis Oil Co.*, 524 F.2d 112, 115-16 (9th Cir. 1975) (fractional oil and gas leases where seller would "conduct oil exploration operations on the leased land"); *El Khadem v. Equity Sec. Corp.*, 494 F.2d 1225, 1226, 1230 (9th Cir. 1974) (agreement where company promised to use invested capital for own investment, for which investor would receive tax benefits and investment leverage); *SEC v. Glenn W. Turner Ents., Inc.*, 474 F.2d 476, 478, 480-82 (9th Cir. 1973) (arrangements where purchaser would receive a right to sell company's self-improvement plans to others and a guaranteed commission on each sale); *L.A. Tr. Deed & Mortg. Exch. v. SEC*, 285 F.2d 162, 171-72 (9th Cir. 1960) (trust deeds where seller promised 10% earnings and to, among other things, service the loan and handle foreclosure on it); *Penfield Co. of Cal. v. SEC*, 143 F.2d 746, 750-51 (9th Cir. 1944) (whiskey purchase and bottling contracts where the company would bottle whiskey and sell it, and then pay contract holders 90% of the profits); *see* Cohen, *supra*, at 53 ("[I]n those very limited appellate cases in which an investment contract was found without there being a written contract between the parties that related to the investment contract transaction, the elements of an implied-in-fact contract are always present.").

[12] When pressed with these arguments in the *Ripple* case pending in the Southern District of New York, the SEC failed to cite a single genuine counter-example (other than a thimbleful of cases involving other digital assets) in which a court found an "investment contract" without the traditional definition of that term being satisfied. *Compare* Ripple Summ. J. Mot., *supra*, at 21-23, *with* SEC Summ. J. Opp'n in *Ripple*, *supra*, at 19-21. At most, the SEC raised out-of-circuit cases that stand for the uncontroversial proposition that an "investment contract" does

---

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

1    The SEC's attempt to regulate the digital assets here—tokens sold on secondary markets,

2  involving no contract, no post-sale obligations, nor any right to share in profits—deviates from

3  the long-settled understanding of the securities laws' scope.  The Court should squarely reject it.

4    **B.     The Major Questions Doctrine Confirms the SEC May Not Jettison the**

5    **Traditional Definition of "Investment Contract" Here.**

6    Precedent and text plainly require dismissal of the SEC's Amended Complaint.  But even

7  if the SEC were able to conjure some ambiguity about the scope of its authority—whether from

8  *Howey* or the federal securities laws themselves—the Major Questions Doctrine would foreclose

9  exploiting that ambiguity here.  That is, *even if* the SEC's competing understanding of the law

10  were "colorable" or "plausible," that is not enough.  *West Virginia*, 142 S. Ct. at 2609.  As

11  between two possible interpretations of the law—one that confers vast power on federal agencies

12  to resolve substantial policy questions, and one that ensures Congress makes major policy

13  choices—the Major Questions Doctrine requires the federal courts to opt for the latter reading.

14    It is hard to fathom a more archetypal violation of the Major Questions Doctrine than the

15  SEC's assertion of authority over digital assets.  That doctrine holds, at heart, that an agency may

16  not bring about a major policy without clear statutory authorization.  *Id.*  And here, the SEC is

17  pressing a novel construction of an isolated term from a Depression-era law to assert regulatory

18  authority over a trillion dollar industry built upon revolutionary technology poised to define the

19  next generation of the internet—all as Congress is actively debating the issue, considering *zero*

20  proposals that bless the SEC's view of its own authority.  Time and again, the Supreme Court

21  has rejected this sort of expansionism by federal agencies.  This Court should do the same here.

22

23

24

25

26  not require a *written* contract.  Sure.  But saying that contractual obligations need not be committed to paper does

27  *not* mean they need not exist *at all*.

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

1   **1.  How to regulate digital assets is a major question requiring clear**

2   **congressional authorization before an agency may act.**

3       The Supreme Court has repeatedly held that "an agency must point to clear congressional

4   authorization when it seeks to regulate a significant portion of the American economy." *West*

5   *Virginia*, 142 S. Ct. at 2621 (Gorsuch, J., concurring) (collecting cases).  The Court has not set a

6   precise dollar amount for this economic trigger, but precedent and common sense give a sense of

7   where the line is drawn.  *See, e.g.*, *id.* at 2622 (regulation imposing over $200 billion in costs);

8   *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 321-22 (2014) (regulation imposing around

9   $150 billion in costs); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)

10  (agency asserting jurisdiction over domestic tobacco industry valued roughly near $100 billion).

11      Here, the SEC is claiming regulatory domain over a digital asset industry worth around

12  $1 *trillion*.[13]  The industry employs thousands of Americans; has attracted record sums of venture

13  capital funding; and has given rise to scores of new businesses.[14]  Moreover, digital assets have

14  become a fact of daily life for many Americans.  Almost one-in-five Americans have invested in

15  cryptocurrency at some point.[15]  And the per-day volume for trading tracks around $100 billion.[16]

16      Digital assets are also built on a pathmarking technology—the blockchain—that is

17  destined to reshape the financial sector and define the next generation of the internet.  As noted,

18  blockchain technology lets parties transact without a centralized intermediary, like a broker or

19  bank.  This has profound implications for financial services.  Blockchain also allows people to

20  store, transfer, and verify data without an intermediary—that is, to interact online without relying

---

22      [13]  *See* sources cited *supra* note 10.

23      [14]  *See, e.g.*, Jamie Redman, *Crypto Employment Abounds with More Than 8,000 Jobs in 2020*, Bitcoin.com (Jan. 18, 2020), https://tinyurl.com/3ph27fsk; Tom Wilson et al., *Cryptoverse: What Crisis? Venture Capitalists Bet Big on Crypto*, REUTERS (July 26, 2022), https://tinyurl.com/3b65ybtd; *Blockchain in Financial Services Startups in the United States*, TRACXN (Sept. 20, 2022), https://tinyurl.com/3azj4tuv (reporting 3,941 U.S. startups using blockchain in financial services).

25      [15]  *See, e.g.*, Thomas Franck, *One in Five Adults Has Invested in, Traded or Used Cryptocurrency*, *NBC News Poll Shows*, CNBC (Mar. 31, 2022), https://tinyurl.com/6ksnk3pa.

27      [16]  *See Q2 2022 Cryptocurrency Report*, COIN GECKO (July 13, 2022), https://tinyurl.com/dpuyw5sr.

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

(as we do today) on a handful of large tech companies to facilitate and monitor those interactions. In this light, blockchain technology will be at the center of future debates about privacy, surveillance, and government power.  All told, blockchain technology has already been used for such varied purposes as tracking tangible items via "smart contracts" (ranging from lettuce to diamonds), empowering foreign refugees to identify themselves digitally after fleeing their home countries, and permitting local communities to securely maintain land registration records.[17]

Because of both the monetary value and societal potential of digital assets, who regulates them and how is a big deal.  Or put another way, regulating digital assets plainly concerns "a significant portion of the American economy."  *West Virginia*, 142 S. Ct. at 2608 (quotation marks omitted).  And for that reason, the question of how to regulate digital assets principally falls to Congress, not an administrative agency like the SEC.  *Id.* at 2609 ("We presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies.").

Recognizing that the regulation of digital assets presents a major question would not put every digital asset beyond the reach of the SEC.  It would, however, require that the SEC satisfy the longstanding meaning of "investment contract" before it can assert authority over a particular digital asset.  The SEC's ability to concoct a "novel" reading of a statute—however "colorable" or "plausible"—is insufficient.  *Id.*  Only "clear congressional authorization" will do.  *Id.*

## 2. The SEC lacks clear congressional authorization to deem the tokens at issue to be "securities."

The SEC does not have clear congressional authorization for its assertion of regulatory power in this case, or broadly over the digital asset space.  Five independent points show why.

*First*, far from clearly authorizing the SEC's assertion of regulatory power, the term "investment contract" *affirmatively forecloses* it.  As explained above, "investment contract" is

---

[17] *See, e.g.*, Michael Corkery & Nathaniel Popper, *From Farm to Blockchain: Walmart Tracks Its Lettuce*, N.Y. TIMES, Sept. 24, 2018, https://tinyurl.com/jkcvrey8; *De Beers Group Successfully Tracks First Diamonds from Mine to Retail on Industry Blockchain*, DE BEERS GRP. (May 10, 2018), https://tinyurl.com/e9cdj8yt; Fixing Aid, *Can Blockchain Help Fix the I.D. Problem for a Billion People?*, NEW HUMANITARIAN (Mar. 31, 2022); Eli Abrams, *How European Countries Are Using Blockchain to Reform the Land Registration Process*, EMERGING EUROPE (Aug. 17, 2022), https://tinyurl.com/436tewjc.

