The Honorable Tana Lin

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

ISHAN WAHI, NIKHIL WAHI, and SAMEER
RAMANI,

Defendants.

NO. 2:22-cv-01009-TL

**BRIEF OF *AMICUS CURIAE*
BLOCKCHAIN ASSOCIATION**

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

## TABLE OF CONTENTS

Page(s)

INTERESTS OF *AMICUS CURIAE* ................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...........................................2

ARGUMENT .................................................................................................5

I. THE WAHI DEFENDANTS' "MAJOR QUESTIONS" ARGUMENT
UNDERSCORES THAT THE SEC IS REGULATING IN EXCESS OF ITS
ENFORCEMENT POWER. ...............................................................5

A. The SEC's Complaint Has Decreed That Nine Tokens Are Securities
Without the Creators of Those Tokens Being Present......................5

B. The SEC's Actions Cause Damage to Protected Property Interests of
Non-Parties, Without Due Process of Law, and Attempt to Create
New Rules In Violation of the Administrative Procedure Act. ........8

C. Market Participants Are Not on Notice Regarding What Is or Is Not a
Security...........................................................................................12

CONCLUSION ............................................................................................19

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1

## <u>TABLE OF AUTHORITIES</u>

2
**Page(s)**

3
**Cases**

4
*Abbott Lab'ys v. Gardner*,
   387 U.S. 136 (1967).................................................................12

5

6
*ASSE Int'l, Inc. v. Kerry*,
   803 F.3d 1059 (9th Cir. 2015) ...........................................10, 11

7
*Commodity Futures Trading Comm'n v. Eisenberg*,
   No. 23-cv-00173-LGS (S.D.N.Y.) ...........................................10

8

9
*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   140 S.Ct. 1891 (2020).................................................................11

10

11
*Kisor v. Wilkie*,
   139 S.Ct. 2400 (2019).................................................................11

12
*SEC v. Eisenberg*,
   No. 23-cv-503, ECF No. 1 (S.D.N.Y. 2023) .......................10, 11

13

14
*SEC v. Kik Interactive Inc.*,
   No. 19-cv-5244 (AKH) (S.D.N.Y.) .............................................7

15

16
*SEC v. LBRY, Inc.*,
   No. 21-cv-00260-PB (D.N.H.)....................................................7

17
*SEC v. Ripple Labs, Inc.*,
   No. 20-cv-10832 (AT), 2021 U.S. Dist. LEXIS 190855 (S.D.N.Y. Oct. 4,

18
   2021) ...........................................................................7, 12, 16

19
*SEC v. Telegram Grp. Inc.*,
   448 F. Supp. 3d 352 (S.D.N.Y. 2020).................................7, 16, 17

20

21
*U.S. v. Eisenberg*,
   No. 23-cr-00010-RMB (S.D.N.Y) ............................................10

22

23
*U.S. v. Wahi*,
   No. 22-cr-0392 (S.D.N.Y.) ..........................................................3

24
*W. Va. v. EPA*,
   142 S. Ct. 2587 (2022)..................................................................5

25

26
*Williamson v. Tucker*,
   645 F.2d 404 (5th Cir. 1981) .....................................................13

**Statutes**

15 U.S.C. § 77.............................................................................................................16, 17

15 U.S.C. § 78...................................................................................................................8

Administrative Procedure Act, "APA"....................................................................2, 4, 8, 11, 12

Securities Exchange Act of 1934 ..................................................................................5, 7, 13

**Other Authorities**

Commissioner Luis A. Aguilar, *A Stronger Enforcement Program to Enhance Investor Protection,* U.S. Sec. and Exch. Comm'n (Oct. 25, 2013), https://www.sec.gov/news/speech/2013-spch102513laa ........................................8

DINNGO, *The Known and the Unsaid from the SEC's Framework* (Aug. 20, 2019), https://medium.com/dinngo-exchange/the-known-and-the-unsaid-from-the-secs-framework-ad8b2a7c6d2c ..................................................................14

DFX, CoinMarketCap (last visited Feb. 13, 2023), https://coinmarketcap.com/currencies/dfx-finance/..................................................9

DLx Law (Nov. 10, 2022), https://dlxlaw.com/wp-content/uploads/2022/11/The-Ineluctable-Modality-of-Securities-Law-DLx-Law-Discussion-Draft-Nov.-10-2022.pdf .............................................................................................................18

Framework for "Investment Contract" Analysis of Digital Assets, U.S. Sec. and Exch. Comm'n (Apr. 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets ..........................................................14

Hester M. Peirce, *Kraken Down: Statement on SEC v. Payward Ventures, Inc., et al.*, U.S. Sec. and Exch. Comm'n (Feb. 9, 2023), https://www.sec.gov/news/statement/peirce-statement-kraken-020923...................16

Hester M. Peirce, *Outdated: Remarks before the Digital Assets at Duke Conference,* U.S. Sec. and Exch. Comm'n, (Jan. 20, 2023), https://www.sec.gov/news/speech/peirce-remarks-duke-conference-012023 ........................15

Jai Massari, *Why Cryptoassets Are Not Securities,* Harvard Law School Forum on Corporate Governance (Dec. 6, 2022), https://corpgov.law.harvard.edu/2022/12/06/why-cryptoassets-are-not-securities/ ..................................................................................................18

