THE HONORABLE TANI LIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

    v.

ISHAN WAHI, NIKHL WAHI, AND
SAMEER RAMANI,

        Defendants.

No.: 22-cv-01009-TL

BRIEF OF AMICUS CURIAE THE
CHAMBER OF DIGITAL COMMERCE

BRIEF OF AMICUS CURIAE THE CHAMBER OF DIGITAL
COMMERCE
NO.: 22-CV-01009-TL

PAGE i

**Winston and Strawn LLP**

200 S. Biscayne Boulevard
Miami, FL 33131
Tel. (305) 910-0787

1

2

# TABLE OF CONTENTS

I.   INTRODUCTION AND STATEMENT OF INTEREST ................................................. 1

II.  THE REGULATORY ENVIRONMENT GOVERNING DIGITAL ASSETS IS
     UNCERTAIN AND CHAOTIC ........................................................................... 5

     a.   The SEC has not defined what a "security" is in the digital assets context. ................ 6

     b.   The SEC's recent expansion of the Howey test to secondary market
          transactions is ahistorical, unwarranted, and in conflict with its own prior
          statements. ............................................................................................... 9

III. THE SEC'S END-RUN AROUND THE NORMAL REGULATORY PROCESS
     IN THIS CASE SEVERELY PREJUDICES OTHER MARKET
     PARTICIPANTS ............................................................................................. 12

     a.   The Prejudicial Impact of Regulation by Individual Enforcement............................. 14

     b.   The Inadequacy of Existing Procedural Mechanisms to Protect Market
          Participants. ............................................................................................... 16

IV.  THIS COURT SHOULD RECOGNIZE THAT THE SEC LACKS STATUTORY
     AUTHORITY TO REGULATE DIGITAL ASSETS AND SHOULD DEFER
     ANY RULING AS TO WHETHER THE DIGITAL ASSETS AT ISSUE IN
     THIS CASE CONSTITUTE "SECURITIES" ......................................................... 19

V.   CONCLUSION ............................................................................................... 22

BRIEF OF AMICUS CURIAE THE CHAMBER OF DIGITAL
COMMERCE
NO.: 22-CV-01009-TL

PAGE ii

**Winston and Strawn LLP**
200 S. Biscayne Boulevard
Miami, FL 33131
Tel. (305) 910-0787

1

2

# **TABLE OF AUTHORITIES**

3

**Page(s)**

4

**Cases**

5

*Ala. Ass'n of Realtors v. Dep't of Health and Human Servs.*,
   141 S. Ct. 2485 (2021) ................................................................... 19, 20

6

7

*Am. Greyhound Racing, Inc. v. Hull*,
   305 F.3d 1015 (9th Cir. 2002) ........................................................... 17

8

9

*Butler, Fitzgerald & Potter v. Sequa Corp.*,
   250 F.3d 171 (2d Cir. 2001) ............................................................... 17

10

*Cnty. of Orange v. Air Cal.*,
   799 F.2d 535 (9th Cir. 1986) ............................................................. 17

11

12

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ........................................................................... 20

13

14

*Gonzales v. Or.*,
   546 U.S. 243 (2006) ...................................................................... 19, 20

15

*Merrill Lynch, Pierce, Fenner & Smith v. Curran*,
   456 U.S. 353 (1982) ........................................................................... 22

16

17

*Reves v. Ernst & Young*,
   949 U.S. 56 (1990) ............................................................................... 7

18

*SEC v. Aqua-Sonic Prods. Corp.*,
   524 F. 866 (S.D.N.Y. 1981) ............................................................... 11

19

20

*SEC v. LBRY, Inc.*,
   26 F.4th 96 (1st Cir. 2022) ........................................................... 12, 17

21

22

*SEC v. Ripple Labs, Inc.*,
   2021 WL 4555352 (S.D.N.Y. Oct. 4, 2021) ............................. 12, 14, 17

23

*SEC v. Telegram Grp. Inc.*,
   2020 WL 1547383 (S.D.N.Y. Apr. 1, 2020) ..................................... 9, 11

24

25

*SEC v. Telegram Grp. Inc.*,
   448 F. Supp. 3d 352 (S.D.N.Y. 2020) ............................................. 9, 11

26

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946) ..................................................................... *passim*

27

28

PAGE iii

**Winston and Strawn LLP**
200 S. Biscayne Boulevard
Miami, FL 33131
Tel. (305) 910-0787

*Trbovich v. UMW of Am.*,
    404 U.S. 528 (1972) .......................................................................... 17

*U.S. v. City of Los Angeles*,
    288 F.3d 391 (9th Cir. 2002) ............................................................ 17

*Util. Air Regulatory Grp. v. EPA*,
    573 U.S. 302 (2014) .......................................................................... 22

*Ward v. Apple Inc.*,
    791 F.3d 1041 (9th Cir. 2015) .......................................................... 17

*West Va. v. EPA*,
    142 S. Ct. 2587 (2022) ......................................................... 19, 20, 21, 22

**Statutes**

7 U.S.C. § 2 ............................................................................................... 2, 21

15 U.S.C. § 77b *et seq* ................................................................................. 6

2022 Lummis-Gillibrand Responsible Financial Innovation Act ........................................... 21

Administrative Procedures Act ......................................................................... 3, 7

Clean Air Act ............................................................................................ 19

Exchange Act ....................................................................................... 2, 6, 7, 21

Securities Act ....................................................................................... 6, 7, 11

**Other Authorities**

17 C.F.R. § 240.10b-5 ..................................................................................... 2

*Bitcoin and Ether Reach Record Highs*, Fortune (November 9, 2021),
    https://fortune.com/2021/11/09/cryptocurrency-market-cap-3-trillion-bitcion-
    ether-shiba-inu/ ..................................................................................... 4

Blockchain Alliance, https://blockchainalliance.org/ (last visited Feb. 20, 2023) .................... 1

Caroline Pham, Commissioner, CFTC, *Statement re: SEC v. Wahi* (July 21, 2020),
    https://www.cftc.gov/PressRoom/SpeechesTestimony/phamstatement072122 ............... 12

CoinMarketCap, http://coinmarketcap.com (last visited Feb. 15, 2023) ................................. 4

Fed. R. Civ. P. 19 ....................................................................................... 17

BRIEF OF AMICUS CURIAE THE CHAMBER OF DIGITAL
COMMERCE
NO.: 22-CV-01009-TL

PAGE iv

**Winston and Strawn LLP**
200 S. Biscayne Boulevard
Miami, FL 33131
Tel. (305) 910-0787

Fed. R. Civ. P. 24 .................................................................................................... 17

Hester M. Peirce, Commissioner and Elad L. Roisman, Commissioner, SEC, *In the Matter of Coinschedule* (July 14, 2021), https://www.sec.gov/news/public-statement/peirce-roisman-coinschedule ............................................................. 6

Hester M. Peirce, Commissioner, SEC, *Not Braking and Breaking* (July 21, 2020), https://www.sec.gov/news/speech/peirce-not-braking-and-breaking-2020-07-21 .................................................................................................................... 8

Hester M. Peirce, Commissioner, SEC, *Outdated: Remarks Before the Digital Assets at Duke Conference* (January 20, 2023), https://www.sec.gov/news/speech/peirce-remarks-duke-conference-012023 ........... 11, 12

*In re Poloniex, LLC*, *Respondent*, Exchange Act Release No. 92607, 2021 WL 3501307, at *1 (Aug. 9, 2021) ................................................................... 10

*In re TokenLot, LLC, Lenny Kugel, and Eli L. Lewitt*, Exchange Act Release No. 84075, at 4 (Sept. 11, 2018) ......................................................................... 10

