The Honorable Tana Lin

1

2

3

4

5

6

7

8

9

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**SEATTLE DIVISION**

10  SECURITIES AND EXCHANGE
    COMMISSION,

11                                          Case No. 2:22-cv-01009-TL

12                         Plaintiff,

13            v.                            **BRIEF FOR *AMICUS CURIAE***
                                            **PARADIGM OPERATIONS LP**
14  ISHAN WAHI, NIKHIL WAHI, AND
    SAMEER RAMANI,

15
                           Defendants.
16

17

18

19

20

21

22

23

24
                       *Counsel for Amicus Curiae*
25                   **PARADIGM OPERATIONS LP**

BRIEF OF AMICUS CURIAE          **COHENWILSON LLP**      **ADMON LAW FIRM PLLC**
PARADIGM OPERATIONS LP              **dba DLx Law**         **www.AdmonLaw.com**
NO.: 2:22-cv-01009-TL           331 Park Avenue South      300 Lenora St., #4008
PAGE 1                            New York, NY 10010        Seattle, WA 98121
                                 Tel. 212.994.6845          Tel. 206.739.8383

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ 3

INTERESTS OF AMICUS CURIAE ............................................................................... 4

SUMMARY OF ARGUMENT ......................................................................................... 4

ARGUMENT ..................................................................................................................... 7

I.   THE TOKENS ARE NOT "SECURITIES" UNDER ANY CURRENTLY RECOGNIZED APPLICATION OF THE SECURITIES ACTS. ............................................. 7

   A.   In the Absence of Extrinsic Factors, the Tokens Are Not Inherently or Intrinsically Securities ............................................................................................. 7

   B.   The Tokens Themselves Are Not Securities Because They May Have Initially Been Sold in Investment Contract Transactions. ........................................................... 9

     1.   The Allegations in the Amended Complaint Are Only Relevant to the Question of Whether the Tokens Were Initially Sold in Investment Contract Transactions. ..................... 9

     2.   Even If the Court Finds that the Allegations in the Amended Complaint Are Sufficient to Support a Claim that the Tokens Were Initially Sold by Promoters Pursuant to Investment Contract Transactions, the SEC Fails to Correctly Apply the *Howey* Test to the Defendants' Specific Transactions. .......................................................................................... 11

     3.   Instead of Establishing that the Defendants' Specific Transactions in the Tokens Meet the *Howey* Test, the Amended Complaint Inappropriately Alleges that these Assets Are Securities Because the Promoters' Schemes Are "Continuing". ........................................... 13

     4.   In light of the Fundamental Deficiencies with the Amended Complaint's Traditional *Howey* Analysis, We Are Left with an Argument that, in Effect, the Tokens "Embody" the Original Promoters' Alleged Investment Schemes and Thus "Become" Securities While these Schemes are Ongoing. .................................................................................... 17

II.   THE SEC'S ATTEMPTED EXPANSION OF *HOWEY* JURISPRUDENCE WHICH WOULD EFFECTIVELY TREAT CRYPTO ASSETS AS SECURITIES BASED ON EXTERNAL FACTORS ON A TEMPORARY BASIS, IS UNFOUNDED, UNWORKABLE AND CONTRARY TO THE FUNDAMENTAL STRUCTURE OF THE FEDERAL SECURITIES LAWS, WHICH ASSUMES A LEGAL RELATIONSHIP BETWEEN AN ISSUER OF A SECURITY AND THE OWNER. ........................................... 18

CONCLUSION ................................................................................................................ 21

BRIEF OF AMICUS CURIAE
PARADIGM OPERATIONS LP
NO.: 2:22-cv-01009-TL
PAGE 2

**COHENWILSON LLP**
**dba DLx Law**
331 Park Avenue South
New York, NY 10010
Tel. 212.994.6845

**ADMON LAW FIRM PLLC**
**www.AdmonLaw.com**
300 Lenora St., #4008
Seattle, WA 98121
Tel. 206.739.8383

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Hocking v. Dubois*, 839 F.2d 560 (9th Cir. 1988)*, modified on reh'g en banc*, 885 F.2d 1449 (9th Cir. 1989) (*en banc*) .................................................................................................. 12

*Hocking v. Dubois,* 885 F.2d 1449 (9th Cir.1989)(*en banc*) .......................................... 11,12,13

*Landreth Timber Co. v. Landreth,* 471 U.S. 681 (1985) ................................................. 10

*Salameh, et al. v. Tarsadia Hotel et al.,* 726 F.3d 1124 (9th Cir. 2013)..................................  20

*S.E.C. v. United Benefit Life,* 387 U.S. 202 (1967) .........................................................  10

*S.E.C. v. W.J. Howey Co.,* 328 U.S. 293 (1946)..................................................................  *passim*

*Tcherepnin v. Knight,* 389 U.S. 332 (1967).....................................................................  10

STATUTES

15 U.S.C. § 77a *et seq*...............................................................................................................  5

15 U.S.C § 78a *et seq*...............................................................................................................  5

15 U.S.C. §78c(a)(10)..............................................................................................................  4

OTHER AUTHORITIES

Ankush Khardori, "*Can Gary Gensler Survive Crypto Winter?  D.C.'s top financial cop on Bankman-Fried blowback*", New York Mag. (Feb. 23, 2023) .......................................... 7

Gary Gensler, *A 'New' New Era*, Prepared Remarks Before the International Swaps and Derivatives Association Annual Meeting (May 11, 2022) ................................................ 7

Gary Gensler, *Kennedy and Crypto*, Speech (Sept. 8, 2022).................................................. 7,18

Lewis Cohen *et al*., *The Ineluctable Modality of Securities Law: Why Fungible Crypto Assets Are Not Securities*, SSRN (Nov. 10, 2022).............................................................. *passim*

David J. Kappos, Lee A. Schneider, Daniel M. Barabander, & Callum A.F. Sproule, "Fuzzy Tokens: Thinking Carefully about Technical Classification Versus Legal Classification of Cryptoassets," (2021) ..................................................................................................... 8

BRIEF OF AMICUS CURIAE
PARADIGM OPERATIONS LP
NO.: 2:22-cv-01009-TL
PAGE 3

**COHENWILSON LLP
dba DLx Law**
331 Park Avenue South
New York, NY 10010
Tel. 212.994.6845

**ADMON LAW FIRM PLLC**
**www.AdmonLaw.com**
300 Lenora St., #4008
Seattle, WA 98121
Tel. 206.739.8383

## INTERESTS OF AMICUS CURIAE

Paradigm Operations LP ("Paradigm") is an investment firm that backs innovative crypto companies and protocols. Issues placed before this Court have the potential to dramatically impact the design and operation of crypto companies and protocols. Paradigm seeks leave to participate in this case because it is concerned that a decision adopting the Securities and Exchange Commission's ("SEC") expansive and unsupported application of the *Howey* test, without appreciating its impact, could have sweeping and unintended effects on Paradigm and many others who seek to utilize new technology in a way that could benefit millions of users in the United States and around the world.

