THE HONORABLE TANA LIN

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

SECURITIES AND EXCHANGE
COMMISSION,

              Plaintiff,

   v.

ISHAN WAHI, NIKHIL WAHI, and
SAMEER RAMANI,

            Defendants.

No. 2:22-cv-01009-TL

**BRIEF OF AMICUS CURIAE
COINBASE, INC. IN SUPPORT OF
DEFENDANTS ISHAN WAHI AND
NIKHIL WAHI'S MOTION TO DISMISS**

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C. 20036
Tel.:  202-955-8500

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND INTEREST OF AMICUS CURIAE ...................................................... 1

BACKGROUND ............................................................................................................................ 3

    I.      Over Ten Years Coinbase Has Built The Largest Cryptocurrency Platform In The United States .............................................................................................................. 3

    II.     Coinbase Has Regularly Engaged With The SEC To Seek Regulatory Clarity ...... 5

          A.     SEC Staff Reviewed Coinbase's Business Model and Cleared the Way for Its Public Listing ......................................................................................... 6

          B.     Coinbase Has Petitioned the SEC to Engage in Rulemaking ..................... 8

SUMMARY OF ARGUMENT ..................................................................................................... 9

ARGUMENT ............................................................................................................................... 12

    I.      Coinbase Does Not List Securities, Period .......................................................... 12

          A.     The Coinbase-Listed Assets Are Not Investment "Contracts" ................. 12

          B.     The Coinbase-Listed Assets Are Not "Investment" Contracts ................. 14

          C.     Were There Any Doubt, the Major Questions Doctrine Would Foreclose the SEC's Position ............................................................................... 17

    II.     The SEC's Regulation-By-Enforcement Approach Violates Due Process And Is Inconsistent With The Agency's Obligations Under The APA ............................ 18

          A.     The SEC's Actions Violate Fundamental Principles of Due Process and Fair Notice ......................................................................................... 18

          B.     The SEC's Regulation-By-Enforcement Approach Is Inconsistent with Core Values Embodied in the APA ...................................................... 22

          C.     The SEC's Suggestions that Crypto Firms Can Comply with Existing Requirements Are Chimerical ................................................................. 24

CONCLUSION ............................................................................................................................ 27

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - i

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C. 20036
Tel.: 202-955-8500

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Christopher v. SmithKline Beecham Corp.*,
  567 U.S. 142 (2012)............................................................................................18, 21

*Cmty. Television of S. Cal. v. Gottfried*,
  459 U.S. 498 (1983).....................................................................................................22

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012)............................................................................................18, 19

*Ford Motor Co. v. FTC*,
  673 F.2d 1008 (9th Cir. 1981) ....................................................................................23

*Fortyune v. City of Lomita*,
  766 F.3d 1098 (9th Cir. 2014) ....................................................................................18

*Gen. Elec. Co. v. EPA*,
  53 F.3d 1324 (D.C. Cir. 1995).....................................................................................20

*George v. McDonough*,
  142 S. Ct. 1953 (2022).................................................................................................13

*Hocking v. Dubois*,
  839 F.2d 560 (9th Cir. 1988) ......................................................................................16

*McCormick v. Shively*,
  267 Ill. App. 99 (1932) ................................................................................................13

*Mordaunt v. Incomco*,
  686 F.2d 815 (9th Cir. 1982) ......................................................................................16

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)..............................................................................................11, 24

*NLRB v. Bell Aerospace Co. Div. of Textron*,
  416 U.S. 267 (1974).....................................................................................................22

*Patel v. INS*,
  638 F.2d 1199 (9th Cir. 1980) ....................................................................................23

*Pfaff v. U.S. Dep't of Hous. & Urban Dev.*,
  88 F.3d 739 (9th Cir. 1996) ............................................................................18, 22, 23

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C. 20036
Tel.: 202-955-8500

# TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) ........................................................................................................23

*SEC v. R.G. Reynolds Enterprises, Inc.*,
   952 F.2d 1125 (9th Cir. 1991) .......................................................................................16

*SEC v. Shavers*,
   No. 4:13-cv-416 (E.D. Tex. July 23, 2013) ..................................................................19

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946)............................................................................9, 10, 12, 13, 14, 15

*SNR Wireless LicenseCo, LLC v. FCC*,
   868 F.3d 1021 (D.C. Cir. 2017) .....................................................................................20

*State v. Evans*,
   191 N.W. 425 (Minn. 1922)...........................................................................................13

*State v. Heath*,
   153 S.E. 855 (N.C. 1930)................................................................................................13

*United Hous. Found., Inc. v. Forman*,
   421 U.S. 837 (1975)..................................................................................................15, 16

*Util. Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014).......................................................................................................17

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022)..............................................................................................10, 17

**STATUTES**

15 U.S.C. § 77b(a)(1)..................................................................................................9, 12, 16

15 U.S.C. § 78c(a)(10) ..........................................................................................................12

15 U.S.C. § 77h(a) ...................................................................................................................7

15 U.S.C. § 78f(c)(1) .............................................................................................................26

**RULE**

Fed. R. App. P. 29(a)(4)(E)......................................................................................................3

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - iii

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C. 20036
Tel.:  202-955-8500

# TABLE OF AUTHORITIES
(Continued)

**Page(s)**

**REGULATION**

SEC, Proposed Rule, *Safeguarding Advisory Client Assets*,
88 Fed. Reg. 14,672 (Mar. 9, 2023) ................................................................ 24

**OTHER AUTHORITIES**

Brian Armstrong, *Coinbase Is a Mission Focused Company*, Coinbase Blog (Sept. 27, 2020),
https://bit.ly/3kkEHfT ................................................................ 4, 17

*Asset Legal Review: How Coinbase Thinks About The Legal Review of New Assets*, Coinbase,
https://bit.ly/3Z2nUgQ ................................................................ 6

Cecilia Chapiro, *Working Toward Financial Inclusion with Blockchain*, Stan. Soc. Innovation Rev. (Nov. 24, 2021),
https://bit.ly/3YdsyqT ................................................................ 4

Coinbase, *Comment Letter to SEC Re: Petition for Rulemaking* (Dec. 6, 2022),
https://bit.ly/3YTE3VN ................................................................ 8

Coinbase, Correspondence Related to Draft Registration Statement (Dec. 21, 2020),
https://bit.ly/3ZipCtQ ................................................................ 6

Coinbase, Correspondence Related to Draft Registration Statement (Feb. 12, 2021),
https://bit.ly/3xPsVNM ................................................................ 6

Coinbase, Petition for Rulemaking – Digital Asset Securities Regulation (July 21, 2022),
https://bit.ly/3lZ7dUH ................................................................ 7, 8, 25

Coinbase Global Inc, CNN Business,
https://cnn.it/3m6kHhC ................................................................ 7

*Coinbase Global Inc Stock Ownership – Who Owns Coinbase?*, WallStreetZen,
https://bit.ly/3Fe19hV ................................................................ 7

Chelsey Cox, *Cryptocurrency Firms Need to 'Come into Compliance' with Existing Rules, SEC Chair Gary Gensler Says*, CNBC (Dec. 7, 2022),
https://cnb.cx/3yspgFQ ................................................................ 26

*Crypto's Emergence as a Geopolitical Force*, Coinbase (Mar. 2022),
https://bit.ly/3y2W4VN ................................................................ 4

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - iv

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C. 20036
Tel.: 202-955-8500

1

**TABLE OF AUTHORITIES**
(Continued)

2

3

**Page(s)**

*First on CNBC: CNBC Transcript: SEC Chair Gary Gensler Speaks with CNBC's "Squawk Box" Today*, CNBC (Feb. 10, 2023),
https://cnb.cx/3IFO7L4 ................................................................................................24

*Framework for "Investment Contract" Analysis of Digital Assets*, SEC (Apr. 3, 2019),
https://bit.ly/2HXfEdZ ................................................................................................20

Gary Gensler, SEC Chair, *Kennedy and Crypto* (Sept. 8, 2022),
https://bit.ly/3XWAkoQ ................................................................................................21

Paul Grewal, *Coinbase Does Not List Securities. End of Story*, Coinbase Blog (July 21, 2022),
https://bit.ly/3IoCnwg ................................................................................................7

Paul Grewal, *Transparency Report 2022*, Coinbase (Dec. 12, 2022),
https://bit.ly/41H8m3y ................................................................................................5

