1
2
3
4

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**SEATTLE DIVISION**

5

SECURITIES AND EXCHANGE
COMMISSION,

6
7

Plaintiff,

8

v.

9

ISHAN WAHI, NIKHIL WAHI, AND
SAMEER RAMANI,

10
11

Defendants.

12
13
14

Civil Action No. 22-CV-01009

**PLAINTIFF'S MOTION FOR A**
**DEFAULT JUDGMENT**
**AGAINST DEFENDANT**
**SAMEER RAMANI AND**
**MEMORANDUM IN SUPPORT**

**NOTE ON MOTION**
**CALENDAR: JANUARY 18, 2024**

15
16
17
18
19
20
21
22
23
24
25
26
27
28

- 1 -

## <u>TABLE OF CONTENTS</u>

BACKGROUND ......................................................................................................- 1 -

FACTS ALLEGED IN THE AMENDED COMPLAINT ........................................- 2 -

ARGUMENT ...........................................................................................................- 5 -

    I.     The Court Has Discretion to Enter Default Judgment.................................- 5 -

        A.     *The Possibility of Prejudice to the SEC* ...................................- 5 -

        B.     *The Merits and Sufficiency of the SEC's Claims* ....................- 5 -

            1.     Ramani Traded on Material Nonpublic Information That He Knew Was Provided to Him in Breach of a Duty ...........................- 6 -

            2.     Ramani's Misconduct Was in Connection with the Purchase or Sale of a Security.................- 8 -

                *Investment of Money* ..........................................- 10 -

                *Common Enterprise* .........................................- 10 -

                *Reasonable Expectation of Profits*....................- 13 -

                *Based on the Efforts of Others* ..........................- 14 -

        C.     *The Sum of Money at Stake in the Action* ..............................- 17 -

        D.     *The Possibility of a Dispute Concerning Material Facts*.........................................................................- 17 -

        E.     *Whether the Default Was Due to Excusable Neglect*............- 17 -

        F.     *The Policy Supporting Resolution on the Merits* ..................- 17 -

    II.    Ramani Should Be Enjoined from Future Violations of Section 10(b) ...........................................................................- 18 -

    III.    Ramani Should Be Ordered To Disgorge $817,602 and Pay Prejudgment Interest of $79,750 ........................................- 18 -

    IV.    Ramani Should Be Ordered To Pay a Civil Penalty of $1,635,204 .............................................................................20

CONCLUSION......................................................................................................- 21 -

1

2

# <u>TABLE OF AUTHORITIES</u>

3

<u>CASES</u>

4

5

*Balestra v. ATBCOIN LLC,*
    380 F. Supp. 3d 340 (S.D.N.Y. 2019) ............................................................. 11-12

6

7

*Barba v. Brimfield,*
    2023 WL 2667494 (D. Or. March 1, 2023) .............................................................2

8

*Beranger v. Harris,*
    2019 WL 5485128 (N.D. Ga. April 24, 2019) .........................................................15

9

10

*Eitel v. McCool,*
    782 F.2d 1470 (9th Cir. 1986) ....................................................................5, 17

11

12

*FIGS, Inc. v. My Open Heart LLC,*
    2023 WL 3402626 (C.D. Cal. March 7, 2023) ........................................................17

13

*Friel v. Dapper Labs, Inc.,*
    2023 WL 21627457 (S.D.N.Y. Feb. 22, 2023).........................................................12

14

15

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    756 F.2d 230 (2d Cir. 1985).........................................................................14

16

17

*Hocking v. Dubois,*
    839 F.2d 560 (9th Cir. 1988) ................................................................ 10-11, 16

18

*Hocking v. Dubois,*
    885 F.2d 1449 (9th Cir. 1989) ............................................................... *passim*

19

20

*Hunichen v. Atonomi LLC,*
    2019 WL 7758597 (W.D. Wash. Oct. 28, 2019) ...................................................11, 14

21

22

*Liu v. SEC,*
    140 S. Ct. 1936 (2020)........................................................................... 18-19

23

*Padded Spaces LLC v. Weiss,*
    2022 WL 2905887 (W.D. Wash. July 22, 2022) ........................................................2

24

25

*Patterson v. Jump Trading,*
    2024 WL 49055 (N.D. Cal. Jan. 4, 2024) ........................................... 10-11, 14, 16

26

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.,*
    442 F.3d 741 (9th Cir. 2006) ........................................................................7

*Salman v. U.S.,*
    580 U.S. 39 (2016)................................................................................6, 7

*SEC v. Terraform Labs Pte. Ltd.*,
  2023 WL 8944860 (S.D.N.Y. Dec. 28, 2023) .................................................................12, 16

*SEC v. Bevil*,
  2020 WL 7048263 (D. Nev. Nov. 30, 2020) ...........................................................................5

*SEC v. Blockvest*,
  2020 WL 7488067 (S.D. Cal. Dec. 15, 2020).......................................................................18

*SEC v. Boucher*,
  2021 WL 321994 (S.D. Cal. Feb. 1, 2021) .............................................................................5

*SEC v. Brenda Christine Barry/Bak West, Inc.*,
  2023 WL 4491724 (C.D. Cal. July 12, 2023) .......................................................................19

*SEC v. C.M. Joiner Leasing Corp.*,
  320 U.S. 344 (1943)................................................................................................................9

*SEC v. C3 Int'l, Inc.*,
  2022 WL 16814859 (C.D. Cal. Nov. 7, 2022)........................................................................5

*SEC v. Clark*,
  60 F. 4th 807 (4th Cir. 2023) .................................................................................................6

*SEC v. Edwards*,
  540 U.S. 389 (2004)................................................................................................................9

*SEC v. Goldfield Deep Mines Co. of Nevada*,
  758 F.2d 459 (9th Cir. 1985) ...............................................................................................13

*SEC v. Hui Feng*,
  935 F.3d 721 (9th Cir. 2019) ...............................................................................................16

*SEC v. Johnson*,
  2023 WL 2628680 (C.D. Cal. March 2, 2023) ...............................................................5, 20

*SEC v. Kik Interactive, Inc.*,
  492 F. Supp. 3d 169 (S.D.N.Y. 2020) ..................................................................................12

*SEC v. LBRY, Inc.*,
  639 F. Supp. 3d 211 (D.N.H. 2022)...............................................................................13-15

*SEC v. Mazzo*,
  2013 WL 12172628 (C.D. Cal. Oct. 24, 2013)......................................................................6

*SEC v. Murphy*,
  626 F.2d 633 (9th Cir. 1980) ...............................................................................................18

*SEC v. NAC Foundation, LLC*,
   512 F. Supp. 3d 988 (N.D. Cal. 2021) ...................................................................13, 14, 15

*SEC v. Next Components, Ltd.*,
   2013 WL 12313350 (C.D. Cal. March 28, 2013) .....................................................17

*SEC v. Obus*,
   693 F.3d 276 (2d Cir. 2012)....................................................................................6, 8

*SEC v. Panuwat*,
   2022 WL 633306 (N.D. Cal. Jan. 14, 2022) .............................................................8

*SEC v. Payton*,
   155 F. Supp.3d 428 (S.D.N.Y. 2015) .......................................................................6

*SEC v. Pedras*,
   2014 WL 12597332 (C.D. Cal. April 16, 2014) .......................................................18

*SEC v. Pithapurwala*,
   2022 WL 2200400 (C.D. Cal. June 13, 2022) ...................................................18, 20

*SEC v. Platforms Wireless Int'l Corp.*,
   617 F.3d 1072 (9th Cir. 2010) ........................................................................... 19-20

*SEC v. R.G. Reynolds Enterprises, Inc.*,
   952 F.2d 1125 (9th Cir. 1991) ........................................................................... 10-11

*SEC v. Rajaratnam*,
   918 F.3d 36 (2d Cir. 2019)........................................................................................20

*SEC v. Rosenthal*,
   426 F. App'x 1(2d Cir. 2011) ...................................................................................21

*SEC v. Rosenthal*,
   650 F.3d 156 (2d Cir. 2011).......................................................................................20

*SEC v. Rubera*,
   350 F.3d 1084 (9th Cir. 2003) .............................................................................9, 14

*SEC v. Sabrdaran*,
   252 F. Supp. 3d 866 (N.D. Cal. 2017) ..................................................................7, 20