MOTION TO DISMISS - 35
CASE NO. 2:22-CV-01009

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

a term of art that Congress incorporated into the federal securities laws—a term of art that necessarily excludes the tokens at issue. *Supra* Section I.A.1. This case is thus far simpler than those in which courts have had to grapple with vague terms that lacked established definitions. *See, e.g.*, *Brown & Williamson*, 529 U.S. at 126-27 ("drugs" and "devices"); *Utility Air*, 573 U.S. at 310 ("air pollutant"); *West Virginia*, 142 S. Ct. at 2610 ("system"). At minimum, the SEC cannot divine a *clear* statement of *existing* authority by recasting a term of art in an entirely novel way.

*Second*, the SEC's position would massively expand its own power. Congress included the phrase "investment contract" in the securities laws to cover one-off business ventures where the investment interests had the basic attributes of a traditional security. *See Edwards*, 540 U.S. at 393-94. And that term has been applied consistently with its limited focus, covering investment schemes involving orange groves, beavers, and real estate.[18] The SEC is now trying to dust off this obscure term to ensnare an *entire industry* worth around $1 trillion. The SEC has "never relied on [this] authority to regulate [business] . . . [in] such a remarkable manner." *West Virginia*, 142 S. Ct. at 2609. And the Major Questions Doctrine forecloses its attempt to "discover" such an "unheralded power" in "a long-extant statute." *Utility Air*, 573 U.S. at 324.

*Third*, the SEC's sweeping view of an "investment contract" is in tension with the existing framework for securities regulation. Not only is the SEC's view inconsistent with the basic function of securities regulation. *Supra* Section I.C. It is also, as a practical matter, an exceedingly poor fit for the securities laws. And when an agency's position is "inconsistent with the design and structure of the statute as a whole," it flunks the Major Questions Doctrine. *Id.* at 321.

---

[18] *See Howey*, 328 U.S. at 299; *Joiner*, 320 U.S. at 348-49; *Continental Marketing*, 387 F.2d at 468-71; *see also, e.g.*, *Rubera*, 350 F.3d at 1087, 1093 (payphone purchase and service agreements); *Goldfield Deep Mines*, 758 F.2d at 462-65 (ore purchase and refinement program); *Penfield*, 143 F.2d at 750-51(whiskey bottling scheme).

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

Consider, for instance, how digital assets may interact with the many disclosure rules in the securities laws.  To take one example, before a security is sold to the public, an "issuer" usually needs to file a registration statement with the SEC detailing information about the issuer's business.  The Securities Act defines "issuer" as "every person who issues or proposes to issue any securities." 15 U.S.C. § 77b(a)(4).  But what does that mean for digital assets?  Is the issuer the computer software that creates and distributes tokens?  Is it the person who originally wrote that program, even if he no longer has anything to do with the platform?  Is it each validator on the platform who gets tokens by verifying transactions?  Each user who earns new tokens as rewards?  Other examples abound.[19]  But the basic point is that there is a mismatch between the securities laws' focus on *centralized* companies (*e.g.*, General Motors) and digital assets' *decentralized* networks.  A legal regime designed around singular companies and business ventures—with clear point people and leaders—does not map cleanly onto a set of products *defined* by their diffuse nature.

*Fourth*, Congress is actively considering how to best regulate digital assets.  The reality is that digital assets do not fit cleanly into any existing federal regulatory regime—they blur the lines across money, commodities, and securities.  That has led to confusion among regulators.  The Commodity Futures Trading Commission ("CFTC"), for example, has taken the view that some digital assets are commodities.  *See, e.g.*, Commodity Futures Trading Comm'n, *Digital Assets Primer* 23 (2020); Amended Complaint ¶ 1, *Commodity Futures Trading Comm'n v. Bankman-Fried*, No. 22-cv-10502 (S.D.N.Y. Dec. 13, 2022).  One CFTC Commissioner even criticized the SEC's decision to allege here "that dozens of digital assets," including utility tokens and governance tokens, "are securities."  Statement, Commodity Futures Trading Comm'n, Statement of Commissioner Caroline D. Pham on *SEC v. Wahi* (July 21, 2022),

---

[19] *See, e.g.*, Chris Brummer, *Disclosure, Dapps and DeFi*, 5 Stan. J. Blockchain L. & Pol'y 137, 144-49 (2022); Carol R. Goforth, *Cinderella's Slipper: A Better Approach to Regulating Cryptoassets as Securities*, 17 Hastings Bus. L.J. 271, 294-301 (2021); Lewis Renaudo Cohen, *Ain't Misbehavin': An Examination of Broadway Tickets and Blockchain Tokens*, 65 Wayne L. Rev. 81, 97 (2019).

MOTION TO DISMISS - 37
CASE NO. 2:22-CV-01009

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

https://tinyurl.com/47wdzu2a.   Meanwhile, one SEC Commissioner has conceded that, if the SEC "seriously grappled with the legal analysis and [its] statutory authority," it "would have to admit that [it] likely need[s] more, or at least more clearly delineated, statutory authority to regulate certain crypto tokens and to require crypto trading platforms to register with us."  Hester M. Peirce, Comm'r, Secs. & Exch. Comm'n, Outdated: Remarks Before the Digital Assets at Duke Conference (Jan. 20, 2023), https://tinyurl.com/eh8cmtbk.   That same Commissioner added: "Congress can figure out whether and how to fill the regulatory gaps."  *Id.*  And given this novel terrain and the jurisdictional questions digital asset regulation presents, Congress appears to have taken on that task and  begun to "debate[] the matter frequently."  *West Virginia*, 142 S. Ct. at 2621 (Gorsuch, J., concurring); *see also, e.g.*, S. 4760 (Aug. 3, 2022) ("Digital Commodities Consumer Protection Act"); S. 4356 (June 7, 2022) ("Lummis-Gillibrand Responsible Financial Innovation Act"); H. 4741 (July 2021) ("Digital Asset Market Structure and Investor Protection Act").[20]

Congress is not now actively debating a question it has already answered.  And the Congress that passed the federal securities laws did not make the policy choice about how to regulate something like crypto.  If anything, the current congressional debates strongly suggest that the SEC should *not* be in charge of digital assets.  None of the current proposals in Congress assigns primary regulatory authority to the SEC.  Indeed, a wide number of proposals have been introduced *specifically* to clarify the SEC *currently lacks* regulatory jurisdiction over broad swaths of digital assets—including tokens like the ones here.  *See, e.g.*, H.R. 1628, §§ 2-5 (Mar.

---

[20]  *See also* S. 5030 (Sept. 29, 2022) ("Digital Trading Clarity Act of 2022"); H.R. 7614 (Apr. 28, 2022) ("Digital Commodity Exchange Act of 2022"); H.R. 4451 (July 16, 2021) ("Securities Clarity Act"); H.R. 1628 (Mar. 8, 2021) ("Token Taxonomy Act"); H.R. 1602 (Mar. 8, 2021) ("Eliminate Barriers to Innovation Act of 2021"); H.R. 923 (Jan. 30, 2019) ("U.S. Virtual Currency Market and Regulatory Competitiveness Act of 2019"); H.R. 6154 (Mar. 9, 2020) ("Crypto-Currency Act of 2020").  The Chairman of the House Financial Services Committee has also recently established a Subcommittee on Digital Assets, Financial Technology and Inclusion tasked with, among other things, "[p]roviding clear rules of the road among federal regulators for the digital asset ecosystem."  Press Release, Fin. Servs. Comm., McHenry Announces Financial Services Subcommittee Chairs and Jurisdiction for 118th Congress (Jan. 12, 2023), https://tinyurl.com/yc7h4kua.  Since then, the Committee's majority wing has announced that the "Howey Test is not fit for the purpose of determining whether many digital assets are a security" and that its members "are committed to fixing this in legislation."  Financial Services GOP (@FinancialCmte), TWITTER (Jan. 26, 2023, 1:20 PM), https://tinyurl.com/3zhkucfh.

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

8, 2021) ("Token Taxonomy Act"); H.R. 4451 §§ 2(a)(2)-(5), 3 (July 16, 2021) ("Securities Clarity Act").  Congress has thus "conspicuously and repeatedly declined" to accede to the SEC's broad view of its own authority.  *West Virginia*, 142 S. Ct. at 2610; *see also id.* at 2620-21 (Gorsuch, J., concurring) ("This Court has found it telling when Congress has considered and rejected bills authorizing something akin to the agency's proposed course of action.").

*Finally*, practical consequences weigh heavily against the SEC's position.  *See id.* at 2608. Given the unprecedented nature of the SEC's interpretation of "investment contract," there are minimal real world consequences to rejecting it; we are aware of no case in which either the Supreme Court or this Circuit has *ever* countenanced an "investment contract" that departs from the term's traditional definition.  The repercussions of adopting the Commission's broad view would, by contrast, be momentous, and would expand far beyond digital assets.  In its plainest form, it is hard to see how the SEC's view—unburdened by the traditional definition of "investment contract"—would not extend to baseball cards, beanie babies, designer sneakers, commemorative coins, initial sales of concert tickets (often bought to flip for a profit), and much more besides.  With that interpretation, as SEC Commissioner Peirce has noted, "functionally the 'most important' factor of the *Howey* Test is an SEC-invented 'fifth shadow factor': whether the SEC wants to regulate the asset."  *See* Peirce, Remarks, *supra*.  But Congress likely did not delegate the question whether to regulate any asset—and thereby an entire industry—to an agency to decide on a whim.  Thus, even if the SEC's interpretation were potentially plausible, "the sheer scope of [its] claimed authority . . . would counsel against [its] interpretation." *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (per curiam).  The Court should decline to go down that perilous path and should instead enforce the law as Congress wrote it.