DFX, CoinMarketCap (last visited Feb. 13, 2023), https://coinmarketcap.com/currencies/dfx-finance/..................................................9

BRIEF OF *AMICUS CURIAE* BLOCKCHAIN ASSOCIATION (NO. 2:22-cv-01009-TL) - iii

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

KROM, CoinMarketCap (last visited Feb. 13, 2023),
https://coinmarketcap.com/currencies/kromatika/ ................................................................9

LCX, CoinMarketCap (last visited Feb. 13, 2023),
https://coinmarketcap.com/currencies/lcx/ ..........................................................................9

Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin, & Sarah Chen, *The Ineluctable Modality of Securities Law:  Why Fungible Crypto Assets Are Not Securities,* DLx Law (Nov. 10, 2022), https://dlxlaw.com/wp-content/uploads/2022/11/The-Ineluctable-Modality-of-Securities-Law-DLx-Law-Discussion-Draft-Nov.-10-2022.pdf..............................................................18

Nina Bambysheva, *Binance. US Delists Cryptocurrency SEC Deemed a Security,* Forbes (Aug. 2, 2022), https://www.forbes.com/sites/ninabambysheva/2022/08/02/binanceus-delists-cryptocurrency-sec-deemed-a-security/?sh=75f8a9b614ac........................................8

*Over-the-Counter Market,* U.S. Sec. and Exch. Comm'n (May 9, 2013), https://www.sec.gov/divisions/marketreg/mrotc.shtml ......................................................17

Public Statement, Hester Peirce and Elad Roisman, *In the Matter of Coinschedule U.S. Sec. and Exch. Comm'n* (July 14, 2021), https://www.sec.gov/news/public-statement/peirce-roisman-coinschedule ...........................15

*Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO,* Sec. and Exch. Comm'n (July 25, 2017), https://www.sec.gov/litigation/investreport/34-81207.pdf...................................................13

William Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic),* Remarks at the Yahoo Finance All Markets Summit: Crypto, U.S. Sec. and Exch. Comm'n (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418 ..............................................................................................................16

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## INTERESTS OF *AMICUS CURIAE*

Blockchain Association (the "Association") is the leading nonprofit membership organization dedicated to promoting a pro-innovation policy environment for the digital asset economy.  The Association endeavors to achieve regulatory clarity and to educate policymakers, regulators, courts, and the public about how blockchain technology can pave the way for a more secure, competitive, and consumer-friendly digital marketplace.  The Association represents nearly 100 member companies reflecting the wide range of the dynamic blockchain industry, including software developers, infrastructure providers, exchanges, custodians, investors, and others supporting the public blockchain ecosystem.

The Association is keenly interested in major litigation regarding blockchain issues, because in this nascent area, overly broad court rulings could negatively affect the blockchain industry in entirely unanticipated and unintended ways.  The Association, as a leader in the blockchain industry, has a significant interest in this litigation.  In this action, the Securities and Exchange Commission ("SEC") alleges that several cryptographic tokens are "securities," without any court having previously made such a determination, and in a manner that does not allow the users or creators of those tokens to argue otherwise.  The SEC's tactic — staking out a position that certain tokens are "securities" in litigation where those with the ability and knowledge to defend are not parties — imperils holders of those tokens, and the people, protocols, or entities that use them.  Such an action may have a severely negative effect on those tokens, which is a denial of third parties' due process rights.  Such actions by the SEC — and this is not the only case in which the SEC is acting in such a manner — could deleteriously affect the Association and its members.

BRIEF OF *AMICUS CURIAE* BLOCKCHAIN ASSOCIATION (NO. 2:22-cv-01009-TL) - 1

This *amicus* brief reflects the views of the Association, but does not reflect the views of any individual member of the Association.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In this action, to support its claim that the defendants here (the "Wahi Defendants") violated the securities laws, the SEC alleges that nine particular tokens are securities. There has never been any prior finding that the tokens at issue are securities. The SEC conflates the tokens themselves, which are, after all, merely software, with any alleged investment contract pursuant to which those tokens were allegedly sold. Worse, the token creators for those particular tokens, other token holders, or users of relevant protocols powered by those tokens, are not defendants in this action, and have no meaningful way to counter the SEC's pronouncements.

Unfortunately, this case is the latest salvo in the SEC's apparent ongoing strategy of regulation by enforcement in the digital assets space. When the SEC asserts that a token is a security, that pronouncement can have immediate, harmful impacts on that token, and the entities or individuals that developed it or use it. People using the token in secondary markets (for software development, payments, lending, derivatives, or any number of other uses that should be exempt from the securities laws) might fear new securities laws implications from their use of the token. Cryptocurrency trading platforms, which previously considered carefully the question of whether the token was a security and concluded that it was not, are forced to consider whether they can continue to list a token now that the SEC has asserted it is a security. The SEC's allegations appear to go beyond enforcing current regulations; the SEC instead is proclaiming new market rules, skirting its obligations to provide the public an adequate opportunity to weigh in on those rules, as would be proper under the Administrative Procedure Act (the "APA").