James D. Cox, SEC Enforcement Heuristics: An Empirical Inquiry, 53 DUKE L.J. 737, 777 (2003) ................................................................................................. 16

Letter from Jay Clayton, Chairman, SEC, to Ted Budd, Congressman, North Carolina (Mar. 7, 2019), https://www.coincenter.org/app/uploads/2020/05/clayton-token-response.pdf ............... 10

Lewis Cohen, *The Ineluctable Modality of Securities Law: Why Fungible Crypto Assets Are Not Securities* at 62 (November 10, 2022), https://ssrn.com/abstract=4282385 ................................................................. 11

MacKenzie Sigalos, *SEC's Hester Peirce Says the U.S. Has Dropped the Ball on Crypto Regulation*, CNBC (May 25, 2022), https://www.cnbc.com/2022/05/25/secs-hester-peirce-us-dropped-the-ball-on-crypto-regulation.html ................................................................................. 9

S. Rep. No. 95-850 (1978), as reprinted in 1978 U.S.C.C.A.N. 2087, 2101 ......................... 22

SEC, *Framework for "Investment Contract" Analysis of Digital Assets* (Apr. 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets ............................................................................................. 8

The Token Alliance, Chamber of Digital Commerce, https://digitalchamber.org/initiatives//token-alliance/ (last visited Feb. 20, 2023) .................................................................................................... 1

BRIEF OF AMICUS CURIAE THE CHAMBER OF DIGITAL COMMERCE
NO.: 22-CV-01009-TL

PAGE v

**Winston and Strawn LLP**
200 S. Biscayne Boulevard
Miami, FL 33131
Tel. (305) 910-0787

*Virtual Currencies: The Oversight Role of the U.S. Securities and Exchange Commission and the U.S. Commodity Futures Trading Commission*, S. Comm. on Banking, Hous., and Urb. Affs. (Feb. 6, 2018), https://www.banking.senate.gov/hearings/virtual-currencies-the-oversight-role-of-the-us-securities-and-exchange-commission-and-the-us-commodity-futures-trading-commission ............................................................................................. 7

William Hinman, Dir., Div. of Corp. Fin., SEC, *Digital Asset Transactions: When Howey Met Gary (Plastic)* (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418 ................................................. 7

BRIEF OF AMICUS CURIAE THE CHAMBER OF DIGITAL COMMERCE
NO.: 22-CV-01009-TL

PAGE vi

**Winston and Strawn LLP**
200 S. Biscayne Boulevard
Miami, FL 33131
Tel. (305) 910-0787

## I.     INTRODUCTION AND STATEMENT OF INTEREST

The Chamber of Digital Commerce (the "Chamber") is the world's largest digital asset and blockchain trade association.  It represents an exceptionally diverse spectrum of more than 200 entities that utilize blockchain technology, ranging from some of the world's largest banks and investment firms, to digital asset exchanges, to early-stage startups offering a wide array of products and services.  Since its founding in 2014, the Chamber has educated members of the public and private sectors regarding the transformative promise of blockchain; formed the Blockchain Alliance, which regularly assists over 100 governmental and commercial entities as part of its mission to combat blockchain-related criminal activity;[1] and, through its Token Alliance working group,[2] facilitated the effective and responsible adoption of blockchain technology across an ever-increasing array of use cases.

These initiatives all stem from the Chamber's foundational desire for regulatory certainty and clear compliance standards in the digital assets and blockchain space.  In furtherance of those same goals, the Chamber advocates for Congressional legislation addressing the creation, dissemination, and trading of digital assets in both primary and secondary transactions.  To date, Congress has not clearly defined the relevant role and reach of the Securities and Exchange Commission (the "SEC"), the Commodity Futures Trading Commission (the "CFTC"), or other regulatory authorities active in this area.  Until it does so, members of the Chamber—and entities utilizing digital assets and blockchain more generally—will remain in regulatory limbo, without clear guidance on how to structure their digital asset-related operations.

The Chamber also represents the interests of its members by filing briefs as *amicus curiae*

---

[1] *See* The Blockchain Alliance, https://blockchainalliance.org/ (last visited Feb. 20, 2023).

[2] The Token Alliance, an industry-led initiative developed to be a key resource for tokenized networks and applications and comprised of 400+ industry thought leaders, technologists, and innovators, has developed a series of tools and resources for industry and policymakers.  *See* The Token Alliance, Chamber of Digital Commerce, https://digitalchamber.org/initiatives//token-alliance/ (last visited Feb. 20, 2023).

BRIEF OF AMICUS CURIAE THE CHAMBER OF DIGITAL          PAGE 1          **Winston and Strawn LLP**
COMMERCE                                                                              200 S. Biscayne Boulevard
NO.: 22-CV-01009-TL                                                                   Miami, FL 33131
                                                                                      Tel. (305) 910-0787

in litigations of especial significance to the digital asset and blockchain community.[3]  This purported "insider trading" case—which quietly represents a dramatic and unprecedented effort to expand the SEC's jurisdictional reach—easily qualifies.  The reason why is simple.  To prove its claims under Section 10(b) of the Securities Exchange Act of 1934, as amended ("Exchange Act"), and Rule 10b-5, the SEC must first demonstrate that the digital assets at issue are "securities" within the meaning of the Exchange Act.  Yet the tokens identified by the SEC in its First Amended Complaint (the "FAC") presumably were not regarded as "securities" by the parties that created them, the digital asset exchanges that facilitate their purchase and sale, or the users who use them to access goods and services.  Indeed, this action—brought against three individuals who engaged in allegedly improper secondary market trading—was the first time the SEC indicated that these specific digital assets might be considered "securities" in *any* context, let alone that the specific transactions involved in *this* case might qualify as "securities transactions."

The Chamber takes no position on whether the SEC can demonstrate that Defendants traded digital assets on the basis of material, non-public information.[4]  It does, however, disagree that secondary market trades of digital assets are "securities transactions."  Moreover, it has serious concerns about the SEC's attempt to label them as such in the context of an enforcement action against third parties who had nothing to do with creating or allocating those assets.  This novel variation on the SEC's "regulation by enforcement" theme not only poses significant notice and due process concerns, but will inevitably engender a host of negative collateral consequences for other market participants, including the very "investors" the SEC is charged to protect.

*First*, as described in Section II below, the SEC has yet to clearly define what sorts of digital asset transactions it considers to be "securities transactions" by promulgating rules under

---

[3] The Chamber does not proffer any opinions on the merits; instead, it promotes its members' interest in ensuring that the legal framework applied to digital assets creates clear and consistent precedent for industry members to follow.

[4] Wahi and his co-defendants were indicted for—and have now pled guilty to—several counts of wire fraud, underscoring the fact that this action is wholly unnecessary in addition to being counterproductive (as explained below).

BRIEF OF AMICUS CURIAE THE CHAMBER OF DIGITAL COMMERCE
NO.: 22-CV-01009-TL

PAGE 2

**Winston and Strawn LLP**
200 S. Biscayne Boulevard
Miami, FL 33131
Tel. (305) 910-0787

the Administrative Procedures Act (the "APA").  Nor has it waited for Congress to resolve what has become a "turf war" between the SEC, the CFTC, and other agencies vying for primary jurisdiction over digital asset businesses.  Instead, the SEC's leadership has issued a series of shifting and often contradictory statements—many of which have been criticized by other regulators and even dissenting SEC commissioners—or otherwise simply attempted to "enforce" its way to a regulatory framework.  The results have been predictable: arbitrariness, inequity, and widespread market confusion.  Moreover, the SEC's lodestar for these enforcement actions—the Supreme Court's decision in *United States v. Howey*—which sets forth a four-prong test for determining whether a given asset was sold as an "investment contract" and thus constituted a securities offering in that context—does not shed any light on whether the underlying asset itself is a security.  (In *Howey* itself, where the underlying assets were orange groves, that was not the case.)  Additionally, the *Howey* test was never meant to apply to the sorts of secondary market transactions at issue here, where there was no "contract" at all.