## SUMMARY OF ARGUMENT

The SEC's attempt to assert jurisdiction over the Defendants' secondary trading of nine crypto assets identified in the Amended Complaint (the "Tokens") by claiming that "these crypto assets were investment contracts," (Amended Complaint dated December 22, 2022, ECF No. 27 (the "Amended Complaint") at ¶100) is not supported by the facts or the law. The SEC incorrectly asserts that, because the Tokens were initially offered and sold in *transactions* that purportedly fell within the definition of "investment contract" as set forth by the Supreme Court in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946) ("*Howey*"), the Tokens themselves *became* "investment contracts", a type of security included in the definition of that term in the Securities Exchange Act of 1934, as amended (the "Exchange Act"). *See* 15 U.S.C. §78c(a)(10). However, this is not how *Howey* has been applied over its 75-year history – and, as discussed below, that is for good reason.

As an initial matter, the Tokens themselves do not intrinsically have the characteristics of any type of "security" as defined in the Securities Act of 1933 (the "Securities Act") or the

BRIEF OF AMICUS CURIAE
PARADIGM OPERATIONS LP
NO.: 2:22-cv-01009-TL
PAGE 4

COHENWILSON LLP
dba DLx Law
331 Park Avenue South
New York, NY 10010
Tel. 212.994.6845

ADMON LAW FIRM PLLC
www.AdmonLaw.com
300 Lenora St., #4008
Seattle, WA 98121
Tel. 206.739.8383

Exchange Act (the Exchange Act, together with the Securities Act, the "Securities Acts").  *See* 15 U.S.C. § 77a *et seq*.; 15 U.S.C § 78a *et seq*.  That is, these nine Tokens, examined on their own without considering extrinsic factors, such as the manner in which the assets were initially sold, distributed, or promoted, do not purport to convey an interest in any person or entity or to create or represent any cognizable legal agreement and thus would not otherwise be considered securities.  This can be seen from an examination of the computer code used to create these assets (known as "smart contract code").[1]

Recognizing this, the SEC focuses on factors extrinsic to the nature of the Tokens, devoting much of the Amended Complaint to alleging that these assets were used by promoters in fundraising schemes that they consider investment contract transactions.  Based on the thinly supported allegations that the original investment schemes are "ongoing" (in ways not clearly specified in the Amended Complaint), the SEC asks the Court to accept the novel idea that these Tokens are securities for only so long as they are deemed to "embody" an ongoing investment scheme (which we refer to as the SEC's "embodiment theory"), making them effectively *temporary* securities.[2]  The Court should not endorse this unjustified expansion of securities law.

Moreover, because there are no allegations in the Amended Complaint that ownership of any of the Tokens creates any *legal relationship* between the owner of one or more of these assets and any other person or entity, adopting the SEC's embodiment theory would require the

---

[1] *See* Exhibit 1 for the annotated smart contract code for one of the Tokens that uses the ERC-20 token standard. As is evident, the code alone does not create an interest in any entity or legal right against, or undertaking of, any entity.

[2] This position is explicitly stated by the SEC in a filing in another case, *S.E.C. v. Ripple Labs, Inc.*, No. 20-cv-10832 (AT) (SN) (S.D.N.Y.) ("*Ripple Labs*"), which is currently pending outside this Circuit.  *See Ripple Labs*, Pl. Mem. of Law in Opp'n to Mot. to Intervene, ECF No. 153 at p. 24 (where the SEC acknowledged that the purported security in the case is not "simply" the crypto asset at issue, known as XRP, and instead asserted that the crypto asset is the "embodiment" of the facts, circumstances, promises, and expectations that constitute the purported investment contract and therefore that XRP represents the purported investment contract).  No judicial authority was cited for this proposition.

BRIEF OF AMICUS CURIAE
PARADIGM OPERATIONS LP
NO.: 2:22-cv-01009-TL
PAGE 5

COHENWILSON LLP
dba DLx Law
331 Park Avenue South
New York, NY 10010
Tel. 212.994.6845

ADMON LAW FIRM PLLC
www.AdmonLaw.com
300 Lenora St., #4008
Seattle, WA 98121
Tel. 206.739.8383

Court to endorse the concept of "issuer-independent" securities – securities whose existence is not linked to a single identifiable issuer.[3]

An identifiable issuer-owner relationship is critical to the analysis underlying the Amended Complaint; however, because third-party market participants, like the Defendants, must be able to practicably ascertain whether the asset they are selling or purchasing is a security.  Yet under the SEC's embodiment theory, transactions with tokens could be considered securities transactions without (i) a defined set of rights or obligations set out in a legal instrument (not alleged in the Amended Complaint) or (ii) the presence of an identifiable legal relationship between an "issuer" (within the meaning of the Exchange Act) and the owner of the asset (not alleged in the Amended Complaint with respect to the Defendants).[4]

As a result, without a legal agreement to review or a business relationship to evaluate, the Defendants, and all other market participants transacting in the Tokens are left to guess at whether a court would conclude that one or more of the Tokens does, or does not, "embody" an ongoing investment scheme at any given time they transact.  This inevitable uncertainty would leave the Defendants and all parties transacting in one of the Tokens potentially responsible for compliance with the federal securities laws as a broker, a dealer, a national securities exchange,

---

[3] For example, the legal entity that deployed the original smart contract code that created the Token and/or the legal entity (or entities) that initially sold a Token to raise funds could subsequently dissolve in a legally appropriate manner and the Token (*i.e.*, the ledger entry recorded in the relevant blockchain network) would continue to exist. This is not possible with any other type of security known to federal securities law where, if the specific entity that is the "issuer" of the security dissolved, the security would continue to exist in a legally cognizable sense.