William Hinman, Dir., Div. of Corp. Fin., SEC, *Digital Asset Transactions: When Howey Met Gary (Plastic)* (June 14, 2018),
https://bit.ly/2l8t5dB ...........................................................10, 14, 15, 20, 21, 26

*How Is Ukraine Using Crypto to Fund the War?*, The Economist (Apr. 5, 2022),
https://econ.st/3J7l8kA ................................................................................................4

Gareth Jenkinson, *Crypto Donations Amplify Speed and Global Reach During Crisis*, Cointelegraph (Mar. 2, 2023),
https://bit.ly/3ZcE5YM ................................................................................................5

Ankush Khardori, *Can Gary Gensler Survive Crypto Winter? D.C.'s Top Financial Cop on Bankman-Fried Blowback*, The Intelligencer (Feb. 23, 2023),
https://nym.ag/3ZjbUXI ................................................................................................21, 26

Sander Lutz, *SEC Chair Gensler Threatens Action Against Unregistered Crypto Exchanges*, Decrypt (May 18, 2022),
https://bit.ly/3kBpd7g ................................................................................................24

*P2P Platforms, Remittances, and Savings Needs Power Africa's Grassroots Cryptocurrency Adoption*, Chainalysis (Oct. 14, 2021),
https://bit.ly/3SrTTVe ................................................................................................4

Hester Peirce, Comm'r, SEC, *Outdated: Remarks Before the Digital Assets at Duke Conference* (Jan. 20, 2023),
https://bit.ly/3YWPSKO ................................................................................................25

27

28

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - v

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C. 20036
Tel.: 202-955-8500

1

2

**TABLE OF AUTHORITIES**
(Continued)

3

**Page(s)**

4

SEC, Correspondence Related to Draft Registration Statement (Dec. 7, 2020),
    https://bit.ly/3lRrY4y ...................................................................................6, 20, 21

5

6

SEC, Correspondence Related to Draft Registration Statement (Feb. 5, 2021),
    https://bit.ly/41lSO51 ..............................................................................................6

7

SEC, Correspondence Related to Draft Registration Statement (Mar. 12, 2021),
    https://bit.ly/3kqEs2T ..............................................................................................6

8

9

SEC, *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* (July 25, 2017),
    https://bit.ly/3IpiWDt ............................................................................................20

10

11

*Terrorism and Cryptocurrency: Industry Perspectives: Hearing Before the Subcomm. on Intel. and Counterterrorism of the H. Comm. on Homeland Sec.*, 117th Cong. 25 (2022),
    https://bit.ly/3majdmk ..............................................................................................5

12

13

U.S. Chamber of Commerce, Center for Capital Markets Competitiveness, *Comment Letter to SEC Re: Coinbase Petition for Rulemaking* (Jan. 19, 2023),
    https://bit.ly/3SsV0Un ..........................................................................................8, 9

14

15

*Voyager Bankruptcy Judge Expresses Skepticism Over U.S. SEC Objection to Binance US Deal*, Coindesk (Mar. 6, 2023),
    https://bit.ly/3ytV9Od ..............................................................................................9

16

17

Jonathan Wheatley & Adrienne Klasa, *Cryptocurrencies: Developing Countries Provide Fertile Ground*, Financial Times (Sept. 5, 2021),
    https://on.ft.com/3SPS7x9 ......................................................................................4

18

19

20

21

22

23

24

25

26

27

28

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - vi

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C. 20036
Tel.:  202-955-8500

**INTRODUCTION AND INTEREST OF AMICUS CURIAE**

Coinbase, Inc. ("Coinbase") is the largest and only publicly traded cryptocurrency trading platform in the United States. It is also a leading provider of financial infrastructure and technology for the crypto economy.

In this case, the Securities and Exchange Commission (SEC or Commission) is alleging that three individuals—including Ishan Wahi, a former Coinbase employee—violated the securities laws by trading seven digital assets that Coinbase listed on its platform (the "Coinbase-listed assets") and two others that Coinbase did not list. Although aimed at three individuals, the SEC's suit hinges on the assumption that Coinbase—the object of the defendants' crimes and a nonparty in this case—has unlawfully listed at least a small number of securities on its platform.

The SEC has it wrong—Coinbase does not list *any* securities on its platform. And equally mistaken is the SEC's pursuit of this case while simultaneously refusing to promulgate any rules for the crypto industry at all. For more than a decade the SEC has failed to provide formal guidance about how it understands the applicability of the federal securities laws to digital assets—despite repeated calls from Coinbase and others for clarity. What few signals the Commission previously sent either suggested that most digital assets fall outside the securities laws or acknowledged that the agency has provided no clear guidance. More recent statements by SEC officials—and this enforcement action—have signaled a potential new view, creating uncertainty for Coinbase and others who built businesses in reliance on the Commission's prior signals.

This state of uncertainty cries out for rulemaking. The SEC must give the industry and the public fair, prospective notice of its current position. Yet to date the Commission has declined even to respond to Coinbase's multiple formal rulemaking requests. Instead, the SEC has sought to regulate through enforcement actions against defendants ill-suited to defend themselves. Such cases typically result in narrow settlement orders that fail to provide genuine guidance to the public and are no substitute for industry-wide rules of general applicability adopted through public notice and comment.

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - 1

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C. 20036
Tel.: 202-955-8500

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

This case puts the unfairness of the Commission's new approach in sharp relief.  The SEC asks this Court to adjudicate issues at the heart of Coinbase's listing decisions for seven assets, and in litigation against unsympathetic individual defendants who stole Coinbase's nonpublic information and are poorly positioned to defend even one of the company's asset-listing decisions, let alone its extensive efforts at compliance and years of engagement with the SEC.

Coinbase condemns the defendants' conduct.  That is why it fully cooperated with law enforcement in investigating the defendants' crimes and was instrumental in bringing them to justice.  Ishan Wahi and his brother have since pleaded guilty to conspiracy to commit wire fraud, in a case where the Department of Justice tellingly declined to bring any securities law charges.  But this separate enforcement action by the SEC relates not only to those individuals' conduct, but also to the regulatory status of digital assets traded in secondary-market transactions.  That is an issue to be addressed in notice-and-comment rulemaking by the Commission, not in litigation with admitted criminals.

Simply put, the SEC is wrong on the merits, and wrong as a matter of process, too.  It lacks authority to charge the defendants' conduct involving the Coinbase-listed assets as securities law violations because those assets are not securities.[1]  Like all digital assets Coinbase lists, the Coinbase-listed assets at issue here lack the essential attributes of the statutory term of art on which the SEC's case rests—they involve neither an "investment" nor a "contract," as those terms have long been understood based on the statutory text, its original meaning distilled from decades of pre-1930s case law, and the very Supreme Court precedent the SEC cites.  Moreover, the Commission's attempt to seize authority over an industry through ad hoc enforcement actions like this one, without clear advance warning of how it now construes the securities laws, contravenes founda-

---

[1] In this brief, Coinbase focuses on the digital assets it has listed.  But the other two tokens (DFX and KROM) should be evaluated under the same legal standards that Coinbase proposes here.

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - 2

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C.  20036
Tel.:  202-955-8500

tional tenets of due process and administrative law. This resort to enforcement promotes uncertainty by leaving regulated parties to divine the law from case-by-case outcomes dependent on the facts of individual cases, the whims of prosecutorial discretion, and the vagaries of litigation.

The way out of this morass is straightforward. The SEC must first provide formal, prospective guidance, through notice-and-comment rulemaking in which the public can be heard on the question of whether, and how, the securities laws may apply to digital assets. Rulemaking would provide clarity, fair notice, and the opportunity for judicial review to correct any misreading of the law by the SEC. This Court, for its part, should dismiss this lawsuit as foreclosed by the long-settled understanding of the securities laws, and as a travesty of fair notice and fair process in which the practices of a respected company are left to be defended by the criminals who harmed it.[2]

## BACKGROUND

### I.   Over Ten Years Coinbase Has Built The Largest Cryptocurrency Platform In The United States

Coinbase is the largest cryptocurrency platform in the United States, serving millions of Americans.[3] Founded in 2012, Coinbase's mission is to create an open financial system that uses cryptographically secured digital assets ("digital assets" or "cryptocurrencies") to bring economic

---

[2] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), Coinbase certifies that: (a) no party's counsel authored this brief in whole or in part; (b) no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and (c) no person, other than Coinbase or its counsel, contributed money that was intended to fund preparing or submitting this brief. In submitting this amicus brief, Coinbase reserves all legal rights, including its right to move to intervene in this action at a later point.