*SEC v. Sabrdaran*,
   2015 WL 901352 (N.D. Cal. March 2, 2015).............................................................6

*SEC v. Sandifur*,
   2006 WL 1719920 (W.D. Wash. June 19, 2006).......................................................5

iii

*SEC v. Skinner*,
   2022 WL 2784811 (C.D. Cal. June 17, 2022) ..................................................................7

*SEC v. Skinner*,
   2022 WL 2784811 (C.D. Cal. June 17, 2022) ................................................................11

*SEC v. Spartan Sec. Gr., Ltd.*,
   2022 WL 3224008 (M.D. Fla. Aug. 10, 2022) ...............................................................19

*SEC v. S-Ray Inc.*,
   2023 WL 121425 (W.D. Wash. Jan. 6, 2023) ..................................................................5

*SEC v. Telegram Group, Inc.*,
   448 F. Supp. 3d 352 (S.D.N.Y. 2020) ....................................................................*passim*

*SEC v. Terraform Labs Pte. Ltd.*,
   2023 WL 8944860 (S.D.N.Y. Dec. 28, 2023) ...............................................................13

*SEC v. Valentine*,
   2021 WL 148361 (N.D. Cal. Jan. 15, 2021) ....................................................................5

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946) ........................................................................................................9

*SEC v. Waldman*,
   407 F. Supp. 3d 299 (S.D.N.Y. 2019) ............................................................................8

*SEC v. Williky*,
   942 F. 3d 389 (7th Cir. 2019) .......................................................................................21

*SEC v. Zandford*,
   535 U.S. 813 (2002) ........................................................................................................8

*Stoyas v. Toshiba Corp.*,
   896 F.3d 933 (9th Cir. 2013) ..........................................................................................9

*U.S. v. Chow*,
   993 F.3d 125 (2d Cir. 2021) ...........................................................................................7

*U.S. v. Smith*,
   155 F.3d 1051 (9th Cir. 1998) .....................................................................................6, 8

*United States v. O'Hagan*,
   521 U.S. 642 (1997) ........................................................................................................8

*United States v. Salman*,
   792 F.3d 1087 (9th Cir. 2015) ........................................................................................6

*United States v. Zaslavskiy,*
    2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) ................................................................10, 14

*Warfield v. Alaniz,*
    569 F.3d 1015 (9th Cir. 2009) ....................................................................................9, 13, 16

*Waters v. Mitchell,*
    2023 WL 3304217 (W.D. Wash. May 8, 2023).......................................................................17

<u>STATUTES</u>

15 U.S.C. § 77b(a)(1).................................................................................................................9

15 U.S.C. § 78c(10) ...................................................................................................................9

15 U.S.C. § 78j(b) .....................................................................................................................8

15 U.S.C. § 78u(d) ...................................................................................................................18

15 U.S.C. § 78u-1 ....................................................................................................................17

15 U.S.C. § 78u-1(a)(2) ...........................................................................................................20

Plaintiff Securities and Exchange Commission ("SEC") respectfully moves the Court to enter final judgment against Defendant Sameer Ramani ("Ramani") pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure and Local Civil Rule 55(b).  On October 26, 2023, the Clerk certified a default against Ramani pursuant to Fed. R. Civ. P. 55(b)(1) and Local Civil Rule 55(a).  (ECF No. 114).  For the reasons set forth in the SEC's memorandum below and the declaration of SEC attorney Michael Brennan, submitted herewith, the SEC requests that the Court enter final judgment, order a permanent injunction and disgorgement of Ramani's illicit proceeds, and order a civil penalty against Ramani.

## BACKGROUND

The SEC filed its initial Complaint on July 21, 2022, and filed an Amended Complaint ("AC," ECF No. 27) on December 22, 2022.  As set forth therein, Defendant Ishan Wahi ("Ishan"), a manager in Coinbase's Asset Listings Group, repeatedly tipped material, nonpublic information about the timing and content of Coinbase's "listing announcements" – in which Coinbase announced that certain crypto asset securities, sometimes referred to as tokens, would be "listed" on its trading platform and available for trading – to his brother Defendant Nikhil Wahi ("Nikhil") and his close friend Ramani.  These listing announcements typically caused the price of the subject token to increase significantly.  Armed with this information, Nikhil and Ramani purchased, or directed the purchase of, the tokens ahead of their respective listing announcements, and then sold them shortly after for substantial profits.  Nikhil and Ishan pled guilty in a parallel criminal proceeding to violating 18 U.S.C. § 1349, *United States v. Ishan Wahi*, No. 1:22-cr-392 (S.D.N.Y.), on January 10 and February 7, 2023, respectively, and settled the SEC's claims, with the Court entering final judgment on June 1, 2023.  (ECF Nos. 109 and 110).

On December 23, 2022, the SEC filed a motion for alternative service on Ramani.  (ECF No. 28).  In that Motion, the SEC explained that Ramani had not entered an appearance and, while he had retained counsel in the parallel criminal proceeding, he had not disclosed his location and appeared to be avoiding service in a foreign country.  The Court granted the SEC's Motion for Alternative Service on May 23, 2023, and directed the SEC to serve Ramani and his criminal counsel by email and Ramani by WhatsApp.  (ECF No. 106 at 7).  The SEC complied, effecting service through email and WhatsApp on both Ramani and his criminal counsel.  Although it appeared that Ramani's WhatsApp was no longer active, ECF No. 112, the SEC received no

indication that its email service did not reach Ramani or his attorney in the parallel criminal proceeding.[1]  (ECF No. 112).

Despite being served pursuant to the Court's Order, Ramani has not entered an appearance in this matter or responded to the AC.  Accordingly, on October 19, 2023, the SEC sought a Clerk's default (ECF No. 113), which the Clerk entered on October 26, 2023.  (ECF No. 114).  The Court subsequently instructed the SEC to file its motion for default judgment within 90 days.  (ECF No. 115). The SEC now moves for a final default judgment against Ramani.

## FACTS ALLEGED IN THE AMENDED COMPLAINT

As a manager in Coinbase's Assets and Investing Products group, Ishan was entrusted with first-hand knowledge of which tokens Coinbase planned to list on its platform, and when those listings would occur.  (AC ¶¶ 4, 30).  Ishan expressly acknowledged his duty to keep listings information confidential by signing an acknowledgement that he had read and understood Coinbase's policies on the proper treatment of material nonpublic information.  (*Id*. ¶¶ 4, 28-29).  Ishan knew access to listing information was restricted even within Coinbase.  (*Id*. ¶ 31-32).  Nevertheless, ahead of dozens of listing announcements in 2021 and 2022, Ishan repeatedly tipped Nikhil and Ramani with material nonpublic information about those listings' timing and content.  (*Id*. ¶¶ 6, 37-96).

Ramani used Ishan's illegal tips to earn substantial trading profits.  For example, on August 19, 2021, Ishan learned that Coinbase intended to list the DDX token on August 24, 2021.  (*Id*. ¶ 53).  Coinbase rescheduled the DDX announcement for August 31, 2021.  (*Id*. ¶ 54).  On August 25 and 31, 2021, blockchain addresses associated with Ramani purchased over 7,000 DDX tokens.  (*Id*. ¶¶ 55-56).  Two hours after the last of these purchases, Coinbase announced that DDX would be made available for trading on its platform, leading DDX's market price to spike nearly 150% in a little more than an hour.  (*Id*. ¶ 57).  Later, on August 31, 2021, blockchain addresses Ramani controlled sold their DDX holdings for profits of approximately $37,000.  (*Id*. ¶ 58).

Ramani repeatedly engaged in similar misconduct with respect to a number of other tokens.  (*Id*. ¶¶ 42-47, 60-78, 88-93).   As a result, he realized $817,602 in illicit profits from trading in the

---

[1] The SEC's completion of the Court-approved alternative service satisfies the Court's obligation to "assess the adequacy of the service of process on the party against whom default is requested."  *Barba v. Brimfield*, No. 3:22-cv-01251, 2023 WL 2667494, at *2 (D. Or. March 1, 2023); *Padded Spaces LLC v. Weiss*, No. C21-0751, 2022 WL 2905887, at *2 (W.D. Wash. July 22, 2022). (entering default judgment where plaintiff "effected service using the alternative methods" approved by court).

tokens described in the AC.  (*Id*. ¶¶ 46, 58, 66, 73, 78, 91; January 17, 2024 Declaration of SEC Attorney Michael Brennan ("Brennan Decl."), submitted herewith, at ¶¶ 12-13).