## C.      Due Process Concerns Similarly Militate Against the SEC's Position.

At minimum, principles of due process forbid the SEC from recasting the term "investment contract" to pick up the tokens at issue here.  Fair notice requires that laws be defined

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

with sufficient clarity that ordinary people like the Wahi brothers may understand what conduct is prohibited.  *See Skilling v. United States*, 561 U.S. 358, 402 (2010).  Congress may not cast a "net large enough to catch all possible offenders," while leaving "it to the courts to step inside and say who could be rightfully detained."  *United States v. Reese*, 92 U.S. 214, 221 (1876).

If the SEC's reading of "investment contract" were permissible—that is, if an "investment contract" does not require anything resembling a contractual relationship or binding obligations thereunder—then the law would be unconstitutional, at least as applied to the Defendants.  Recall, not even the phalanx of sophisticated counsel at Coinbase thinks the tokens at issue are securities. *Supra* p. 10.  The industry has been raising the alarm for years that nobody has any clue what digital assets the SEC considers to be federal securities.[21]  And one Commissioner has admitted that the regulatory environment is "opaque," with the SEC's "regulation-by-arbitrary-and-tardy-enforcement-actions approach" being "the opposite of a rational regulatory framework."  Peirce, Remarks, *supra*.  Indeed, if the SEC is able to detach the term "investment contract" from its historical meaning, then all sorts of assets become potentially fair game—virtually all items that people buy for investment purposes based on expectations about what some other person or entity will do.  There is no reason to invite such constitutionally problematic chaos.  This Court should instead reject the SEC's open-ended conception of an "investment contract" and dismiss the Amended Complaint.

## III.   THE TOKENS ARE NOT "INVESTMENT CONTRACTS" UNDER *HOWEY*'S TERMS ALONE.

The most straightforward basis for dismissal is that none of the tokens at issue here are "investment contracts" under that term's traditional definition, as explained above.  But even under the prongs of *Howey*—removed from context and stripped of their historical meaning— the SEC still loses.  Under *Howey*, an "investment contract" must include "(1) an investment of

---

[21]  *See, e.g.*, Petition for Rulemaking – Digital Assets Securities Regulation, SECS. & EXCH. COMM'N (July 21, 2022), https://tinyurl.com/22xb6e52; Sumathi Bala, *Ripple CEO Says the U.S. Lacks Regulatory Clarity on Cryptocurrency*, CNBC (Apr. 30, 2021), https://tinyurl.com/bdzcrxmc; *Is XRP a Security?  We May Never Know*, COIN TELEGRAPH (Sept. 29, 2019), https://tinyurl.com/32tyebdt; Kate Rooney, *Crypto Industry Leaders Warn Congress: Figure out Regulation, or Watch Innovation Leave the US*, CNBC (Sept. 25, 2018), https://tinyurl.com/3ckujbfd.

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

1  money (2) in a common enterprise (3) with an expectation of profits produced solely by the

2  efforts of others." *Warfield*, 569 F.3d at 1020.  The *Howey* Test is conjunctive, so failing any of

3  its elements means the instrument is not a security.  *Howey*, 328 U.S. at 301.  And here, on the

4  Amended Complaint's own terms, none of the tokens satisfies *Howey*'s latter two prongs.  Even

5  under the SEC's preferred framework, the Amended Complaint must therefore be dismissed.

6           **A.      None of the Tokens Involves a "Common Enterprise."**

7           As noted, an "investment contract" is something more than an ordinary asset sale.  Among

8  other things, it requires an investment in a "common enterprise."  Courts have divided over the

9  precise meaning of this term, but the basic notion captures a shared endeavor where the

10 participants' fortunes are intertwined.  James D. Gordon, *Defining a Common Enterprise in*

11 *Investment Contracts*, 72 Ohio St. L.J. 59, 61 (2011).  There are two ways to establish a "common

12 enterprise" in the Ninth Circuit—through "horizontal commonality" or "strict vertical

13 commonality."  *Hocking v. Dubois*, 885 F.2d 1449, 1455 (9th Cir. 1989) (en banc).  Broadly

14 speaking, *horizontal* commonality focuses on the relationship *across* similarly situated investors,

15 while strict *vertical* commonality focuses on the relationship *between* promoter and investor.  *Id.*

16          The SEC does not say whether it thinks the tokens here exhibit a "common enterprise"

17 under a theory of horizontal or strict vertical commonality.  But it does not matter.  The SEC fails

18 to plausibly allege a "common enterprise" for any token under either theory.

19                **1.      None of the tokens satisfies horizontal commonality.**

20          Again, horizontal commonality focuses on the relationship across investors.  Namely,

21 horizontal commonality requires investors to commingle assets in a common pool so that their

22 fortunes rise and fall as one (something called "pooling").  *Hocking v. Dubois*, 839 F.2d 560, 566

23 (9th Cir. 1988), *aff'd in relevant part*, 885 F.2d 1449 (9th Cir. 1989) (en banc).  In other words,

24 investors "pool their investments together and split the net profits and losses in accordance with

25 their pro rata investments."  *Id.*  And by "pooling their assets and giving up their claims to any

26

27

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

1  profit or loss attributable to their particular investments, investors make their collective fortunes

2  dependent on the success of a single common enterprise." *Id.*

3       As an example of horizontal commonality, consider the facts of *Howey*.  There, investors

4  did not purchase particular orange groves or specific allocations of fruit.  Instead, they put their

5  money together as part of a shared endeavor, where Mr. Howey commingled fruit from all the

6  groves and allocated pro rata profits to investors based on overall production.  *Howey*, 328 U.S.

7  at 296.  If there was a good harvest, investors received a higher pro rata distribution; if there was

8  a bad one, lower, consistent with those "investors' allocable shares of the profits."  *Id.* at 300.

9       By contrast, horizontal commonality is lacking whenever an individual purchaser may

10  "make profits or sustain losses independent of the fortunes of other purchasers."  *Revak v. SEC*

11  *Realty Corp.*, 18 F.3d 81, 88 (2d Cir. 1994); *see also* 3 Harold S. Bloomenthal & Samuel Wolff,

12  *Securities and Federal Corporate Law* § 2:26 (2d ed.) (explaining an investment scheme "does

13  not involve the pooling of one investor's moneys with the other, [when] they are in fact separately

14  invested and accounted for").  For instance, in *Revak*, the Second Circuit held individual condo

15  owners who bought their units from the same property company lacked horizontal commonality,

16  because the "rents and expenses attributable to each unit were not shared or pooled in any

17  manner, but were instead the sole responsibility of the unit owner."  18 F.3d at 88.

18       Here, the SEC fails to plausibly allege horizontal commonality for any of the tokens.  This

19  is because no token involves "pooling" across purported investors.  For starters, where, as here,

20  token-holders purchase their tokens on an exchange, no money accrues in a common "pool"

21  under the developer's discretionary control.  In the typical exchange transaction, money flows

22  from the token-buyer to the *individual* token-seller (or perhaps the exchange itself), not the token

23  developer.  *See* O'Connor, *supra*, at 577.  The SEC cannot allege a common "pooling" of assets

24  based on transactions where no money ever goes to the promoter.

25       Fundamentally, horizontal commonality is lacking because, among other reasons, each

26  token-holder is simply an individual asset-holder, whose "profits or losses [are] attributable to

27

MOTION TO DISMISS - 42
CASE NO. 2:22-cv-01009

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

their particular investment," not some pro rata distribution of shared earnings. *See Hocking*, 885 F.2d at 1459; *see also Lavery v. Kearns*, 792 F. Supp. 847, 858-59 (D. Me. 1992) (no horizontal commonality where developers "may have had a plan by which they would use the capital from [condo] sales for their other projects" but "[condo] owners were not a part of that plan" because they could chose to "hold on to their property, using or renting it, or resell it").

Consider POWR.  As the Amended Complaint tells it, people who bought POWR bought individual tokens that they could "buy and sell" "whenever they want."  Am. Compl. ¶ 184.  That is irreconcilable with horizontal commonality.  Horizontal commonality "requires that investors share in the profits and risks *of the enterprise*," *SEC v. SG Ltd.*, 265 F.3d 42, 50 (1st Cir. 2001) (emphasis added), and so relinquish any claim to profits or losses attributable *to their individual investments*, *see Revak*, 18 F.3d at 88.  But here, POWR token-holders own their tokens outright, and profits or losses turn wholly on when they choose to sell.  That is apples to *Howey*'s oranges; an individual investment as compared to a pro rata distribution from a collective pot.  *Id.*

It makes no difference that the market price of POWR tokens fluctuates the same way for all token-holders.  That is all true for the sale of *any* fungible asset that could be resold on a secondary market—gold bars, concert tickets, condominiums, beanie babies, etc.  What disables horizontal commonality in those examples is that an *individual* buyer can earn profits or incur losses on an *individual* basis.  *Hocking*, 839 F.2d at 566.  Because buyers can profit individually in those examples—as token-holders could here—horizontal commonality is lacking.  *See, e.g.*, *Wals v. Fox Hills Dev. Corp.*, 24 F.3d 1016, 1019 (7th Cir. 1994) (pooling requires "an undivided share in the same pool of assets and profits").