BRIEF OF *AMICUS CURIAE* BLOCKCHAIN ASSOCIATION (NO. 2:22-cv-01009-TL) - 2

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

All bad enough.  But here, it's regulation by enforcement <u>against absent third parties</u>. Because the original creators of those tokens are not parties in this case, they have no practical ability to be heard on the subject.  By statute, they cannot intervene.  Nor would they want to, even if they could — few (if any) digital asset creators want to pick a fight with the SEC, an inordinately expensive and burdensome battle at best.  And they should not have to.  Token creators should not have to bear the burdens and costs of being dragged into this case, all because a stranger to their project allegedly misappropriated confidential information from his employer, another stranger to the case.  The SEC's allegation of a token potentially being a security thus has an effect on these tokens that is immediate, negative, and practically unchallengeable.

It is devastating to the blockchain industry at large for the SEC to be able to proclaim, at will, in litigation, and without meaningful review or challenge, that certain software packages are securities.  It gives the SEC the ability to cause great damage to the creators and users of these software packages, merely by making allegations that may be proven untrue if contested in a court of law, but which the SEC knows may not be contested squarely.

Moreover, the SEC's actions here are unnecessary to punish the alleged wrongdoing, or deter future similar wrongdoing, because the SEC is not the sole government agency seeking to hold the defendants accountable for allegedly unlawful conduct.  The U.S. Department of Justice (the "DOJ") has brought criminal charges against the Wahi Defendants for the same conduct, but without improperly implicating third parties or alleging securities violations.  *See U.S. v. Wahi*, No. 22-cr-0392 (S.D.N.Y.).  The SEC's action is therefore wholly unnecessary to punish bad behaviors and is solely aligned with its effort to regulate by absentee enforcement.  Such behavior is improper for a government agency, and is irreconcilable with due process concerns.  The SEC's motive, then, is merely to backdoor a precedent that can be used in other cases — as, indeed, it is

BRIEF OF *AMICUS CURIAE* BLOCKCHAIN ASSOCIATION (NO. 2:22-cv-01009-TL) - 3

already doing in other cases where the DOJ has brought an action, and the SEC has piled on with similar allegations of securities laws violations against absent third parties.

More broadly, this action appears on a landscape where there is a pervasive lack of clarity for the digital assets industry.  Market participants across the industry already struggle to decipher how securities laws apply to digital assets.  Even beyond the "Securities Law 101" question of whether a particular digital asset is or could be a security, many securities regulations simply do not fit digital assets, particularly in secondary markets.  While the SEC invites parties to "come in and register," that registration is functionally impossible, and routinely denied by the SEC, because the current rules do not work for digital assets.  Rather than pursue proper rulemaking under the APA to address those issues, the SEC has instead issued a long history of inconsistent, incomplete, and confusing public statements, and has pursued a pattern of "regulation by enforcement."  Now, the SEC extends its doctrine of "regulation by enforcement" to "regulation by unchallengeable allegation" — a bridge too far.

Federal courts should strongly disfavor the notion that the SEC can "morph" a piece of software into a security, merely by alleging it is so in a third-party action.  It is, of course, common and routine for the SEC to allege securities fraud when the securities at issue are already widely recognized to be a security — say, a stock that trades on the NASDAQ.  But in this case to allege that software is a security, the SEC is asserting facts that have not been proven, on legal theories that have been debunked by scholars and practitioners, and against token creators that cannot defend themselves.

The Association respectfully requests that any ruling this Court may make in this case should carefully denote that the Court is not making any factual findings about the nature of any of the tokens addressed herein, and certainly not making any finding that operates outside the four

BRIEF OF *AMICUS CURIAE* BLOCKCHAIN ASSOCIATION (NO. 2:22-cv-01009-TL) - 4

Byrnes ♦ Keller ♦ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

corners of this case.  Any such findings for the purposes of this case should explicitly carry no collateral estoppel effects (or other ill effects) against absent third parties.  Otherwise, the SEC has arrogated to itself enormous and nearly unreviewable power to inflict damage on third parties, without due process.

## ARGUMENT

## I.   THE WAHI DEFENDANTS' "MAJOR QUESTIONS" ARGUMENT UNDERSCORES THAT THE SEC IS REGULATING IN EXCESS OF ITS ENFORCEMENT POWER.

The Wahi Defendants argue in their motion to dismiss that the SEC has exceeded its enforcement power under the "major questions" doctrine.  *See* Defendants Ishan and Nikhil Wahi's Motion to Dismiss, ECF No. 33 at 33-39.  The "major questions" doctrine applies when "agencies assert[] highly consequential power beyond what Congress could reasonably be understood to have granted."  *W. Va. v. EPA*, 142 S. Ct. 2587, 2609 (2022).  The agency "must point to 'clear congressional authorization' for the power it claims" when it addresses matters of "vast economic and political significance."  *Id.* at 2605-09.  While there is no need to repeat the Wahi Defendants' detailed "major questions" doctrine argument, the Association would like to underscore how the industry — and the broader public — is being hurt by the SEC's actions, including the tactic of decreeing that certain tokens are securities without giving the creators of those tokens a fair opportunity to respond, or giving the public an adequate notice and opportunity to be heard.

### A.   The SEC's Complaint Has Decreed That Nine Tokens Are Securities Without the Creators of Those Tokens Being Present.