*Second*, the SEC's attempt in this case (and others) to classify digital assets as securities via the "back door" of an insider trading action is misguided as a practical matter.  One can comprehend the surface appeal to the SEC of such a strategy: the defendants in such cases likely will have had nothing to do with the creation or distribution of the underlying digital assets, and may not have the resources or information to contest the asset's status as a "security" as vigorously as the entity that did.  But, as Section III details, any such benefits are dwarfed by the damage to the digital assets market.  Creators of digital assets will suffer harm to goodwill and face the prospect of class action lawsuits, all without having been given a proper forum to defend their classification of the asset.  Exchanges, too, will confront the threat of state and federal regulatory actions, as well as private litigation, and may feel compelled to delist digital assets targeted by the SEC in a litigation like this one.  And holders as well as consumptive users of those assets will see their liquidity and value destroyed, leaving the very "investors" the SEC is attempting to protect holding—to paraphrase a recent statement by SEC Commissioner Hester Peirce—a bag of worthless coins.

BRIEF OF AMICUS CURIAE THE CHAMBER OF DIGITAL COMMERCE
NO.: 22-CV-01009-TL

PAGE 3

Winston and Strawn LLP
200 S. Biscayne Boulevard
Miami, FL 33131
Tel. (305) 910-0787

Nor is that all.  The SEC's tactical shift will do grave harm to the larger economic landscape as well as its ability to fulfill its own mandate.  Increased regulatory uncertainty and the threat of collateral consequences will drive innovators to offshore havens, thus reducing both the U.S.'s competitiveness in the burgeoning field of blockchain technology as well as its ability to safeguard the interests of digital asset "investors."  And any perceived efficiency gains will prove ephemeral, as at least some market participants with a direct interest in the digital asset at issue seek to intervene in these actions rather than allow their fates and fortunes to be determined by accused insider traders.  When that occurs, what should have been straightforward fraud actions will devolve into expensive and inefficient multi-party litigations that may very well fail to achieve their ostensible goal—holding the actual fraudsters liable.

*Third*, while all of this is as undesirable as it is predictable, it is not inevitable.  As Section IV explains, the SEC currently lacks the authority to seek the adjudication of digital assets as securities, particularly in the context of an insider trading case like this one.  The Supreme Court's major questions doctrine makes clear that, where a regulatory agency claims the power to make decisions of "vast economic and political significance," it must be able to point to "clear congressional authorization" in support.  Here, where the SEC seeks to unilaterally regulate virtually *all* transactions in digital assets, including secondary market transactions which differ greatly from traditional securities transactions, there is no question that its assertion of authority implicates issues of such significance.  The adoption of blockchain technology (which is inextricably intertwined with the creation of digital assets) is increasing at an exponential rate across a wide range of industries, from supply chain management to insurance to manufacturing to music.  Indeed, there are tens of thousands of digital assets, with an aggregate market size estimated at more than $1 trillion.[5]  Nor is there any doubt that the SEC lacks congressional

---

[5] CoinMarketCap, http://coinmarketcap.com (last visited Feb. 15, 2023).  At its height, the market capitalization for a subset of digital assets sometimes referred to as "cryptocurrencies" exceeded $3 trillion.  *See* Yvonne Lau, *Cryptocurrencies Hit Market Cap of $3 Trillion for the First Time as Bitcoin and Ether Reach Record Highs*, Fortune (November 9, 2021), https://fortune.com/2021/11/09/cryptocurrency-market-cap-3-trillion-bitcoin-ether-shiba-inu/.

BRIEF OF AMICUS CURIAE THE CHAMBER OF DIGITAL COMMERCE
NO.: 22-CV-01009-TL

PAGE 4

**Winston and Strawn LLP**
200 S. Biscayne Boulevard
Miami, FL 33131
Tel. (305) 910-0787

authority (let alone "clear" authority) in this area, and that its related enforcement efforts do not really "fit" within its traditional mandate.  At a basic level, many digital assets—particularly in the context of secondary market transactions—more closely resemble a "commodity" within the purview of the CFTC; to return to *Howey*: they are more akin to oranges than to investment contracts for the development and management of an orange grove by a promoter.  Others, particularly those designed for use within a particular blockchain ecosystem, may be neither securities nor commodities, as those century-old legal constructs are typically defined.  Moreover, pending legislation before Congress indicates that, wherever the line ends up being drawn, it likely won't be where the SEC seems to think it is.  Indeed, consistent with Congress's historically restrictive view of the SEC's jurisdiction, both chambers are currently considering legislation which would dramatically constrain the SEC's regulatory powers over digital asset transactions and expressly clarify that the SEC is divested of jurisdiction over the very type of digital asset transactions at issue here.  Accordingly, and for the reasons enumerated herein, this Court should decline to lend its imprimatur to the SEC's jurisdictional incursion and instead dismiss this action in its entirety.

## II.    THE REGULATORY ENVIRONMENT GOVERNING DIGITAL ASSETS IS UNCERTAIN AND CHAOTIC

Contrary to the public dialogue which surrounds them, "digital assets" or tokens do not constitute a single asset class.  Rather, there is a wide and nearly limitless world of digital assets with extensive differences in characteristics and properties.  Some facilitate payment; others demonstrate ownership and provenance of a particular real world or digital asset, like art; others facilitate voting; and still others entitle the token holder to a good or service, like online file storage space.  Accordingly, digital assets, and the blockchain technology that powers them, are utilized by a broad array of entities—from artists to insurers to governments—for a myriad of purposes. This incredible diversity poses a serious challenge for lawmakers and regulators, as different tokens implicate very different regulatory concerns depending on their precise attributes and use cases.  Moreover, as discussed below, the appropriate treatment of a given digital asset may vary

BRIEF OF AMICUS CURIAE THE CHAMBER OF DIGITAL COMMERCE
NO.: 22-CV-01009-TL

PAGE 5

**Winston and Strawn LLP**
200 S. Biscayne Boulevard
Miami, FL 33131
Tel. (305) 910-0787

over time based on the unique facts and circumstances of the particular transaction in which it is sold or utilized.

Unlike other countries, the United States has no federal law or regulation that specifically addresses the circumstances under which a given digital asset should be classified as a security, a commodity, a currency, or something else entirely.  This in turn has created a void, with several federal agencies (including the SEC, the CFTC, the Financial Crimes Enforcement Network, the Department of Justice, and the Department of Treasury's Office of Foreign Assets Control), as well as individual states, seeking to assert jurisdiction over the vast and extremely diverse digital asset industry.

Of all these regulators, the SEC has been the most forceful in asserting its jurisdiction in this area, moving towards the maximalist position that even secondary market transactions in most digital assets are securities transactions falling within its regulatory purview.  But the SEC's view is based on an ahistorical misreading of the securities laws, and its advancement of that view has relied on unclear guidance and seemingly arbitrary enforcement actions instead of the typical rulemaking process.  The result—particularly when juxtaposed with conflicting positions taken by the CFTC and others—has been regulatory chaos and widespread market confusion.  Indeed, as two SEC Commissioners have stressed, "[t]here is a *decided lack of clarity* for market participants around the application of the securities laws to digital assets and their trading."  Hester M. Peirce, Commissioner and Elad L. Roisman, Commissioner, SEC, *In the Matter of Coinschedule* (July 14, 2021), https://www.sec.gov/news/public-statement/peirce-roisman-coinschedule (emphasis added).

a. <u>**The SEC has not defined what a "security" is in the digital assets context.**</u>

Any analysis of whether a given digital asset is a "security" begins with the Securities Act of 1933, as amended (the "Securities Act"), as well as the Exchange Act, both of which define the term by enumerating a lengthy list of financial instruments, including "stocks" and "bonds."  *See* 15 U.S.C. § 77b *et seq*.  The lists, though different in certain respects, are considered functionally

BRIEF OF AMICUS CURIAE THE CHAMBER OF DIGITAL COMMERCE
NO.: 22-CV-01009-TL

PAGE 6

Winston and Strawn LLP
200 S. Biscayne Boulevard
Miami, FL 33131
Tel. (305) 910-0787

equivalent;[6] and needless to say, the phrase "digital asset" does not appear in either ninety-year-old statute.