[4] In all of the appellate cases in this Circuit where an investment contract transaction was found to be present, there has always been an identifiable business relationship (and, in almost all federal appellate cases, an actual legal agreement) between the party alleged to have created or promoted the relevant investment scheme and the person or entity that provided the "investment of money" required by *Howey*.  This business or contractual relationship with the promoter of the scheme or investment allows the person or entity making the investment of money to have access to the information needed to determine whether they are engaging in a securities transaction, including private information.

BRIEF OF AMICUS CURIAE
PARADIGM OPERATIONS LP
NO.: 2:22-cv-01009-TL
PAGE 6

COHENWILSON LLP
dba DLx Law
331 Park Avenue South
New York, NY 10010
Tel. 212.994.6845

ADMON LAW FIRM PLLC
www.AdmonLaw.com
300 Lenora St., #4008
Seattle, WA 98121
Tel. 206.739.8383

an investment advisor or investment company, or otherwise without an ability to definitively determine whether they are transacting in a token that "embodies" an investment contract.

Even taking into account the broad remedial purposes of federal securities laws, embracing the embodiment theory would be neither an appropriate nor an effective extension or modernization of the *Howey* jurisprudence as a matter of public policy.  And, certainly, such a deviation from current law should not be imposed retrospectively on the Defendants. Essentially, the SEC seems to suggest that market participants should simply assume that the Tokens and, based on public statements made by the SEC's Chair and other senior officials of the SEC,[5] virtually *all* crypto assets, are securities until the SEC tells them otherwise, a power not granted to the SEC by the Congress.[6]

## **ARGUMENT**

I.   **THE TOKENS ARE NOT "SECURITIES" UNDER ANY CURRENTLY RECOGNIZED APPLICATION OF THE SECURITIES ACTS.**

A.    In the Absence of Extrinsic Factors, the Tokens Are Not Inherently or Intrinsically Securities

Examined independently from any extrinsic factors, such as the manner in which they were sold, distributed or promoted, the Tokens are simply ledger entries (numbers) maintained

---

[5] *See, e.g.*, Ankush Khardori, "Can Gary Gensler Survive Crypto Winter?  D.C.'s top financial cop on Bankman-Fried blowback", New York Mag. (Feb. 23. 2023), available at: https://nymag.com/intelligencer/2023/02/gary-gensler-on-meeting-with-sbf-and-his-crypto-crackdown.html (in which Chair Gensler is quoted as stating that "everything other than bitcoin" is a security because "there's a group in the middle and the public is anticipating profits based on that group."); *see also* Gary Gensler, "Kennedy and Crypto", Speech (Sept. 8, 2022), available at: https://www.sec.gov/news/speech/gensler-sec-speaks-090822 ("Of the nearly 10,000 tokens in the crypto market, I believe the vast majority are securities"); *see also* Gary Gensler, "A 'New' New Era," Prepared Remarks Before the International Swaps and Derivatives Association Annual Meeting (May 11, 2022), available at: https://www.sec.gov/news/speech/gensler-remarks-swaps-and-derivatives-association-annual-meeting-051122 (expressing the view that "[w]ithout prejudging any one [crypto] token, most crypto tokens are investment contracts under the Supreme Court's *Howey* Test.").

[6] It should be noted that *amicus* expresses no view as to whether the individuals or entities that offered or sold these assets violated the federal securities laws at any point; we address only the question of whether the facts alleged in the Amended Complaint support a finding that the Defendants engaged in securities transactions.

BRIEF OF AMICUS CURIAE
PARADIGM OPERATIONS LP
NO.: 2:22-cv-01009-TL
PAGE 7

COHENWILSON LLP
dba DLx Law
331 Park Avenue South
New York, NY 10010
Tel. 212.994.6845

ADMON LAW FIRM PLLC
www.AdmonLaw.com
300 Lenora St., #4008
Seattle, WA 98121
Tel. 206.739.8383

by a network of computers operating a common protocol.  This is shown through an examination of a representative sample of the smart contract code that created the Tokens.  *See* Exhibit 1.[7]

It is possible that a token created and sold by a company could be paired with a legally recognized interest in, or an enforceable agreement of, that company.  In such a case, it would be this interest or agreement that would constitute the "security".  For example, a company could expressly designate a given token as the means by which an owner of the token could evidence its ownership interest in the company or enforce a traditional legal agreement against the company.[8]  In this way, the token would theoretically function similarly to a stock or bond certificate.

However, none of the Tokens are alleged to be associated with a legally recognized interest in any company nor do they create any enforceable legal right for the benefit of the owner against any third party.  Rather, the Amended Complaint relies on a range of vague statements made by persons presumed to be associated with the companies or unincorporated businesses that initially sold the tokens.  For example, XY Labs, Inc., a company associated with the development of the XY token, is alleged to have posted a "roadmap" with target dates for the development of the XYO Network.  Amended Complaint, at ¶149.  However, it is not alleged that this "post" was intended to create a binding obligation of XY Labs to meet this roadmap,

---

[7] For a more in-depth look at how crypto assets in general are created ("minted"), transferred, and destroyed ("burned"), *see*  David J. Kappos, Lee A. Schneider, Daniel M. Barabander, & Callum A.F. Sproule, "Fuzzy Tokens: Thinking Carefully about Technical Classification Versus Legal Classification of Cryptoassets,"  available at https://btlj.org/wp-content/uploads/2023/03/Kappos_WebFile_02-28-23.pdf

[8] For an example of a company intentionally associating a crypto asset with a specific legal promise, *see* Amendment 11 to INX Limited Registration Statement on Form F-1 ("each INX Token held by parties other than the Company, shall entitle its holder to receive a Pro Rata Portion … of an aggregate amount which equals 40% of our cumulative Adjusted Operating Cash Flow, net of Adjusted Operating Cash Flows that have already formed a basis           for           a           prior           distribution")           available           at https://www.sec.gov/Archives/edgar/data/0001725882/000121390020023078/ea125736-f1a11_inxlimited.htm#a_014.