[3] Coinbase's parent company, Coinbase Global, Inc., serves tens of millions more worldwide through distinct, non-U.S. entities.

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - 3

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C. 20036
Tel.: 202-955-8500

freedom to people all over the world.[4]  That mission is premised on Coinbase's belief that widespread adoption of digital assets and the blockchain technology underlying them will lead to a more cost-effective, inclusive, and secure financial system.

Since 2012, Coinbase has worked tirelessly to realize its mission by empowering people to use digital assets as a force for good.  That mission has been a success, notwithstanding the recent turmoil in the industry.  Digital assets are now a mainstream part of global financial markets, with a market capitalization of around $1 trillion and hundreds of millions of users around the world. Digital assets have provided a financial lifeline to millions of unbanked individuals, and have significantly reduced the costs of cross-border remittances to developing countries.[5]  To take just one example, from 2020 to 2021 more than $100 billion in crypto remittance payments were sent to Africa—a 1,200% increase over the previous year—as users took advantage of the accessibility, lower transaction costs, and reduced transaction times offered by cryptocurrencies.[6]  And people are increasingly relying on cryptocurrencies to provide instantaneous financial support to those in need around the world.  During Russia's invasion of Ukraine, for example, the Ukrainian government has raised over $50 million in cryptocurrencies from supporters worldwide just by sharing a cryptocurrency "address" on its Twitter account.[7]  And when devastating earthquakes hit parts of

---

[4] *See* Brian Armstrong, *Coinbase Is a Mission Focused Company*, Coinbase Blog (Sept. 27, 2020), https://bit.ly/3kkEHfT.

[5] *See, e.g.*, Cecilia Chapiro, *Working Toward Financial Inclusion with Blockchain*, Stan. Soc. Innovation Rev. (Nov. 24, 2021), https://bit.ly/3YdsyqT; Jonathan Wheatley & Adrienne Klasa, *Cryptocurrencies: Developing Countries Provide Fertile Ground*, Financial Times (Sept. 5, 2021), https://on.ft.com/3SPS7x9 ("According to the World Bank, the cost of sending $200 to countries in sub-Saharan Africa averaged 9 per cent of the transaction value . . . .  On peer-to-peer crypto networks, however, these fees are typically about 2-5 per cent . . . .").

[6] *P2P Platforms, Remittances, and Savings Needs Power Africa's Grassroots Cryptocurrency Adoption*, Chainalysis (Oct. 14, 2021), https://bit.ly/3SrTTVe.

[7] *How Is Ukraine Using Crypto to Fund the War?*, The Economist (Apr. 5, 2022), https://econ.st/3J7l8kA; *Crypto's Emergence as a Geopolitical Force*, Coinbase (Mar. 2022), https://bit.ly/3y2W4VN.

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - 4

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C.  20036
Tel.:  202-955-8500

Turkey and Syria last month, donors used cryptocurrencies to instantly transmit approximately $100 million to the afflicted areas.[8]

Coinbase always has understood that digital assets can achieve and maintain the mainstream legitimacy needed to transform the financial system only if industry participants operate within a clear, predictable regulatory framework—one that promotes innovation while also protecting consumers and ensuring stability.  Coinbase thus chose to set up shop in the United States and to elevate compliance and regulator engagement as its highest priorities.  To that end, Coinbase has been registered as a money-services business with FinCEN since 2013; is a member of the federal Bank Secrecy Act Advisory Group; is licensed by the New York State Department of Financial Services; and is authorized to transmit money in dozens of states.  Coinbase also is a critical partner to law enforcement agencies around the world, having trained thousands of law enforcement agents and analysts in blockchain analytics and other cutting-edge investigative techniques.[9] Coinbase constantly engages with law enforcement and regulators to better understand its obligations and help push forward smart regulation—even when Coinbase fundamentally disagrees with the regulator's view of the law.[10]

## II.    Coinbase Has Regularly Engaged With The SEC To Seek Regulatory Clarity

Coinbase is not registered with the SEC as a national securities exchange (or as an "alternative trading system") because Coinbase does not list securities.  Coinbase would like to expand its platform to include digital-asset securities (such as tokenized stocks), but no U.S. company can do so until the SEC provides a clear regulatory framework explaining how the securities laws apply

---

[8] Gareth Jenkinson, *Crypto Donations Amplify Speed and Global Reach During Crisis*, Cointelegraph (Mar. 2, 2023), https://bit.ly/3ZcE5YM.

[9] *See Terrorism and Cryptocurrency: Industry Perspectives: Hearing Before the Subcomm. on Intel. and Counterterrorism of the H. Comm. on Homeland Sec.*, 25, 117th Cong. 25 (2022) (statement of John Kothanek, Vice President, Global Intelligence, Coinbase, Inc.), https://bit.ly/3majdmk ("Our investigators spend hours with law enforcement each week . . . .").

[10] For example, between October 2021 and September 2022 alone, Coinbase responded to 5,304 requests from U.S. law enforcement entities and government agencies.  Paul Grewal, *Transparency Report 2022*, Coinbase (Dec. 12, 2022), https://bit.ly/41H8m3y.

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - 5

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C.  20036
Tel.:  202-955-8500

to digital assets.  Seeking such regulatory clarity, Coinbase has actively engaged with the SEC for years, including about Coinbase's asset-listing process and the pressing need for rulemaking in this area.

### A.    SEC Staff Reviewed Coinbase's Business Model and Cleared the Way for Its Public Listing

In keeping with Coinbase's commitment to transparency and compliance, in October 2020 Coinbase submitted a registration statement to the SEC to allow it to become listed as a public company.  The registration statement contained detailed information regarding Coinbase's business model, financial information, and the risks faced by Coinbase's business.  During the registration process, the SEC Staff submitted detailed comments to Coinbase about various issues, including Coinbase's process for listing digital assets on its platform and the safeguards that Coinbase employs to ensure that it does *not* list assets that are securities.[11]

As Coinbase explained to the SEC in responding to these comments, Coinbase reviews and analyzes each digital asset that it lists on its platform *before* making the asset available for trading.[12]  Among other things, Coinbase performs extensive factual due diligence and then analyzes these facts under the federal securities laws.[13]  The goal of this process is to identify digital assets that *might* be deemed securities.  Out of an abundance of caution due to the substantial regulatory uncertainty in this space, Coinbase is overinclusive in what it views as a potential security, and

---

[11] *See* SEC, Correspondence Related to Draft Registration Statement (Dec. 7, 2020), https://bit.ly/3lRrY4y; SEC, Correspondence Related to Draft Registration Statement (Feb. 5, 2021), https://bit.ly/41lSO51; SEC, Correspondence Related to Draft Registration Statement (Mar. 12, 2021), https://bit.ly/3kqEs2T.

[12] *See* Coinbase, Correspondence Related to Draft Registration Statement (Dec. 21, 2020), https://bit.ly/3ZipCtQ; Coinbase, Correspondence Related to Draft Registration Statement (Feb. 12, 2021), https://bit.ly/3xPsVNM.

[13] *Asset Legal Review: How Coinbase Thinks About The Legal Review of New Assets*, Coinbase, https://bit.ly/3Z2nUgQ.

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C.  20036
Tel.:  202-955-8500

often declines to list assets based on concerns that they might constitute (or be deemed) securities.[14]  Indeed, most assets that Coinbase subjects to its review process ultimately are not listed by Coinbase.[15]

In 2021, after thoroughly engaging with Coinbase on these issues, the SEC Staff declared Coinbase's registration statement effective for its public listing.  Under Section 8(a) of the Securities Act, that action necessarily reflected findings by the Staff that (among other things) Coinbase's public listing was consistent with "the public interest and the protection of investors" and that there was "adequa[te]" information about Coinbase "available to the public."  15 U.S.C. § 77h(a).  Throughout the registration process, the Staff never said that Coinbase's business model violated the securities laws, or that Coinbase unlawfully listed unregistered securities on its platform, or that Coinbase must register as a national securities exchange or an alternative trading system.