Ramani also took steps to conceal his and Nikhil's illegal trading by using multiple accounts, crypto asset wallets, and addresses across different trading platforms to trade and transfer assets.  (AC ¶¶ 41, 93).  For example, in February 2022, Ramani and Nikhil arranged to transfer funds between anonymous wallets they controlled in an apparent attempt to conceal the origins of their illicit trading proceeds.  (*Id*. ¶¶ 95).

Ishan and Ramani are friends.  When Ishan sent a panicked message to Ramani alerting him that Coinbase's legal personnel had sought an interview with Ishan in connection with Coinbase's asset listing process, Ramani did not react with surprise or confusion.  (*Id*. ¶ 97).  Instead, he simply said: "Bro I'm on standby.  Let me know if you need anything." (*Id*.).  Ishan also repeatedly communicated with Ramani on May 16, 2022, the day Ishan attempted to flee the country.  (*Id*. ¶ 98).  Indeed, Ramani has known Ishan since at least 2013; they attended the University of Texas together.  (*Id*. ¶ 35).  They followed each other on social media and communicated by phone, text, and WhatsApp in 2021 and 2022.  (*Id*. ¶ 35-36).[2]

The tokens in which Ramani traded were investment contracts and, therefore, securities, because each involved the investment of money, in a common enterprise, with a reasonable expectation of profit derived from the efforts of others.

First, investors paid money or other consideration for the tokens, which were then issued and distributed to the investors' blockchain addresses.   (AC at, *e.g.*, ¶¶ 101, 109, 111, 124-125, 135-137, 149-150, 159-162, 174, 182-183, 195-197, 210-211).

Second, the fortunes of investors and those offering the nine tokens were also linked – a fact that management often touted – demonstrating a common enterprise. The management teams of each issuer retained a substantial number of tokens, specifically to incentivize them and align their interests with investors.  (*Id.* at, *e.g.*, ¶¶ 110, 116, 125, 126, 135, 150, 154, 159, 175, 195, 211, 212). For example, Flexa's management retained 20% of available Flexacoin/AMP tokens to "incentiviz[e] current and future Flexa team members." (*Id*. ¶¶ 115, 116).  And Rari stated that it retained RGT tokens "to incentivize future team members with token compensation but will also serve to sustain the operations of the Rari Capital organization . . ." (*Id.* ¶163).  Accordingly, as Rari stated on its homepage, "The more money you make, the more money we make." (*Id*. ¶ 164).

---

[2] While perpetrating this scheme, Defendants lived in the United States.  (*Id*. ¶¶ 14-17, 38, 79, 87).

Third, the issuers solicited investors by focusing on the tokens' potential investment profits. (*Id.* ¶ 102). The issuers and promoters of each of the nine tokens claimed in broadly available social media posts, blogs, articles, white papers, websites, and interviews: 1) that the tokens could appreciate dramatically in value; 2) that token holders could have other opportunities to earn fees and other benefits; and 3) that the issuers were taking steps to increase the tokens' value, including limiting the supply of tokens, facilitating trading on secondary market trading platforms, and retaining substantial numbers of tokens to incentivize their management. (*Id.* at, *e.g.*, ¶¶ 110, 111, 114-119, 125-127, 135, 139-141, 150-152, 154, 159, 162-167, 175-178, 184-186, 190, 195, 201-202, 211-214).[3]

The issuers explained that secondary market liquidity was both a means for investors to earn returns and a way for broader market participants to participate in the issuers' growth. (*Id.* at, *e.g.*, ¶¶ 103-105, 119, 127, 151-152, 178, 202). For example, Flexa said that Flexacoin, the precursor to AMP, could be traded on a secondary market trading platform, "making it easier for people all over the world to take part in Flexa's vision of mainstream cryptocurrency payments." (*Id.* at ¶ 119).

Issuers also stressed the importance of pairing supply restrictions with broader demand. For example, LCX limited the supply of LCX tokens to increase their price: "when the total supply of coins in circulation is intentionally decreased, the prices of tokens and coins are increased and further stabilized." (*Id.* ¶ 177). Rari said that its goal was to avoid RGT token "price dilution," and to "invest the protocol's holdings in an intelligent way that will be used to indirectly accrue value toward the RGT." (*Id.* ¶ 164).

Finally, each issuer repeatedly emphasized that identified teams of founders and employees were exclusively responsible for the development and operation of the ecosystem linked to each token, as well as the placement of their token on secondary market trading platforms. (*Id.* at, *e.g.,* ¶¶ 121, 128-130, 142-144, 153-154, 168-170, 175, 179, 188, 204-206, 215-216). As just one example, Rari's founders referred to themselves as the "lead developer" of the protocol, and in a December 2020 listing application for a secondary trading platform, stated that protocol changes could not be made without the founding team's consent and that the public viewed Rari as being run by a "single, unified team." (*Id.* ¶ 168). Indeed, the issuers stated that management would continue retain a substantial number of tokens, financially incentivizing management to undertake

---

[3] Multiple issuers posted their token's daily price on their websites. (*Id.* ¶¶ 177, 201, 214).

managerial and entrepreneurial efforts to increase the value of the tokens.  (*Id*. ¶¶ 110, 116, 125, 135, 150, 154, 159, 175, 195, 211, 212).

## ARGUMENT

### I.    The Court Has Discretion to Enter Default Judgment

"The district court's decision whether to enter a default judgment is a discretionary one." *SEC v. Johnson*, No. 2:20-cv-08985, 2023 WL 2628680, at *4 (C.D. Cal. March 2, 2023) (citation and quotation omitted).  To determine whether to grant a default judgment, courts consider the following factors:

> (1)The possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Id*. (quoting *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986)).  For the reasons set forth below, these factors strongly favor entry of a default judgment against Ramani and the imposition of injunctive relief and monetary remedies.

### A.    *The Possibility of Prejudice to the SEC*

Courts have repeatedly found that where, as here, a defendant has refused to take part in the litigation, the first *Eitel* factor "weighs in favor of granting default judgment because the Commission has no recourse otherwise."  *SEC v. Valentine*, No. 20-cv-04358, 2021 WL 148361, at *2 (N.D. Cal. Jan. 15, 2021); *see also, e.g.*, *SEC v. Bevil*, 2:19-cv-0590, 2020 WL 7048263, at *2 (D. Nev. Nov. 30, 2020); *SEC v. S-Ray Inc*., 2023 WL 121425, at *1 (W.D. Wash. Jan. 6, 2023). More generally, courts have recognized the strong public interest in the brisk resolution of SEC actions.  *See, e.g.*, *SEC v. Boucher*, No. 20-cv-1650, 2021 WL 321994, at *3 (S.D. Cal. Feb. 1, 2021); *SEC v. Sandifur*, No. C05-1631C, 2006 WL 1719920, at *3 (W.D. Wash. June 19, 2006). The first *Eitel* factor thus favors a default.

### B.    *The Merits and Sufficiency of the SEC's Claims*

The second and third *Eitel* factors, the merit and sufficiency of the SEC's claims, also support a default judgment.  "Courts often consider the second and third *Eitel* factors together." *SEC v. C3 Int'l, Inc*., No. 8:21-cv-01586, 2022 WL 16814859, at *4 (C.D. Cal. Nov. 7, 2022). These factors "assess the substantive merits of the movant's claims and the sufficiency of its pleadings, which require that a movant state a claim on which it may recover."  *Id*.  That

requirement is met here.  As explained below, the allegations in the Amended Complaint – which are taken as true for purposes of this Motion, *Johnson*, 2023 WL 2628680 at *4 – demonstrate Ramani's liability for securities fraud.