This fundamental defect is common to all the tokens at issue.  For each, the SEC does not allege a scheme whereby token-buyers cede control of assets to a common pool of funds.  *E.g.*, Am. Compl. ¶¶ 114 (AMP); 125 (RLY); 136 (DDX); 149 (XYO); 160 (RGT); 174 (LCX); 183 (POWR); 197 (DFX); 211 (KROM).  Rather, each individual investor acts on his own accord when buying or selling tokens—earning profits and incurring losses according to his own

decisions.  *E.g.*, *id.* ¶¶ 122 (AMP); 131 (RLY); 145 (DDX); 155 (XYO); 171 (RGT); 178 (LCX); 190-91 (POWR); 207 (DFX); 214-15 (KROM).   That forecloses horizontal commonality for every token.

Finally, the fact some tokens allow for "staking" does not change the analysis.  As noted above, "staking" involves token-holders posting their own tokens as collateral for their work helping the platform operate.  But staking is both *optional* (it is not something every token-holder has to do) and *individualized* (what a person earns via "staking" turns on individual conduct).  It does not involve investors pooling their funds together on the front end, nor pro rata distributions drawn from common earnings on the back end.  As such, any suggestion by the SEC that staking may give rise to horizontal commonality is deeply mistaken.  *E.g.*, *id.* ¶ 114 (AMP).

### 2. None of the tokens satisfies strict vertical commonality.

The Amended Complaint also fails to plausibly allege strict vertical commonality. Vertical commonality generally focuses on the relationship among the promoter and investor (rather than across the investors themselves).   And *strict* vertical commonality requires the fortunes of promoter and investor to be inextricably linked; if one can do well while the other does poorly, strict vertical commonality is destroyed.  But that very dynamic defines each of the tokens here.

Stated simply, the distinction between broad vertical commonality and strict is that the former requires only that the fortunes of the investor be linked to the *efforts* of the promoter while the latter requires that the fortunes of the investor be linked to the *fortunes* of the promoter.  *See, e.g.*, *Brodt v. Bache & Co.*, 595 F.2d 459, 461 (9th Cir. 1978) (rejecting "broad" vertical commonality).  In particular, strict vertical commonality turns on a "direct relation between the success or failure of the promoter and that of his investors."  *Mordaunt v. Incomco*, 686 F.2d 815, 817 (9th Cir. 1982).   Something more is needed than a link between the "fortunes of investors" and the "*efforts* of the promoter."  *Revak*, 18 F.3d at 88.  Rather, as the Ninth Circuit has made plain, strict vertical commonality exists only where the "fortunes of the investor are

MOTION TO DISMISS - 44
CASE NO. 2:22-CV-01009

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

*interwoven with* and *dependent upon* the efforts and success of those seeking the investment or of third parties." *Brodt*, 595 F.2d at 460 (emphases added).   Critically, strict vertical commonality does not exist whenever an investor's fortunes can operate independently from those of the promoter; that is, whenever an investor can experience profits while the promoter can experience losses (or vice versa). *Mordaunt*, 686 F.2d at 817.

As the Amended Complaint itself explains, however, no token-holder's fortune is *interwoven* with that of the developers.   Rather, for each of the tokens, the Amended Complaint describes how token price turns principally on market forces *rather than* the vitality of the underlying platform. *See, e.g.*, Am. Compl. ¶¶ 122 (describing 1000% price swing in AMP), 131 (100% for RLY), 145 (300% for DDX), 155 (200% for XYO), 171 (6300% for RGT), 173 (700% for LCX), 191 (300% for POWR), 208 (700% for DFX), 214 (1200% for KROM).   A token-holder could turn a profit by selling a token despite the platform struggling. *See, e.g., id.* ¶¶ 143-45 (noting possible 300% return for platform that still is not fully operational).   And a platform could be performing well even while the price of its token sags. *See, e.g., id.* ¶¶ 172-78 (describing how price for LCX fluctuated during period while platform earned money from "crypto-related services").

Contrast this dynamic again to the facts of *Howey*.   There, the orange harvest affected Mr. Howey and his investors in equal measure.   All profited alike from selling the grove's oranges.   But that is not true for the tokens here.   For each of the tokens, a token-holder's success turns on *individual* decisions about when to buy and sell tokens—as the allegations that the Defendants strategically timed their token purchases and sales amply confirm—rather than the "sound management and continued solvency" of the developers. *SEC v. Eurobond Exch., Ltd.*, 13 F.3d 1334, 1340 (9th Cir. 1994).   That fundamental mismatch defeats strict vertical commonality. *See, e.g., Meyer v. Thomas & McKinnon Auchincloss Kohlmeyer, Inc.*, 686 F.2d 818, 819 (9th Cir. 1982).

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

1    The SEC says each token involves a "common enterprise" because the interests of token-

2    holders and developers are broadly aligned, in part because the developers often hold tokens

3    themselves, and in part because both token-holders and developers generally want the underlying

4    platform to do well. *See, e.g.*, Am. Compl. ¶ 175. But that proves too much. If a mere alignment

5    of interests could satisfy strict vertical commonality, then *Howey*'s requirement that an investor

6    and a promoter share in a "common enterprise" (*i.e.*, "a profit-seeking business venture") would

7    be rendered meaningless. 328 U.S. at 299-300; *see, e.g.*, *Mordaunt*, 686 F.2d at 817; *Bobrowski*

8    *v. Red Door Grp., Inc.*, No. CV-09-02077, 2011 WL 3875424, at *1 (D. Ariz. Aug. 31, 2011)

9    (rejecting similar argument based on "tenuous link" between investor's profits and promoter's

10   success).

11   Indeed, investors and promoters will *always* want the overarching venture to succeed

12   rather than fail. As such, more is needed to show *strict* vertical commonality. *See Revak*, 18

13   F.3d at 88. Someone who buys gold from a jeweler is not in strict vertical commonality with that

14   jeweler, even if the jeweler also owns gold and even though both generally hope that gold prices

15   will increase. To establish strict vertical commonality, an investor's profits and losses must be

16   *tied* in some meaningful way to the profits and losses of the promoter. For this reason, courts

17   have typically found that where (as here) investors and promoters can sell their assets at different

18   times for varying profits and losses, that is fatal to strict vertical commonality—even where

19   general market conditions will have a common effect on investor and promoter alike. *See, e.g.*,

20   *Marini v. Adamo*, 812 F. Supp. 2d 243, 257-58 (E.D.N.Y. 2011) ("[W]hile the valuation of their

21   portfolios may have paralleled one another given their similar contents, and any deal that [the

22   promoter] found could have affected the prices of the coins that [the investor] owned, [their]

23   portfolios were not intertwined such that [their] fortunes *had* to rise and fall together.").

24   These defects are common to all the tokens underlying the Amended Complaint. That is,

25   as alleged, each of the nine tokens at issue were sold on the secondary market, and thus

26   necessarily came with the possibility that the token could perform well while the underlying

27

MOTION TO DISMISS - 46
CASE NO. 2:22-cv-01009

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

1  platform struggled (or vice versa).  Accordingly, on the Amended Complaint's own terms, the
2  fortunes of token-holders and developers do not invariably rise-and-fall together as one.  There
3  is in turn no strict vertical commonality.

4  **3.    There is no investment *in* any common enterprise.**

5  Even if some of the tokens here exhibit a common enterprise (be it on a horizontal or
6  strict vertical theory of commonality), the SEC still cannot satisfy *Howey*'s second prong.  This
7  is because *Howey* requires "a person invests his money *in* a common enterprise."  328 U.S. at
8  299 (emphasis added); *see, e.g.*, *Tarsadia Hotel*, 726 F.3d at 1130.  And here, where tokens are
9  purchased on the secondary market from a third-party seller rather than the developer, there is no
10 investment *in* a common enterprise.  There is just a token purchase; there cannot be an *investment*
11 of money in a common enterprise without *money* being invested *in* that enterprise.  Unlike shares
12 purchased on the New York Stock Exchange—which represent fractional ownership of a public
13 company—tokens are not an ownership stake in anything beyond the tokens themselves.

14 Compare this all again to the facts of *Howey*.  There, investors paid Mr. Howey directly
15 for a piece of his orange grove operation.  328 U.S. at 295.  They invested money with him, and
16 hoped they would turn a profit based on his efforts.  But here, there is nothing of the sort.  Again,
17 when a token is purchased on an exchange, the money stays between buyer and third-party
18 seller—it does not pass through to the underlying platform, or become managed by its developers.