The SEC's Complaint is predicated on its assertion that nine cryptographic tokens are securities.  The SEC alleges that, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Defendant Ishan Wahi misappropriated material nonpublic information about these tokens from his employer, and tipped Defendants Nikhil Wahi and Sameer Ramani, who

BRIEF OF *AMICUS CURIAE* BLOCKCHAIN ASSOCIATION (NO. 2:22-cv-01009-TL) - 5

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

subsequently profited off of trades in those tokens.  *See* Amended Complaint dated December 22, 2022, ECF No. 27 (the "Amended Complaint" or the "Am. Compl.") at 62-64 ¶¶ 1-8.   The Amended Complaint is replete with references to the nine tokens as "securities," such as:

- "This case involves insider trading in certain crypto asset securities …,"  Am. Compl. ¶ 1;

- "People own crypto assets, such as the crypto asset securities traded in the transactions at issue in this matter …"  Am. Compl. ¶ 22;

- "Nikhil and Ramani traded in, at least nine crypto assets securities that meet this definition [of a security]," Am. Compl. ¶ 25;

- "The existence of the secondary trading market offered by platforms such as Coinbase allows market participants to buy and sell crypto assets, including crypto asset securities," Am. Compl. ¶ 26;

- "… Ishan repeatedly tipped … with material, nonpublic information in advance of Coinbase's listing announcements of certain crypto asset securities," Am. Compl. ¶ 38;

- "Nikhil and Ramani traded in securities subject to the federal securities laws because these crypto assets were investment contracts; they were offered and sold to investors who made an investment of money in a common enterprise, with a reasonable expectation of profits to be derived from the efforts of others," Am. Compl. ¶ 100; and

- "These hallmarks of the definition of a security continue to be true for the nine crypto assets securities that are the subject of the trading in this complaint …," Am. Compl. ¶ 105.

However, there has never been a finding in this Court, or in any other court or administrative proceeding, that those nine tokens are securities.  The SEC clearly considers this question to be central to its allegations; the Amended Complaint spends more than 100 paragraphs

BRIEF OF *AMICUS CURIAE* BLOCKCHAIN ASSOCIATION (NO. 2:22-cv-01009-TL) - 6

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

purporting to analyze why the SEC believes that the nine tokens are securities.  Am. Compl. ¶¶ 95-206.

As evidenced by the dockets in other SEC litigations involving allegations that tokens are securities — such as *SEC v. Ripple, Inc.*, No. 20-cv-10832 (AT) (SN) (S.D.N.Y.), *SEC v. Telegram Grp. Inc., et al.*, No. 19-cv-9439 (PKC) (S.D.N.Y.), *SEC v. Kik Interactive Inc.*, No. 19-cv-5244 (AKH) (S.D.N.Y.), or *SEC v. LBRY, Inc.*, No. 21-cv-00260-PB (D.N.H.) — as well as by the extra pages the parties requested to brief the motions to dismiss, ECF No. 23, these intensely fact-specific questions can require voluminous fact development and briefing.  Thus, this case may well need to encompass nine mini-trials to determine the contested issue of whether the nine tokens are actually securities or not, in order to determine, in turn, whether Exchange Act Section 10(b) and Rule 10b-5 even apply.  No doubt the Parties and the Court will have to expend enormous resources to make these determinations.

But even if any of the token creators had any desire to be involved in federal litigation with the SEC (and it is hard to imagine they do), they will have no practical opportunity to participate in this case concerning the absolutely critical question of whether the tokens they created are considered securities.  The token creators will have to rely on the Wahi Defendants — who are strangers to the projects — to make a case that the tokens are not securities.  Even extensive third-party discovery of those strangers, which itself would be incredibly expensive, burdensome, and inequitable to the non-party token creators (and thus should not be countenanced here) will not result in a full and fair hearing of those issues.  Even if a token creator would want to intervene in this case — and they almost certainly do not wish to, given the enormous expense and risk of litigation — that entity or individual would not be permitted to intervene in this SEC enforcement action in any event.  *See Ripple Labs, Inc.*, 2021 U.S. Dist. LEXIS 190855, at *9 (S.D.N.Y. Oct.

BRIEF OF *AMICUS CURIAE* BLOCKCHAIN ASSOCIATION (NO. 2:22-cv-01009-TL) - 7

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

4, 2021) ("intervenors cannot compel the SEC to join *them* as defendants") (emphasis in original); 15 U.S.C. § 78u(g) (parties prohibited from "consolidate[ing] or coordinat[ing]" private claims with enforcement actions brought by the SEC in which equitable relief is sought.).

Moreover, the SEC undoubtedly understands that this matter — like almost every other SEC litigation — is very likely to settle.  While the numbers vary year by year, one SEC Commissioner once remarked that the SEC settled approximately 98% of its enforcement cases. *See* Commissioner Luis A. Aguilar, *A Stronger Enforcement Program to Enhance Investor Protection,* Sec. and Exch. Comm'n (Oct. 25, 2013), https://www.sec.gov/news/speech/2013-spch102513laa.

Thus, the SEC picked a time and place to issue damaging broadsides against tokens in which the creators cannot intervene voluntarily, and would not want to even if they could, and in a case that (judging by past history) is highly likely to settle rather than be adjudicated on the merits.  The SEC maximized its chances of being able to allege whatever it wants, with a minimal risk of being held to account for it.