Accordingly, and given the novel regulatory issues presented by the broad array of digital assets and the burgeoning importance of blockchain, one might have expected the SEC to either wait for Congress to act or to engage in the rulemaking process prescribed by the APA.  It has done neither.  Instead, it zeroed in on the catch-all term "investment contract," which, while referenced, is undefined in both the Exchange Act and the Securities Act.  Specifically, the SEC decreed—without formal public notice or a chance for public comment—that the proper standard for determining whether a digital asset transaction constituted an "investment contract" (and thus a security) is the four-part *Howey* test first announced in the eponymous 1946 Supreme Court case, *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).

Given the fact that *Howey* was decided in 1946 (at a time when the concept of "digital assets," not to mention the computing and blockchain technology that underlies them, was unimaginable), the SEC's reliance on that case in various enforcement actions hardly gave the market clear guidance as to what it considered a "security."  Although SEC officials made certain public pronouncements in an attempt to clarify matters, these were high-level and shed little light on how the securities laws would be applied to specific digital assets in specific instances.[7]  Market participants were thus left to pore over the various enforcement actions brought by the SEC—primarily against entities which had engaged in initial coin offerings, or ICOs—in an attempt to divine which digital assets transactions implicated securities regulations and which did not.  But this too was of little help: the vast majority of enforcement actions settled almost immediately,

---

[6] *Reves v. Ernst & Young*, 949 U.S. 56, 61 n. 1 (1990).

[7] William Hinman, Dir., Div. of Corp. Fin., SEC, *Digital Asset Transactions: When Howey Met Gary (Plastic)* (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418 (hereinafter, "Hinman 2018"); *Virtual Currencies: The Oversight Role of the U.S. Securities and Exchange Commission and the U.S. Commodity Futures Trading Commission*, S. Comm. on Banking, Hous., and Urb. Affs. (Feb. 6, 2018), https://www.banking.senate.gov/hearings/virtual-currencies-the-oversight-role-of-the-us-securities-and-exchange-commission-and-the-us-commodity-futures-trading-commission.

BRIEF OF AMICUS CURIAE THE CHAMBER OF DIGITAL COMMERCE
NO.: 22-CV-01009-TL

PAGE 7

**Winston and Strawn LLP**
200 S. Biscayne Boulevard
Miami, FL 33131
Tel. (305) 910-0787

failing to provide precedential guidance.

In 2019, as part of an effort to allay some of the resulting uncertainty, a unit of the SEC published informational and nonbinding guidance laying out a framework for analyzing the circumstances under which a digital asset transaction might qualify as an investment contract (the "Framework").  SEC, *Framework for "Investment Contract" Analysis of Digital Assets* (Apr. 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets (hereinafter "Framework 2019").   The 5,000-plus-word Framework identified an astounding *thirty-eight* separate unweighted, non-exclusive, and non-determinative "characteristics" of a digital asset securities offering.  How to resolve situations where some factors are present and others are not, or where factors are present on either side of the scale, or indeed, how to reach any definitive conclusion as to securities status, were not addressed.  Unsurprisingly, it only served to muddy the waters further, "resulting in public confusion," as Commissioner Hester Peirce publicly acknowledged.  *See* Hester M. Peirce, Commissioner, SEC, *Not Braking and Breaking* (July 21, 2020), https://www.sec.gov/news/speech/peirce-not-braking-and-breaking-2020-07-21.   Worse, the SEC has never indicated that it applies the Framework when analyzing a specific digital asset, and none of the settled actions illustrate the SEC's application of the thirty-eight "characteristics" test in connection with a particular digital asset offering.  For market participants craving predictability, this opacity is little better than having no guidance at all.

The SEC claims that its enforcement activities, along with the various cryptic pronouncements offered by its officials over the years, provide the market with all the certainty it needs.  The truth of that assertion is belied not only by the undeniably widespread confusion that continues to exist amongst market participants, but by the SEC's own leadership.  For instance, Commissioner Peirce has stated that because the SEC's "hints at clarification" have arisen in the context of enforcement activity, the "resulting settlement orders and litigation releases *leave the industry to guess* at the path to compliance."  *Id.* (emphasis added).  She has also bemoaned the fact that the United States has "dropped the regulatory ball" and impeded innovation and experimentation in the field of digital assets, with potential long-term consequences for the

BRIEF OF AMICUS CURIAE THE CHAMBER OF DIGITAL COMMERCE
NO.: 22-CV-01009-TL

PAGE 8

Winston and Strawn LLP
200 S. Biscayne Boulevard
Miami, FL 33131
Tel. (305) 910-0787

industry and the United States.[8]

**b.**   **The SEC's recent expansion of the Howey test to secondary market transactions is ahistorical, unwarranted, and in conflict with its own prior statements.**

Prior to this litigation, the SEC had generally confined its application of the *Howey* test to initial offerings of digital assets (*see* FAC ¶¶ 101-105) and not secondary market transactions like the ones at issue here.  This made sense: at the core of *Howey*'s definition of a security (and, as explained in the Wahi Motion to Dismiss, the "blue sky" definition of an "investment contract," as that term is used in the Securities and Exchange Acts), is the requirement that a given asset be coupled with an enforceable promise by the offeror.  Wahi Mot. to Dismiss at 22.

In *Howey*, for instance, the Supreme Court analyzed whether the sale of a real estate parcel in an orange grove, *plus* the offeror's contractual promise to cultivate that parcel and provide a share of profits to the investor, constituted an "investment contract" and thus a security.  *See Howey*, 328 U.S. at 295-96, 299.  The fact that an asset is part of a securities transaction once does not immutably and permanently render it a security; had the orange groves in *Howey* been resold without the accompanying contract, they would just be orange groves.  *Howey*, 328 U.S. at 295-96, 299; *SEC v. Telegram Grp. Inc.*, 2020 WL 1547383, at *1 (S.D.N.Y. Apr. 1, 2020) (explaining that "the 'security' was neither the Gram Purchase Agreement *nor the Gram*") (emphasis added).  Accordingly, in order to determine whether a given digital asset is a security, a court must "examine the series of understandings, transactions, and undertakings *at the time they were made*."  *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 368 (S.D.N.Y. 2020) (emphasis added).

SEC officials have emphasized this very point.  In 2018, then-Director of the Division of Corporate Finance, William Hinman, unequivocally stated: "[T]he token—or coin or whatever the digital information packet is called—all by itself is not a security, just as the orange groves in *Howey* were not."  *See* Hinman 2018, *supra* n.7.  He further noted that "the digital asset itself is simply code" and that its classification would depend on "how [the asset] is being sold."  *Id.*

---

[8] *See* MacKenzie Sigalos, *SEC's Hester Peirce Says the U.S. Has Dropped the Ball on Crypto Regulation*, CNBC (May 25, 2022), https://www.cnbc.com/2022/05/25/secs-hester-peirce-us-dropped-the-ball-on-crypto-regulation.html.