BRIEF OF AMICUS CURIAE
PARADIGM OPERATIONS LP
NO.: 2:22-cv-01009-TL
PAGE 8

**COHENWILSON LLP**
**dba DLx Law**
331 Park Avenue South
New York, NY 10010
Tel. 212.994.6845

**ADMON LAW FIRM PLLC**
**www.AdmonLaw.com**
300 Lenora St., #4008
Seattle, WA 98121
Tel. 206.739.8383

enforceable by holders of the XY token.  Rather, the post can at most be alleged to create general expectations on the part of future purchasers of the XY tokens, a concept which is discussed below.

These and other statements set out in the Amended Complaint may be sufficient to allow a court to conclude that the various fundraisings utilizing the Tokens were "investment contract transactions" (discussed below), but they do not establish that these assets are themselves intrinsically "securities" by reference to an identified interest or agreement.  As a result, other than potentially being offered and sold as part of an "investment contract", the Tokens do not fall within any of the other enumerated types of "security" in the Securities Acts.

B.      The Tokens Themselves Are Not Securities Because They May Have Initially Been Sold in Investment Contract Transactions.

1.      The Allegations in the Amended Complaint Are Only Relevant to the Question of Whether the Tokens Were Initially Sold in Investment Contract Transactions.

The Amended Complaint focuses on the actions of the persons or entities that acted as "promoters" of the Tokens, noting that each of the Tokens "were offered and sold by an issuer to raise money that would be used for the issuer's business".  Amended Complaint, at ¶101.  Under current law, a "scheme" to fundraise by offering an asset that is not otherwise a security (a "non-security asset", whether it be animals being grown for their pelts, whiskey aging in barrels, or a crypto asset), together with some accompanying undertakings on the part of the fundraising entity to increase that asset's value over time or to produce income from the asset when made to a person with no "consumptive interest" in that asset will be an investment contract transaction.

BRIEF OF AMICUS CURIAE
PARADIGM OPERATIONS LP
NO.: 2:22-cv-01009-TL
PAGE 9

COHENWILSON LLP
dba DLx Law
331 Park Avenue South
New York, NY 10010
Tel. 212.994.6845

ADMON LAW FIRM PLLC
www.AdmonLaw.com
300 Lenora St., #4008
Seattle, WA 98121
Tel. 206.739.8383

*See Howey*, 328 U.S. at 299-300.[9]   In *Howey*, the Supreme Court evaluated whether the circumstances of a given *contract, transaction or scheme* involves: (1) an investment of money (2) in a common enterprise (3) with an expectation of profits to come (4) solely[10] from the efforts of the promoter or a third party.  *See id.* at 298.

The Supreme Court and Ninth Circuit appellate courts have consistently noted that whether an investment contract scheme is present will be based on all of the facts and *circumstances* involved.[11]   However, the Amended Complaint provides relatively brief and selective descriptions of the activities purportedly giving rise to the underlying investment contract transactions that are supposedly "embodied" by the Tokens.[12]   For example, in an attempt to show that purchasers of Amp tokens from Flexa invested in a "common enterprise", the SEC alleges that the Amp token can be staked in collateral pools to secure the network and that "[i]f the collateral pools are profitable, investors who stake Amp can share in the profits".  Amended Complaint, at ¶114.  Yet the Amended Complaint does not present any details as to how many holders staked Amp, the amount of profit they earned, those purchasers' reasons for

---

[9] In a much smaller number of cases under *Howey*, there is an unusual legal instrument that sets out certain rights or interests conveyed to an owner but which does not fall clearly within any of the other enumerated categories in the definitions of "security" in the Securities Acts.  Examples include a flexible fund annuity offered by an insurance company to its customers (*S.E.C. v. United Benefit Life,* 387 U.S. 202 (1967)), and nonnegotiable capital shares in a state-chartered savings and loan association (*Tcherepnin v. Knight*, 389 U.S. 332 (1967)).  However, none of the Tokens belong to this type of investment contract arrangement.

[10] This standard has been modified in subsequent decisions to no longer require that the efforts made are "solely" from the others involved in the scheme, however this distinction is not material to the arguments made in this brief.

[11] *See*, *e.g.*, *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 689 (1985) ("an unusual instrument could be considered a "security" if the circumstances of the transaction so dictated.")

[12] The facts alleged with respect to each of the nine Tokens in the Amended Complaint run between approximately three pages to approximately six pages in length.  In contrast, the SEC's complaint against LBRY, Inc. alleging sales of crypto assets in violation of Section 5 of the Securities Act ran 16 pages and the SEC's first amended complaint on a similar theory against Ripple Labs, Inc. and two of its senior executives ran 79 pages. *See S.E.C. v. LBRY, Inc.*, D.N.H. Case No. 1:21-CV-00260 D.E. 1 (March 29, 2021), and *S.E.C. v. Ripple Labs, Inc. et al.*, No. 20-10832 (S.D.N.Y. Dec. 22, 2020), ECF No. 4.

BRIEF OF AMICUS CURIAE
PARADIGM OPERATIONS LP
NO.: 2:22-cv-01009-TL
PAGE 10

COHENWILSON LLP
dba DLx Law
331 Park Avenue South
New York, NY 10010
Tel. 212.994.6845

ADMON LAW FIRM PLLC
www.AdmonLaw.com
300 Lenora St., #4008
Seattle, WA 98121
Tel. 206.739.8383

acquiring Amp, or whether they had other strategic reasons for participating in the network.
Likewise, we are told that 20% of Amp's predecessor token was allocated to the founding team
and an employee pool.  *See* Amended Complaint, at ¶116.  Yet the Amended Complaint fails to
specify how many of the recipients stayed with Flexa or the extent to which their contributions
were material to the success of the project (as opposed to, say, factors outside the control of these
individuals) in order to support the allegation of a common enterprise.

In the absence of robust pleading, *amicus* believes that it is not possible to conclude that
the allegations in the Amended Complaint are sufficient to support even the basic claim that the
Tokens were *initially* sold pursuant to investment contract transactions.