Since Coinbase's public listing, a broad range of stakeholders have invested in Coinbase and its mission.  Coinbase employs thousands of people and has signed up millions of users.  Its largest investors include leading asset managers like Goldman Sachs, Vanguard, and BlackRock, who collectively hold billions of dollars' worth of the company's stock, often on behalf of retail investors, pension funds, and institutions.[16]  Retail investors independently hold billions more in Coinbase stock.[17]

---

[14] Coinbase, Petition for Rulemaking – Digital Asset Securities Regulation, at 8 (July 21, 2022), https://bit.ly/3lZ7dUH ("Coinbase Rulemaking Petition").

[15] Paul Grewal, *Coinbase Does Not List Securities. End of Story*, Coinbase Blog (July 21, 2022), https://bit.ly/3IoCnwg.

[16] Coinbase Global Inc, CNN Business, https://cnn.it/3m6kHhC (last visited Mar. 10, 2023).

[17] *Coinbase Global Inc Stock Ownership – Who Owns Coinbase?*, WallStreetZen, https://bit.ly/3Fe19hV (last visited Mar. 10, 2023).

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - 7

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C.  20036
Tel.:  202-955-8500

### B.     Coinbase Has Petitioned the SEC to Engage in Rulemaking

Coinbase has continued to engage with the SEC since its public listing, actively seeking regulatory clarity from the agency.  In July 2022, after consulting with a range of industry stakeholders, Coinbase filed a petition with the SEC requesting that the agency "propose new rules for the offer, sale, registration, and trading of digital asset securities."  Coinbase Rulemaking Petition, *supra* note 14, at 3.  Coinbase explained that although the "[d]igital assets that trade today overwhelmingly have the characteristics of commodities," an SEC rulemaking "facilitating the use of digital asset securities" would clarify the law and "allow for a more efficient and effective allocation of capital in financial markets."  *Id.* at 1.  Coinbase encouraged the agency to abandon its recently adopted "enforcement-first approach," which has led to "arbitrary outcomes with limited value as guiding precedent," and instead follow the "well-established rulemaking process."  *Id.* at 2–3.  Doing so, Coinbase explained, "would allow for input from a wide range of stakeholders, advance the goals of transparent and orderly policy development, and result in clear rules and fair notice to all market participants."  *Id.* at 3.

In December 2022, having received no response from the SEC on its still-pending rulemaking petition, Coinbase filed a supplemental comment reiterating and further supporting its request for rulemaking.  *See* Coinbase, *Comment Letter to SEC Re: Petition for Rulemaking* (Dec. 6, 2022), https://bit.ly/3YTE3VN.  Coinbase stressed "the lack of a workable set of regulatory requirements" for prospective issuers of digital asset securities and proposed a specific, tailored regulatory framework that accounts for the differences between digital asset securities and traditional securities.  *Id.* at 1.

Coinbase's petition has garnered support from numerous individuals and organizations, including the U.S. Chamber of Commerce.  *See* U.S. Chamber of Commerce, Center for Capital Markets Competitiveness, *Comment Letter to SEC Re: Coinbase Petition for Rulemaking* (Jan. 19, 2023), https://bit.ly/3SsV0Un.  A consensus has emerged among industry members, commentators, and policymakers that the existing securities regulations are incompatible with the crypto

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - 8

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C.  20036
Tel.:  202-955-8500

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

industry, and that, in the words of the SEC's own Commissioner Peirce, the SEC must "provide a level of clarity that heretofore has been absent." *Id.* at 2.  Courts, too, have expressed frustration with the SEC's failure to "make up their minds on points that they seem to have been debating for years."[18]

Yet seven months after Coinbase submitted its original petition, the SEC *still* has not responded or provided regulatory clarity.  Instead, it has chosen to charge ahead with this and other ill-conceived enforcement actions, seeking to accomplish by way of ad hoc *ex post* enforcement what the law and good sense demand be pursued through orderly *ex ante* rulemaking.

## SUMMARY OF ARGUMENT

The defendants and other amici have highlighted a variety of problems with the Commission's charges.  In this brief, Coinbase focuses on two fundamental flaws in the SEC's position, each independently dispositive of this case.

***First***, the SEC's suit rests on the erroneous premise that the seven Coinbase-listed assets identified in its complaint are "securities."  But Coinbase does not list *any* securities on its platform.  The SEC posits that the digital assets qualify as securities because they are "investment contract[s]." Am. Compl. ¶ 25 (quoting 15 U.S.C. § 77b(a)(1)).  But the assets lack both essential attributes of that statutory term:  They are neither contracts nor investments.

Extensive evidence of original meaning and Supreme Court precedent confirms what the text makes plain.  Congress borrowed "investment contract" from state blue-sky laws, which were uniformly understood to require (among other things) a contractual relationship between the investor and promoter and an outlay intended to yield a profit.  The Supreme Court's decision in *Howey* reinforces that understanding.  The Court held, as a gateway matter, that the "contract" requirement was easily satisfied by the multiple contracts at issue.  *SEC v. W.J. Howey Co.*, 328 U.S. 293, 300 (1946).  The Court then explained that contracts of the "investment" variety under

---

[18] *Voyager Bankruptcy Judge Expresses Skepticism Over U.S. SEC Objection to Binance US Deal*, Coindesk (Mar. 6, 2023), https://bit.ly/3ytV9Od.

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - 9

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C.  20036
Tel.:  202-955-8500

the securities laws are those that involve "an investment of money in a common enterprise with profits to come solely from the efforts of others"—a formulation commonly known as the "*Howey* test"—and concluded that the contracts at issue qualified.  *Id.* at 301.

The Coinbase-listed assets flunk both criteria.  Most critically, the SEC has not alleged—and could not allege—that the assets involved *any* contracts, much less that the defendants' secondary-market transactions did.  The Coinbase-listed assets are simply assets, like gold or trading cards.  They overwhelmingly have the characteristics of commodities, and commodities are subject to separate federal laws.  And though digital assets *could* be the subject of contracts, that cannot transform the asset itself.  As a senior SEC official explained in 2018, a digital asset "all by itself is not a security, just as the orange groves in *Howey* were not."[19]  That alone is the ballgame: Without a contract, there is no need to reach the so-called *Howey* test for distinguishing "*investment* contracts" from other agreements.  But the Coinbase-listed assets do not meet that test, either—they do not involve "an investment of money in a common enterprise with profits to come solely from the efforts of others."  *Howey*, 328 U.S. at 301.  *Howey*'s 80-year-old test for identifying contracts that involve "investment" makes little sense as applied to digital assets.

The deeper problem with the SEC's misreading of "investment contract" is the expansive authority it would improperly arrogate to the agency.  To reach the assets here, the term "investment contract" must be stripped of its essential textual elements.  That would enable the SEC to regulate vast numbers of tradeable assets—from diamonds to Beanie Babies—that have (rightly) never been viewed as securities.  The SEC cannot claim such power to "substantially restructure" the American economy and regulate untold classes of assets absent "clear congressional authorization."  *West Virginia v. EPA*, 142 S. Ct. 2587, 2607–10 (2022).  That is completely lacking here.

***Second***, the SEC's insistence on establishing a de facto, retroactively applicable regulatory framework for crypto through ad hoc enforcement actions—rather than engaging in prospective

---

[19] William Hinman, Dir., Div. of Corp. Fin., SEC, *Digital Asset Transactions: When Howey Met Gary (Plastic)* (June 14, 2018), https://bit.ly/2l8t5dB.

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - 10

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C.  20036
Tel.:  202-955-8500

notice-and-comment rulemaking—offends fundamental principles of fair notice and due process and raises serious concerns under the APA.  If the Court does not reject the SEC's allegations as contrary to the statute, it should at a minimum reject the agency's attempt to seek penalties premised on its novel, never-promulgated position.

Whether and how the securities laws apply to any digital assets raise important and sometimes intricate questions.  Clear advance notice about industry participants' obligations is essential. Yet for more than a decade the SEC has failed to provide clear guidance, has deviated dramatically from its own earlier statements, and has refused even to respond to a petition filed by Coinbase and supported by many others asking that it commence rulemaking.  Proceeding with enforcement in these circumstances violates bedrock principles of due process and fundamental fairness, which bar an agency from seeking to punish regulated parties without providing the regulatory clarity necessary to discern their legal obligations.  Moreover, by refusing to follow the path Congress laid out for agencies to address such issues—notice-and-comment rulemaking—and proceeding instead through ad hoc enforcement actions, the Commission has set itself up for failure under the APA.  That law obligates an agency to consider the whole picture; even if it regulates incrementally, an agency cannot ignore "an important aspect of the problem."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Rulemaking is the only realistic way in which the SEC can provide fair notice to affected stakeholders and coherently consider all important aspects of regulating the crypto industry.