    1.  <u>Ramani Traded on Material Nonpublic Information That He Knew Was Provided to Him in Breach of a Duty</u>

"Section 10(b) of the Securities Exchange Act of 1934 and . . . Rule 10b-5 prohibit undisclosed trading on inside corporate information by individuals who are under a duty of trust and confidence that prohibits them from secretly using such information for their personal advantage." *Salman v. U.S.,* 580 U.S. 39, 41-42 (2016).  A misappropriator "also may not tip inside information to others for trading." *Id.* at 42.  When they do, the "tippee acquires the tipper's duty to disclose or abstain from trading if the tippee knows the information was disclosed in breach of the tipper's duty." *Id.*  A tipper breaches a duty when the information was disclosed "for a personal benefit" to the tipper. *Id.*  The tipper obtains a personal benefit when they give "inside information to a trading relative or friend." *Id.* at 49-50.

In sum, to establish Ramani's liability as one of Ishan's tippees, the SEC must show that, in connection with the purchase or sale of a security: 1) Ishan breached a duty of trust and confidence by disclosing inside information for a personal benefit; 2) Ramani knew or was reckless in not knowing that the information had been divulged in breach of a duty of trust and confidence for personal benefit; and 3) Ramani traded on the basis of the information, despite knowing or being reckless in not knowing that it was material and nonpublic. *Id.* at 41-42; *United States v. Salman*, 792 F.3d 1087 (9th Cir. 2015); *SEC v. Obus*, 693 F.3d 276, 284-89 (2d Cir. 2012); *SEC v. Payton*, 155 F. Supp.3d 428, 430-31 (S.D.N.Y. 2015); *SEC v. Sabrdaran*, No. 14-cv-04825, 2015 WL 901352, at *14 (N.D. Cal. March 2, 2015).

The circumstantial evidence – including Ishan, Nikhil's and Ramani's communications and Ramani's otherwise implausible trading – establishes that each of these elements have been met. *U.S. v. Smith*, 155 F.3d 1051, 1069 (9th Cir. 1998) (explaining that "any number of types of circumstantial evidence" can show that a tippee received and used material nonpublic information, including "unique trading patterns or unusually large trading quantities"); *SEC v. Mazzo,* No. 12-cv-1327, 2013 WL 12172628, at *5 (C.D. Cal. Oct. 24, 2013) (circumstantial evidence of relationship, communications, and trading changes supports tippee liability) (discussing *Obus*, 693 F.3d at 289); *SEC v. Clark*, 60 F. 4th 807,  812 (4th Cir. 2023) (in case against tippee, the SEC "may present

1    circumstantial evidence to meet its burden or proof, . . . [which] may also be more certain,

2    satisfying and persuasive than direct evidence.").[4]

3           First, Ishan had a duty of trust and confidence that he breached by disclosing inside

4    information to Ramani and Nikhil.  Ishan was a "covered person" under Coinbase's trading policies,

     which stated that a covered person "may disclose Material Nonpublic Information ONLY to

5    Personnel designated by your manager.  You should never disclose [MNPI] to any other person,

6    even co-workers, family or friends."  (AC at ¶¶ 27-28).  Ishan acknowledged that he had read and

7    understood these policies.  (*Id*. at ¶ 29).  Ishan was also explicitly reminded that the asset listings

8    information was "MNPI" and should be kept confidential.  (*Id*. at ¶¶ 31-32).  Yet, in violation of his

9    duty, he repeatedly provided that information to Ramani and Nikhil.  (*Id*. at ¶¶ 38-96).

10          Next, by tipping Ramani, Ishan received a personal benefit.  He and Ramani attended

11   college together and had been friends for years, so much so that in a moment of personal crisis –

     Coinbase appeared to have discovered his breaches of duty – Ishan promptly contacted Ramani.

12   (AC at ¶ 97).  In response, Ramani addressed Ishan as "Bro" and offered his support.  (*Id*.).  Ramani

13   and Ishan then communicated repeatedly as Ishan prepared to flee the country.  (*Id*. at ¶ 98).  More

14   generally, the sheer volume of Ishan's tips speaks to the depth of his relationship with Ramani;

15   Ishan, at great personal risk, spent months repeatedly feeding Ramani confidential information that

16   allowed Ramani to quickly amass over – at least – $817,602 in trading profits.  *See U.S. v. Chow*,

     993 F.3d 125, 141-42 (2d Cir. 2021) (explaining that the evidentiary bar for personal benefit "is not

17   a high one" and is satisfied where there is evidence that the "tipper intended to benefit the

18   recipient").  Indeed, Ramani's trading profits vastly exceeded those of Nikhil, Ishan's brother.  (AC

19   at ¶ 9, alleging Nikhil made $33,500 trading on the securities at issue); *see Salman*, 580 U.S. at 49-

20   50; *SEC v. Sabrdaran*, 252 F. Supp. 3d 866, 881 (N.D. Cal. 2017) ("The personal benefit

21   requirement is also satisfied when an insider makes a gift of confidential information to a trading . .

22   . friend").

23

24   ───────────────────

25   [4] To dispel any possible doubt, Ishan has stated in his consent to judgment that, as part of his guilty plea in the parallel
     criminal case *United States v. Ishan Wahi*, No. 1:22-cr-392 (S.D.N.Y.), he admitted he conspired with Nikhil and
26   Ramani to misappropriate Coinbase's confidential information for their personal use.  (ECF No. 108-1 in this matter).
     Further, he "provided that confidential business information to Nikhil Wahi and Sameer Ramani, knowing they would
     use the information to make trading decisions and purchase . . . crypto assets."  (*Id*.).  The SEC asks that the Court take
     judicial notice of Ishan's consent and guilty plea.  *See SEC v. Skinner*, 2022 WL 2784811, at *2 n.2 (C.D. Cal. June 17,
     2022) (granting similar SEC request and taking notice of guilty plea in granting SEC's motion for default judgment)
     (citing *Reyn's Pasta Bella, LLC v. Visa USA, Inc.,* 442 F.3d 741, 746 n.6 (9th Cir. 2006)).

Ramani knew or was reckless in not knowing both that Ishan violated his duty and that he obtained a personal benefit.  Ramani obviously knew he and Ishan were friends.  Ramani's behavior also reflected his awareness that Ishan's tips breached his duty to Coinbase.  Ramani sought to conceal his trading by utilizing multiple accounts, crypto wallets, addresses across multiple trading platforms, and transfers with Nikhil.  (AC at ¶¶ 41, 93, 95-96).  *See, e.g., SEC v. Waldman*, 407 F. Supp. 3d 299, 308 (S.D.N.Y. 2019) ("A defendant's resort to deceptive trading practices supports the inference that he was trading illegally on inside information.").  Further, Ramani did not react with surprise or confusion when Ishan forwarded him the request by Coinbase for an interview regarding the asset listings.  (*Id*. ¶ 97).  Ramani knew where Ishan worked and, as his trading profits make clear, understood the significance of the information that Ishan conveyed.  *Obus*, 693 F.3d at 288 (explaining that whether tippee knew or should have known the tipper breach his duty depends on the tippee's "own knowledge and sophistication and on whether the tipper's conduct raised red flags").  In short, the AC establishes that Ramani knew or was reckless in not knowing that, by trading on the material nonpublic information Ishan provided, he was engaging in insider trading.

Finally, there is no doubt that Ramani traded on the basis of the information he received from Ishan and that he knew, or was reckless in not knowing, that it was material and nonpublic.  As described in the AC, his purchases occurred shortly after Ishan learned that Coinbase would list the token, and then he typically sold or transferred the tokens immediately after the public announcement.  This pattern repeated across at least seven tokens.  This trading pattern, together with Ramani's relationship with Ishan and Nikhil (as well as Ishan's guilty plea), establishes that Ramani traded on the basis of the information Ishan provided, which Ramani knew, or was reckless in not knowing, was material and nonpublic.  *Smith*, 155 F.3d at 1069; *SEC v. Panuwat*, 2022 WL 633306, at *7 (N.D. Cal. Jan. 14, 2022) (denying motion to dismiss in part because allegations that defendant traded almost immediately after learning of an imminent announcement supports conclusion that trader "used" the material nonpublic information).

2.   Ramani's Misconduct Was in Connection with the Purchase or Sale of a Security

For conduct to violate Section 10(b), it must occur "in connection with the purchase or sale of a security." 15 U.S.C. § 78j(b); *United States v. O'Hagan*, 521 U.S. 642, 655-59 (1997) (misappropriation of inside information is fraud "in connection with" securities transactions); *SEC v. Zandford*, 535 U.S. 813, 819-820, 824 (2002) (affirming a "broad" and "flexible" interpretation of the "in connection with" requirement, such that securities transactions and breach of duty need

only "coincide").  Here, the allegations in the amended complaint establish that the tokens Ramani traded were offered and sold as investment contracts and thus as securities.