19 Of course, if someone purchases tokens on the secondary market, the value of those
20 tokens may be *affected* by the actions of the platforms (or its developers).  That, however, is not
21 enough.  Mr. Howey could affect the secondary market price for his oranges—say, by espousing
22 radical political views.  But the fact remains that people who purchased his *oranges* are
23 differently situated than those who invested in his *orange groves*.  So too for any good bought
24 on the secondary market.  De Beers can always drive down the general price for diamonds by
25 flooding the market.  But that has no bearing on the question of whether someone who purchased
26 a De Beers diamond on the secondary market has somehow invested money *in* De Beers itself.

27

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

1    In short, the Amended Complaint fails to plausibly allege any common enterprise. But

2    even more fundamental, the Amended Complaint fails to show how any money was invested in

3    any common enterprise, assuming one exists. That independent defect is also fatal to the entire

4    Amended Complaint.

5    **B.    All Tokens Fail the "Expectation of Profits" Prong.**

6    Even if the nine tokens here each involved a "common enterprise," they are still not

7    securities. No token satisfies *Howey*'s final prong, which says an investment must be made on

8    the "expectation that [the investor] would earn a profit solely through the efforts of the promoter

9    or of some one other than themselves." *Howey*, 328 U.S. at 298. This prong has two dimensions.

10   *See Warfield*, 569 F.3d at 1020. First, a product must be sold as a *profit-making* investment

11   rather than an item be *used* or *consumed*. *United Hous. Found., Inc. v. Forman*, 421 U.S. 837,

12   858 (1975). Second, profits must derive significantly from *managerial efforts* rather than *market*

13   *forces*. *Noa v. Key Futures, Inc.*, 638 F.2d 77, 79 (9th Cir. 1980) (per curiam). All nine tokens

14   fail both fronts.

15   **1.    All of the tokens are "utility tokens."**

16   There is a critical distinction between investments that have some utility, and utilitarian

17   purchases that may have some investment value. The former *may* give rise to an "investment

18   contract"; the latter *cannot*. For instance, in *Tarsadia Hotel*, the Ninth Circuit held the purchase

19   of a condo unit did not constitute an "investment contract" because the units served as "short-

20   term vacation homes" rather than investment properties. 726 F.3d at 1132; *see also, e.g.*,

21   *Bronstein v. Bronstein*, 407 F. Supp. 925, 930 (E.D. Pa. 1976) (distinguishing ventures with "an

22   eye towards personal use or consumption of the underlying interest [and those for] the purpose

23   of acquiring an interest in a profit-making venture"). The question here is objective; courts look

24   to what an investor was reasonably led to expect. *Warfield*, 569 F.3d at 1021.

25   Applying that principle here, none of the nine tokens at issue is a security, because each

26   is a "utility token"—something that, by nature and design, is *used* on a platform rather than *stored*

27

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

as an investment.  *See, e.g.*, Carol Goforth, *Securities Treatment of Tokenized Offerings Under U.S. Law*, 46 Pepp. L. Rev. 405, 429-30 (2019).  Indeed, each token was principally branded as having a primarily consumptive purpose—be it facilitating transactions, voting on issues related to the platform's operation, or accessing the platform itself:

1) **Flexa** is a digital payment platform designed to facilitate safe, fast, and private retail transactions.  These transactions are done with its **AMP** tokens.  AMP token-holders may choose to deposit or "stake" their tokens in "pools" to collateralize transactions on the Flexa network.  In turn, Flexa's protocols distribute rewards to those users in the form of more AMP tokens.  AMP is a utility token.  Am. Compl. ¶¶ 106-22.

2) **Rally** is a platform that, among other things, helps content creators, brands, and celebrities launch their own "social tokens."  People use the **RLY** token to interact with one another over the platform.  RLY tokens enable users to vote on governance issues and to propose how money in the Rally treasury should be spent.  RLY is a governance token and a utility token.  *Id.* ¶¶ 123-31.

3) **DerivaDex** is an exchange for derivative contracts.  Its **DDX** token would enable users to make trades on the platform, and vote on governance issues.  The DDX token would also enable users to obtain fee discounts and receive rewards in exchange for staking insurance pools on the platform.  DDX is both a governance token and a more traditional utility token.  *Id.* ¶¶ 132-45.

4) **XY Labs** hosts a platform where people can submit geographic data location queries.  People put up **XYO** tokens when asking questions, and receive XYO tokens when successfully answering them.  The XYO token is used as the "gas" or transaction fee that facilitates transactions on the platform.  XYO is a utility token.  *Id.* ¶¶ 146-55.

5) **Rari** allows users to deposit digital assets and receive high-yield interest.  The **RGT** token enables users to obtain fee discounts, vote on investing decisions, and otherwise participate on the platform.  The Rari platform lets users earn RGT tokens in exchange

MOTION TO DISMISS - 49
CASE NO. 2:22-CV-01009

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

1   for depositing their cryptocurrencies in liquidity pools, a process known as "liquidity

2   mining."  RGT is both a governance token and a utility token.  *Id.* ¶¶ 156-71.

3   6)  The **Liechtenstein Cryptoassets Exchange** is an exchange where people can trade

4       digital assets and obtain financial services.  The **LCX** token enables users to make

5       transactions or receive discounts over the platform.  Some services on the platform

6       can only be purchased with LCX tokens.  LCX is a utility token.  *Id.* ¶¶ 172-79.

7   7)  **Power Ledger** is a peer-to-peer platform that lets people trade energy in real time.

8       The **POWR** token allows users to access the platform as well as receive certain

9       discounts or rewards for their participation.  There is a limited supply of POWR

10      tokens in circulation, and users cannot trade energy on the platform without them.

11      POWR is a utility token.  *Id.* ¶¶ 180-92.

12   8)  **DFX Finance** operates as an exchange for foreign digital assets.  **DFX** tokens are the

13      mode of payment across transactions on the platform.  DFX tokens enable users to

14      vote on some governance issues, such as what cryptocurrencies the exchange will list,

15      and allow users to earn more DFX tokens through liquidity mining.  DFX is a

16      governance token and a utility token.  *Id.* ¶¶ 193-207.

17   9)  **Kromatika Finance** runs a platform where users can efficiently trade digital assets

18      by placing range orders on certain exchanges.  The **KROM** token, among other

19      things, is how people pay for transactions on the platform.  The platform also allows

20      token-holders to earn more KROM by collateralizing or "staking" the platform with

21      cryptocurrency.  KROM is a utility token.  *Id.* ¶¶ 208-17.

22      At bottom, each token was chiefly created to be *used*.  *E.g.*, Am. Compl. ¶ 151 (XYO

23  developers stating that "mak[ing] a profit from trading . . . [was] not the intended purpose of an

24  XYO token").  None of the tokens were like stock—something that sits as an investment with no

25  practical utility.  Rather, the *very object* of each token was to facilitate activity on the underlying

26  platforms and, in so doing, enable each network to develop and grow.  *See, e.g.*, Goforth,

27

1    *Securities Treatment*, *supra*, at 429 ("[Utility tokens] are designed to offer intrinsic utility that

2    powers a decentralized, distributed network that delivers to the users of the network a

3    consumptive good or service.").

4          The fact that tokens may *also* have investment value—or that some people may have

5    bought tokens for investment reasons—does not alter the analysis.  *See, e.g.*, *Rice v. Branigar*

6    *Org., Inc.*, 922 F.2d 788, 790-91 (11th Cir. 1991).  A utility token's investment value is derivative

7    of its primary function; the token is designed to be used even if that usability also makes the

8    token ultimately more valuable.  *See, e.g.*, Nate Crosser, *Initial Coin Offerings As Investment*

9    *Contracts: Are Blockchain Utility Tokens Securities?*, 67 U. Kan. L. Rev. 379, 393 (2018)

10    ("[Utility tokens] primarily exist to integrate into the blockchain application they are issued

11    for. . . . [A]lthough the utility token may appreciate as the usefulness of the application is proved,

12    its primary function is as an internal currency that incentivizes people to [utilize the underlying

13    platform.]").  That is especially true where, as here, a token's presence on secondary markets

14    *furthers* its functional ends.  Indeed, as alleged, the developers here regularly promoted trading

15    their tokens on secondary exchanges *because* doing so would advance their intended

16    consumptive purposes.  The more people that purchase the token, the more people who will be

17    able to participate in (and improve) the related platform.  *See, e.g.*, Am. Compl. ¶ 119 (quoting

18    Flexa blog post touting that AMP's precursor coin was available to buy on secondary markets

19    because that would then bring more people to Flexa's payment platform).

20          In short, *Howey* requires that the SEC plausibly allege each token was chiefly branded as

21    an *investment* rather than an *instrument*; that the tokens here were ultimately more like the shares

22    in Mr. Howey's orange groves than the keys to the vacation condominiums from *Tarsadia Hotel*.

23    The Amended Complaint does not do so.  Rather, the Amended Complaint confirms that the

24    tokens here were all principally "utility tokens" to be used for functional purposes on each

25    platform.  And for that reason, the Amended Complaint fails to state sufficient factual allegations

26    to get over *Howey*'s last hurdle.