**B.**  **The SEC's Actions Cause Damage to Protected Property Interests of Non-Parties, Without Due Process of Law, and Attempt to Create New Rules In Violation of the Administrative Procedure Act.**

The SEC's actions caused harsh consequences for those creators.  The SEC's pronouncement that a particular token is a security has also already resulted in delisting from cryptocurrency trading platforms.  For example, shortly after the SEC filed the original complaint in this case, Binance.US delisted one of the tokens at issue (the only one of the nine tokens at issue in this case that was trading on its platform), "out of abundance of caution."  Nina Bambysheva, *Binance.US Delists Cryptocurrency SEC Deemed a Security*, Forbes (Aug. 2, 2022), https://www.forbes.com/sites/ninabambysheva/2022/08/02/binanceus-delists-cryptocurrency-

BRIEF OF *AMICUS CURIAE* BLOCKCHAIN ASSOCIATION (NO. 2:22-cv-01009-TL) - 8

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

sec-deemed-a-security/?sh=75f8a9b614ac.  Thus, although trading platforms carefully consider whether a given token is a security prior to listing that token, those platforms must then determine whether they can continue to list that token or not, merely because the SEC has publicly pronounced that it is a security.

Additionally, an allegation by the SEC that a given token is a security can lead to immediate decreases in the value of that token.  The LCX token declined from $0.07311 on July 20, 2022 (the day before the original complaint was filed) to $0.06445 on July 22, 2022 (the day after the original complaint was filed) — an 11.85% decrease.  *See* LCX, CoinMarketCap (last visited Feb. 13, 2023), https://coinmarketcap.com/currencies/lcx/.  DFX declined from $0.5542 on July 20 to $0.4198 on July 22, a 24.25% decrease.  *See* DFX, CoinMarketCap (last visited Feb. 13, 2023), https://coinmarketcap.com/currencies/dfx-finance/.  KROM declined from $0.4935 on July 20 to $0.3991 on July 22, a 19.13% decrease.  *See* KROM, CoinMarketCap (last visited Feb. 13, 2023), https://coinmarketcap.com/currencies/kromatika/.  These decreases in value may be driven by a sudden reluctance to interact with those tokens, based on a concern that the SEC could pursue some securities laws violations against users of a token that the SEC has suddenly deemed to be a security.

The full scope of the damage the SEC has caused is difficult to know, in large part because there will necessarily be a chilling effect on future projects, and the blockchain industry in general, as token creators may be concerned that the crucial question of whether the token they create is a security will be decided in an action in which they are not a party, without any prior warning or fair opportunity to respond.

This case is not an outlier; it is part of an SEC pattern.  The SEC recently filed a complaint for securities fraud against an individual, Avraham Eisenberg, in connection with an alleged

BRIEF OF *AMICUS CURIAE* BLOCKCHAIN ASSOCIATION (NO. 2:22-cv-01009-TL) - 9

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

scheme to manipulate the MNGO token.  In that complaint, the SEC decreed that MNGO was a security, and that the creator of the MNGO token "offers and sells MNGO tokens in unregistered transactions."  *SEC v. Eisenberg*, No. 23-cv-503, ECF No. 1 (S.D.N.Y. 2023).  The creators of the MNGO token were not parties to that case — similar to the SEC's tactics here.  Regardless of the merits of the SEC's allegations against the Wahi Defendants, or against Avraham Eisenberg, the SEC's pattern of alleging legal conclusions adverse to token creators who are not parties to a case is a disturbing pattern.

Similar to its actions here, in *Eisenberg* the SEC's lawsuit followed actions by other government entities.  Both the DOJ and the Commodity Futures Trading Commission initiated actions against Mr. Eisenberg prior to the SEC's suit.  *See U.S. v. Eisenberg*, No. 23-cr-00010-RMB (S.D.N.Y); *Commodity Futures Trading Comm'n v. Eisenberg*, No. 23-cv-00173-LGS (S.D.N.Y.).  The SEC did not need to go out on a limb to obtain justice against alleged perpetrators.  But the SEC filed these actions anyway, illustrating that the SEC's motivation is not merely to punish alleged wrongdoers, or even to deter future wrongdoing, but rather to regulate by enforcement by setting forth new positions, in ways that cannot be meaningfully challenged.

The SEC's strategy bypasses procedural due process protections that should be afforded to those token creators.  A "procedural due process claim hinges on proof of two elements:  (1) a protected liberty or property interest and (2) a denial of adequate procedural protections."  *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1073 (9th Cir. 2015).  Whether the tokens are centrally-controlled by an identifiable group, or held by a decentralized and diffuse group of individuals or entities, a protected property interest exists.  Both token creators and token holders suffer a severe impediment to the value of their property, without any practical opportunity to contest the SEC's allegations, a denial of adequate procedural due process protections.  In *ASSE*, for example, the

BRIEF OF *AMICUS CURIAE* BLOCKCHAIN ASSOCIATION (NO. 2:22-cv-01009-TL) - 10

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

Ninth Circuit found that the plaintiff's due process claims should not have been dismissed where it "did not have a meaningful opportunity to rebut significant portions of the evidence that the [State] Department used against it" in levying sanctions.  803 F.3d at 1079.  In that case, the court found a due process violation even where the harmed party was a party in the case, and was able to contest the violation.  Here, by contrast, the harmed parties have no meaningful opportunity to be heard, and are even prevented by law from making the attempt, as explained above.  The violation of their due process rights is even more acute.