Likewise, then-Chairman Jay Clayton agreed "that the analysis of whether a digital asset is offered or sold as a security is not static and does not strictly inhere to the instrument," explaining that "[a] digital asset may be offered and sold initially as a security…but that designation may change over time if the digital asset later is offered and sold in such a way that it will no longer meet that definition."  Letter from Jay Clayton, Chairman, SEC, to Ted Budd, Congressman, North Carolina (Mar. 7, 2019), https://www.coincenter.org/app/uploads/2020/05/clayton-token-response.pdf. Indeed, the Framework itself recognizes that whether a digital asset, even one "previously sold as a security," is an "investment contract" contract under *Howey* must "be reevaluated at the time of later offers or sale."  Framework 2019*, supra* p. 7 (noting that "[w]hether a particular digital asset *at the time of its offer or sale* satisfies the *Howey* test depends on the specific facts and circumstances" and that "under *Howey*, courts conduct an objective inquiry focused *on the transaction itself* and the manner in which it is offered") (emphasis added).

Here, however, the SEC appears to be adopting a far more expansive position, suggesting categorically that so long as the initial offering of a digital asset constituted an offering of securities, the digital assets themselves are permanently securities under U.S. law.[9]  Although the insider trading allegations revolved around third parties buying and selling digital assets in the secondary market, the FAC focuses myopically—and improperly—on the initial distribution of those digital assets by the allocator years before.  Specifically, the FAC alleges that "[i]n the [initial] offerings, the issuers directly sold crypto asset securities to investors" by "touting the potential for profits to be earned from investing in these securities based on the efforts of others." FAC ¶¶ 101-102.  But the SEC never explains how any of this is relevant to the specific transactions at issue here, which, under *Howey* and its progeny, must be examined "at the time

_____

[9] Although the SEC has settled administrative proceedings by consent against intermediaries it contends facilitated secondary trading in tokens that were securities, it has typically not disclosed which tokens it considered to be securities.  *See, e.g.*, *In re TokenLot, LLC, Lenny Kugel, and Eli L. Lewitt*, Exchange Act Release No. 84075, at 4 (Sept. 11, 2018) ("During the Relevant Period, Respondents acted as brokers by facilitating the sales of a total of nine digital tokens as part of ICOs"); *see also In re Poloniex, LLC, Respondent*, Exchange Act Release No. 92607, 2021 WL 3501307, at *1 (Aug. 9, 2021) (referring to "digital assets that were investment contracts … and therefore securities").

BRIEF OF AMICUS CURIAE THE CHAMBER OF DIGITAL COMMERCE
NO.: 22-CV-01009-TL

PAGE 10

**Winston and Strawn LLP**
200 S. Biscayne Boulevard
Miami, FL 33131
Tel. (305) 910-0787

they were made" and did not involve any of those "issuers." *See Telegram*, 448 F. Supp. 3d at 368; *see also SEC v. Aqua-Sonic Prods. Corp.*, 524 F. 866, 876 (S.D.N.Y. 1981). Nor does the FAC offer much with respect to the "understandings" and "undertakings" of participants in the non-issuer secondary transactions involved here at the time these transactions were made. *Telegram*, 448 F. Supp. at 368. Essentially, the FAC's allegations that these tokens continue to be securities, despite the dearth of pleaded facts establishing that the characteristics of an investment contract existed *at the time of the secondary transaction* at issue, boil down to the facile assertion that "once an investment contract, always an investment contract." That, of course, is not the law.[10]

Even certain members of the SEC have recognized the problems with this expansive approach to defining a securities transaction. In January 2023, shortly after the filing of this action, Commissioner Peirce explained that *Howey* may not apply to secondary transactions at all, and even if it does, the test must be satisfied with respect to the particular transactions at issue. Hester M. Peirce, Commissioner, SEC, *Outdated: Remarks Before the Digital Assets at Duke Conference* (January 20, 2023), https://www.sec.gov/news/speech/peirce-remarks-duke-conference-012023 (hereinafter "Peirce Duke Conference Remarks"). Specifically, she noted that "under *Howey*, an investment contract requires some form of business relationship between the parties and a counterparty against which rights can be enforced. . . . Thus, secondary market-based transfers of crypto assets do not create an investment contract unless they sufficiently convey a bundle of rights and obligations or the facts and circumstances of the secondary transaction itself are otherwise sufficient to do so." *Id.* Here, of course, the anonymous counterparties to the transactions at issue had no business relationship and exchanged no bundles of rights and obligations. Even if an "initial fundraising transaction involving a crypto token can create an investment contract, [] the

---

[10] *See* Lewis Cohen, *The Ineluctable Modality of Securities Law: Why Fungible Crypto Assets Are Not Securities* at 62 (November 10, 2022), https://ssrn.com/abstract=4282385 ("The one critical quality that can be found across each of the enumerated categories [of "security" in the Securities Act] is the presence of a legal relationship volitionally established by an identifiable legal entity that acts as the issuer of the security and the various other parties who, from time to time, are owners of that security").

BRIEF OF AMICUS CURIAE THE CHAMBER OF DIGITAL COMMERCE
NO.: 22-CV-01009-TL

PAGE 11

**Winston and Strawn LLP**
200 S. Biscayne Boulevard
Miami, FL 33131
Tel. (305) 910-0787

token itself is not necessarily the security even if it is sold on the secondary market." *Id.*

Other regulators have also been critical. Following the filing of the SEC's complaint in this action, CFTC Commissioner Caroline Pham criticized it as "a striking example of 'regulation by enforcement,'" and observed that "[r]egulatory clarity comes from being out in the open, not in the dark." Caroline Pham, Commissioner, CFTC, *Statement re: SEC v. Wahi* (July 21, 2020), https://www.cftc.gov/PressRoom/SpeechesTestimony/phamstatement072122. Commissioner Pham's statement also stressed the difficulty in fulfilling the CFTC's own statutory mandate in light of the SEC's expansive approach to secondary market transactions, which continued to raise questions regarding the "legal statuses of various digital assets." *Id.* This dramatic shift in the SEC's position has greatly exacerbated the regulatory confusion which already existed. As discussed below, however, it presents other issues as well.

### III.   THE SEC'S END-RUN AROUND THE NORMAL REGULATORY PROCESS IN THIS CASE SEVERELY PREJUDICES OTHER MARKET PARTICIPANTS

Although a "regulation by enforcement" approach to the question "what is a security?" leaves much to be desired as a general matter, it has at least been historically aimed at market participants with a direct interest in the digital asset at issue[11] and the incentive (and often, the ability) to test and contest the SEC's labeling efforts. Indeed, several sophisticated market participants, such as Ripple Labs and LBRY, have mounted forceful defenses against SEC lawsuits alleging that they issued, listed, or traded in unregistered securities. *See SEC v. Ripple Labs, Inc.*, 2021 WL 4555352 at *1 (S.D.N.Y. Oct. 4, 2021); *SEC v. LBRY, Inc.*, 26 F.4th 96 (1st Cir. 2022). As a result, the SEC has to date met only scattered success in its efforts to use such enforcement actions against token allocators to define which categories of digital assets constitute securities and which (to the extent the SEC believes there are any) do not.

---

[11] Namely the asset's allocators, promoters, or the entities which acted as intermediaries in facilitating trading in that asset (e.g., exchanges) or advised others how to do so.

Winston and Strawn LLP
200 S. Biscayne Boulevard
Miami, FL 33131
Tel. (305) 910-0787

The roadmap laid out by the FAC offers what at first glance appears to be a neat shortcut: bring insider trading suits against individuals without the same incentives, resources, or institutional knowledge to push back effectively on the question of whether the misconduct alleged is *securities* fraud, as opposed to some other kind; obtain a threshold ruling that the assets in question constitute securities; and use that decision and subsequent ones as a cudgel to bring an ever-expanding mélange of digital assets into the SEC's jurisdictional fold.