**2.    Even If the Court Finds that the Allegations in the Amended
Complaint Are Sufficient to Support a Claim that the Tokens Were Initially
Sold by Promoters Pursuant to Investment Contract Transactions, the SEC
Fails to Correctly Apply the *Howey* Test to the Defendants' Specific
Transactions.**

To the extent that the SEC wishes to allege that the Defendants' purchases and sales of
the Tokens were *also* investment contract transactions, under current law in the Ninth Circuit, all
four *Howey* factors must be established *at the time each transaction took place*.  This principle is
illustrated in *Hocking v. Dubois*, 885 F.2d 1449 (9th Cir. 1989) (*en banc*) ("Hocking II"), where
the full Ninth Circuit analyzed a transaction under *Howey* that did not directly involve as a party
the entity that would purportedly be the "issuer" of the alleged investment scheme (a real estate
developer).[13]

In *Hocking II*, an individual investor looking for an income-producing property
purchased a rentable condominium unit from the unit's original purchasers in a secondary

---

[13] For a more detailed discussion of *Hocking II*, *see* Lewis Cohen et al., *The Ineluctable Modality of Securities
Law: Why Fungible Crypto Assets Are Not Securities* (Nov. 10, 2022) at pp. 58 – 61.

BRIEF OF AMICUS CURIAE
PARADIGM OPERATIONS LP
NO.: 2:22-cv-01009-TL
PAGE 11

**COHENWILSON LLP
dba DLx Law**
331 Park Avenue South
New York, NY 10010
Tel. 212.994.6845

**ADMON LAW FIRM PLLC
www.AdmonLaw.com**
300 Lenora St., #4008
Seattle, WA 98121
Tel. 206.739.8383

transaction based on information about the unit developer's rental scheme provided to Hocking by his broker, Dubois.  When the deal went sour, Hocking sued his broker, alleging that the secondary sale was an investment contract transaction subject to the antifraud provisions of the Exchange Act in which the broker made misrepresentations.  The District Court found that Hocking's transaction did not constitute an investment contract.  *See Hocking v. Dubois*, 839 F.2d 560, 562 (9th Cir. 1988) ("Hocking") (describing trial court opinion), *modified on reh'g en banc*, 885 F.2d 1449 (9th Cir. 1989) (*en banc*).  However, a tribunal of the Ninth Circuit reversed, finding that an "offering of a condominium with [a rental pool agreement] automatically makes the [transaction an investment contract].'"  *Id*. at 565.  The SEC also took the highly unusual step of submitting an *amicus* brief to the court arguing that the facts in *Hocking* did not warrant the finding of an investment contract transaction.  After a rehearing by the full Ninth Circuit, the outcome was reversed again, to find that the arrangement did not *automatically* constitute an investment contract transaction.    Accordingly, the case was remanded back to the lower court for further fact finding.  On rehearing, the *Hocking II* majority reasoned:

> We agree with defendants and *amici* that the three-judge panel may have written too broadly its conclusion that so long as a rental pool 'option' exists, all secondary market sales necessarily involve a security.  Such a *per se* rule would be ill-suited to the examination of the economic reality of *each transaction* required by *Howey*.

*Hocking II*, 885 F.2d at 1462 (emphasis added).  Critically, the majority in *Hocking II* did not assume that because the purchase of the condominium and the rental pool agreement directly from the developer would have constituted an investment contract transaction, that the purchase of those same items in a transaction with a secondary seller through the broker should automatically be treated as an investment contract transaction as well.  See *id*. at 1456.  Rather, the majority's analysis relied on an application of the *Howey* test to the specific facts and

COHENWILSON LLP
**dba DLx Law**
331 Park Avenue South
New York, NY 10010
Tel. 212.994.6845

**ADMON LAW FIRM PLLC**
**www.AdmonLaw.com**
300 Lenora St., #4008
Seattle, WA 98121
Tel. 206.739.8383

circumstances surrounding Hocking's (secondary market) purchase of the condominium and the rental purchase agreement before them.  Following *Hocking II*, this Court should dismiss the SEC's Amended Complaint for its failure to plead allegations that the Defendant's specific transactions in the Tokens met the definition of "investment contracts" at the time and in the context they took place.

> **3.      Instead of Establishing that the Defendants' Specific Transactions in the Tokens Meet the *Howey* Test, the Amended Complaint Inappropriately Alleges that these Assets Are Securities Because the Promoters' Schemes Are "Continuing".**

To correctly apply the *Howey* test to the Defendants' transactions, the Amended Complaint would need to show how each of such transactions met all four prongs of the *Howey* test at the time they occurred – something that the Amended Complaint fails to do.  Instead, the Amended Complaint alleges that facts which attempt to establish that the Tokens were sold by promoters in investment schemes that are "ongoing," somehow resulting in the Defendants' purchases and sales separately constituting investment contract transactions.   This is a misapplication of *Howey* that departs from all precedent.

Neither the Ninth Circuit nor any other federal appellate court has ever suggested that the object of the investment contract (*i.e.*, an asset, like the Tokens, that is not intrinsically a security), if transferred between unaffiliated third parties, in any way represents or "embodies" the underlying investment scheme.  *See* Lewis Cohen *et al.*, *The Ineluctable Modality of Securities Law: Why Fungible Crypto Assets Are Not Securities* ("*Why Fungible Crypto Assets Are Not Securities*") (Nov. 10, 2022), at pp. 55-58, attached as Exhibit 2.  Rather than following 75 years of accepted *Howey* jurisprudence by focusing its enforcement efforts on the actions of the persons it has identified as the promoters of investment schemes involving the Tokens, the

BRIEF OF AMICUS CURIAE
PARADIGM OPERATIONS LP
NO.: 2:22-cv-01009-TL
PAGE 13

**COHENWILSON LLP**
**dba DLx Law**
331 Park Avenue South
New York, NY 10010
Tel. 212.994.6845

**ADMON LAW FIRM PLLC**
**www.AdmonLaw.com**
300 Lenora St., #4008
Seattle, WA 98121
Tel. 206.739.8383

SEC's Amended Complaint instead seeks to apply the Exchange Act to the Defendants, who are third-party purchasers of the Tokens. This unsupported expansion of the Securities Acts shifts the burden of compliance from the persons who may have sold non-security assets to raise funds for a business without SEC registration to the third-party owners of these assets – the very persons the Securities Acts are intended to protect. *See* Amended Complaint, at ¶100.