Thus, although the digital assets at issue in this case are of marginal economic significance to Coinbase, the case itself raises critically important issues about the SEC's authority and its processes.  Coinbase remains ready to engage with the SEC on these issues, but it strongly opposes the SEC's efforts to effectuate its policy views through ad hoc litigation.  The appropriate venue to address these issues is the Federal Register, not a federal district court.

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - 11

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C.  20036
Tel.:  202-955-8500

**ARGUMENT**

## I.   Coinbase Does Not List Securities, Period

The SEC's complaint contends that the seven Coinbase-listed assets are securities because they constitute "investment contract[s]." Am. Compl. ¶ 25, 100–192. That contention fails for the simple reason that the assets do not involve *contracts* at all. That irrefutable reality means that *Howey*'s test for identifying "investment"-oriented contracts does not apply here. In any event, applying *Howey*'s test leads to the same conclusion. The SEC's contrary position that the Coinbase-listed assets constitute securities without meeting both the "investment" and "contract" elements is independently foreclosed by the major-questions doctrine: The Commission's view would stretch the statute, and the SEC's authority, to encompass an almost economy-wide swath of assets. To claim that kind of authority, the Commission needs—but lacks—a clear congressional mandate.

### A.   The Coinbase-Listed Assets Are Not Investment "Contracts"

The federal securities laws underlying the SEC's claims in this action apply only to "securities." That term is defined to encompass a laundry list of financial instruments, including any "note," "stock," "bond," and, as relevant here, "investment contract." 15 U.S.C. § 77b(a)(1); *id.* § 78c(a)(10). In this case, as in other recent enforcement actions, the SEC has alleged that certain digital assets are "investment contract[s]." Am. Compl. ¶ 25, 100–217. The Commission purports to ground its analysis in the Supreme Court's distillation of which contracts involve "investment": those with "an investment of money in a common enterprise with profits to come solely from the efforts of others." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946); *accord* Am. Compl. ¶ 25. But the SEC's analysis skips a critical step: There must be a "contract."

That requirement is plain on the face of the relevant statutes. 15 U.S.C. § 77b(a)(1); *id.* § 78c(a)(10). And it is compelled by the settled meaning of "investment contract" when the Securities Act and the Exchange Act were enacted. As *Howey* explained, Congress did not invent the term "investment contract" from whole cloth; it incorporated a familiar, well-understood term

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - 12

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C.  20036
Tel.:  202-955-8500

whose meaning had been "crystallized by th[e] prior judicial interpretation" in "state blue sky laws," a meaning which was "uniformly applied by state courts." 328 U.S. at 298 (quotation marks omitted). State courts had consistently interpreted "investment contract" to require (1) a contract between a promoter and an investor that (2) imposes post-sale obligations on the promoter and (3) gives the investor a right to receive profits from the promoter's venture. *See* Defs.' Mot. to Dismiss at 17. First and foremost, then, an investment contract required a contract. *See, e.g.*, *State v. Heath*, 153 S.E. 855, 857 (N.C. 1930) ("The term ['investment contract'] implies the apprehension of an investment *as well as of a contract*." (emphasis added)).[20] By transplanting that term, Congress brought the settled meaning with it. *George v. McDonough*, 142 S. Ct. 1953, 1959 (2022) ("Where Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it." (citation and quotation marks omitted)).

Given that none of the Coinbase-listed assets involves a contractual arrangement, the SEC seems to tacitly assume that *Howey* silently deleted the word "contract" from the statutory phrase "investment contracts." To the contrary, *Howey* explained that the "contract" requirement in that case was readily satisfied by multiple agreements between the promoter and his purchasers—namely, "land sales contracts, warranty deeds and service contracts." 328 U.S. at 300. *Howey*'s principal focus was clarifying what *kind* of contract the term "investment contract" entails. *See id.* at 297–98. Applying what has become known as the "*Howey* test," the Court held that an "investment" contract entails "an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.* at 301. In elucidating the indicia that distinguish "investment" contracts, *Howey* assuredly did not dispense with the gateway contract requirement

---

[20] *See also, e.g.*, *McCormick v. Shively*, 267 Ill. App. 99, 102 (1932) ("The statute clearly contemplates that *only such contracts* shall be considered investment contracts as provide for the payment of money at a future time to the purchaser or holder of the contract." (emphasis added)); *State v. Evans*, 191 N.W. 425, 427 (Minn. 1922) (same).

itself, which the statute's text and original meaning require the SEC to satisfy in every case. *See* Defs.' Mot. to Dismiss at 29–30.

The SEC, however, has not attempted to satisfy the "contract" requirement here. Its complaint does not allege *any* contract between purchasers of the seven Coinbase-listed assets and the developers of the protocols underlying those assets, much less any contracts involved in the defendants' particular secondary-market transactions. That is because no such contracts exist. The developers of the assets do not owe continuing legal obligations to the defendants or any secondary-market purchasers, and the defendants and secondary-market purchasers lack any legal entitlement to a share in the developers' profits. Instead, the Coinbase-listed assets are simple assets—like gold or other commodities. As the SEC's then-Director of Corporation Finance explained in 2018, each digital asset "all by itself is not a security, just as the orange groves in *Howey* were not."[21]

Of course, the Coinbase-listed assets—and digital assets in general—could be the *subject* of investment contracts that qualify as securities. For example, certain primary offerings of digital assets (*e.g.*, initial coin offerings) might constitute investment contracts depending on the nature of the agreement between the developer and purchasers. But no such contractual arrangements exist here with respect to existing digital assets trading in secondary markets. That dooms the SEC's case, making it unnecessary for the Court to reach the *Howey* test at all.

### B.   The Coinbase-Listed Assets Are Not "Investment" Contracts

Beyond the SEC's failure to allege a contract, the agency cannot and does not plead any "investment" contract as the Supreme Court construed that term in *Howey* and lower courts have understood it since. *Howey* requires the SEC to allege that the contract at issue involves "an investment of money in a common enterprise with profits to come solely from the efforts of others." *Howey*, 328 U.S. at 301. But as the defendants and other amici explain, the *Howey* test makes little sense—and cannot be satisfied—when applied to many (perhaps most) digital assets. Defs'

---

[21] Hinman, *supra* note 19.

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - 14

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C.  20036
Tel.:  202-955-8500

Mot. to Dismiss at 40–59; Paradigm Amicus Br. at 7–18. That is because most digital assets—particularly when traded on secondary markets like Coinbase's—are fundamentally different from the kinds of stocks, bonds, and investment contracts that the securities laws and *Howey* were designed to capture.

Take *Howey*'s requirements of a common "enterprise" run by a "manager" or "promoter." *Howey*, 328 U.S. at 300–01. Those requirements assume that there *is* a manager or enterprise, but digital assets often have neither. Indeed, developers of many digital assets aim to—and do—*decentralize* their networks by relinquishing control to a community of users whose involvement with a project may ebb and flow over time. SEC officials have acknowledged this, and have said that such decentralization can mean that even digital assets that once were securities under *Howey* "no longer represent a security offering" because "purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts."[22]

*Howey*'s "expectation of profit" requirement likewise is inapt as applied to many digital assets. *Howey*, 328 U.S. at 298. For starters, purchasers of digital assets can have no legitimate expectation of profits when they have no contractual rights to profits. In addition, the Supreme Court has held that "the securities laws do not apply" "when a purchaser is motivated by a desire to use or consume the item purchased." *See United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975). But *many* purchasers of digital assets buy the assets *exclusively* for their utility, rather than with any expectation of profit. Purchasers often use digital assets as money—for example, to make remittances to relatives or victims of disasters abroad. *See supra*, at 4–5. They also use digital assets to secure blockchain networks and to engage with and support applications running on the blockchain. For instance, the SEC admits in its complaint that the AMP token is *used* "as collateral to decentralize risk within the Flexa network." Am. Compl. ¶ 108; *see also* Defs' Mot. to Dismiss 49–50. The fact that *some* people purchase digital assets as investments cannot transform the entire asset class into securities, particularly when it is impossible to know which or how

---

[22] Hinman, *supra* note 19.