Congress "enacted a broad definition of security, sufficient to encompass virtually any instrument that might be sold as an investment." *SEC v. Edwards*, 540 U.S. 389, 393 (2004); *SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003) ("Congress did not intend the definition of 'security' . . . to be restrictive.").  The Ninth Circuit has embraced the Supreme Court's guidance that "in searching for the meaning and scope of the word 'security' in the Act[s], form should be disregarded for substance and the emphasis should be on economic reality." *Hocking v. Dubois* (*"Hocking II"*), 885 F.2d 1449, 1457 (9th Cir. 1989); *see also Stoyas v. Toshiba Corp.*, 896 F.3d 933, 939 (9th Cir. 2013) (Exchange Act's "expansive list" of possible securities, "along with [its] remedial purpose, precludes a narrow and literal reading of the definition of securities") (citations and quotation omitted).

One type of security specifically enumerated in both the Securities Act of 1933 and the Exchange Acts is an "investment contract." *Edwards,* 540 U.S. at 393 (citing the definitions of "security" in the Securities Act of 1933, 15 U.S.C. § 77b(a)(1), and Exchange Act, 15 U.S.C. § 78c(10)).  "The term 'investment contract' has been interpreted to reach '[n]ovel, uncommon, or irregular devices, whatever they appear to be.'" *Hocking II*, 885 F.2d at 1455 (quoting *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943)).  The meaning of investment contract thus "embodies a flexible rather than a static principle, one that is capable of adaption to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* (quoting *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946)).

In *Howey,* 328 U.S. at 298-99, the Supreme Court defined the term "investment contract" as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or third party."  The Ninth Circuit has adopted and "refined the three prongs of the *Howey* test." *Hocking II*, 885 F.2d at 1457.  These are: "(1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others."[5] *Rubera*, 350 F.3d at 1090; *see also Warfield v. Alaniz*, 569 F.3d 1015, 1020 n.6 (9th Cir. 2009) (explaining that the third prong "involves two distinct concepts" – an

---

[5] For "efforts of others," the Ninth Circuit has "dropped the term 'solely' and instead require[s] that the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Hocking II*, 885 F.2d at 1455; *see also Rubera*, 350 F.3d at 1092 ("We have rejected a strict interpretation of this [third] prong.").

"expectation of profits" obtained by "the efforts of others" – and noting that other circuits have accordingly described the *Howey* prongs as a "four-part test").

As offered and sold, each of the tokens Ramani traded in easily meets these requirements.

*Investment of Money*

First, there is no dispute that token purchasers made an "investment of money." (AC at ¶¶ 101-102). The Amended Complaint describes a process where issuers sold the tokens in exchange for cash or other tangible financial consideration. (*Id*. at ¶¶ 106-217). In fact, Ramani paid for the tokens he purchased. (*Id*. at ¶¶ 43, 55, 63, 68-69, 71, 75-76, 89). *See also Patterson v. Jump Trading*, 2024 WL 49055, at *11 (N.D. Cal. Jan. 4, 2024) (allegation that investors paid U.S. dollars, Bitcoin, and Ethereum in exchange for crypto assets establishes "investment of money" on a motion to dismiss); *United States v. Zaslavskiy*, 2018 WL 4346339, at *5 (E.D.N.Y. Sept. 11, 2018) (rejecting defendant's argument that using virtual currency to purchase crypto coins or tokens does not satisfy *Howey*'s "investment of money" requirement).

*Common Enterprise*

Next, the "common enterprise" requirement "has been construed by this Circuit as demanding either an enterprise common to the investor and the seller, promoter or some third party (vertical commonality) or an enterprise common to a group of investors (horizontal commonality)." *Hocking II,* 885 F.2d at 1457. "Vertical commonality may be established by showing that the fortunes of the investors are linked with those of the promoters." *SEC v. R.G. Reynolds Enterprises, Inc.*, 952 F.2d 1125, 1130 (9th Cir. 1991).[6] Horizontal commonality occurs where investors' "collective fortunes depend[] on the success of a single common enterprise." *Hocking v. Dubois* ("*Hocking I*"), 839 F.2d 560, 566 (9th Cir. 1988). As the *Hocking I* court explained: "Clearly, horizontal commonality describes the relationship that purchasers of a company's securities share with one another." *Id.*; *see also Hocking II*, 885 F.2d at 1455, 1459 (defining horizontal commonality as "an enterprise common to a group of investors" and stating that it agrees with *Hocking I*'s explanation of common enterprise). The allegations in the AC establish both horizontal and vertical commonality, though either suffices. *Hocking II*, 885 F.2d at 1459.

---

[6] Courts in the Ninth Circuit sometimes refer to this as "strict vertical commonality." The label does not alter the underlying test – the fortunes of the investor must be linked to the fortunes of the promoter – a requirement the AC's allegations easily meet. Courts elsewhere, including district courts in the Second Circuit, also accept "strict" vertical commonality as a means of establishing common enterprise. *See, e.g., SEC v. Telegram Group, Inc.*, 448 F. Supp. 3d 352, 369 (S.D.N.Y. 2020).

First, there was horizontal commonality among investors.  Each token issuer pooled proceeds raised from investors, which each issuer stated it would use to launch and/or develop its business.  For example, XY Labs stated that proceeds from purchases of XYO tokens were to be allocated: 40% to "XYO Network Growth & Marketing Strategic Partnership"; 35% to "Engineering & R&D"; and 15% to operations, overhead, and supporting platform projects.  (*Id*. ¶ 150).  Moreover, issuers emphasized that the value of tokens would collectively benefit from the business's success.  (*See, e.g.,* AC ¶¶ 117, 125-126, 151-153, 176-177.)  As Rari's founders put it, "The more money you make, the more money we make."  (*Id*. ¶ 164).  In other words, each token holder's financial fortunes were tied to the success of the enterprise.

Numerous courts in the Ninth Circuit have readily found that such allegations establish horizontal commonality.  The use of investor proceeds to develop a business, the success or failure of which will impact all investors, ties the financial fortunes of the investors together.  *See, e.g., RG Reynolds*, 952 F.2d at 1134 (horizontal commonality exists where investor assets were pooled to "finance the construction of a plant where their ore was to be refined"); *Patterson*, 2024 WL 49055 at *11 (pooling of funds to develop the digital ecosystem and allegation that fortunes of token purchasers were tied to one another and depended on issuer's efforts established element on a motion to dismiss); *Hunichen v. Atonomi LLC*, 2019 WL 7758597, at *12-13 (W.D. Wash. Oct. 28, 2019) (recommending that motion to dismiss be denied in part because investor proceeds from token purchasers were pooled by defendant "to develop blockchain technology and issue future tokens, from which investors would profit") (recommendation adopted 2020 WL 1929372 (W.D. Wash. Apr. 21, 2020)); *SEC v. Skinner*, 2022 WL 2784811, at *4 (C.D. Cal. June 17, 2022) (finding as a matter of law that "[t]here is also horizontal commonality because the investors' funds were pooled together to finance the projects").

Fundamentally, because the issuers of these tokens have made "their collective fortunes dependent on the success of a single common enterprise." *Hocking I*, 839 F.2d at 566.  Here, as explained above, as to each of the tokens at issue, investors' fortunes were all equally dependent on the success of the same common enterprise—the value of the token and its ecosystem.  *Patterson* at 18.

Courts in the Second Circuit have consistently applied similar reasoning to allegations that crypto assets are securities.  In *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340 (S.D.N.Y. 2019), the court denied a motion to dismiss because proceeds from token purchases "were pooled together to facilitate the launch of the ATB Blockchain, the success of which, in turn, would increase the

value of Plaintiff's ATB Coins." *Id*. at 353.  Horizontal commonality existed even though the tokens "did not entitle purchasers to a pro rata share of the profits derived." *Id*. at 354 (holding that "a formalized profit-sharing mechanism is not required[,]" where the value of the assets was "dictated by the success of the ATB enterprise as a whole").  And, in *SEC v. Kik Interactive, Inc.,* 492 F. Supp. 3d 169, 178 (S.D.N.Y. 2020), the court found a common enterprise where the funds were pooled and used for "the construction of the digital ecosystem [Kik] promoted," which was "crucial" because the "success of the ecosystem drove demand for [the cryptocurrency] and thus dictated investors' profits."  In other words, the "economic reality" was that the "stronger the ecosystem that Kik built, the greater demand for [the cryptocurrency], and thus the greater the value of each purchaser's investment." *Id.* at 370.