27

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

2. **The value of each token is driven by market forces.**

The nine tokens here fail to satisfy *Howey*'s third prong for an independent reason.  For there to be an "investment contract," profits must come from "undeniably significant . . . [and] essential managerial efforts [that] affect the failure or success of the enterprise."  *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973).[22]  That is, profits must come from *significant managerial efforts* as opposed to solely from *external market forces*.  Once again, *Howey* is a good example:  There, investors either gained or lost money depending on how well Mr. Howey managed his groves.  By contrast, the Ninth Circuit held there was no "investment contract" where a business sold silver bars to people, given that "the profits to the investor depended upon the fluctuations of the silver market, not the [seller's] managerial efforts."  *Noa*, 638 F.2d at 79; *see also, e.g.*, *SEC v. Belmont Reid & Co., Inc.*, 794 F.2d 1388, 1391 (9th Cir. 1986) (*Howey*'s third prong not met where primary purpose of purchase of gold coins was "to profit from the anticipated increase in the world price of gold"); *Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 253 F. Supp. 359, 367 (S.D.N.Y. 1966) ("In a sense anyone who buys or sells a horse or an automobile hopes to realize a profitable 'investment.' But the expected return is not contingent upon the continuing efforts of another.").

All of the nine tokens at issue fall on the latter side of this line.  Indeed, the Amended Complaint details how the price of every token here widely fluctuated on secondary markets.  Am. Compl. ¶¶ 122 (describing 1000% price swing in AMP), 131 (100% for RLY), 145 (300% for DDX), 155 (200% for XYO), 171 (6300% for RGT), 173 (700% for LCX), 191 (300% for POWR), 208 (700% for DFX), 214 (1200% for KROM).   These price swings were not

---

[22] In *Howey*, the Supreme Court actually said profits must come "*solely* from the efforts of others."  328 U.S. at 299 (emphasis added).  The Ninth Circuit has declined to read "solely" literally, opting for a more flexible standard.  *Glenn W. Turner*, 474 F.2d at 482.  But the Supreme Court has never blessed this interpretation of *Howey*, and has in fact expressly reserved judgment on the Ninth Circuit's decision to adopt it.  *See United Hous.*, 421 U.S. at 852 n.16.  While this Court is of course bound by the Ninth Circuit's precedent, we respectfully submit that such precedent is wrong and should be overturned.  *Howey* is best read as meaning what it says, and its final prong requires profits *solely* from the efforts of others.  In any event, the SEC's Amended Complaint fails even under the Ninth Circuit's looser interpretation of "solely," and the Defendants need not take any position on the foregoing in order to prevail here.

MOTION TO DISMISS - 52
CASE NO. 2:22-CV-01009

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

accompanied by parallel radical changes in company policy or managerial efforts.  As such, these swings illustrate that the value of the tokens turned on the market, not the managers.  After all, the whole theory of the SEC's case is that Ishan Wahi allegedly front-ran the announcements of these tokens *being listed*—not some change in policy at each platform or new set of "managerial efforts" by their developers.

This is all especially true for the tokens here that were already functional at the time of the purchases at issue (which describes every token but DDX).  *See id.* ¶ 134.  As noted, by the time any of the purchases at issue were made, the platform underlying each token was already up-and-running—that is, each network was functional and operated on its own without extensive managerial supervision.  *Supra* pp. 48-50.  But once a token became functional, its value was largely out of the hands of its developers.  Indeed, the entire point of blockchain technology is to create platforms that become functional such that they can operate *independent* from their original developers and early managers.  *See, e.g.*, Scott W. Maughan, *Utility Token Offerings: Can A Security Transform into A Non-Security?*, 2019 BYU L. Rev. 1113, 1137 (2019) ("Once the network is functional, developers have completed the lion's share of the work. While they may make some additional improvements or tweaks to the network, those small efforts will not affect the value of the tokens nearly as much as supply and demand, government action, public sentiment, and other events over which neither the investor nor the promoter has any control.").

Moreover, the fact that any given set of developers may have retained the ability to *affect* a token's price does not change the analysis.  *Howey*'s third prong requires that profits come from "undeniably significant [and] essential managerial efforts."  *Glenn W. Turner*, 474 F.2d at 482.  That requires something more than merely having the capacity to *influence* a token's price. Managerial efforts must drive price in order to satisfy *Howey*.  *See, e.g.*, *SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 744 n.5 (11th Cir. 2005) ("[I]f the realization of profits depends significantly on the post-investment operation of *market forces*, pre-investment activities by a promoter would not satisfy *Howey*'s third prong."); *Grenader v. Spitz*, 537 F.2d 612, 619 (2d

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

1  Cir. 1976) ("While efficient management of the cooperative will enhance its desirability as a

2  place of residence, it is hardly a factor which would result in the appreciation in value of the

3  shares . . . . Realistically, that will depend upon the general housing market, the status of the

4  neighborhood and the availability of credit."); *Lehman Bros. Com. Corp. v. Minmetals Int'l Non-*

5  *Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 164 (S.D.N.Y. 2001) (holding no investment

6  contract where "any gain likely would result in large part from market movements, not from

7  capital appreciation due to Lehman's efforts").

8         To satisfy *Howey*, the SEC needs to plausibly allege that the value of the nine tokens here

9  turns on significant managerial efforts rather than market forces.  As shown above, it has not

10  done so.

11         **C.**      **The "Initial Coin Offering" Cases Are Irrelevant Here.**

12         To the extent the SEC intends to rely on cases where other courts have found tokens from

13  "initial coin offerings" to be securities, those cases have no bearing on this case—where all the

14  allegations concern purchases of tokens in secondary markets.  *See, e.g.*, *SEC v. Kik Interactive*

15  *Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020); *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352

16  (S.D.N.Y. 2020); *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340 (S.D.N.Y. 2019).[23]  Each of

17  these cases turned on the promises and circumstances made *by the developer to the purchasers*

18  in connection with the initial coin offering.  Any discussion of the attributes of the tokens

19  themselves were purely incidental to the outcome.

20

21       [23] Almost all of the federal cases dealing with digital assets have arisen in the context of initial coin offerings. One recent outlier is *SEC v. LBRY, Inc.*, No. 21-cv-260, 2022 WL 16744741 (D.N.H. Nov. 7, 2022), but

22  that out-of-circuit district court case also has no bearing here. One, the parties in that case did not raise—and the court did not grapple with—the arguments made above about the traditional definition of "investment contract."

23  *Supra* Parts I and II. Two, there, unlike here, the defendants *conceded* the first two prongs of *Howey*, including the existence of a "common enterprise." 2022 WL 16744741, at *3. And beyond that, respectfully, the court's analysis is not persuasive.  The court obscured the difference between an *investment contract* and its *underlying asset*—

24  reasoning that a token itself can be a security *even if* the token-holder has no ongoing relationship with the token's developer.  As explained, that is a fundamental error.  *Supra* Section I.A.3.b.  Also, the court based its analysis

25  entirely on the view that people who bought LBRY (the token at issue) did so in large part because they expected its value to go up due to actions taken by LBRY's developers.  But as also explained, that is simply not enough to

26  create an "investment contract."  *Supra* Section I.A.3.  What is essential for there to be an "investment contract" is not the ability of the promoter to *affect* the asset's price, but an *obligation* on the part of the promoter to take certain

27  actions with respect to the asset, and to do so in a manner that ties the promoter's fortunes to the investor's.

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

1      Again, the *Howey* Test turns on the promises and circumstances surrounding a

2  transaction, which is why that test can encompass investment schemes involving assets that range

3  from beaver pelts to oranges.  But when the promises and circumstances surrounding a

4  transaction change, the nature of the transaction (as far as *Howey* is concerned) changes with it.

5  In other words, as one Commissioner describes the argument, "an initial fundraising transaction

6  can create an investment contract, but the token itself is not necessarily the security even if it is

7  sold on the secondary market."  Peirce, Remarks, *supra*.  That is because forming an investment

8  contract requires *both* an underlying asset (Howey's land) *and* attendant contractual obligations

9  (Howey's promise to cultivate oranges on his investors' behalf).  Secondary sales of *only* the

10  asset *without* promises by the promoter are categorically and fundamentally distinct.[24]

11      This is true for several reasons.  Most basically, there is a critical difference between

12  when someone buys a token in an "initial coin offering" versus on an exchange.  An ICO is the

13  (provocative and tendentious) term that is broadly used when a developer sells a new token to

14  the public to raise money for its platform.  The important feature of the ICO is not, however, the

15  standalone token-sale; it is the promises that *accompany* the token-sale, and the promises that

16  *induce* the buyer to invest money with the upstart enterprise.  What matters is the direct

17  relationship between the token-buyer and the developer—and that relationship arises not from

18  the mere fact the token-buyer holds a token, but because the buyer received the token *as part of*

19  an enforceable exchange with the developer.  In that light, as compared to ICOs, secondary sales

20  are horses of a different color.  Yes, in both instances, the buyer has in his possession some token.