Finally, the SEC's attempt to utilize actions against third parties to create new rules violates the APA, which "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts" and "requires agencies to engage in reasoned decision making." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S.Ct. 1891, 1905 (2020) (citations and quotation marks omitted).  Agency actions can "be set aside if they are arbitrary or capricious." *Id.* (citation and quotation marks omitted).  Under the APA, for a legislative rule to "be valid," it must "go through notice and comment." *Kisor v. Wilkie*, 139 S.Ct. 2400, 2420 (2019).

The SEC's use of this litigation or similar actions to make new rules concerning when a token is or is not considered a security is not consistent with the APA's rulemaking requirements. While the SEC clearly has the authority to bring enforcement actions for violations of currently existing federal securities regulations, the SEC is using this case (along with the *Eisenberg* case) to create <u>new</u> rules.  The allegations against the absent token projects are not merely that their tokens are securities.  Taken together, the allegations attempt to carve out new rules for a variety of different tokens, used for a variety of different purposes (some vastly different from others), and assert that they are still securities even when they are tokens being traded on a spot market,

far away from their original issuance.  *See Ripple Labs, Inc.*, Brief of *Amicus Curiae* The Blockchain Association, ECF No. 706 (S.D.N.Y.) (setting forth some of the many different ways in which tokens can be utilized).  This position is not enforcement of an existing regulation.  It is promulgating new rules for the industry, telling the industry what it can and cannot do, all without the procedural protections of the APA.  The APA establishes a "basic presumption of judicial review [for] one 'suffering legal wrong because of agency action.'"  *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967).  Here, there is no effective judicial review of the agency action against the token creators.

To be blunt, this type of litigation is an abuse of the SEC's authority.  It sidesteps due process.  Merely by proclaiming that a token is a security, the SEC gives certain tokens a "scarlet letter," impairing their value, hampering any secondary market trading of the token, and interfering with technological development — all without providing token creators any meaningful ability to respond.  It hands the SEC an enormous amount of unreviewable power to damage a burgeoning sector of the U.S. economy, while avoiding any democratic rulemaking processes or other input.

### C.   Market Participants Are Not on Notice Regarding What Is or Is Not a Security.

The SEC's actions in this case are emblematic of the inappropriate way it has handled matters of "vast economic and political significance."  The notion that a token theoretically <u>could</u> be offered as part of an investment contract is certainly well-known, but a host of unanswered questions remain, both as to the basic question of what is a security, and the more complicated but equally important questions of what rule-abiding market participants may do with their tokens even if they were classified as securities.  The SEC has shown little willingness to answer those questions.  The Association, as an industry group, can certainly state that its members do not have

BRIEF OF *AMICUS CURIAE* BLOCKCHAIN ASSOCIATION (NO. 2:22-cv-01009-TL) - 12

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

a clear sense of what is or is not considered a security, much less how tokens could or should be treated and traded on spot markets in a manner consistent with securities laws.

In the past, the SEC has pointed to its enforcement actions and public statements to support its assertion that the law is clear, particularly including the *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO*, Sec. and Exch. Comm'n (July 25, 2017), https://www.sec.gov/litigation/investreport/34-81207.pdf (the "DAO Report").   But the DAO Report itself is ineffective in putting participants on notice as to whether transactions involving any particular token can be considered a security.   For example, the DAO Report, which concerns initial issuances rather than spot market trading, repeatedly uses vague and conditional language, such as the "U.S. federal securities laws may apply to various activities, including distributed ledger technology, depending on the particular facts and circumstances…" DAO Rep. at 10.   It states that "[w]hether or not a particular transaction involves the offer and sale of a security—regardless of the terminology used—will depend on the facts and circumstances, including the economic realities of the transaction." *Id.* at 17-18.   It also acknowledges case law that would, given the right facts and circumstances, render a token a non-security.  *Id.* at 14 (citing *Williamson v. Tucker*, 645 F.2d 404, 422-24 (5th Cir. 1981)).   Aside from merely citing *Howey*, the DAO Report does not provide further clarity for which issuances are securities, and which are not.   It stands for the proposition that a token could be offered as part of an investment contract, but provides little further concrete guidance.

All blockchain projects are different, and there are numerous issuances of and uses for tokens that are not for investment purposes.  The blockchain industry is much broader than the DAO tokens at issue in the nearly six-year-old DAO Report.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

Other than through enforcement actions, the SEC's last guidance on the question of whether a token was a security in April 2019, a near-lifetime ago in a sector where technology is evolving at lightning speed. *See Framework for "Investment Contract" Analysis of Digital Assets*, U.S. Sec. and Exch. Comm'n (Apr. 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets (the "2019 Framework").  But this guidance, too, fell woefully short.  As an initial matter, the division of the SEC that issued the guidance — the Strategic Hub for Innovation and Financial Technology ("FinHub") — disclaimed that it represented the views of the SEC, limiting the ability of industry participants to rely on it.  *See* 2019 Framework at n.1. Adding to the confusion, that guidance provided a list of over sixty factors for analyzing whether a token is a security — without weighting any particular factors, or explaining whether any of them were dispositive.  It actually created <u>more</u> confusion in the industry.  *See, e.g.*, DINNGO, *The Known and the Unsaid from the SEC's Framework* (Aug. 20, 2019), https://medium.com/dinngo-exchange/the-known-and-the-unsaid-from-the-secs-framework-ad8b2a7c6d2c ("from a crypto exchange's perspective, [the SEC's 2019 Framework] has muddied the waters rather than clearing them").  However, the 2019 Framework did recognize that tokens qualifying as securities at the time of an initial sale sometimes "should be reevaluated at the time of later offers or sales," an explicit acknowledgment of the distinction between initial sales and spot market transactions on a secondary market.