Like many other apparent "shortcuts," however, this one is far more trouble than it is worth. As an initial matter, the very things that make the strategy superficially appealing from an "ease of enforcement" standpoint make it extraordinarily problematic from the standpoint of equity, efficiency, and due process. Given the complexity of litigating the *Howey* analysis for a single transaction of a single digital asset (never mind, as here, at least nine different ones), as well as the information asymmetries they face, individual defendants are more likely to focus their efforts and resources on defending other aspects of the alleged conduct. For example, an individual defendant facing claims of insider trading might make the strategic decision to concede the question of whether a digital asset is a security if she believes she can establish that the information on which she traded was in the public domain. Although that gambit might serve their individual interests, it simultaneously poses a grave economic and legal threat to the rest of the market, particularly those entities holding a direct interest in those assets (like allocators or exchanges), who then find themselves in a world where the digital asset they distributed or listed has been adjudicated an unregistered security without giving them a say in the matter.

The irony, of course, is that the one procedural mechanism on which these entities could potentially fall back to safeguard their interests—intervention in the underlying action—is likely to transform what could have been a straightforward fraud case into a circular firing squad involving multiple market participants, years of expensive, fact-intensive discovery, and the risk of inconsistent decisions from different courts. It is therefore critical, as Commissioner Peirce recently put it, that the SEC or, better yet, Congress (given the multiple agencies and regulators currently asserting jurisdiction and oversight responsibility) must "develop a coherent and

BRIEF OF AMICUS CURIAE THE CHAMBER OF DIGITAL COMMERCE
NO.: 22-CV-01009-TL

PAGE 13

**Winston and Strawn LLP**
200 S. Biscayne Boulevard
Miami, FL 33131
Tel. (305) 910-0787

consistent legal framework that works across all asset classes." Peirce Duke Conference Remarks, *supra* p. 11.

a.    **The Prejudicial Impact of Regulation by Individual Enforcement.**

The first problem with bringing insider trading cases like this one in order to define a digital asset or digital asset class as a security (as opposed to first defining the security and then bringing insider trading actions as appropriate) is one of asymmetry. Individual defendants who have no relationship with the allocator of the digital assets have inferior and almost always incomplete knowledge of and access to the relevant facts needed to contest the notion that a given digital asset offering is an "investment contract" and hence a "security" under *Howey*. *See Ripple*, 2021 WL 4555352, at *4 (stating that "legal or practical constraints" in obtaining facts from discovery can be considered "incompetence" showing inadequate representation of a nonparty to a litigation). For instance, if individual defendants choose to contend that the digital assets at issue are not securities, they likely lack information regarding the level of decentralization of the allocator, initial marketing efforts of the core team (which may never have reached them or may no longer be available to the public), or the expectations of "investors" generally, all of which have been identified by the SEC as key considerations in determining whether a given transaction involves a "security." *See* Framework 2019, *supra* p. 7. Indeed, enforcement actions for a failure to register tokens as securities are usually preceded by an extensive dialogue and exchange of information between the allocators of those tokens and the SEC, which helps the parties evaluate the relative strength of their positions and prosecute and defend their claims.

In cases like this one, neither the defendants nor the SEC would have had access to that information at the inception of suit, meaning that this Court would either be deciding the issue on an inadequate record or the parties would be forced to engage in extensive (and expensive) third-party discovery. Not only is this an inefficient and ineffective way of proceeding, but it also threatens to compound the economic and legal risk which token allocators or exchanges already face with the burden of producing documents and sitting for depositions. In addition, there is a strong likelihood that individual defendants will prove to be "soft targets" who simply lack the

resources to adequately contest the issue of whether the underlying digital assets do in fact constitute "investment contracts."  Given these hurdles, the odds of an individual defendant adequately contesting the SEC's interpretation of a "security" are vanishingly small.

The second problem with the SEC's back-door approach—collateral impact—is severe indeed.  At the most basic level, allocators of those digital asserts face damage to goodwill and reputation as well as to the value of those digital assets they still hold and to their business as a whole, particularly if the token at issue has some unique utility necessary to the functioning of a network or application.  Holders of the affected digital assets likewise would be faced with the loss of value and liquidity, especially in the U.S. market.  In the weeks following the filing of the SEC's complaint against the promoters of XRP, for instance, the token lost over half of its market capitalization compared to the days prior to the filing of the complaint.  As Commissioner Peirce recently put it, the SEC's "imprecise application of the law has created arbitrary and destructive results for crypto projects and purchasers," with "secondary purchasers of the token often [] left holding a bag of tokens that they cannot trade or use because the SEC requires special handling consistent with the securities laws."  Peirce Duke Conference Remarks, *supra* p. 11.

In addition, digital assets targeted in this manner could potentially face immediate delisting by U.S. exchanges wary of the potential regulatory ramifications.  For example, the SEC's mere initiation of its lawsuit against Ripple Labs prompted Coinbase to suspend XRP trading on its platform in January 2021.  This in turn might also prompt the liquidation of holdings in relevant assets by investment funds (for instance, by commodity-based trusts which are not allowed to invest in securities), negatively impacting the value of those entities' investment portfolios, and thus adversely affecting their investors and shareholders.

The SEC's current approach also threatens a cavalcade of legal consequences.  Any decision defining a digital asset as a security would very likely be used to support (as persuasive authority if not precedent) enforcement actions by the SEC or state agencies for issuing or transacting in "unregistered securities."  And, as is common in the wake of an enforcement actions, myriad private individual and class actions "piggybacking" on the SEC enforcement actions would

BRIEF OF AMICUS CURIAE THE CHAMBER OF DIGITAL COMMERCE
NO.: 22-CV-01009-TL

PAGE 15

**Winston and Strawn LLP**
200 S. Biscayne Boulevard
Miami, FL 33131
Tel. (305) 910-0787

certainly follow, presenting significant costs not only to directly affected parties but also the public as a whole.  Indeed, should attempting to define digital assets as securities using insider trading actions against third-party individuals become an integral part of the SEC's playbook, the result would almost certainly be more litigation (including frivolous litigation) and larger settlements.[12]  The digital assets landscape would become even more uncertain and fraught than it is today, stifling development of a nascent technology in the United States and incentivizing innovators to move offshore.

The consequences are likewise not necessarily confined to the specific digital assets contested by the SEC in this action.  Individuals and entities holding a stake in other digital assets sharing certain similarities with the digital assets at issue may likewise be adversely impacted, as markets anticipate future enforcement actions against those other assets as well.  Indeed, the nine digital assets at issue here—which appear to represent a broad swath of token classifications—certainly suggests the SEC may have such an emblematic approach in mind.

**b.  The Inadequacy of Existing Procedural Mechanisms to Protect Market Participants.**

Unfortunately, those market participants which stand to be impacted by any threshold adjudications arising from third-party insider trading actions have few good options available to them.  As non-participants in the action, they have no presumptive right to defend against claims that those tokens are not securities, leaving them open to the collateral consequences described above.  Although there do exist certain procedural mechanisms designed to protect the interests of third parties implicated in a given litigation—namely, joinder and intervention—neither of those provides a compelling solution to the problem at hand, and each raises a host of other issues.

Take joinder, for instance.  A digital assets allocator could attempt to protect its interests by seeking joinder to an action against alleged fraudsters involving its digital asset on the grounds that it is a necessary party with a "legally cognizable interest" in that case.  However, because the

---

[12] For example, one study found that defendants may be more likely to promptly settle tagalong private actions.  *See* James D. Cox, SEC Enforcement Heuristics: An Empirical Inquiry, 53 DUKE L.J. 737, 777 (2003).