The locus of the SEC's misreading of *Howey* in the context of secondary transactions in non-security assets, such as the Tokens, is the "common enterprise" element of the test. In fundraisings that are considered investment contract transactions, persons provide capital to the "enterprise" in exchange for some non-security asset that, generally, the purchaser has no consumptive interest in. The common enterprise exists due to the shared "investment of money" between the asset purchaser and the promoter. However, absent unusual facts not alleged in the Amended Complaint, secondary market purchasers of non-security assets initially sold in an investment contract transaction do not provide any funding to the relevant promoters and therefore cannot be said to be in a "common enterprise" with the promoter or other owners of the asset within the meaning of *Howey*.

In their analysis of each of the Tokens, the SEC attempts to establish the existence of a "common enterprise" primarily on the basis that the Token owners share a "common interest" with the alleged promoters. For example, "Amp investors share a common interest with Flexa's management team". *See* Amended Complaint, at ¶116. "DerivaDEX and its management team retain the vast majority of the 'emitted' DDX token, creating a common interest between management and other investors". Amended Complaint, at ¶138. However, this conclusion is mistaken. There are many examples where non-security assets are purchased partially or entirely for their profit potential and derive their value significantly from the purchaser's reasonable

BRIEF OF AMICUS CURIAE
PARADIGM OPERATIONS LP
NO.: 2:22-cv-01009-TL
PAGE 14

COHENWILSON LLP
dba DLx Law
331 Park Avenue South
New York, NY 10010
Tel. 212.994.6845

ADMON LAW FIRM PLLC
www.AdmonLaw.com
300 Lenora St., #4008
Seattle, WA 98121
Tel. 206.739.8383

expectations of the actions of "others".  Absent some other relationship between the parties, this relatively familiar arrangement does not create a "common enterprise" between the asset purchaser and the "others" within the meaning of *Howey*.  These include:

- A speculative buyer that made a secondary purchase of a parcel of real estate that was part of a larger development may reasonably expect the developer that owns many of the other nearby parcels to add features to the development that would increase the value of all of these parcels based on statements made in advertising brochures concerning the development published by the developer;

- A fund acquiring certain cartel-supported commodities (like diamonds or crude oil) for investment purposes may reasonably expect the relevant cartel (*e.g.,* De Beers or OPEC) to maintain production levels that support publicly announced unit price targets that would benefit both the buyer and the cartel members;

- A hobbyist collector/investor in children's limited-edition plush dolls may see a social media post by the dolls' manufacturer and reasonably expect a particular line of dolls to be discontinued by the manufacturer after a run of a certain volume, increasing scarcity and therefore price of the dolls, providing profit to the buyer and enhancing demand for future toys to be sold by the manufacturer;

- A purchaser of bitcoin might reasonably expect the declining market price of the asset to stabilize following the public statements of the CEO of a publicly traded technology company that the company would maintain their extensive holdings of bitcoin for the foreseeable future, providing an economic benefit to the purchaser and the public company.

BRIEF OF AMICUS CURIAE
PARADIGM OPERATIONS LP
NO.: 2:22-cv-01009-TL
PAGE 15

**COHENWILSON LLP**
**dba DLx Law**
331 Park Avenue South
New York, NY 10010
Tel. 212.994.6845

**ADMON LAW FIRM PLLC**
**www.AdmonLaw.com**
300 Lenora St., #4008
Seattle, WA 98121
Tel. 206.739.8383

In none of these cases would a court in the Ninth Circuit have judicial precedent to find that the third-party asset buyer is in a "common enterprise" within the meaning of *Howey*.  The fact that the buyer had a shared economic interest with the real estate developer, the commodities cartel, the doll manufacturer, or the public company, which had made public statements that could reasonably be interpreted as having a positive impact on the price of the asset is not sufficient to find a common enterprise.

To bolster the "common interest" argument, the Amended Complaint references a highly selective set of statements made by the parties that deployed the smart contract code creating the Tokens or otherwise sold these assets to others.  However, not only is it not alleged that the Defendants were aware of these facts, in many cases the SEC's alleged facts are not ones it would even be possible for the Defendants (or any other third party) to be aware of.  For example, the statements "Rally … applied to Coinbase to have RLY listed" (Amended Complaint, at ¶127); "DerivaDEX and its management team retain the vast majority of 'emitted' DDX tokens" (Amended Complaint, at ¶138); "XY's day-to-day operations and Board of Directors are run by a centralized leadership group that include [sic] two of XY's three co-founders" (Amended Complaint, at ¶ 154) each contain non-public information.

Yet the Amended Complaint suggests that, as a matter of law in the Ninth Circuit, the Court should accept that the very brief periods of common ownership of the Tokens between the Defendants and the promoters of the various schemes associated with these assets, without any alleged contractual or other relationship between the parties or even allegations that the Defendants were aware of the facts alleged about these schemes, is sufficient to establish a "common enterprise" for purposes of *Howey*.  Having cited limited evidence to support their assertion that the *initial* fundraising sales of the Tokens constituted investment contract

BRIEF OF AMICUS CURIAE
PARADIGM OPERATIONS LP
NO.: 2:22-cv-01009-TL
PAGE 16

**COHENWILSON LLP**
**dba DLx Law**
331 Park Avenue South
New York, NY 10010
Tel. 212.994.6845

**ADMON LAW FIRM PLLC**
**www.AdmonLaw.com**
300 Lenora St., #4008
Seattle, WA 98121
Tel. 206.739.8383

transactions, the SEC then completely fails to present any meaningful factual allegations to support the proposition that the Defendants' secondary transactions in those assets are also investment contract transactions, instead making a cursory observation that "the hallmarks of the definition of a security" continue to exist "at all times relevant to the conduct alleged in [the Amended Complaint]". Amended Complaint, at ¶105.

### 4. In light of the Fundamental Deficiencies with the Amended Complaint's Traditional *Howey* Analysis, We Are Left with an Argument that, in Effect, the Tokens "Embody" the Original Promoters' Alleged Investment Schemes and Thus "Become" Securities While these Schemes are Ongoing.