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - 15

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C.  20036
Tel.:  202-955-8500

many purchasers are using or investing in particular digital assets.  *See Forman*, 421 U.S. at 849.

*Howey*'s requirements make even less sense where, as here, the SEC seeks to stretch them to cover digital assets trading in the secondary market.  Under this Circuit's interpretation of *Howey*'s "common enterprise" requirement, the SEC must show "either an enterprise common to an investor and the seller, promoter, or some third party (vertical commonality) or an enterprise common to a group of investors (horizontal commonality)."  *SEC v. R.G. Reynolds Enters., Inc.*, 952 F.2d 1125, 1130 (9th Cir. 1991).  Neither showing is possible for most (if not all) digital assets trading on secondary markets.  Horizontal commonality does not exist because secondary-market purchasers never "pool their investments together."  *See Hocking v. Dubois*, 839 F.2d 560, 566 (9th Cir. 1988), *aff'd in relevant part*, 885 F.2d 1449, 1459 (9th Cir. 1989) (en banc).  Rather, each purchaser transacts with a seller to exchange money or other digital assets.  Money changes hands, but it is not pooled together in a common fund—in the way that, for example, a group of investors' assets are pooled when they invest in a business together.[23]  Vertical commonality also is lacking, because there is no "direct relation between the success or failure of the promoter and that of his investors."  *Mordaunt v. Incomco*, 686 F.2d 815, 817 (9th Cir. 1982).  Users of the digital assets may sustain profits or losses based on market forces and the timing of their individual purchasing decisions, regardless of the project's success or failure.  And the fact that some users and developers may have aligned economic interests is not enough to show vertical commonality.  *See* Defs.' Mot. to Dismiss at 44–47; Paradigm Amicus Br. 14–17.

In short, even if *Howey*'s test were implicated here (and it is not), the SEC could not satisfy it.  And the fundamental mismatches between *Howey*'s test and digital assets further demonstrate that the Coinbase-listed assets are a world apart from "investment contracts" under the securities laws.

---

[23] To be sure, no pooling of assets occurs when stocks are traded on secondary markets.  But "stocks" are separately and expressly enumerated as "securities" under the Securities Act.  *See* 15 U.S.C. § 77b(a)(1) ("The term 'security' means any . . . stock . . . .").  The absence of pooling is thus irrelevant to stocks but is essential for investment contracts.

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - 16

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C.  20036
Tel.:  202-955-8500

1
2

### C.     Were There Any Doubt, the Major Questions Doctrine Would Foreclose the SEC's Position

3
4

Even if the Commission could demonstrate some ambiguity in the statute and put forward

5

a passable interpretation, that interpretation still would have to be rejected under the major-ques-

6

tions doctrine.  As the Supreme Court has explained, when the government "claims to discover in

7

a long-extant statute an unheralded power to regulate a significant portion of the American econ-

8

omy," it must come bearing "clear congressional authorization." *Util. Air Regul. Grp. v. EPA*, 573

9

U.S. 302, 324 (2014) (quotation marks omitted); *see also West Virginia v. EPA*, 142 S. Ct. 2587,

2607–09 (2022).

10

To reach the Coinbase-listed assets, the SEC is forced to excise the essential elements of

11

an "investment contract" so that it covers assets that involve no contract, no post-sale obligations,

12

no sharing of profits, and at best a tenuous connection to the requirements of *Howey*.  That retro-

13

active Executive amendment of the statute would sweep the $1 trillion crypto industry within the

14

nearly 90-year-old securities statutes.  It also would endow the SEC with broad and novel authority

15

to regulate the sale of a vast number of *other* commodities and assets.  Such unprecedented power

16

in a single agency to "substantially restructure" a massive portion of the American economy at

17

least requires "clear congressional authorization." *West Virginia*, 142 S. Ct. at 2610, 2614.  Yet

18

clarity is completely lacking here, as the SEC has acknowledged (*see* Section II.A, *infra*).

19

To be explicit, Coinbase's position is *not* and has never been that digital assets should be

20

immune to regulation.  As Coinbase's CEO recently explained, Coinbase supports a clear, well-

21

tailored regulatory regime around which it can confidently build, expand, and compete.[24]  Ulti-

22

mately, only Congress can craft a comprehensive regulatory regime for the crypto industry.  In the

23

interim, greater clarity from the SEC about how it intends to use any proper authority it has in this

24

industry must be the starting point.  But the Commission may not lawfully shoehorn crypto into

25

an ill-fitting framework designed decades ago.

26

27

[24] *See* Armstrong, *supra* note 4.

28

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - 17

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C.  20036
Tel.:  202-955-8500

## II.    The SEC's Regulation-By-Enforcement Approach Violates Due Process And Is Inconsistent With The Agency's Obligations Under The APA

Even if the SEC's atextual, expansive reading of "investment contract" were somehow sustainable, the agency's effort to foist that interpretation onto the crypto industry retroactively through piecemeal enforcement proceedings is independently unlawful.  The Commission's approach has deprived regulated parties (and the defendants in this case) of constitutionally required fair notice and all but ensured that the agency will default on its duty to regulate rationally under the APA.  Even if the Court does not reach or reject the Commission's interpretation of "investment contract," it should still reject the agency's attempt to erect a legal framework retroactively through litigation without fair notice to the industry and the public.

### A.    The SEC's Actions Violate Fundamental Principles of Due Process and Fair Notice

The "requirement of clarity in regulation is essential to the protections provided by the Due Process Clause." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  This due-process requirement bars an agency from punishing a regulated party if the agency "fails to provide a person of ordinary intelligence fair notice of what is prohibited." *Id.* at 253–54; *see also Fortyune v. City of Lomita*, 766 F.3d 1098, 1105 (9th Cir. 2014) ("Entities regulated by administrative agencies have a due process right to fair notice of regulators' requirements.").  Fair notice is of special concern when an agency announces and enforces a new policy for the first time in an adjudicatory setting, where its view can apply retroactively.  After all, regulated parties cannot be expected to "divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 159 (2012); *see also Pfaff v. U.S. Dep't of Hous. & Urban Dev.*, 88 F.3d 739, 748 n.4 (9th Cir. 1996) ("The disadvantage to adjudicative procedures is the lack of notice they provide to those subject to the agency's authority.").

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - 18

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C.  20036
Tel.:  202-955-8500

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The SEC has failed to provide the "clarity in regulation" necessary to support its increasingly aggressive enforcement actions. *Fox*, 567 U.S. at 253. In particular, the SEC has not provided any explicit meaningful guidance about *which* digital assets it believes to be subject to the securities laws, and more importantly *why*. This enforcement action is illustrative. Although the SEC has brought enforcement suits in the crypto context before, its complaint in this case was the *first* time the agency explained to the public, to the defendants, or to Coinbase why it believes the digital assets at issue here are securities. "Notice" on the day enforcement proceedings begin is the antithesis of *fair* notice. And although the SEC's complaint and its public statements elsewhere imply that the agency is seeking to enforce a new "rule" that substantial numbers of digital assets are securities, even in this case the agency has yet to articulate a rationale or limits that industry participants can rely on to guide their business models, activities, and decisions.

The SEC's failure to provide real guidance regarding digital assets is especially unjustifiable here because the agency has had more than a decade to do so. Bitcoin, the first blockchain and cryptocurrency, was launched in 2009. The SEC has been keenly aware of the crypto industry since 2013 at the latest, when the agency brought its first crypto-related enforcement action. *See SEC v. Shavers*, No. 4:13-cv-416 (E.D. Tex. July 23, 2013). Yet in the years since, the agency has refused to provide clear rules of the road through notice-and-comment rulemaking, despite appeals from Coinbase and others.