Here, the economic reality is that the value of each investor's tokens is tied to the success of the issuer's efforts to develop, grow, and maintain a blockchain "ecosystem" that could spur demand, and therefore increase the price of, the tokens.  As the court explained in *SEC v. Telegram Group, Inc*., 448 F. Supp. 3d 352, 369 (S.D.N.Y. 2020), horizontal commonality existed where the defendant pooled the money received from token purchasers and "used it to develop the TON blockchain," since, as a result, the "ability of each [investor] to profit was entirely dependent on the [blockchain's] successful launch[.]."  In *Telegram*, as here, the "fortunes of the [investors] will . . . remain tied to each other's fortunes as well as to the fortunes of the protocol." *Id*. (emphasizing that investors at different stages of the blockchain's development will still "possess an identical instrument").[7] *See also SEC v.  Terraform Labs Pte. Ltd.*, 2023 WL 8944860, at *15 (S.D.N.Y. Dec. 28, 2023) (ruling that, where, as defendants represented, investors' proceeds were pooled to improve the protocol and profits were "fed back" to investors, the crypto asset "passes the *Howey* test with flying colors.").

The facts in the AC also demonstrate vertical commonality.  As detailed above, the issuers retained substantial tokens for their management teams, specifically to align the financial fortunes of management and token-holders.  (AC ¶¶ 110, 116, 125, 135, 150, 154, 159, 175, 195, 211, 212).

---

[7]  The timing of a specific investor's sale does not impact this underlying commonality.  As one court recently held: "With respect to horizontal commonality, the key feature is not that investors must reap their profits at the same time; it is that investors' profits at any given time are tied to the success of the enterprise." *Friel v. Dapper Labs, Inc*., 2023 WL 21627457, at *12-13 (S.D.N.Y. Feb. 22, 2023) (finding horizontal commonality because the "economic realities" and "totalities of the scheme" made clear that the crypto instrument's "continued value is dependent on the success of Dapper Labs"); *see also SEC v. Kik Interactive, Inc.,* 492 F. Supp. 3d 169, 178 (S.D.N.Y. 2020) ("Kik used the [investor] funds for its operations, including the construction of the digital ecosystem it promoted. . . . The success of the ecosystem . . . dictated investors' profits.").

Courts have found that such arrangements create vertical commonality.  For example, in *SEC v. NAC Foundation, LLC*, 512 F. Supp. 3d 988, 998 (N.D. Cal. 2021), the court denied a motion to dismiss, ruling that vertical commonality existed where defendant promoters "retained a healthy share of [crypto] tokens," and both investors and defendants stood to profit from the "general success of their enterprise." *See also Telegram*, 448 F. Supp. 3d at 370 (finding that "strict vertical commonality" existed because the issuer's "fortunes are directly tied to the fortunes of the [investors], which will rise and fall with the success or failure of the TON Blockchain"); *cf. SEC v. LBRY, Inc.*, 639 F. Supp. 3d 211, 220 (D.N.H. 2022) (reasoning, with respect to the efforts of others portion of *Howey*, that "by retaining hundreds of millions of LBC [tokens] for itself, LBRY also signaled that it was motivated to work tirelessly to improve the value of its blockchain for itself and any LBC purchasers.").  Investors and management also shared a risk of loss.  *SEC v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 463 (9th Cir. 1985) (concluding that vertical commonality existed where, if defendant's "processing technique were to prove faulty, then both the investors and [defendant entity] would suffer financial losses").

*Reasonable Expectation of Profits*

In determining whether reasonable purchasers of the nine tokens had an expectation of profits, courts assess the "economic inducements held out to the prospect." *Warfield*, 569 F.2d at 1021.  "Accordingly, courts have frequently examined the promotional materials associated with an instrument or transaction in determining whether an investment contract is present." *Id.*  That examination is "an objective inquiry . . . based on what the purchasers were led to expect." *Id.*[8]

Here, as described above, the AC alleges that the nine issuers broadly and repeatedly disseminated claims that each token would appreciate in value.  (AC at, *e.g.*, ¶¶ 110, 111, 114-119, 125-127, 135, 139-141, 150-152, 154, 159, 162-167, 175-178, 184-186, 190, 195, 201-202, 211-214).  They promoted the tokens based on their potential for investment returns, which they claimed derived from the promised efforts of the promoter's management team to create, develop, and maintain an ecosystem that would increase the demand for a token, and thus its price.  *See SEC v. Terraform Labs Pte. Ltd.*, 2023 WL 8944860, at *14 (S.D.N.Y. Dec. 28, 2023) (ruling that multiple tokens were securities because defendants "made specific, repeated statements that would lead a reasonable investor . . . to expect a profit based on defendants' efforts to further develop the . . . blockchain").  A number of issuers posted their token's daily price on their websites.  (*Id.* ¶¶ 177,

---

[8] The Ninth Circuit employs a "commonsense" definition of "profits," including the "increased value of the investment," or, put another way, "simply financial returns on investments." *Warfield*, 569 F.3d at 1023-24.

201, 214).  The inducement was clear – buy tokens, and profit either by re-selling the tokens or by earning fees and various other financial benefits.  *Hocking II*, 885 F.2d at 1457 (explaining that "whether a scheme involves a security" depends on the nature of "the inducement," which is defined by the issuers' collective representations).

Courts in this Circuit and elsewhere have consistently held that such representations invited objective investors to have a reasonable expectation of profits.  As the court explained in *Patterson*, 2024 WL 8944860 at *11, the complaint sufficiently pled this part of the *Howey* test because it pled that the promoters, "through social media, blog posts, and marketing materials, for example, promoted LUNA as an investment that would increase in value with the increased usage of the Terraform blockchain that could result from their continued development and maintenance."

Similarly, in *NAC Foundation*, 512 F. Supp. 3d at 997, statements in a white paper "that both ABTC tokens and AML BitCoins would be tradeable on stock market-like exchanges, and . . . could appreciate in value through speculative trading" establish the reasonable expectation of profits requirement.  *See also Hunichen*, 2019 WL 7758597 at *13 (investor in tokens had reasonable expectation of profits based on "multiple forms of communication, solicitation, and advertising to secure investments from the public") (collecting authority); *Telegram*, 448 F. Supp. 3d at 372 (issuer's promotion of affiliate's "power to support the market price of Grams[,]" among other factors, created reasonable expectation of profits); *Zaslavskiy*, 2018 WL 4346339 at *7 (marketing materials and advertisements claiming that proceeds from token purchases would be used to generate profits, and that investors could trade coins "on an external exchange and make more profit" satisfied reasonable expectation of profits requirement); *LBRY,* 639 F. Supp. 3d at 219 (concluding that as a result of "LBRY's overall messaging [in blog posts and elsewhere] about the growth potential for LBC [tokens] . . . investors would understand that LBRY was pitching a speculative value proposition for the digital token").

*Based on the Efforts of Others*

Given the issuers' many public statements, investors reasonably expected to profit based upon the efforts of the issuers and their core management teams.  (AC at, *e.g.,* ¶¶ 121, 128-130, 142-144, 153-154, 168-170, 175, 179, 188, 204-206, 215-216).  *See, e.g., Rubera*, 350 F.3d at 1093 (holding that third prong was satisfied where the issuer "promoted the opportunity in part by highlighting [defendant's company's] experience and skill in the telecommunications industry"); *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 756 F.2d 230, 240-41 (2d Cir. 1985) (promoters implicit promise to facilitate secondary trading market made CD Program

a security).  The promised efforts of management were the "undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."  *Hocking II*, 885 F.2d at 1455; *Telegram*, 448 F. Supp. 3d at 375 (finding defendants invited investors to expect profits from defendants' promise to "develop, launch, and support the TON Blockchain," because if Telegram "ceased all further efforts to support the TON Blockchain, . . . [it] and Grams would exist in some form but would likely lack the mass adoption, vibrancy, and utility that would enable the Initial Purchasers to earn their expected huge profits"); *Beranger v. Harris*, No. 1:18-cv-05054, 2019 WL 5485128, at *3 (N.D. Ga. April 24, 2019) (expectation of profits from third party's efforts existed because defendant promised to launch platform to keep token from being "worthless").