21  But crucially, in the latter instance, the original developers do not *owe* any obligations to the

22  token-holders.  Again, tokens primarily enable people to *use* an underlying platform (*e.g.*, enter

23

24      [24] This distinction is longstanding in the academic literature on *Howey* and digital assets.  *See, e.g.*,
Maughan, *supra* at 1135 (noting "a number of legal and policy-based arguments" that "suggest a token can transform

25  from a security into a non-security once it crosses a certain line"); Yuliya Guseva, *A Conceptual Framework for
Digital-Asset Securities: Tokens and Coins as Debt and Equity*, 80 Md. L. Rev. 166, 192-93 (2021) (conceptualizing

26  token sales as a "two-stage" process in which "what [developer] originally promised to the Initial Purchasers is
irrelevant" to subsequent token-buyers); *see also* Juan Batiz-Benet et al., *The SAFT Project: Toward a Compliant

27  Token Sale Framework,* PROTOCOL LABS (Oct. 2, 2017), https://tinyurl.com/yp2arwr5.

MOTION TO DISMISS - 55
CASE NO. 2:22-CV-01009

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

1   transactions, vote on subjects, confer rewards); they do not inherently confer to the possessor any

2   rights enforceable *against* the platform's original developers.  The tokens themselves are just

3   assets, nothing more.

4         For these reasons, it would be a mistake to think that all token-holders are equal, or that

5   the token itself holds dispositive weight in the analysis.  Once more, the asset underlying any

6   "investment contract"—be it a digital token or a physical orange—is not what gives rise to the

7   security; rather, what matters are the legally enforceable obligations that run between promoter

8   and investor.  Those obligations do not ordinarily run with the token, and the SEC alleges nothing

9   to the contrary for any of the tokens here.  And without those running obligations, there is nothing

10  that can transform the sort of naked digital assets here into federal securities.  *See, e.g.*, Yuliya

11  Guseva, *A Conceptual Framework for Digital-Asset Securities: Tokens and Coins as Debt and*

12  *Equity*, 80 Md. L. Rev. 166, 197 (2021).  That is as true for tokens as it would be for an orange.

13        Each ICO case above tracks these principles.  In each one, developers sold tokens to raise

14  capital to develop platforms they promised investors would become operational in the future.

15  *Kik*, 492 F. Supp. 3d at 174; *Telegram*, 448 F. Supp. 3d at 367; *Balestra*, 380 F. Supp 3d. at 347.

16  In each, the court concluded that the developer had promised very real post-sale obligations to

17  its buyers—even taking the form of explicit *written contracts* in *Telegram* and *Kik*—to deliver a

18  functional product to the investors who capitalized their projects.  *Kik*, 492 F. Supp. 3d at 174-75;

19  *Telegram*, 448 F. Supp. 3d at 361-62, 372, 377; *Balestra*, 80 F. Supp. 3d at 355-56.  And in each,

20  the court concluded that those promises were what defined and animated each transaction.  *Kik*,

21  492 F. Supp. 3d at 180 ("without the promised digital ecosystem, Kin would be worthless");

22  *Telegram*, 448 F. Supp. 3d at 375 (similar); *Balestra*, 380 F. Supp. 3d at 357 (similar).

23        All told, with each ICO case, the court focused on the relationship between the developer

24  and the token-buyer.  And each court found it was the *relationship* that ultimately mattered, not

25  the token.  For instance, the *Telegram* Court specifically parsed the token at issue from the overall

26  investment scheme, reasoning that the former alone did not give rise to a security.  *See* 448 F.

27

Supp. 3d at 379 ("[T]he security in this case is not simply the Gram, which is little more than alphanumeric cryptographic sequence."); *see also SEC v. Telegram Grp. Inc.*, No. 19-cv-9439, 2020 WL 1547383, at *1 (S.D.N.Y. Apr. 1, 2020) (explaining that the security at issue was "neither the Gram Purchase Agreement nor the Gram but the entire scheme that comprised the Gram Purchase Agreements and the accompanying understandings and undertakings made by Telegram").[25]

But here, as explained, there is no investment scheme, no ongoing relationship, and no binding promises across developer and buyer.  There are only tokens, without anything else.

Even on more granular points, the ICO cases are inapposite.  This is because, at bottom, those cases all involved pre-functional tokens; tokens that required the ongoing efforts of the original developers to become operational.  (And further, it bears mention that in *Telegram* and *Kik*, the defendants affirmatively *conceded* that their token offerings were securities offerings—they only disputed whether immediately subsequent public sales should be considered part of the same investment scheme.  In both cases, the court disagreed with the developers, and collapsed their intertwined transactions into a single public offering.  *See Kik*, 492 F. Supp. 3d at 174; *Telegram*, 448 F. Supp at 367.)

For example, some developers in the ICO cases raised the defense that their tokens were not securities because they would be designed primarily to be consumed and used.  The courts rejected that argument, but only because the tokens were *pre*-functional, and thus could not (at least for the foreseeable future) be used *at all*.  *Kik*, 492 F. Supp. 3d at 180 (noting the Kin token's

---

[25] The fact that *Telegram* technically involved a "secondary public market" sale is irrelevant here.  In *Telegram*, the developers held an initial private sale for Gram tokens where investors provided "upfront capital in exchange for a discounted future delivery of a discounted asset" with the expectation of quickly reselling their Gram tokens to the public at a profit.  448 F. Supp. 3d at 367.  But the "economic reality" of this transaction, the court concluded, was a singular public offering of Gram tokens, not a true secondary sale.  *Id.*  The court disregarded Telegram's attempt to "disguise[]" its public offering through "investors" who really functioned as "statutory underwriters." *Id.* at 380-81.  Instead, the court concluded that the initial private sale constituted "merely a step" in Telegram's "ongoing public distribution" scheme of trading Gram tokens in exchange for capital.  *Id.*  Unlike *Telegram*, the secondary sales here cannot be merged with any initial offering because, among other reasons, the secondary sales involving the Wahis took place on exchanges years or months after any initial offering, and were far removed from the token developers' original investment scheme.  *Supra* note 3 and accompanying text.

MOTION TO DISMISS - 57
CASE NO. 2:22-CV-01009

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

1   consumptive use "would materialize only if the enterprise advertised by Kik turned out to be

2   successful"); *Telegram*, 448 F. Supp. 3d at 374 ("Consumptive uses for Grams were not features

3   that could reasonably be expected to appeal to the Initial Purchasers targeted by Telegram.").  In

4   contrast, the tokens at issue in this case all exist on a functional blockchain; all have been listed

5   on prominent secondary markets (like Coinbase); and all (except DDX, which functions in beta)

6   are fully functional.  *Supra* pp. 48-50.  The tokens *can* be used, and buyers purchase them *to* use

7   them.

8         Similarly, the ICO cases' observations about "common enterprise" are inapposite.  The

9   developers there took investors' money with the stated purpose of building out the blockchain

10  and/or the functionality of their token—something, the courts found, readily met the "pooling"

11  element necessary for horizontal commonality.  *Telegram*, 448 F. Supp. 3d at 369-70; *Kik*, 492

12  F. Supp. 3d at 179; *Balestra*, 380 F. Supp. 3d at 353.  But such "pooling" is lacking here, where

13  secondary market buyers neither transmitted funds to developers, nor expected collective returns

14  as part of some pooled investment.  *Supra* Section III.A.  Likewise, when tokens are *pre-*

15  functional, strict vertical commonality is more intuitive, given that if the underlying platform

16  failed to launch, the investors "would be equally affected as all would lose their opportunity to

17  profit."  *Telegram*, 448 F. Supp. 3d at 369-37; *see Kik*, 492 F. Supp. 3d at 178-79; *Balestra*, 380

18  F. Supp. 3d at 354.  But here, where the platforms are operational and the tokens are subject to

19  market forces, there is no such dynamic tying the fortunes of the investor and those of the

20  developer.  *Supra* Section III.B.2.

21        In sum, token sales might constitute investment contracts when the sale includes promises

22  by the developer that amount to contractual obligations (as in some ICOs) but that does not

23  convert the tokens into investment contracts for all time.  In each of the ICO cases, the developer

24  made promises to its initial buyers in connection with its token sales and those promises gave

25  rise to investment contracts.  Here, there is nothing of the kind.

26                                    *  *  *

27

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

In bringing this action, the SEC woefully misreads *Howey*, and seeks to sever the term "investment contract" from its historical and statutory moorings.  But even excusing those fatal errors, the Amended Complaint is still deficient.  On *Howey*'s terms alone, none of the tokens is a federal security.  From all vantage points, the SEC is operating outside its statutory authority.

Given this, one final points bears mention.  The SEC suggests in its Amended Complaint that it might be relying upon *other* tokens besides the nine specifically discussed as part of its action against the Wahis.  *See, e.g.*, Am. Compl. ¶¶ 8, 25, 93-96.  But if the nine tokens identified by the SEC are not securities, the agency's secret tokens cannot save the Amended Complaint.  The SEC is required to state a *plausible* claim upon which relief may be granted.  And to do so, the SEC must identify at least one actual security to support its jurisdiction and this action under the federal securities laws.  Because it has not—and cannot—the Court should dismiss the Amended Complaint.