As for enforcement actions themselves, it is impossible to parse them for some kind of unified theory as to what is or isn't a security, because each SEC enforcement decision is based on the unique facts and circumstances of that case.  And the vast majority of those enforcement actions remain unadjudicated by a court or jury, often resulting in an immediate settlement, or never proceeding beyond the pleading stage of litigation.  The lack of certainty — especially for fact

BRIEF OF *AMICUS CURIAE* BLOCKCHAIN ASSOCIATION (NO. 2:22-cv-01009-TL) - 14

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

patterns that are not identical to the "2017-era initial coin offering" cases that the SEC has repeatedly brought — forces many token creators to consider structures that are unnecessarily disadvantageous, or counsels them to move outside the borders of the United States altogether.

Even the SEC's own commissioners don't believe that the SEC has delivered clear enough guidance.  In 2021, for example, Commissioner Hester M. Peirce and then-Commissioner Elad L. Roisman criticized a settlement with a digital assets exchange that publicized upcoming digital token offerings.  *See* Public Statement, Hester Peirce and Elad Roisman, *In the Matter of Coinschedule*, U.S. Sec. and Exch. Comm'n (July 14, 2021), https://www.sec.gov/news/public-statement/peirce-roisman-coinschedule.   The Commissioners were "disappointed that the Commission's settlement … did not explain <u>which</u> digital assets … were securities, an omission which is symptomatic of our reluctance to provide additional guidance about how to determine whether a token is being sold as part of a securities offering or which tokens are securities."  *Id.* (emphasis in original).  They added that "[t]here is a decided lack of clarity for market participants around the application of the securities laws to digital assets and their trading."  *Id.*

In a speech by Commissioner Peirce just last month, she acknowledged that the SEC's reference "to the crypto assets themselves as securities" indicates an "imprecise application of the law [that] has created arbitrary and destructive results for crypto projects and purchasers."  Hester M. Peirce, *Outdated: Remarks before the Digital Assets at Duke Conference*, U.S. Sec. and Exch. Comm'n,  (Jan. 20, 2023), https://www.sec.gov/news/speech/peirce-remarks-duke-conference-012023.  And, even just last week, Commissioner Peirce observed, in connection with a settlement related to a "cryptocurrency staking program," that "[u]sing enforcement actions to tell people what the law is in an emerging industry is not an efficient or fair way of regulating … A paternalistic and lazy regulator settles on a solution like the one in this settlement:  do not initiate

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

a public process to develop a workable registration process that provides valuable information to investors, just shut it down."  Hester M. Peirce, *Kraken Down: Statement on SEC v. Payward Ventures, Inc., et al.*, U.S. Sec. and Exch. Comm'n (Feb. 9, 2023), https://www.sec.gov/news/statement/peirce-statement-kraken-020923.

Even past the overarching question of whether a particular token is a security, numerous other questions confound the issue of whether a token transaction in the spot market could be treated as a security.  The now-infamous June 2018 "Hinman Speech" asked the basic question: even if a token was originally offered to purchasers as part of an investment contract, at what point can it become a non-security?  *See* William Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic)*, Remarks at the Yahoo Finance All Markets Summit: Crypto, U.S. Sec. and Exch. Comm'n (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418.  The following year, FinHub's aforementioned April 2019 guidance made a brief, unofficial, and unsatisfactory attempt at an answer.  Since then, silence.

In the *Ripple* case pending in the S.D.N.Y., the SEC's rejoinder to these deep, persistent industry concerns was that "transactions between two public investors not involving Ripple's affiliates, dealers, or underwriters would be exempt from Section 5's registration requirements, despite such transactions involving securities," because such "public" transactions would not involve an issuer, underwriter, or dealer.  *Ripple Labs, Inc.*, ECF No. 674 at 45 n.25 (S.D.N.Y.), *citing* 15 U.S.C. § 77d(a)(1).  Thus, the SEC asserts that the requirement to "register" tokens would not impact the business of subsequent users of that token.

That answer provides no solace.  If the SEC were to initiate such an action against such a downstream user, seller, or purchaser, that person has the burden to show that the tokens were exempt from the registration requirement.  *See SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352,

365 (S.D.N.Y. 2020).  Such exemptions are "construed strictly."  *Id.* at 366.  Those questions hang over this case — the Wahi Defendants have the burden to show exemptions (or non-security status) relating to tokens whose issuance they may know nothing about.

Even if a downstream user of tokens is exempted from the registration requirements of 15 U.S.C. § 77(e), the question of whether the token was originally considered to be a security undoubtedly <u>matters</u> to future transactions in the spot market.  The token would have to trade as a security, on securities exchanges or over-the-counter ("OTC").  And compliance with all of the ongoing rules for registered securities would lead to a host of new "square peg, round hole" problems.  What is the mechanism for users to take such tokens off-exchange?  How would users be able to build software on top of the tokens?  What would happen if the original creator went bankrupt and the tokens were de-listed by the exchanges?  Would the tokens then trade OTC?  Since "only broker-dealers qualified with FINRA as market makers can apply to quote securities on the OTCBB," *see Over-the-Counter Market*, U.S. Sec. and Exch. Comm'n (May 9, 2013), https://www.sec.gov/divisions/marketreg/mrotc.shtml, what if no brokers were approved to broker such transactions?  Since "companies that want to have their securities quoted on the OTCBB must seek the sponsorship of a market maker as well as file current financial reports with the SEC or with their banking or insurance regulator," *id.*, what happens if there are no such qualified market makers?  Or no "company" to file current financial reports?  The SEC has not begun to scratch the surface of all these unanswered questions, and more.  In that context, it is impossible to conclude that the industry is on fair notice — not just of the elementary question of whether a token can even be a security, but if so, the myriad of questions about how that could possibly work consistent with securities regulations.