BRIEF OF AMICUS CURIAE THE CHAMBER OF DIGITAL COMMERCE
NO.: 22-CV-01009-TL

PAGE 16

**Winston and Strawn LLP**
200 S. Biscayne Boulevard
Miami, FL 33131
Tel. (305) 910-0787

definition of a "necessary party" under Federal Rule of Civil Procedure 19 is exceptionally difficult to satisfy, it is unlikely such a motion would succeed. *See Ward v. Apple Inc.*, 791 F.3d 1041, 1051 (9th Cir. 2015). Specifically, courts typically require there to be, *at a minimum*, a contractual or quasi-contractual relationship between the parties in the lawsuit and the allegedly impacted third party. *See Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1023 (9th Cir. 2002) (recognizing a legally protected interest arising from "terms in bargained contracts"). Where, as here, the digital assets transactions at issue occurred within a secondary market between retail investors, market participants with a direct interest in the asset (such as the allocator), but with no relationship to those investors, would be highly unlikely to qualify as a "necessary party."

Alternatively, relevant market participants could move to intervene in the litigation in an effort to head off a potential adverse decision regarding whether the assets are "securities" under *Howey*.[13] This, at least, is a more promising procedural path. For intervention to be appropriate, a party must at minimum demonstrate there is some property interest at stake. *See*, *e.g.*, *Cnty. of Orange v. Air Cal.*, 799 F.2d 535, 537 (9th Cir. 1986). In addition, she must also show that representation of its interests by current litigants "may be inadequate [] and the burden of making that showing should be treated as minimal." *Trbovich v. UMW of Am.*, 404 U.S. 528, 538, n.10 (1972); *see also U.S. v. City of Los Angeles*, 288 F.3d 391, 398 (9th Cir. 2002); *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 181 (2d Cir. 2001) ("[A]n existing party's proven lack of financial resources to continue litigation may signify inadequate representation").

But Federal Rule of Civil Procedure 24 is no panacea either. As an initial matter, although the standard for intervention is not especially demanding, the would-be intervenor still must meet the minimal criteria above, and courts recently rejected motions to intervene in at least two other SEC enforcement actions seeking to label tokens as securities. *See Ripple*, 2021 WL 4555352, at *1; *see also LBRY, Inc.*, 26 F.4th at 96. Those cases were of course distinguishable—there, the

---

[13] Relevant entities that are foreign (as several appear to be in this case) confront an even more complex situation, as the SEC may have no jurisdiction over them in the first instance. If these entities are compelled to intervene, they could expose themselves to enforcement by the U.S. government as well as potential private litigation in U.S. courts.

BRIEF OF AMICUS CURIAE THE CHAMBER OF DIGITAL COMMERCE
NO.: 22-CV-01009-TL

PAGE 17

**Winston and Strawn LLP**
200 S. Biscayne Boulevard
Miami, FL 33131
Tel. (305) 910-0787

alleged "issuers" were named defendants with deep pockets, sophisticated counsel, and a powerful incentive to defend against the SEC's allegations, while the would-be intervenors were simply holders of the digital assets at issue.  That said, there are no guarantees that a motion to intervene will be successful.   Even where intervention is appropriate, however, it is an impractical, inefficient, and inequitable solution to a problem of the SEC's own making.

*First*, it poses a Hobson's choice for would-be intervenors seeking to protect their interest in any similar enforcement action.  Intervening would subject them to jurisdiction and significant legal expenditures, even if they were to mount a successful defense; if they were to lose, they would be staring down a ruling with potentially preclusive effect, which would almost inevitably result in further regulatory enforcement and private litigation (including potentially devastating class actions).  Alternatively, interested parties could take a passive role and run the risk of an unfavorable decision or a public settlement order, but this would leave their fate in the hands of others and expose them to other collateral consequences detailed above.  *Second*, it would often mean that companies are forced to intervene in lawsuits and align themselves with defendants who might have engaged in unsavory conduct, thus posing additional reputational risk.  *Third*, and more broadly, it threatens to transform what could (and should) have been straightforward fraud cases into chaotic, years-long affairs, replete with dozens of parties, costly discovery proceedings and disputes, and impossibly complicated and inefficient trials.  This would tie up valuable judicial resources, cost U.S. taxpayers and private stakeholders dearly, and greatly exacerbate the regulatory uncertainty which already exists.  In light of these drawbacks, the answer must lie elsewhere.  As explained in the next section, it does: congressional action to harmonize the federal regulatory framework for digital assets.

BRIEF OF AMICUS CURIAE THE CHAMBER OF DIGITAL COMMERCE
NO.: 22-CV-01009-TL

PAGE 18

**Winston and Strawn LLP**
200 S. Biscayne Boulevard
Miami, FL 33131
Tel. (305) 910-0787

**IV.   THIS COURT SHOULD RECOGNIZE THAT THE
SEC LACKS STATUTORY AUTHORITY TO REGULATE
DIGITAL ASSETS AND SHOULD DEFER ANY RULING
AS TO WHETHER THE DIGITAL ASSETS AT ISSUE IN
THIS CASE CONSTITUTE "SECURITIES"**

Congress has never authorized the SEC's encroachment into the digital assets market, which (unlike the securities market) is based on the concept of decentralization and often involves instruments bearing little resemblance to securities.  Nevertheless, the SEC is seeking to significantly expand its writ into this area of major national and economic significance on the basis of laws and precedent dating from decades before the emergence of digital assets and blockchain technology.  As the Supreme Court has made clear in recent years, where so far-reaching an assertion of authority has not been authorized by Congress, the major questions doctrine demands dismissal of the action or rule the agency is improperly advancing.  *See*, *e.g.*, *West Va. v. EPA*, 142 S. Ct. 2587, 2602 (2022); *Ala. Ass'n of Realtors v. Dep't of Health and Human Servs.*, 141 S. Ct. 2485 (2021); *Gonzales v. Or.*, 546 U.S. 243 (2006).

As each of the decisions above illustrate, the SEC's current effort is not the first time a federal agency has overreached in this fashion.  To the contrary, it mirrors that of several other regulators which have sought to expand their jurisdiction through enforcement actions or arbitrary rulemaking.  For example, in *Gonzales*, the U.S. Attorney General attempted to bar certain substances from being used in state-authorized assisted suicide by adopting a broad (and novel) interpretation of the phrase "legitimate medical purpose" as it appears in the Controlled Substance Act.  546 U.S. at 251.  Similarly, in *West Virginia*, the EPA repurposed what one of its architects called "an obscure, never-used section" of the Clean Air Act, and the phrase "best system of emission reduction," to impose requirements on the coal industry after Congress failed to enact similar proposals.  142 S. Ct. at 2602.