The last way the SEC may seek to persuade the Court that the Tokens "are" securities (without having to establish how the Defendants entered into separate investment contract transactions) is by asserting that these assets "embody" the underlying investment schemes and thus are *temporary* securities for so long as the original scheme is "ongoing." In *Ripple Labs*, despite citing no legal authority, the SEC took the position that the token, known as XRP, although not itself a security, function as the "embodiment" of the facts, circumstances, promises, and expectations that constitute the purported investment contract and therefore that the crypto asset *represents* the purported investment contract. *See Supra* fn. 2.

However, the SEC has not cited any case law for the proposition that an asset *that itself is not a security* can "evidence" an investment contract and thus become a temporary security, either in the Amended Complaint or, to the knowledge of *amicus*, anywhere else. In fact, a review of the case law in *Why Fungible Crypto Assets Are Not Securities* demonstrates that this is not something found elsewhere in the entirety of *Howey* appellate jurisprudence. Holding aside the merits of adopting the embodiment theory (discussed below), it would be wholly

BRIEF OF AMICUS CURIAE
PARADIGM OPERATIONS LP
NO.: 2:22-cv-01009-TL
PAGE 17

**COHENWILSON LLP**
**dba DLx Law**
331 Park Avenue South
New York, NY 10010
Tel. 212.994.6845

**ADMON LAW FIRM PLLC**
**www.AdmonLaw.com**
300 Lenora St., #4008
Seattle, WA 98121
Tel. 206.739.8383

1    inappropriate to allow charges to be brought against the Defendants based on a novel theory of
2    the law of which the Defendants could not have had any knowledge.

3

4    II.    **THE SEC'S ATTEMPTED EXPANSION OF *HOWEY* JURISPRUDENCE
5           WHICH WOULD EFFECTIVELY TREAT CRYPTO ASSETS AS SECURITIES
6           BASED ON EXTERNAL FACTORS ON A TEMPORARY BASIS, IS
7           UNFOUNDED, UNWORKABLE AND CONTRARY TO THE FUNDAMENTAL
           STRUCTURE OF THE FEDERAL SECURITIES LAWS, WHICH ASSUMES A
           LEGAL RELATIONSHIP BETWEEN AN ISSUER OF A SECURITY AND THE
           OWNER.**

8          The SEC has suggested that the "flexibility" of the *Howey* test should allow them to

9    extend its scope to any circumstance in which it concludes that investor protection is required.[14]
10
11   In order to capture secondary activity in most crypto assets within the jurisdiction of the SEC,
12   the Amended Complaint stretches the Supreme Court's reasoning in *Howey* and its progeny past
13
14   its breaking point.  The catch-all concept in the definitions of "security" in the Securities Acts,
15   "investment contract", has been used to bring *fundraising transactions* that elevate form over
16
17   substance within the ambit of the federal securities laws.  However, until now, the concept of
     "investment contract" has not been extended to activities of companies or individuals not directly
18
     or indirectly part of those fundraising transactions, and that is for good reason.
19
20         Market participants purchasing or selling an asset must be able to evaluate on their own
21
     whether the asset they transact in would be considered a security under the Securities Acts.
22
     Where the asset consists of an instrument that sets forth the rights and benefits that ownership of
23
     the asset conveys, market participants can conduct that analysis and reach a reliable conclusion.
24
25   However, it is not reasonable to expect the Defendants or other purchasers of the Tokens to

---

[14]  *See, e.g.,* Gary Gensler, "Kennedy and Crypto", Speech (Sept. 8, 2022), available at:
https://www.sec.gov/news/speech/gensler-sec-speaks-090822 (stating, "[n]othing about the crypto markets is
incompatible with the securities laws. Investor protection is just as relevant, regardless of underlying technologies.")

BRIEF OF AMICUS CURIAE
PARADIGM OPERATIONS LP
NO.: 2:22-cv-01009-TL
PAGE 18

**COHENWILSON LLP**
**dba DLx Law**
331 Park Avenue South
New York, NY 10010
Tel. 212.994.6845

**ADMON LAW FIRM PLLC**
**www.AdmonLaw.com**
300 Lenora St., #4008
Seattle, WA 98121
Tel. 206.739.8383

attempt to locate the original sellers of the crypto assets (and, potentially, loosely affiliated entities or individuals), monitor their ongoing statements across all media and communication channels and their other potentially relevant activities (*e.g.*, public appearances) and make a determination on their own as to whether the original investment scheme is still "ongoing" and as such determine its status as a security.

It is also unclear how the Defendants or other purchasers of the Tokens should weigh different statements by different parties,[15] and how these statements may (or may not) persuade a court that a "common enterprise" and the other elements of the *Howey* test are present. In the SEC's view, it appears that as long as there are one or more entities that both own some (indeterminate) amount of the Token and are in any way promoting the benefits of the associated protocol on an "ongoing" basis, then these circumstances should be sufficient to create a "common enterprise" resulting in the crypto asset embodying the purportedly ongoing investment scheme. But, as discussed above, such an approach would not apply in similar circumstances in the case of real estate, crude oil, diamonds, plush dolls, or bitcoin – why should it apply to the Tokens? This approach would be wholly inconsistent with how statements with respect to other non-security assets made by third parties are viewed – even where there is a shared economic interest among owners of the asset in question.

The embodiment theory inherently conflicts with a basic assumption of the federal securities laws: that all securities will have an "issuer"—an identifiable person or entity that creates the security and against whom a securityholder's rights can be exercised. Each type of security enumerated by Congress in the Securities Acts, other than "investment contracts" which

---

[15] For example, if a statement is made in a blog post is that more relevant than a statement made in a tweet? What if there are contradictory or apparently superseding statements made by different persons working on a project? How should statements made by person no longer actively involved in a project be weighed?

BRIEF OF AMICUS CURIAE
PARADIGM OPERATIONS LP
NO.: 2:22-cv-01009-TL
PAGE 19

**COHENWILSON LLP**
**dba DLx Law**
331 Park Avenue South
New York, NY 10010
Tel. 212.994.6845

**ADMON LAW FIRM PLLC**
**www.AdmonLaw.com**
300 Lenora St., #4008
Seattle, WA 98121
Tel. 206.739.8383

are defined by case law, of necessity involves a *legal relationship* volitionally established by an identifiable legal entity that acts as the *issuer* of the security and the various other parties who, from time to time, are *owners* of that.  This legal relationship can be determined by third parties through an examination of a legal instrument – the "security" – with obligations on the part of the issuer that are readily discernible from an examination of the written documentation.