The handful of SEC settlement orders and enforcement actions in the industry fall far short of providing even informal "guidance," and all the while the SEC has continued to send conflicting and confusing signals. The SEC's first attempt at "guidance" for the industry—called the DAO Report—came in 2017, and it amounted to no guidance at all. The DAO Report merely analyzed "the particular facts and circumstances of the offer and sale" of one type of digital asset, and con-

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - 19

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C.  20036
Tel.:  202-955-8500

cluded that issuers of others would have to evaluate their own "particular facts and circumstances."[25]   One year later, William Hinman, a senior SEC official, declared in a speech that a "token . . . all by itself is not a security, just as the orange groves in *Howey* were not."[26]   Hinman further stated that ether—the native token of the Ethereum blockchain—also is not a security, and that a digital-asset security loses that status once "the network on which the token or coin is to function is sufficiently decentralized."[27]   In 2019, a division of the SEC published a "Framework" that included Hinman's concept of decentralization as one of *more than 60* factors that the industry should assess to determine whether a digital asset is (in the SEC's view) an "investment contract" under *Howey*.[28]   The Framework further stated that it "d[id] not replace or supersede" the 2018 Hinman speech, encouraging continued reliance on it.[29]   More recently, during Coinbase's public-listing process, the SEC Staff informed Coinbase that "there is currently no certainty" about whether *any* digital assets are securities—except for bitcoin and ether, which senior officials at the SEC had publicly stated are *not* securities.[30]   The agency's "considerable difficulty" in interpreting a statute that it administers over a course of years, and the "considerable uncertainty" that has resulted, "heighten[s]" the fair-notice problem here.   *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1332 (D.C. Cir. 1995); *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1044 (D.C. Cir. 2017).

The SEC's more recent actions have exacerbated the problem.   The agency has issued no further guidance on which cryptocurrency transactions are subject to the securities laws.   Yet the

[25] SEC, *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* (July 25, 2017), https://bit.ly/3IpiWDt.

[26] Hinman, *supra* note 19.

[27] *Id.*

[28] *Framework for "Investment Contract" Analysis of Digital Assets*, SEC (Apr. 3, 2019), https://bit.ly/2HXfEdZ.

[29] *Id.* at n.1.

[30] SEC, Correspondence Related to Draft Registration Statement (Dec. 7, 2020), *supra* note 11, at 4.

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - 20

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C.  20036
Tel.:  202-955-8500

SEC now appears internally to have embraced a new, dramatically broader view of its jurisdiction over crypto and is making that view public in piecemeal fashion, by filing new enforcement actions and giving media interviews.  Until recently, the SEC's public position (to the extent it was discernible at all) appeared to be that bitcoin and ether are not securities, that a digital asset "by itself is not a security," and that there is "no certainty" beyond that.[31]  Today, by contrast, the SEC Chair has suggested that "[e]verything other than bitcoin," including ether, *is clearly* a security.[32]

The agency's new position is not remotely discernible from the settled meaning of "investment contract," as explained above.  Worse, the SEC has sought to effectuate this apparent change in policy by seeking retroactive penalties against industry participants who did not predict that the agency would abandon its earlier statements.  And in this case, the agency is attempting to obtain judicial approval that its new "rule" applies *to Coinbase*—a nonparty in this action and the object of the fraudulent conduct at issue.  Basic notions of fairness dictate that Coinbase should not be forced to defend its business practices in a shadow enforcement action against third parties with no long-term stake in the industry.  The unfairness of the agency's approach is particularly acute given Coinbase's repeated attempts to obtain clarity from the SEC on these issues—clarity the SEC has declined to provide and that cannot be gleaned from the agency's narrow, context-specific settlement orders.

In sum, the SEC's "conspicuous" inability to provide regulatory clarity for such a "lengthy period," combined with its inducement of investment-backed expectations that many cryptocurrencies would *not* be regulated, make the "unfair surprise" (and due-process violation) in enforcement actions such as this one particularly "acute."  *Christopher*, 567 U.S. at 158.  Coinbase and many other companies and individuals have accrued significant reliance interests by operating in

---

[31] Hinman, *supra* note 19; SEC, Correspondence Related to Draft Registration Statement (Dec. 7, 2020), *supra* note 11, at 4.

[32] *See, e.g.*, Ankush Khardori, *Can Gary Gensler Survive Crypto Winter? D.C.'s Top Financial Cop on Bankman-Fried Blowback*, The Intelligencer (Feb. 23, 2023), https://nym.ag/3ZjbUXI; Gary Gensler, SEC Chair, *Kennedy and Crypto* (Sept. 8, 2022), https://bit.ly/3XWAkoQ ("vast majority" of cryptocurrencies "are securities").

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - 21

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C.  20036
Tel.:  202-955-8500

the cryptocurrency space for years, without clear regulations to follow or fair notice that their basic business models or core activities could violate the securities laws. Indeed, the SEC indicated the opposite when it accepted Coinbase's registration statement in 2021, after reviewing Coinbase's business model and its safeguards for ensuring that Coinbase does not list securities on its platform. If the SEC now maintains, incorrectly, that substantial numbers of digital assets are securities, then due process and basic notions of fairness require the agency to engage in notice-and-comment rulemaking to clarify the precise scope of its claimed authority, and then to apply that position prospectively only. Until the SEC provides the regulatory clarity required by the Constitution, its ad hoc enforcement actions will continue to violate due-process and fair-notice principles.

### B. The SEC's Regulation-By-Enforcement Approach Is Inconsistent with Core Values Embodied in the APA

There is a better way—one that basic rules of administrative law require. Notice-and-comment rulemaking, in contrast to "adjudicative procedures," "give[s] notice of proposed changes before they occur." *Pfaff*, 88 F.3d at 748 n.4. It is by far the "better, fairer, and more effective method of implementing" a "new industry-wide policy" for crypto. *Cmty. Television of S. Cal. v. Gottfried*, 459 U.S. 498, 511 (1983) (quotation marks omitted). Unlike an ad hoc enforcement approach, rulemaking would allow for input from a wide range of stakeholders, advance the goals of transparent and orderly policy development, result in clear rules and fair notice to all market participants, and facilitate global resolution through consolidated judicial review. *See Pfaff*, 88 F.3d at 748 n.4 (recognizing that "the notice and comment rulemaking procedure" provides the public with "notice of proposed changes before they occur" in contrast to "adjudicative procedures," which provide a "lack of notice . . . to those subject to the agency's authority"). Rulemaking also is necessary for the SEC to fulfill its APA obligations.

To be sure, agencies generally have discretion to choose between rulemaking and adjudication as a means of effectuating policy choices. But the Supreme Court and the Ninth Circuit have each recognized that there are "situations where [an agency's] reliance on adjudication would amount to an abuse of discretion." *NLRB v. Bell Aerospace Co. Div. of Textron*, 416 U.S. 267,

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - 22

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C. 20036
Tel.: 202-955-8500

294 (1974); *Patel v. INS*, 638 F.2d 1199, 1204 (9th Cir. 1980).  In particular, when an agency interpreting a statute seeks to take a "great lea[p] forward" and "prospectively pronounce[s] a broad, generally applicable requirement"—and when none of the traditional justifications for adjudication apply—it is "an abuse of discretion" for the agency to "circumvent the rulemaking procedures of the APA." *Patel*, 638 F.2d at 1204; *Ford Motor Co. v. FTC*, 673 F.2d 1008, 1009 (9th Cir. 1981).  That is particularly so when the "new standard, adopted by adjudication, departs radically from the agency's previous interpretation of the law, where the public has relied substantially and in good faith on the previous interpretation, where fines or damages are involved, and where the new standard is very broad and general in scope and prospective in application." *Pfaff*, 88 F.3d at 748.  This is precisely the situation here.

None of the "specified limited circumstances in which adjudication would be preferable to rulemaking" is present here.  *Patel*, 638 F.2d at 1204 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 202–03 (1947)).[33]  The SEC surely could "reasonably foresee" and has "sufficient experience with" the issues inherent in applying the securities laws and regulations to crypto transactions, developers, and platforms.  *Chenery*, 332 U.S. at 202–03.  The crypto industry has been around for nearly 15 years, the SEC has issued informal "guidance" and brought enforcement actions since at least 2013, and Coinbase and others have *asked* the SEC to engage in rulemaking on these issues.  Nor are these issues "so specialized and varying in nature as to be impossible to capture within the boundaries of a general rule."  *Id.*  Although issues surrounding regulation of the crypto industry are complex and multi-faceted, the SEC's recently proposed amendments to its "custody rule"

---

[33] Although in this case the Commission chose to make new law in district court rather than in an administrative proceeding, that approach still leaves regulated entities without clear, prospective guidance of the agency's position—a stance that departs markedly from the view it had previously communicated.  Courts should greet with skepticism an agency's effort to use litigation as an avenue to sidestep administrative-law requirements.