Courts have found that investors reasonably expected profits based on the efforts of others in similar circumstances.  For example, in denying defendant's motion to dismiss, the court in *NAC Foundation* concluded:

> Nor, given the totality of the circumstances, can defendants brush away the inference that an objectively reasonable [token] purchaser likely viewed his or her prospective trading success as a function of the defendants' efforts: after all, demand for [tokens], as reflected in those assets' pricing, would rely almost exclusively on market perception of defendants' work product.

512 F. Supp. 2d at 997.  The retention of tokens to incentivize management and align their interests with those of investors makes the economic reality even clearer; the issuers recognized that management's efforts were directly linked to the tokens' value.  *See, e.g., LBRY*, 639 F. Supp. 3d at 220 ("[B]y retaining hundreds of millions of LBC [tokens] for itself, LBRY also signaled that it was motivated to work tirelessly to improve the value of its blockchain for itself and any LBC purchasers.").

The above analysis is unaffected by the fact that defendants bought the tokens discussed in the AC on crypto asset trading platforms, as *amici* and the Wahis contended in connection with the Wahis' motion to dismiss.  ECF Nos. 33 at 21, 27, 43, 46-47, 51; 43 at 7-10; 78 at 14-16.  Their arguments are fundamentally flawed, since the issue is not about trading on the secondary market generally, but simply whether Ramani purchased investment contracts.  The Ninth Circuit has explained that whether an instrument purchased in a resale is an investment contract depends on the "economic reality of each transaction" and a determination of "what investment package was actually offered."  *Hocking II*, 885 F.2d at 1463.  This review requires an analysis under *Howey* of, among other things, how the investment "was promoted to the investor" and "the nature of the investment."  *Id.*

The promotional statements and managerial promises set forth in the AC applied equally to tokens that an investor may have bought from the issuer or from another investor, including on a crypto asset trading platform.  As alleged here, each issuer promoted their token as a profitable investment, representations that continued to be made even as the tokens traded on secondary markets.  (AC ¶¶ 119-121, 127, 141, 152, 165, 167, 178, 186, 201-203, 213-214).  Under *Howey*, the crypto assets that Ramani purchased were thus investment contracts.[9]  *See Terraform,* 2023 WL 4858299 at *15 (public representations by defendants who engaged in "public campaign" to persuade both direct and indirect purchasers to buy tokens "would presumably have reached individuals who purchased their crypto-assets on secondary markets – and, indeed, motivate those purchases.")  As the Court in *Terraform* explained, *"Howey* makes no … distinction between [direct and indirect] purchasers. . . . That a purchaser bought the coins directly from the defendants or, instead, in a secondary resale transaction has no impact on whether a reasonable individual would objectively view the defendants' actions and statements as evincing a promise of profits based on their efforts." *Id*.

Moreover, all investors – and each issuer's identified management team – stood to benefit from the success of the protocol.  *Hocking I*, 839 F.2d at 566 (a common enterprise exists where investors' "collective fortunes dependent on the success of a single common enterprise.").  Accordingly, neither Defendants nor *amici* point to a single case in which the *Howey* analysis somehow turned on the *locus* of the sale.  *See also Patterson,* 2024 WL 49055 at *11-12 (concluding that tokens purchased by secondary market investors on Binance and Kraken were securities).

---

[9] The *Howey* analysis does not change because the SEC has alleged Ramani purchased the tokens based on Ishan's tips instead of an issuer's public claims.  The Ninth Circuit has made clear that the subjective intent of Ramani and any other particular purchaser does not control whether, for purposes of *Howey*, the reasonable expectations of investors:

> While the subjective intent of the purchasers may have some bearing on the issue of whether they entered into investment contracts, we must focus our inquiry on what the purchasers were offered or promised.  Under *Howey*, courts conduct an objective inquiry into the character of the instrument or transaction offered based on what the purchasers were led to expect. . . . Accordingly, courts have frequently examined the promotional materials associated with an instrument or transaction in determining whether an investment contract is present.

*Warfield,* 569 F.3d at 1021; *SEC v. Hui Feng*, 935 F.3d 721, 729 (9th Cir. 2019) (rejecting argument that investors' subjective motivation meant there was no investment contract).  Whether the tokens were investment contracts depends on the issuers' claims, not on Ramani's subjective intent.  To be clear, though, Ramani did not purchase the tokens for some consumptive purpose, but rather to earn a very rapid investment return.  *Hocking II*, 885 F. 2d at 1469 (for purposes of applying the securities laws, contrasting buyers who purchase a product primarily to consume it, as opposed to a buyer expecting, as here, an investment return).

- 16 -

In sum, given the detailed allegations set forth in the AC, which are deemed true for purposes of this Motion, the SEC has met each *Howey* requirement. The tokens Ramani purchased were offered and sold as investment contracts, and thus securities. Ramani's illicit trading was accordingly in connection with the purchase or sale of a security. The second and third *Eitel* factors thus favor the entry of default judgment.

### C. The Sum of Money at Stake in the Action

"The fourth *Eitel* factor weighs in favor of default when the recovery sought is proportional to the harm caused by defendant's conduct." *Waters v. Mitchell*, 2023 WL 3304217, at *7 (W.D. Wash. May 8, 2023). In other words, "when the sum of money at stake is tailored to the specific misconduct of the defendant, default may be appropriate." *Id.* Here, as set forth in the Brennan Declaration, the SEC seeks disgorgement of Ramani's illicit proceeds and a penalty equal to twice Ramani's illicit trading profits, as specifically authorized by statute. 15 U.S.C. § 78u-1. Because Congress has determined that remedy to be proportional and tailored to the wrongdoing, the fourth *Eitel* factor favors default.

### D. The Possibility of a Dispute Concerning Material Facts

Ramani has failed to appear and respond to the Amended Complaint. Accordingly, he has "admitt[ed] all material facts" in the Amended Complaint, meaning "no factual dispute exists that would preclude entry of default judgment." *FIGS, Inc. v. My Open Heart LLC*, 2023 WL 3402626, at *3 (C.D. Cal. March 7, 2023). Moreover, as noted above, Ramani's co-Defendants have largely admitted the allegations in pleading guilty in a parallel criminal proceeding.

### E. Whether the Default Was Due to Excusable Neglect

It appears that Ramani has fled the country to avoid prosecution. His default is therefore not the result of excusable neglect. Rather, his default stems from his desire to avoid the consequences of his actions. *SEC v. Next Components, Ltd.,* 2013 WL 12313350, at *5 (C.D. Cal. March 28, 2013) ("There is no indication of any justification for Defendants' default and failure to respond, and this factor therefore favors issuance of default judgment.").

### F. The Policy Supporting Resolution on the Merits

Although courts may prefer to decide cases on the merits, where such a resolution is not "'reasonably possible,'" this factor "does not weigh against default judgment." *Id*. (quoting *Eitel*, 782 F.2d at 1472).

In sum, for all the reasons set forth above, the *Eitel* factors overwhelmingly favor the entry of default judgment against Ramani.

## II.     Ramani Should Be Enjoined from Future Violations of Section 10(b)

The Exchange Act authorizes the issuance of permanent injunctions.  15 U.S.C. § 78u(d).

To obtain an injunction, "the SEC must show that there is a reasonable likelihood of future

violations of the securities laws."  *SEC v. Blockvest*, 2020 WL 7488067, at \*2 (S.D. Cal. Dec. 15,

2020).  To predict the likelihood of future violations, "a court must assess the totality of the

circumstances surrounding the defendant and his violations and it considers factors such as the

degree of scienter involved; the isolated or recurrent nature of the infraction; the likelihood, because

of defendant's professional occupation, that future violations might occur; and the sincerity of his

assurances against future violations."  *Id.* (quoting *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir.

1980)).  "A permanent injunction may especially be proper where a violation was founded on

systemic wrongdoing rather than isolated occurrence or involved a high degree of scienter."  *SEC v.*

*Pedras*, 2014 WL 12597332, at \*9 (C.D. Cal. April 16, 2014).