## IV.    THE SEC'S AMENDED COMPLAINT DOES NOT PLAUSIBLY ALLEGE SCIENTER.

Finally, the SEC's Amended Complaint should be dismissed for a more elementary reason.  To press the sort of claim the SEC is pressing against the Defendants, the agency must plausibly allege that they knew (or were recklessly indifferent to the possibility) that the information at issue was "material for *securities* trading purposes."  *SEC v. Obus*, 693 F.3d 276, 286, 287 (2d Cir. 2012) (emphasis added); *see also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976) (identifying scienter requirement for claims under § 10(b) and Rule 10b-5); *id.* at 197 (noting knowing or intentional conduct suffices); *id.* at 201 (holding that negligence is not enough); *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc) (holding that reckless conduct is sufficient).

But here, the SEC offers nothing to suggest that the Wahis even had an inkling that the tokens at issue were securities.  Nor could it.  Ishan Wahi worked at Coinbase—a massive, multi-billion dollar publicly traded company whose *entire* business model is premised on *not* listing securities.  The company uses a legion of lawyers and other employees to conduct a "rigorous

MOTION TO DISMISS - 59
CASE NO. 2:22-CV-01009

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

process to analyze and review each digital asset before making it available on our exchange." Paul Grewal, *Coinbase Does Not List Securities. End of Story.*, Coinbase (July 21, 2022), https://tinyurl.com/3rph85vm.  It has also worked with the Crypto Ratings Council to develop a point-based framework for analyzing tokens under the *Howey* Test.  *See Asset Legal Review*, Coinbase (last visited Feb. 2, 2023), https://tinyurl.com/3ketxen5; *Crypto Rating Council's Securities Law Framework*, Crypto Rating Council (May 10, 2021), https://tinyurl.com/ycxzewbu.[26]  And it independently performs a three-part review before a potential listing:  (1) factual diligence on a token, (2) "an analysis under the Howey line of securities cases to determine the likelihood that an asset qualifies as an investment contract under U.S. securities laws," and (3) an evaluation to determine "whether the asset has characteristics of other instruments that may be deemed to be securities, such as a note or stock," or of a derivative.  *Asset Legal Review*, *supra.*  Every token at issue was listed on Coinbase and thus had passed that "rigorous" process—a process that the SEC *itself* has reviewed and approved. Grewal, *supra.*  There was no reason for Ishan Wahi to think that any of those tokens were nonetheless securities, and the SEC has alleged nothing to indicate otherwise.  Nor has it alleged anything that suggests that Nikhil Wahi somehow knew more about the tokens' nature than his older brother.

More still, it is especially implausible to suggest the *Wahis* knew what tokens were securities when the *SEC* cannot even say.  The SEC alleges that the Defendants traded in "dozens" of digital assets, Am. Compl. ¶¶ 93-96, but can only muster that "at least" nine of these tokens were securities, *id.* ¶ 8.  When the *regulator* cannot readily parse a security from a non-security, it is deeply unfair to expect the *regulated* to do so.  Especially so, where, as here, the *regulators* cannot even agree among themselves.  *Supra* p. 37 (describing statement from CFTC Commissioner Caroline Pham criticizing the SEC's conception of a "security" in this Amended

---

[26] An earlier version of this framework used a similar scorecard methodology.  Coinbase, Coin Center, USV & Consensys, *A Securities Law Framework for Blockchain Tokens* (Dec. 7, 2016), https://tinyurl.com/dsz65yyd.

MOTION TO DISMISS - 60
CASE NO. 2:22-cv-01009

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

Complaint); Peirce, Remarks, *supra* (explaining that the SEC has "implied that secondary trading of tokens that were once sold as part of a securities contract is also governed by the securities laws *without adequately explaining* why that trading constitutes securities transactions" (emphasis added)).

It is not enough for the SEC to insist that Ishan Wahi knew he was misappropriating Coinbase's confidential information.  As the Supreme Court has made clear, § 10(b) "does not catch all conceivable forms of fraud involving confidential information," just "fraudulent means of capitalizing on such information *through securities transactions*."  *United States v. O'Hagan*, 521 U.S. 642, 656 (1997) (emphasis added).  Absent a plausible allegation that Ishan Wahi knew he was interfering with the securities markets, the "animating purpose" behind the federal securities fraud laws is not implicated.  *Id.* at 658-59.  In other words, the SEC's allegations, taken as true, may give rise to an employee misconduct claim or some other charge; but not *securities* fraud.

In short, the only certain feature of the SEC's approach to digital asset regulation is its uncertainty.  Nobody—from Congress to Coinbase, Washington regulators to Wahis—can state with any degree of assuredness what token is or is not an "investment contract" in the eyes of the SEC.  At some point, the SEC's Delphic strategy of revealing one-off securities via enforcement actions has to run up against the basic protections of the legal system.  A scienter requirement is one of those protections.  And at the very least, it guards against Amended Complaints like this one.

## <u>CONCLUSION</u>

For the reasons detailed above, Defendants Ishan and Nikhil Wahi respectfully request that this Court dismiss with prejudice the SEC's Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

MOTION TO DISMISS - 61
CASE NO. 2:22-cv-01009

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

1

2

3       DATED this 6th day of February, 2023.

4

5                                                  Respectfully submitted,

6                                                  /s/ James M. Burnham

7    David I. Miller, Admitted *Pro Hac Vice*      James M. Burnham, Admitted *Pro Hac Vice*
     Charles J. Berk, Admitted *Pro Hac Vice*      Harry Graver, *Pro Hac Vice* Pending
8    GREENBERG TRAURIG, LLP                        S. Matthew Krsacok, *Pro Hac Vice* Pending
     One Vanderbilt Avenue                         JONES DAY
9    New York, NY 10017                            51 Louisiana Avenue NW
     Phone: 212-801-9200                           Washington, DC 20001-2113
10   Email: david.miller@gtlaw.com                 Phone: 202-879-5429
     Email: berkc@gtlaw.com                        Email: jburnham@jonesday.com
11

12   Andrew St. Laurent, Admitted *Pro Hac Vice*   Mark W. Rasmussen, *Pro Hac Vice* Pending
     HARRIS ST. LAURENT & WECHSLER LLP             JONES DAY
13   40 Wall Street, 53rd Floor                    2727 North Harwood Street
     New York, NY 10005                            Dallas, TX 75201
14   Phone: 646-248-6010                           Phone: 214-220-3939
     Email: andrew@hs-law.com                      Email: mrasmussen@jonesday.com
15

16                                                 Eric Tung, *Pro Hac Vice* Pending
                                                   JONES DAY
17                                                 555 South Flower Street, 50th Floor
                                                   Los Angeles, CA 90071
18                                                 Phone: 213-243-2151
                                                   Email: etung@jonesday.com
19

20                         *Attorneys for Defendant Ishan Wahi*

21

22

23

24

25

26

27

/s/ Priya Chaudhry

Priya Chaudhry, Admitted *Pro Hac Vice*
CHAUDHRYLAW PLLC
147 West 25th Street, 12th Floor
New York, NY 10001
Phone: 212-785-5550
Email: priya@chaudhrylaw.com

*Attorney for Defendant Nikhil Wahi*

/s/ Todd Maybrown

Todd Maybrown
ALLEN HANSEN MAYBROWN & OFFENBECHER
600 University Street, Suite 3020
Seattle, WA 98101
Phone: 206-447-9681
Email: todd@ahmlawyers.com

*Local Counsel for Defendants Ishan Wahi and Nikhil Wahi*

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

1

## **CERTIFICATE OF CONFERRAL**

2

3        Pursuant to Judge Lin's Standing Order for All Civil Cases, I certify that undersigned

4   counsel met and conferred with the Plaintiff, and determined that the basis for this motion cannot

5   be cured by filing an amended pleading.

6

7                                        /s/ James M. Burnham
                                         James M. Burnham

8                                        *Attorney for Defendant Ishan Wahi*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**JONES DAY**
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com

1

## <u>CERTIFICATE OF SERVICE</u>

2   I hereby certify that on February 6, 2022, I electronically filed the foregoing with the

3 Clerk of the Court using the CM/ECF system, which will send notification of this filing to the

4 counsel of record.

5   I further certify that I have sent this filing to Sameer Ramani by email to his counsel in a

6 criminal proceeding, David Kornblau, at david.kornblau@dentons.com, and to a Gmail account

7 Ramani has used, at samyramani@gmail.com.  Ramani has not yet appeared in this proceeding,

8 and a motion for alternative service (Dkt. #28) by these methods is pending before this Court.

9

10        /s/ James M. Burnham
           James M. Burnham

11

12        *Attorney for Defendant Ishan Wahi*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

MOTION TO DISMISS - 65
CASE NO. 2:22-CV-01009

JONES DAY
51 Louisiana Ave, NW
Washington, D.C., 20001
Tel. 202-879-5429 • jonesday.com