BRIEF OF *AMICUS CURIAE* BLOCKCHAIN ASSOCIATION (NO. 2:22-cv-01009-TL) - 17

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

These questions may seem far afield, or theoretical, but they are centrally relevant to this case.  The SEC has decided to label tokens securities, unilaterally causing them damage, without any possibility for the token or its creator to defend itself, without answering a host of questions about how those tokens could fit into a securities regulation framework.  And, if a token could not possibly fit into a securities regulation framework, if there is literally no way to register a particular token as a security, it is reasonable to conclude that the reason is because the token is not a security.

One team of prominent securities lawyers recently published an exhaustive review of nearly a century of appellate case law and related legal scholarship to demonstrate that the SEC's position that most fungible blockchain-based crypto assets themselves are securities under current law is inconsistent with the Supreme Court's definition of the term "investment contract" as developed by federal appellate courts.  *See* Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin, & Sarah Chen, *The Ineluctable Modality of Securities Law:  Why Fungible Crypto Assets Are Not Securities*, DLx Law (Nov. 10, 2022), https://dlxlaw.com/wp-content/uploads/2022/11/The-Ineluctable-Modality-of-Securities-Law-DLx-Law-Discussion-Draft-Nov.-10-2022.pdf.  *See also* Jai Massari, *Why Cryptoassets Are Not Securities*, Harvard Law School Forum on Corporate Governance (Dec. 6, 2022), https://corpgov.law.harvard.edu/2022/12/06/why-cryptoassets-are-not-securities/.

The lack of clarity on these key issues has plagued the blockchain industry, stifled innovation, and created an arbitrary and ever-shifting playing field, where a well-meaning, careful, and thoughtful token creator that believes in good faith that it is not violating any securities regulations can be suddenly branded a bad actor by the SEC, with no chance to respond.

Here, if the Court finds that the tokens themselves are not securities, then the SEC cannot prevail in this case.  At a minimum, this Court should lay down a marker:  before the SEC brings

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

enforcement actions against blockchain industry participants for failing to abide by securities laws and regulations, those laws and regulations must be clear, understandable, and sensible.  Because the token or its creator cannot defend itself here, we respectfully submit that the Court should be very reticent to make any findings that could cause collateral damage to third parties.  To the extent the Court is required to reach any findings about the nature of the tokens at issue in this case, the Court should be clear that such findings have no collaterally preclusive effect outside this litigation.

A software token has a fundamentally different technological nature than a traditional security.  It is not at all obvious that a token, which can be easily divorced from an investment contract under which it was sold, even if it was originally sold as part of an investment contract, is itself a security.  Indeed, the better weight of case law and scholarly authority is that a token is merely software, not itself the embodiment of an investment contract.  For the SEC to simply announce that a particular token is a security gives the SEC inordinate, unchecked power to harm individual technology projects, and American innovation as a whole.  For the SEC to do so in an action against a stranger to that project deprives the affected entities and individuals of any meaningful chance to respond.  The United States federal government should not be allowed to trample the due process owed to bystanders in order to pursue an unrelated wrongdoer.

## CONCLUSION

The Association respectfully requests that the Court consider the issues presented herein when determining the motion to dismiss.

BRIEF OF *AMICUS CURIAE* BLOCKCHAIN ASSOCIATION (NO. 2:22-cv-01009-TL) - 19

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

DATED this 17th day of March, 2023.

BYRNES KELLER CROMWELL LLP


By /s/ John A. Tondini
    John A. Tondini, WSBA #19092
    1000 Second Avenue, 38th Floor
    Seattle, WA 98104
    Telephone:  (206) 622-2000
    jtondini@byrneskeller.com

MORRISON COHEN LLP
    Jason Gottlieb (*pro hac vice*)
    Michael Mix (*pro hac vice*)
    Alexandra W. Wang (*pro hac vice*)
    909 Third Avenue
    New York, New York 10022
    (212) 735-8600
    jgottlieb@morrisoncohen.com
    mmix@morrisoncohen.com
    awang@morrisoncohen.com

***Attorneys for Amicus Curiae Blockchain Association***

BRIEF OF *AMICUS CURIAE* BLOCKCHAIN ASSOCIATION (NO.
2:22-cv-01009-TL) - 20

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on the 17th day of March, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel on record in the matter.

/s/ John A. Tondini

Byrnes Keller Cromwell LLP
1000 Second Avenue, 38th Floor
Seattle, WA  98104
Telephone:  (206) 622-2000
Facsimile:  (206) 622-2522
jtondini@byrneskeller.com

BRIEF OF *AMICUS CURIAE* BLOCKCHAIN ASSOCIATION (NO. 2:22-cv-01009-TL) - 21

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000