In these cases, the Supreme Court rejected the agencies' improper expansion of jurisdiction and granted motions seeking to dismiss, enjoin, or reject the agency's actions.  Underlying the Court's rationale is what it recently christened the "major questions doctrine," which, as explained

BRIEF OF AMICUS CURIAE THE CHAMBER OF DIGITAL COMMERCE
NO.: 22-CV-01009-TL

PAGE 19

**Winston and Strawn LLP**
200 S. Biscayne Boulevard
Miami, FL 33131
Tel. (305) 910-0787

in *West Virginia*, flows both from "separation of powers principles and a practical understanding of legislative intent," and dictates that "the agency must point to clear congressional authorization for the authority it claims."  *Id.* at 2609.  The Court explained that the major questions doctrine "refers to an identifiable body of law that has developed over a series of significant cases all addressing a particular and recurring problem: agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted."  *Id.*[14]

As defined in *West Virginia*, the major questions doctrine applies in "extraordinary cases in which the history and the breadth of the authority that the agency has asserted and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority."  *Id.* at 2608.  In such cases, the Court "expect[s] Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance."  *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489; *West Va.*, 142 S. Ct. at 2608; *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) ("Congress [does not] delegate . . . decisions of such economic and political significance to an agency in so cryptic a fashion").  It follows that, as the Court has observed, "Congress is unlikely to alter a statute's obvious scope and division of authority through muffled hints."  *Gonzales*, 546 U.S. at 274.  That is because, "no matter how important, conspicuous, and controversial the issue, and regardless of how likely the public is to hold the Executive Branch politically accountable, an administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress."  *Brown & Williamson Tobacco Corp.*, 529 U.S. at 161; *see also Ala. Ass'n of Realtors*, 141 S. Ct. at 2490.  These principles apply with special force here, where the SEC is asserting jurisdiction over an evolving industry that is still in its infancy and is premised

---

[14] The dissent in *West Virginia* takes issue with the idea of a "major questions doctrine," insisting that the decisions in which the majority opinion locates that throughline simply "do normal statutory interpretation." *Id.* at 2633. Rather than create a higher substantive bar for certain types of regulatory activity, the dissent proposes that an agency's action exceeds its authority where it is "operating far outside its traditional lane" or where it "would have conflicted with, or even wreaked havoc on, Congress's broader design." *Id.*  The SEC's enforcement activity—which at a minimum encroaches upon the authority Congress explicitly granted to the CFTC—easily satisfies even this arguably more demanding standard.

BRIEF OF AMICUS CURIAE THE CHAMBER OF DIGITAL COMMERCE
NO.: 22-CV-01009-TL

PAGE 20

Winston and Strawn LLP
200 S. Biscayne Boulevard
Miami, FL 33131
Tel. (305) 910-0787

on technological advancements unimaginable at the time that Congress established the SEC pursuant to the Exchange Act. *See West Virginia*, 142 S. Ct. at 2609 ("Agencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line").

The SEC's lack of clear congressional authority is highlighted by the fact that Congress is currently considering legislation that would—partly and perhaps entirely—divest the SEC of jurisdiction to regulate the digital assets industry. *See West Va.*, 142 S. Ct. at 2620-21 (Gorsuch, J., concurring) (noting that when Congress was "engaged in robust debates" over an issue, the agency action typically involved a major question). As Commissioner Peirce explained, Congress has not "clearly" authorized the SEC's authority here "and Congress might decide to give that authority to someone else." Peirce Duke Conference Remarks, *supra* p. 11. One example of how it might do so is the bipartisan 2022 Lummis-Gillibrand Responsible Financial Innovation Act ("RFIA"), which determines whether a given digital asset should be classified as a commodity or a security by examining the purpose of the asset and the rights and powers it conveys to the consumer. Notably, the RFIA correctly draws a distinction between the initial transaction distribution (i.e., the initial offering) and the underlying assets being offered, which it refers to as "ancillary assets." So long as the underlying assets do not include financial interests—e.g., legal rights to debt or equity—they are deemed to be commodities subject to CFTC regulation. Moreover, the RFIA recognizes that once an asset becomes fully decentralized and thus independent of the issuing entity's entrepreneurial or managerial efforts, any associated disclosure requirements would cease and the asset would be treated as a commodity. Effectively, the RFIA (and other proposals like it) would divest the SEC of precisely the jurisdiction it is seeking to assert in this case.

The SEC's overreach is also evidenced by the fact that Congress specifically entrusted the CFTC with "exclusive jurisdiction [over] transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated . . . or any other board of trade, exchange, or market, and transactions." 7 U.S.C. § 2. The purpose of this grant was to

BRIEF OF AMICUS CURIAE THE CHAMBER OF DIGITAL COMMERCE
NO.: 22-CV-01009-TL

PAGE 21

**Winston and Strawn LLP**
200 S. Biscayne Boulevard
Miami, FL 33131
Tel. (305) 910-0787

"separate the functions" of the CFTC from those of the SEC and other agencies. *Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 386 (1982). A Congressional report on that provision stated that it was intended to help "erect a sound and strong Federal regulatory policy governing futures trading" under the CFTC's auspices. S. Rep. No. 95-850 (1978), as reprinted in 1978 U.S.C.C.A.N. 2087, 2101.

All of the above considerations weigh strongly against allowing this action to proceed in its current incarnation. Judicial restraint would not let the alleged wrongdoers off the hook; they have been indicted by the Department of Justice and are certainly subject to an action for civil fraud, as well. Conversely, a ruling embracing the SEC's position and endorsing its tactics would have tremendously negative implications for the digital economy and its institutional and individual participants, as detailed above. *See supra* pp. 12-14. Were this Court to dismiss the complaint, the SEC could instead offer guidance through proper rulemaking, or even provide the Ninth Circuit an opportunity to pass upon the unprecedented legal theory the SEC is pursuing. Accordingly, this Court should "hesitate" before allowing the SEC to expand its authority and begin regulating markets that never have and simply do not fall within its purview. *West Va.*, 142 S. Ct. at 2612–13; *see also Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism") (cleaned up). Here, that "hesitation" means dismissing the instant action in deference to future legislative action—or, at the very least, an explicit regulatory scheme promulgated by the SEC pursuant to the APA's notice and comment provisions and ultimately subject to Congressional and judicial review.

## V.   CONCLUSION

This purported "insider trading" action represents a dramatic—and potentially disastrous— overreach by the SEC. Not only is there no statutory or jurisprudential basis for its underlying assertion that secondary market transactions of digital assets such as the ones at issue in this case constitute "securities transactions," but the continued pursuit of actions like this one promises to

open a Pandora's box of collateral consequences that will harm both participants in the digital assets marketplace as well as the public good.  The Chamber thus respectfully requests that, in ruling on Defendants' Motion to Dismiss, this Court consider the significant substantive and procedural problems which pervade the FAC—in particular, the SEC's lack of statutory authority to bring this case—or, at the very least, reiterate the long-held understanding that the law applicable to an investment contract is separate and distinct from the law applicable to secondary market transactions in the same underlying asset.

Dated: March 20, 2023

**BULLIVANT HOUSER BAILEY PC**

By:/s/ Daniel R. Bentson
Daniel R. Bentson, WSBA #36825
925 Fourth Avenue
Seattle, WA 98104
Tel. (206) 292-8930
Dan.bentson@bullivant.com

**WINSTON & STRAWN LLP**

By:/s/ Daniel T. Stabile
Daniel T. Stabile, *pro hac vice*
200 S. Biscayne Boulevard
Miami, FL 33131
Tel. (305) 910-0787
dstabile@winston.com

George E. Mastoris, *pro hac vice*
Kerry C. Donovan *pro hac vice*
Thania (Athanasia) Charmani, *pro hac vice*
200 Park Avenue
New York, NY 10166
Tel. (212) 294-6700
gmastoris@winston.com
kcdonovan@winston.com
acharmani@winston.com

Jeffrey L. Steinfeld *pro hac vice*
333 South Grand Avenue
Los Angeles, CA 90071
Tel. (213) 615-1700
jlsteinfeld@winston.com

***Attorneys for Amicus Curiae***
***The Chamber of Digital Commerce***

BRIEF OF AMICUS CURIAE THE CHAMBER OF DIGITAL COMMERCE
NO.: 22-CV-01009-TL

PAGE 23

Winston and Strawn LLP
200 S. Biscayne Boulevard
Miami, FL 33131
Tel. (305) 910-0787