If the Court were to adopt the embodiment theory, it would present insurmountable difficulties for market participants in the U.S. seeking to buy, hold or sell crypto assets.  Neither the Defendants nor any other purchaser of a Token in a secondary market transaction has any way of knowing or determining all of the "facts, circumstances, promises, and expectations" that might be deemed by a court reviewing the circumstances in hindsight to be "embodied" in any given crypto asset.  Moreover, many of these circumstances relevant to a *Howey* analysis may not be matters of the public record or capable of discovery by third parties who lack the SEC's subpoena power.

To make matters even more complicated, in such circumstances, courts do not rely solely on the contractual agreements between the parties to evaluate whether the arrangement constituted an investment contract transaction or scheme, a point driven home in this Circuit by the SEC themselves.[16]  As a result, even if the Defendants or other persons transacting in the Tokens had access to all relevant documents and public statements about the assets and the related protocol, other non-public actions or statements could be deemed to supersede the public information concerning the assets and the promoters available to the Defendants.

---

[16] In the SEC's *amicus curiae* brief filed in *Salameh, et al. v. Tarsadia Hotel et al.*, 726 F.3d 1124 (9th Cir. 2013), a case involving purchases of condominiums in the Hard Rock Hotel San Diego alleged to be a disguised securities transaction by the plaintiffs, they write that the district court "placed dispositive weight on these representations [in the Purchase Contract] and, in doing so, failed to fully consider the broader realities of the overall transaction."  Br. of *Amicus Curiae* SEC at 16-17.

BRIEF OF AMICUS CURIAE
PARADIGM OPERATIONS LP
NO.: 2:22-cv-01009-TL
PAGE 20

COHENWILSON LLP
dba DLx Law
331 Park Avenue South
New York, NY 10010
Tel. 212.994.6845

ADMON LAW FIRM PLLC
www.AdmonLaw.com
300 Lenora St., #4008
Seattle, WA 98121
Tel. 206.739.8383

In addition, to correctly apply the *Howey* test, a party would have to make its evaluation *each and every* time a specific transaction takes place when the facts and circumstances could be constantly changing and third parties seeking to own, use and transfer crypto assets do not have the economic resources or incentive to constantly monitor this information.  As demonstrated by the research undertaken in *Why Fungible Crypto Assets Are Not Securities*, it is hardly a "fact" that each and every time a specific transaction takes place, the transaction is a securities transaction.  Indeed, in totality, of the 253 relevant federal appellate decisions reviewed, a majority (56%) of those relevant disputes end either in a conclusion by the court that no investment contract was present and thus that the Securities Acts should not apply to the transaction (42%), or remand for further fact-finding (12%).  More specifically, the Ninth Circuit, which has thus far been responsible for 27% of all federal appellate investment contract cases, has found that an investment contract was not present, or remanded for further proceedings, in 53% of all of its decisions, thus highlighting that a *Howey* analysis is particularly challenging to get right.  Implementing the embodiment theory would present insurmountable difficulties for market participants to evaluate all the applicable facts and circumstances on their own, or risk strict liability violations of the Securities Acts.

## CONCLUSION

There is no basis in current law to classify the Tokens as "investment contracts" when purchased and sold by the Defendants because these crypto assets are not themselves securities and the Defendants' purchases and sales of the Tokens would not be properly characterized as investment contract transactions under current interpretations of the *Howey* Test in the Ninth Circuit.  In addition, there is no current jurisprudential authority for asserting that the Tokens somehow "embody" an ongoing investment scheme being undertaken by parties unrelated to the

BRIEF OF AMICUS CURIAE
PARADIGM OPERATIONS LP
NO.: 2:22-cv-01009-TL
PAGE 21

**COHENWILSON LLP**
**dba DLx Law**
331 Park Avenue South
New York, NY 10010
Tel. 212.994.6845

**ADMON LAW FIRM PLLC**
**www.AdmonLaw.com**
300 Lenora St., #4008
Seattle, WA 98121
Tel. 206.739.8383

Defendants.  The SEC ignores the correct application of *Howey* to each *transaction* and instead, attempts to create a *de facto* presumption that most, if not all, crypto assets are themselves investment contracts despite the fact that there is no legal or logical basis for such a presumption. This approach is untethered from the powers conferred on the SEC by Congress.

For the aforementioned reasons, the SEC has not met its burden of alleging facts sufficient to establish that the Defendants entered into securities transactions, requiring the Court to grant the Defendants' Motion to Dismiss.

Dated: March 28, 2023

**ADMON LAW FIRM PLLC**

By */s/Moshe Y. Admon*
Moshe (Jeff) Admon, WSBA #50235
300 Lenora St., #4008, Seattle, WA 98121
T: (206) 739-8383 | F: (206) 494-0001
Email: jeff@admonlaw.com

COHENWILSON LLP
Lewis Rinaudo Cohen, (*Admitted pro hac vice*)
Gregory Strong, (*Admitted pro hac vice*)
Weiyang Chen, (*Admitted pro hac vice*)
Freeman Lewin, (*Admitted pro hac vice*)
331 Park Avenue South, New York, NY 10010
T: (212) 984-6845
Email: lewis.cohen@dlxlaw.com
Email: greg.strong@dlxlaw.com
Email: sarah.chen@dlxlaw.com
Email: freeman.lewin@dlxlaw.com

PARADIGM OPERATIONS LP
Rodrigo Seira, (*Admitted pro hac vice*)
548 Market Street, San Francisco, CA 94104
T: (415) 986-9283
Email: rodrigo@paradigm.xyz

***Attorneys for Amicus Curiae Paradigm Operations LP***

BRIEF OF AMICUS CURIAE
PARADIGM OPERATIONS LP
NO.: 2:22-cv-01009-TL
PAGE 22

**COHENWILSON LLP**
**dba DLx Law**
331 Park Avenue South
New York, NY 10010
Tel. 212.994.6845

**ADMON LAW FIRM PLLC**
**www.AdmonLaw.com**
300 Lenora St., #4008
Seattle, WA  98121
Tel. 206.739.8383