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - 23

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C.  20036
Tel.:  202-955-8500

demonstrate that the agency is capable of engaging in rulemaking on complex issues relating to digital assets.[34]

Even more fundamentally, an agency must consider all important aspects of the problem before asserting jurisdiction over an entire industry. *See State Farm*, 463 U.S. at 43. The SEC's decision to regulate by enforcement rather than engage in formal rulemaking makes it exceedingly and perhaps prohibitively difficult for the agency to consider the whole picture of regulation in a coherent way. By focusing on narrow and potentially unrepresentative components of the industry—for example, a small sampling of digital assets in cases in which many key industry participants and stakeholders are not represented—and by suing individuals who are no longer in the industry at all, the SEC cannot possibly consider all the important problems inherent in regulating the crypto industry under the securities laws. *Cf.* Blockchain Association Amicus Br. 7–8.

## C.     The SEC's Suggestions that Crypto Firms Can Comply with Existing Requirements Are Chimerical

Emblematic of the arbitrariness of the SEC's approach is its mantra that crypto developers and platforms need only "come in and register" in order to avoid enforcement actions.[35] It is simply not possible for crypto developers and platforms to register under current regulations and processes. Cryptocurrency developers cannot use current SEC registration, disclosure, and listing requirements. Many of the largest cryptocurrencies (such as Ethereum) are decentralized in a way that means there is no one who could be responsible for registering and complying with the applicable regulations. But even for the few centralized protocol developers, current SEC disclosure

---

[34] SEC, Proposed Rule, Safeguarding Advisory Client Assets, 88 Fed. Reg. 14,672 (Mar. 9, 2023).

[35] *See, e.g.*, *First on CNBC: CNBC Transcript: SEC Chair Gary Gensler Speaks with CNBC's "Squawk Box" Today*, CNBC (Feb. 10, 2023), https://cnb.cx/3IFO7L4; Sander Lutz, *SEC Chair Gensler Threatens Action Against Unregistered Crypto Exchanges*, Decrypt (May 18, 2022), https://bit.ly/3kBpd7g.

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - 24

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C.  20036
Tel.:  202-955-8500

requirements do not work for digital assets.[36]  As one of the SEC's own Commissioners has explained, the SEC's "traditional disclosures are designed for traditional corporate entities that typically issue and register equity and debt securities."[37]  The focus of existing requirements "on disclosure about companies, their management, and their financial results" "poorly fit the decentralized and open-source nature of blockchain-based digital asset securities" because they do "not cover a number of features unique to digital assets that would undoubtedly be considered important when making an investment decision."[38]  To take just one critically important distinction in the crypto industry, in many cases cryptocurrency purchasers are likely to care much more about the technical details of the underlying protocol (for example, how it is audited and how transactions are validated) than about traditional financial reporting.  That would mean that in many instances, disclosure under the current regime is likely to *mislead* cryptocurrency users, who might believe that certain irrelevant information is material to their investment decisions because the SEC mandated its disclosure.

The SEC has provided *zero* guidance on any of these issues.  Absent an actual, usable path to register, crypto developers are stuck.  The net effect is that even actual digital-asset securities could not possibly be registered under the current framework, and for assets like those in this case (which are not securities) the hurdles are even higher.  And so, even if a platform like Coinbase *could* register as a securities exchange (or alternative trading system), there would be no securities for it to list.

But in fact, it is also infeasible for crypto platforms to register as exchanges.[39]  For one, crypto platforms, including Coinbase, internalize trading and settlement of digital assets within a

---

[36] Coinbase Rulemaking Petition, *supra* note 14, at 12–17.

[37] Hester Peirce, Comm'r, SEC, *Outdated: Remarks Before the Digital Assets at Duke Conference* (Jan. 20, 2023), https://bit.ly/3YWPSKO (quotation marks omitted).

[38] *Id.*

[39] Coinbase Rulemaking Petition, *supra* note 14, at 17–20.

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - 25

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C.  20036
Tel.:  202-955-8500

single entity, thereby eliminating the need for settlement of each transaction on the blockchain. This is one of the critical, risk- and cost-reducing benefits to customers that digital assets and the blockchain provide.  But existing SEC requirements allow only broker-dealers to be members of registered securities exchanges.  *See* 15 U.S.C. § 78f(c)(1).  Requiring Coinbase to incorporate clearing, settlement, and custody services through broker-dealer intermediaries would add risk for customers, dramatically increase settlement times, and add costs by requiring settlement on the blockchain.  In addition, unlike traditional securities exchanges, which facilitate trading only in securities, platforms like Coinbase facilitate trading in assets that are indisputably *not* securities (bitcoin, for example), as SEC officials have acknowledged.[40]  Before a platform like Coinbase could register as a national securities exchange, then, the SEC would need to modify its regulations to allow registered exchanges to facilitate trading in both security and non-security digital assets. In addition, national securities exchanges facilitate only trading that opens and closes during business hours on weekdays, whereas crypto platforms facilitate trading twenty-four hours a day, seven days a week.  SEC regulations as they exist today do not accommodate an around-the-clock market, potentially taking yet another benefit from customers in order to force the industry into a framework that does not fit.

Recent suggestions that the SEC may need to resort to its authority to exempt actors in the cryptocurrency industry from certain requirements of the securities laws demonstrate the agency's recognition that existing registration and disclosure requirements are not suitable for the crypto industry—while also confirming that, under the statute, most digital assets are not "securities" in the first place.[41]  Coinbase does not currently facilitate trading in digital assets that *are* securities, but, as detailed at length in its petition for rulemaking last summer and subsequent comments, would eagerly consider doing so through its SEC-registered securities broker-dealer subsidiaries

---

[40] *See, e.g.*, Hinman, *supra* note 19; Khardori, *supra* note 32.

[41] *See, e.g.*, Chelsey Cox, *Cryptocurrency Firms Need to 'Come into Compliance' with Existing Rules, SEC Chair Gary Gensler Says*, CNBC (Dec. 7, 2022), https://cnb.cx/3yspgFQ.

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - 26

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C.  20036
Tel.:  202-955-8500

once rules are in place that can accommodate the technological manner in which digital-asset se-curities would be offered, sold, custodied, and cleared.  But in the absence of a rulemaking from the SEC adapting the current registration and disclosure regime to the cryptocurrency context, the SEC Chair's call for members of the industry to simply "come in and register" is an empty invita-tion—and an arbitrary and capricious basis on which to premise enforcement actions.

## CONCLUSION

Coinbase seeks more engagement by the Securities and Exchange Commission with the cryptocurrency industry, not less.  But that engagement must take the right form:  Rulemaking, with clear and fair notice of the law's prospective application.  This case, by contrast, pursues a mistaken view of the law through a manifestly improper vehicle.  It should be dismissed, so the Commission may promptly turn its attention to engaging with the public to craft a sound and sus-tainable crypto regulatory framework.

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - 27

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C.  20036
Tel.:  202-955-8500

Dated: April 3, 2023

Respectfully submitted,

By: /s/ Steven W. Fogg
Steven W. Fogg, WSBA No. 23528
Corr Cronin LLP
1015 Second Avenue, Floor 10
Seattle, WA 98104
Phone:  (206) 625-8600
Fax:  (206) 625-0900
sfogg@corrcronin.com

Eugene Scalia (*pro hac vice*)
escalia@gibsondunn.com
Jonathan C. Bond (*pro hac vice*)
jbond@gibsondunn.com
Nick Harper (*pro hac vice*)
nharper@gibsondunn.com
Robert A. Batista (*pro hac vice*)
rbatista@gibsondunn.com
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
Phone: (202) 955-8500

Reed Brodsky (*pro hac vice*)
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY  10166
Phone: (212) 351-4000
rbrodsky@gibsondunn.com

Monica Loseman (*pro hac vice*)
Gibson, Dunn & Crutcher LLP
1801 California St., Unit 4200
Denver, CO  80202
Phone: (303) 298-5700
mloseman@gibsondunn.com

Attorneys for Amicus Curiae Coinbase, Inc.

BRIEF OF AMICUS CURIAE COINBASE, INC.
CASE NO. 2:22-cv-01009-TL - 28

Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C.  20036
Tel.:  202-955-8500