Here, Ramani's conduct involved a long-running scheme to trade unlawfully on material

nonpublic information.  His misconduct was systemic, repetitive, and intentional.  To avoid

responsibility, he has fled the country and has otherwise shown no signs of remorse or regret,

including Ramani learned that Ishan Wahi feared that he was about to be confronted by Coinbase

officials about their wrongdoing.  The AC also makes clear that Ramani is a sophisticated trader,

skilled at using anonymous accounts and foreign trading platforms, among other means, to avoid

detection.  Future violations are, to say the least, very likely.  The Court should therefore enter an

injunction prohibiting Ramani from future violations of Section 10(b) of the Exchange Act.

## III.    Ramani Should Be Ordered To Disgorge $817,602 and Pay Prejudgment Interest of $79,750

"District courts have broad equity powers to order disgorgement of ill-gotten gains obtained

through violations of securities laws."  *SEC v. Pithapurwala*, 2022 WL 2200400, at \*2 (C.D. Cal.

June 13, 2022).  Disgorgement cannot exceed a wrongdoer's net profits.  *Liu v. SEC*, 140 S. Ct.

1936, 1940 (2020).  The SEC must demonstrate "a reasonable approximation of profits causally

connected to the violation."  *Pithapurwala*, 2022 WL 2200400 at \*2.

Here, Ramani's illicit trading proceeds equaled $817,602.  As explained in greater detail in

the Brennan Declaration, at ¶¶ 7-12, that figure was calculated by subtracting each token's purchase

price from its sale price.  The purchases and sales prices were derived from information on an

established analytics platform and a website that provides pricing data for crypto assets.  *Id.*

The SEC requests permission to send the disgorged funds to the U.S. Treasury, and the proposed Final Judgment includes a finding that this aligns with equitable principles. This result is appropriate under Exchange Act Section 21(d)(5), 15 U.S.C. 78u(d)(5), the provision construed in *Liu*, and Exchange Act Section 21(d)(7), 15 U.S.C. 78u(d)(7), a post-*Liu* amendment to the Exchange Act.  *See SEC v. Brenda Christine Barry/Bak West, Inc*., 2023 WL 4491724, at *2 (C.D. Cal. July 12, 2023) (recognizing that Congress eliminated the requirement in *Liu* that disgorgement be "for the benefit of investors" and concluding that disgorgement "is well within the Court's discretion").  Courts have recognized that disgorgement is appropriate even where the SEC cannot identify specific investors that were harmed.  *Id*. (discussing authority).

Here, identifying specific investors that Ramani harmed while trading in multiple tokens would be extremely difficult and costly.  Ramani used multiple accounts and wallets, transferred and converted his proceeds, and specifically took steps to obscure and conceal his trading.  Further, Ramani appears to have fled prosecution in this case and has done nothing to assist the SEC in identifying his victims.  While *Liu* criticized the distribution of disgorged funds to the Treasury "instead of" to "known victims," 140 S. Ct. at 1946, 1948 (emphasis added), it left as "an open question whether, and to what extent," distribution to the Treasury is permissible under Exchange Act Section 21(d)(5) where distribution to investors is infeasible.  *Id*. at 1948-49.  Ramani's fraud precludes a distribution.  Here, the choice is between ordering disgorgement to the Treasury and letting Ramani profit from his fraud.  Under "foundational" equitable principles, the decision is straightforward: allowing Ramani to benefit is the worse outcome.  *Liu*, 140 S. Ct. at 1943.  In circumstances like this, courts have properly recognized that "[b]etween the money staying with [the violator] or a fund at the Treasury, it is more equitable to order disgorgement."  *SEC v. Spartan Sec. Gr., Ltd.,* 2022 WL 3224008, at *9-10 (M.D. Fla. Aug. 10, 2022).  The facts of this case, and Ramani's intentional non-cooperation, show that sending any disgorged funds to the Treasury is consistent with traditional equitable principles – including that a fraudster should not be able to keep his illicit profits – and for the benefit of investors, since allowing Ramani to keep his funds would incentivize insider trading.  *Liu*, 140 S. Ct. at 1943, 1948 (a "foundational" principle of equity is that no person should profit from their own wrong); *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1097 (9th Cir. 2010) (holding that "unlike [] damages … the purpose of a

disgorgement remedy is to prevent unjust enrichment and to make securities law violations unprofitable, not to compensate victims")..[10]

Further, Ramani's "ill-gotten gains include prejudgment interest to ensure that the wrongdoer does not profit from the illegal activity." *Id*. at *3.  The Ninth Circuit has "approved the calculation of prejudgment interest based on the tax underpayment rate set forth in 26 U.S.C. § 6621(a)(2)." *Id*.  Accordingly, "using the same rate used by the Internal Revenue Service to calculate underpayment penalties," *id*., Ramani's prejudgment interest is $79,500.  Brennan Decl. at ¶ 14.

## IV.    Ramani Should Be Ordered To Pay a Civil Penalty of $1,635,204

Section 21A of the Exchange Act "provides for civil penalties for insider trading" of up to "three times the profit gained or loss avoided." *Sabrdaran*, 252 F. Supp. 3d at 904 (quoting 15 U.S.C. § 78u-1(a)(2)).  Under this statute, the amount of penalty "is tethered to the profits – the statute makes the amount of financial liability to which a violator of the insider trading laws may be exposed directly proportional to the amount of the profit gained or the loss avoided from the purchase or sale of a security." *Id*. at 905 (quoting *SEC v. Rosenthal*, 650 F.3d 156, 162 (2d Cir. 2011)).

The Court has discretion to impose a monetary penalty.  (*Id*.).  In determining the amount of penalty, courts weigh factors similar to those for a permanent injunction, including the "egregiousness of the violations," "the isolated or repeated nature of the violations," and "whether the defendant concealed his trading." *Id*. (collecting authority).  *Pithapurwala*, 2022 WL 2200400 at *3 ("Because the factor test supported the imposition of a permanent injunction, it also supports the imposition of civil penalties."); *SEC v. Rajaratnam*, 918 F.3d 36, 44-45 (2d Cir. 2019) (discussing factors).

Here, Ramani's violations were repeated, willful, and highly profitable.  This was not a case where Ramani traded on a single tip from Ishan; instead, Ramani and his co-Defendants schemed to systematically exploit Ishan's unique access to Coinbase's material nonpublic information.  Moreover, as noted above, Ramani took elaborate steps to conceal his misconduct, and has not provided any assurances against future misconduct.  Ramani appears to have fled the country and to be evading the charges against him.  Accordingly, the Court should impose a penalty of $1,635,204

---

[10] In *Johnson*, the court denied a request that disgorgement be sent to Treasury on the grounds that the Commission failed to explain how the award was "appropriate and necessary for the benefit of investors" as required to satisfy Section 21(d)(5). 2023 WL 2628678, at *55-56.  The court did not, however, discuss the availability of disgorgement under the post-*Liu* amendments found in Sections 21(d)(3) and (d)(7), which omit that language.

on Ramani, equal to twice his illicit proceeds of $817,602.  That figure is actually less than what Section 21A empowers the SEC to seek and the district court to impose, and is warranted in light of the conduct described in the AC and Ramani's efforts to avoid the consequences of his actions.  *See, e.g., SEC v. Rosenthal*, 426 F. App'x 1, 4 (2d Cir. 2011) (affirming penalty equal to twice trading profits on tipper and tippee who engaged in "repeated and knowing violations of the securities laws"); *SEC v. Williky*, 942 F. 3d 389, 393-94 (7th Cir. 2019) (affirming penalty equal to two times profits where defendant in insider trading case sought to avoid responsibility and failed to admit any wrongdoing).

## **CONCLUSION**

For the reasons set forth above, the Court should enter a default judgment against Ramani, enter a permanent injunction prohibiting from future violations of Section 10(b) of the Exchange Act, and order the requested monetary relief.

Dated:        January 18, 2024

Respectfully submitted,

By: s/Daniel J. Maher
DANIEL J. MAHER
PETER C. LALLAS
(Conditionally Admitted Pursuant to Local Rule 83.1)
maherd@sec.gov
lallasp@sec.gov
(202) 551-4737 (Maher)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F. Street, NE
Washington D.C. 20549