1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SECURITIES AND EXCHANGE
COMMISSION,

                          Plaintiff,

        v.

ISHAN WAHI et al,

                          Defendants.

CASE NO. 2:22-cv-01009-TL

ORDER GRANTING IN PART AND
DENYING IN PART MOTION FOR
DEFAULT JUDGMENT AGAINST
DEFENDANT SAMEER RAMANI

        This matter comes before the Court on Plaintiff Securities and Exchange Commission's

("the SEC") Motion for Default Judgment against Defendant Sameer Ramani. Dkt. No. 118.

Having reviewed the Motion and the relevant record, the Court GRANTS IN PART and DENIES IN

PART Plaintiff's Motion.

## I.        BACKGROUND

**A.        Relevant Factual Allegations**

        This case originally involved three individuals accused of securities violations for insider

trading of certain crypto asset securities: (1) Defendant Ishan Wahi ("Ishan"), a former manager

in Coinbase Global Inc.'s ("Coinbase") Asset Listings Group; (2) his brother, Defendant Nikhil Wahi ("Nikhil"); and (3) a close friend, Defendant Sameer Ramani ("Ramani").[1] Ishan was entrusted with first-hand knowledge of tokens Coinbase planned to list on its cryptocurrency platform, and when those listings would occur. Dkt. No. 27 ¶¶ 4, 30. Ishan knew access to listing information was restricted, even within Coinbase, and acknowledged his duty to keep listings information confidential per Coinbase's policies regarding material nonpublic information. *Id.* ¶¶ 4, 28–29, 31–32. Ishan provided Nikhil and Ramani with material nonpublic information ahead of dozens of listing announcements in 2021 and 2022, including the timing and content of the listings. *Id.* ¶¶ 6, 37–96. Ramani then used the confidential information to earn substantial trading profits. *See, e.g.*, *id.* ¶¶ 53–58; *see also* Dkt. No. 118-1 ("Brennan Decl.") at ¶¶ 4–13. Allegedly, Ramani repeatedly engaged in such misconduct with respect to a number of tokens. Dkt. No. 27 ¶¶ 42–47, 53–58, 60–78, 88–93. As a result, Ramani realized $817,602 in illicit proceeds from illegally trading in the tokens as described by the SEC. *Id.* ¶¶ 46, 58, 66, 73, 78, 91; Dkt. No. 118-1 at ¶¶ 12–13. Ramani also took steps to conceal the illegal trading by using multiple accounts, crypto asset wallets, and addresses across different trading platforms. Dkt. No. 27 ¶¶ 41, 93–96.

Ishan and Ramani are friends. Ramani has known Ishan since at least 2013; they attended the University of Texas together. *Id.* ¶ 35. They followed each other on social media and communicated by phone, text, and WhatsApp in 2021 and 2022. *Id.* ¶ 35–36. In May 2022, Ishan alerted Ramani that Coinbase's legal personnel had begun investigating Ishan in connection with Coinbase's asset listing process. *Id.* ¶ 97. Ramani responded, "Bro I'm on standby. Let me know

---

[1] At all times relevant to this case, Defendants lived in the United States. Dkt. No. 27 ¶¶ 14–17, 38, 79, 87.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANT SAMEER RAMANI - 2

if you need anything." *Id.* Ishan also repeatedly communicated with Ramani on May 16, 2022, the day Ishan attempted to flee the country. *Id.* ¶ 98.

According to the SEC, the tokens in which Ramani traded were investment contracts and, therefore, securities, because each involved the investment of money, in a common enterprise, with a reasonable expectation of profit derived from the efforts of others. Dkt. No. 27 ¶ 100. Investors paid money or other consideration for the tokens, which were then issued and distributed to the investors' blockchain addresses. *Id.* ¶¶ 101, 109, 111, 124–25, 135–37, 149–50, 159–62, 174, 182–83, 195–97, 210–11. The fortunes of investors and those offering the tokens were linked—demonstrating a common enterprise—because the management teams of each issuer retained a substantial number of tokens, specifically to incentivize and align interests with investors. *Id.* ¶¶ 110, 115–16, 125, 126, 135, 150, 154, 159, 163–64, 175, 195, 211, 212.

The issuers solicited investors by focusing on the tokens' potential investment profits. *Id.* ¶ 102. The tokens were broadly promoted on social media posts, blogs, articles, white papers, websites, and interviews with claims: (1) that the tokens could appreciate dramatically in value; (2) that token holders could have other opportunities to earn fees and other benefits; and (3) that the issuers were taking steps to increase the tokens' value, including limiting the supply of tokens, facilitating trading on secondary market trading platforms, and retaining substantial numbers of tokens to incentivize their management. *Id.* ¶¶ 110, 111, 114–19, 125–27, 135, 139–41, 150–52, 154, 159, 162–67, 175–78, 184–86, 190, 195, 201–02, 211–14. Multiple issuers posted their tokens' daily prices on their websites. *Id.* ¶¶ 177, 201, 214. The issuers explained to potential investors that secondary market liquidity was both a means for investors to earn returns and a way for broader market participants to participate in the issuers' growth. *Id.* ¶¶ 103–105, 119, 127, 151–52, 178, 202. Issuers also stressed the importance of pairing supply restrictions with broader demand. *E.g.*, *id.* ¶¶ 164, 177. Finally, each issuer repeatedly emphasized that

identified teams of founders and employees were exclusively responsible for the development and operation of the ecosystem linked to each token, as well as the placement of their token on secondary market trading platforms. *Id.* ¶¶ 121, 128–30, 142–44, 153–54, 168–70, 175, 179, 188, 204–06, 215–16. Issuers stated that management would continue to retain a substantial number of tokens, financially incentivizing management to undertake managerial and entrepreneurial efforts to increase the value of the tokens. *Id.* ¶¶ 110, 116, 125, 135, 150, 154, 159, 175, 195, 211, 212.

**B.    Procedural History**

The SEC filed its initial Complaint (Dkt. No. 1) on July 21, 2022, and its First Amended Complaint ("FAC," Dkt. No. 27) on December 22, 2022. In a parallel criminal proceeding, Defendants Nikhil and Ishan pled guilty to violating 18 U.S.C. § 1349 on January 10 and February 7, 2023, respectively. *See United States v. Ishan Wahi*, No. CR22-392, Dkt. Nos. 68, 81 (S.D.N.Y.).[2] The SEC settled its civil claims against Ishan and Nikhil, and the Court entered final judgment as to Nikhil and Ishan on June 1, 2023. Dkt. Nos. 109–110.

On December 23, 2022, the SEC filed a motion for alternative service on Ramani. Dkt. No. 28. The Court granted the SEC's motion on May 23, 2023, directing the SEC to serve Ramani and his criminal counsel by email and Ramani directly via WhatsApp. Dkt. No. 106 at 7. The SEC complied, effecting service through email and WhatsApp on both Ramani and his criminal counsel. Although it appears that Ramani's WhatsApp is no longer active, the SEC received no indication that email service did not reach Ramani or his counsel. Dkt. No. 112.

Despite being served pursuant to the Court's Order, Ramani has neither entered an appearance in this matter nor responded to the FAC. Accordingly, on October 19, 2023, the SEC

---

[2] The Court generally takes judicial notice of all filings in the parallel criminal action as referenced throughout the SEC's briefing and this Order pursuant to Federal Rule of Evidence 201(b)(2).

sought entry of default (Dkt. No. 113), which the Clerk of Court entered on October 26, 2023 (Dkt. No. 114). The SEC now moves for a final default judgment against Ramani. Dkt. No. 118.

## II.   LEGAL STANDARD

A court's decision to enter a default judgment is discretionary. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). Default judgment is "ordinarily disfavored," because courts prefer to decide "cases on their merits whenever reasonably possible." *Eitel v. McCool*, 782 F.2d 1470, 1472 (9th Cir. 1986). When considering whether to exercise discretion in entering default judgments, courts consider the following factors:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of a plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure.

*Id.* at 1471–72. Courts reviewing motions for default judgment must accept the allegations in the complaint as true, except facts related to the amount of damages. *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977).

## III.   DISCUSSION

As an initial matter, the Court finds that it has jurisdiction over this action pursuant to 15 U.S.C. §§ 78u(d), 78u(e), 78u-1, 78aa, and 28 U.S.C. § 1331. The Court also finds that venue is proper under 15 U.S.C. § 78aa(a) because purchases and sales of securities and acts, practices, transactions, and courses of business constituting the violations alleged in the FAC occurred within the Western District of Washington, and were achieved, directly or indirectly, by making use of the means, instruments, or instrumentalities of transportation or communication in interstate commerce.

1

**A.** *Eitel* **Factors**

2

Considering the *Eitel* factors, the Court finds that entry of default judgment is proper.

3

       1.     **First Factor: Prejudice to Plaintiff**

4

Courts have repeatedly found in cases such as this, where a defendant has refused to take

5

part in litigation initiated by the SEC, that the first *Eitel* factor "weighs in favor of granting

6

default judgment because the Commission has no recourse otherwise." *SEC v. Valentine*, No.

7

C20-4358, 2021 WL 148361, at *2 (N.D. Cal. Jan. 15, 2021); *see also, e.g.*, *SEC v. S-Ray Inc.*,

8

No. C22-5150, 2023 WL 121435, at *1 (W.D. Wash. Jan. 6, 2023). Therefore, this first factor

9

favors default judgment.

10

       2.     **Second and Third Factors: Substantive Merits of Claim and Sufficiency of Complaint**

11

12

"Courts often consider the second and third *Eitel* factors together." *SEC v. C3 Int'l, Inc.*,

13

No. C21-1586, 2022 WL 16814859, at *4 (C.D. Cal. Nov. 7, 2022). These factors "assess the

14

substantive merits of the movant's claims and the sufficiency of its pleadings, which require that

15

a movant state a claim on which it may recover." *Id.* The SEC's claims against Ramani arise

16

from the Securities Exchange Act of 1934 ("Exchange Act"). Dkt. No. 27 ¶ 11. "Section 10(b) of

17

the [Exchange Act and a related rule] . . . prohibit undisclosed trading on inside corporate

18

information by individuals who are under a duty of trust and confidence that prohibits them from

19

secretly using such information for their personal advantage." *Salman v. U.S.*, 580 U.S. 39,

20

41–42 (2016) (internal citations omitted). A misappropriator of insider information "also may

21

not tip inside information to others for trading." *Id.* at 42. When they do, the "tippee acquires the

22

tipper's duty to disclose or abstain from trading if the tippee knows the information was

23

disclosed in breach of the tipper's duty." *Id.* A tipper breaches a duty when the information was

24

disclosed "for a personal benefit," including when they give "inside information to a trading

1   relative or friend." *Id.* at 49–50. For conduct to violate Section 10(b), it must occur "in

2   connection with the purchase or sale of a security." 15 U.S.C. § 78j(b); *United States v.*

3   *O'Hagan*, 521 U.S. 642, 655–59 (1997).

4       Taking the allegations in the FAC as true, the Court finds that: (1) Ramani traded on

5   material nonpublic information that he knew was provided to him in breach of Ishan's duty as a

6   Coinbase manager; and (2) Ramani's misconduct was in connection with the purchase and sale

7   of securities.

8               a.      ***Ramani's illicit trades.***

9       To establish Ramani's liability as one of Ishan's tippees, the SEC must show that, in

10  connection with the purchase or sale of a security: (1) Ishan breached a duty of trust and

11  confidence by disclosing inside information to Ramani for a personal benefit; (2) Ramani knew

12  or was reckless in not knowing that the information had been divulged in breach of a duty of

13  trust and confidence; and (3) Ramani traded on the basis of the information, despite knowing or

14  being reckless in not knowing that it was material and nonpublic. *Salman*, 580 U.S. at 41–42.

15  Circumstantial evidence, including "unique trading patterns or unusually large trading

16  quantities," can show that a tippee received and used material nonpublic information. *U.S. v.*

17  *Smith*, 155 F.3d 1051, 1069 (9th Cir. 1998).

18      The SEC's factual allegations establish that Ishan acknowledged that he was a "covered

19  person" under Coinbase's trading policies. Dkt. No. 27 ¶¶ 27–29, 31–32. Therefore, Ishan had a

20  duty of trust and confidence that he breached by disclosing information regarding the issuance of

21  tokens to Ramani. *Id.* ¶¶ 27–29, 31–32, 38–96. Ishan personally benefitted from the tips that he

22  provided because Ramani was a close friend who greatly profited from the subsequent trades. *Id.*

23  ¶¶ 35–36, 46, 58, 66, 73, 78, 91, 97–98; Dkt. No. 118-1 ¶¶ 12–13; *see also U.S. v. Chow*, 993

24  F.3d 125, 141–42 (2d Cir. 2021) (explaining that the evidentiary bar for personal benefit "is not a

1   high one" and is satisfied where there is evidence that the "tipper intended to benefit the

2   recipient"); *Salman*, 580 U.S. at 49–50 (holding that a tipper obtains a personal benefit when

3   they give "inside information to a trading relative or friend"). Here, the information Ishan

4   provided was intended to benefit his friend, Ramani, and allowed his friend to amass at least

5   $817,602 in trading profits. *Id.* ¶¶ 46, 58, 66, 73, 78, 91; Dkt. No. 118-1 ¶¶ 12–13.

6        The alleged facts further establish that Ramani new or should have known that the

7   information he received from Ishan was confidential yet traded on it anyway. Ramani appears to

8   have tried to conceal his trading by utilizing multiple accounts, crypto wallets, and addresses

9   across multiple trading platforms. Dkt. No. 27 ¶¶ 41, 93, 95–96; *see also SEC v. Waldman*, 407

10  F. Supp. 3d 299, 308 (S.D.N.Y. 2019) ("A defendant's resort to deceptive trading practices

11  supports the inference that he was trading illegally on inside information."). Ramani was aware

12  of Ishan's position at Coinbase, and his trading pattern shows that he was sophisticated enough

13  to understand the significance of the information that Ishan provided. *See id.* ¶¶ 42–47, 53–58,

14  60–78, 88–93; *see also SEC v. Obus*, 693 F.3d 276, 288 (2d Cir. 2012) (explaining that whether

15  a tippee knew or should have known the tipper breached his duty depends on the tippee's "own

16  knowledge and sophistication and on whether the tipper's conduct raised red flags").

17       Finally, the alleged facts establish that Ramani traded on the basis of the information he

18  received from Ishan and that he knew, or was reckless in not knowing, that it was material and

19  nonpublic. Ramani's purchases occurred shortly after Ishan learned that Coinbase would list the

20  token and then he typically sold or transferred the tokens immediately after the public

21  announcement. *Id.* ¶¶ 42–47, 53–58, 60–78, 88–93. This pattern repeated across at least seven

22  trades. *Id.* This trading pattern, together with Ramani's relationship with Ishan and Nikhil (as

23  well as Ishan's guilty plea), establishes that Ramani traded on the basis of the information Ishan

24  provided, which Ramani knew, or was reckless in not knowing, was material and nonpublic.

*Smith,* 155 F.3d at 1069; *SEC v. Panuwat*, No. C21-6322, 2022 WL 633306, at *7 (N.D. Cal. Jan. 14, 2022) (denying motion to dismiss in part because allegations that defendant traded almost immediately after learning of an imminent announcement supports conclusion that trader "used" the material nonpublic information).

> b. ***Ramani's trades involved securities.***

The allegations in the FAC establish that the tokens Ramani traded were offered and sold as investment contracts and, thus, were securities. Congress "enacted a broad definition of security, sufficient to encompass virtually any instrument that might be sold as an investment." *SEC v. Edwards*, 540 U.S. 389, 393 (2004); *SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003) ("Congress did not intend the definition of 'security' . . . to be restrictive."). One type of security specifically enumerated in both the Securities Act of 1933 and the Exchange Act is an "investment contract." *Edwards*, 540 U.S. at 393. The Ninth Circuit has adopted a three-prong test for determining whether a financial instrument qualifies as an "investment contract." *Hocking v. Dubois*, 885 F.2d 1449, 1457 (9th Cir. 1989) (citing *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946)). The Court must consider whether the instrument in question involves "(1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others." *Rubera*, 350 F.3d at 1090.

> (1)   <u>Investment of Money</u>

The FAC describes a process where issuers sold the tokens in exchange for cash or other tangible financial consideration. Dkt. No. 27 ¶¶ 106–217. Ramani himself paid for the tokens he purchased. *Id.* ¶¶ 43, 55, 63, 68–69, 71, 75–76, 89. Therefore, the purchase of tokens involved an investment of money.

(2)     <u>Common Enterprise</u>

In the Ninth Circuit, this prong of the analysis requires "either an enterprise common to the investor and the seller, promoter or some third party (vertical commonality) or an enterprise common to a group of investors (horizontal commonality)." *Hocking*, 885 F.2d at 1457. Taken as true, the facts alleged are sufficient to show both horizontal and vertical commonality in the token trading enterprise at issue in this case.

<u>*Horizontal Commonality*</u>: Courts have generally found that horizontal commonality exists when the use of investor proceeds to develop a business—the success or failure of which will impact all investors—ties the financial fortunes of the investors together. *See, e.g.*, *SEC v. R.G. Reynolds Enterss, Inc.*, 952 F.2d 1125, 1134 (9th Cir. 1991) (horizontal commonality exists where investor assets were pooled to "finance the construction of a plant where their ore was to be refined"); *Patterson v. Jump Trading*, No. C22-3600, 2024 WL 49055, at *11 (N.D. Cal. Jan. 4, 2024) (pooling of funds to develop the digital ecosystem and allegation that fortunes of token purchasers were tied to one another and depended on issuer's efforts established element on a motion to dismiss); *Hunichen v. Atonomi LLC*, No. C19-615, 2019 WL 7758597, at *12–13 (W.D. Wash. Oct. 28, 2019) (recommending that motion to dismiss be denied in part because investor proceeds from token purchasers were pooled by defendant "to develop blockchain technology and issue future tokens, from which investors would profit"), *report and recommendation adopted*, 2020 WL 1929372 (W.D. Wash. Apr. 21, 2020)).

Here, for each of the tokens at issue, the FAC indicates that investors' fortunes were all equally dependent on the success of the same common enterprise—maintaining the value of tokens collectively and nurturing the development of the cryptocurrency ecosystem. Each token issuer expressly stated an intent to use pooled proceeds raised from investors to launch and develop its business and emphasized that token-holders would collectively benefit from their

success. *Id.* ¶¶ 101–217. In other words, every token-holder's financial fortunes were intertwined with the continued success of the entire token trading enterprise.

*Vertical Commonality:* "Vertical commonality may be established by showing that the fortunes of the investors are linked with those of the promoters." *R.G. Reynolds*, 952 F.2d at 1130; *accord SEC v. Telegram Group, Inc.*, 448 F. Supp. 3d 352, 369–70 (S.D.N.Y. 2020) (finding that "strict vertical commonality" existed because the issuer's "fortunes are directly tied to the fortunes of the [investors], which will rise and fall with the success or failure of the TON Blockchain"). The FAC demonstrates that the issuers retained substantial tokens for their management teams, specifically to align the financial fortunes of management and token-holders. *Id.* ¶¶ 110, 116, 125, 135, 150, 154, 159, 175, 195, 211, 212. Thus, here the token holders and issuers shared a risk of loss. *SEC v. Goldfield Deep Mines Co. of Nev.*, 758 F.2d 459, 463 (9th Cir. 1985) (concluding that vertical commonality existed where, if defendant's "processing technique were to prove faulty, then both the investors and [defendant entity] would suffer financial losses"). Taken together, the factual allegations here are sufficient to establish vertical commonality. *See, e.g.*, *SEC v. NAC Found., LLC*, 512 F. Supp. 3d 988, 998 (N.D. Cal. 2021) (denying motion to dismiss, ruling that vertical commonality existed where defendant promoters "retained a healthy share of [crypto] tokens," and both investors and defendants stood to profit from the "general success of their enterprise"); *cf. SEC v. LBRY, Inc.*, 639 F. Supp. 3d 211, 220 (D. N.H. 2022) (reasoning, with respect to the efforts of others portion of *Howey*, that "by retaining hundreds of millions of LBC [tokens] for itself, LBRY also signaled that it was motivated to work tirelessly to improve the value of its blockchain for itself and any LBC purchasers.").

(3)    <u>Reasonable Expectation of Profits Induced by Efforts of Others</u>

Finally, the last prong of the analysis requires the Court to assess the "economic inducements held out to the" prospective investor. *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009). This "involves two distinct concepts"—an "expectation of profits" obtained by "the efforts of others." *Id.* The Ninth Circuit employs a "commonsense" definition of "profits," including the "increased value of the investment," or, put another way, "simply financial returns on investments." *Id.* at 1023–24. For "the efforts of others" concept, the Ninth Circuit "require[s] that the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Hocking*, 885 F.2d at 1455 (internal citation omitted). Under this test, "courts [] frequently examine[] the promotional materials associated with an instrument or transaction in determining whether an investment contract is present." *NAC Found.*, 512 F. Supp. 2d at 996–97 (internal citation omitted). That examination is "an objective inquiry . . . based on what the purchasers were led to expect." *Id.* at 996.

The FAC establishes that the nine token issuers the SEC identified in relation to Ramani's trades broadly and repeatedly disseminated claims that each token would appreciate in value. Dkt. No. 27 ¶¶ 110, 111, 114–19, 125–27, 135, 139–41, 150–52, 154, 159, 162–67, 175–78, 184–86, 190, 195, 201–02, 211–14. The issuers promoted the tokens based on their potential for investment returns, which they claimed derived from the promised efforts of the promoter's management team to create, develop, and maintain an ecosystem that would increase the demand for a token, and thus its price. *Id.* ¶¶ 102–05. A number of issuers even posted their tokens' daily price on their websites. *Id.* ¶¶ 177, 201, 214. Any objective investor would therefore have expected to profit from trading in the tokens.

Further, an investor's expectation of profit was directly linked to the efforts of the token issuers and their core management teams. *See id.* ¶¶ 121, 128–30, 142–44, 153–54, 168–70, 175, 179, 188, 204–06, 215–16. The retention of tokens to incentivize management and align their interests with those of investors highlights this economic reality; the issuers recognized that management's efforts were directly linked to the tokens' value. *See, e.g., Id.* ¶ 164 (promoting their token to potential investors, Rari's founders asserted "[t]he more money you make, the more money we make"); *see also LBRY*, 639 F. Supp. 3d at 220 ("[B]y retaining hundreds of millions of LBC [tokens] for itself, LBRY also signaled that it was motivated to work tirelessly to improve the value of its blockchain for itself and any LBC purchasers.").

Courts have found that objective investors would reasonably expect profits based on the efforts of others under similar circumstances. For example, in denying a defendant's motion to dismiss, the court in *NAC Foundation* concluded:

> Nor, given the totality of the circumstances, can defendants brush away the inference that an objectively reasonable [token] purchaser likely viewed his or her prospective trading success as a function of the defendants' efforts: after all, demand for [tokens], as reflected in those assets' pricing, would rely almost exclusively on market perception of defendants' work product.

512 F. Supp. 2d at 997; *see also Telegram*, 448 F. Supp. 3d at 375 (finding defendants invited investors to expect profits from defendants' promise to "develop, launch, and support the TON Blockchain," because if Telegram "ceased all further efforts to support the TON Blockchain, . . . [it] and Grams would exist in some form but would likely lack the mass adoption, vibrancy, and utility that would enable the Initial Purchasers to earn their expected huge profits").

The Court's analysis remains the same even to the extent Ramani traded tokens on the secondary market. The Ninth Circuit has explained that whether an instrument purchased in a resale market is an investment contract depends on the "economic reality of each transaction"

and a determination of "what investment package was actually offered." *Hocking*, 885 F.2d at 1463. The promotional statements and managerial promises set forth in the FAC apply equally to tokens that an investor may have bought from the issuer directly or from another investor, including on a crypto asset trading platform. Each issuer continued to make such representation regarding the profitability of their tokens even as the tokens were traded on secondary markets. *Id.* ¶¶ 119-121, 127, 141, 152, 165, 167, 178, 186, 201–03, 213–14). Thus, under *Howey*, all of the crypto assets that Ramani purchased and traded were investment contracts. *See SEC v. Terraform Labs Pte. Ltd.*, No. C23-1346, 2023 WL 8944860, at *15 (S.D.N.Y. Dec. 28, 2023) (public representations by defendants who engaged in "public campaign" to persuade both direct and indirect purchasers to buy tokens "would presumably have reached individuals who purchased their crypto-assets on secondary markets—and, indeed, motivate those purchases").

Ramani's illicit trading was accordingly in connection with the purchase or sale of a security; the second and third *Eitel* factors therefore favor default judgment.

### 3.   **Fourth Factor: Sum of Money Involved**

"[W]hen the sum of money at stake is tailored to the specific misconduct of the defendant, default may be appropriate." *Waters v. Mitchell*, No. C21-87, 2023 WL 3304217, at *7 (W.D. Wash. May 8, 2023). Here, the SEC seeks only disgorgement of Ramani's actual illicit proceeds and a statutorily authorized civil penalty equal to twice that amount. 15 U.S.C. § 78u-1. The Court finds the requested amount of money damages sought by the SEC to be proportional and tailored to the wrongdoing, especially considering that it is less than what Congress has determined a potential maximum remedy to be.[3] Therefore, the fourth *Eitel* factor favors default judgment.

---

[3] *See* 15 U.S.C. §§ 78u(d)(3) (authorizing disgorgement *and* civil penalties), 78u-1(a)(2) (authorizing civil penalties of up to "*three times* the profit gained . . . as a result of" prohibited insider trading (emphasis added)).

### 4.   **Fifth Factor: Possible Disputes of Material Facts**

Ramani has failed to appear in this case or respond to the FAC. Accordingly, "no factual dispute exists that would preclude entry of default judgment" because the alleged facts are considered admitted for pleading purposes. *FIGS, Inc. v. My Open Heart LLC*, No. C22-6129, 2023 WL 3402626, at *3 (C.D. Cal. March 7, 2023). Moreover, Ramani's co-Defendants have largely admitted many of the allegations in pleading guilty in the parallel criminal proceeding. *See United States v. Ishan Wahi*, No. 1:22-cr-392, Dkt. Nos. 68, 81 (S.D.N.Y.). The fifth *Eitel* factor favors default judgment.

### 5.   **Sixth Factor: Excusable Neglect**

Ramani appears to have fled the country to avoid criminal prosecution for the actions alleged in this case. Dkt. No. 27 ¶¶ 17, 99. His default is therefore not the result of excusable neglect. Rather, his default stems from his desire to avoid the consequences of his actions. *SEC v. Next Components, Ltd.*, No. C08-1112, 2013 WL 12313350, at *5 (C.D. Cal. Mar. 28, 2013) ("There is no indication of any justification for Defendants' default and failure to respond, and this factor therefore favors issuance of default judgment."). Therefore, the sixth *Eitel* factor favors default judgment.

### 6.   **Seventh Factor: Policy Preferring Resolution on the Merits**

Despite the Court's strong policy preference for resolving cases on their merits, when resolution on the merits is not "'reasonably possible,'" this factor "does not weigh against default judgment." *Id.* (quoting *Eitel*, 782 F.2d at 1472).

Consequently, the Court finds that all of the *Eitel* factors favor default judgment against Defendant Ramani.

**B.      Requested Relief**

The SEC requests the following relief: (1) a permanent injunction against further violations; (2) civil penalties authorized by statute; and (3) disgorgement of proceeds from the illegal trades; and (4) prejudgment interest. Dkt. No. 118 at 25–28; *see also* 15 U.S.C. § 78u(d).

1.      **Permanent Injunction**

An injunction is appropriate when the totality of the circumstances establishes that "there is a reasonable likelihood of future violations of the securities laws." *SEC v. Blockvest*, No. C18-2287, 2020 WL 7488067, at *2 (S.D. Cal. Dec. 15, 2020). The Court "considers factors such as the degree of scienter involved; the isolated or recurrent nature of the infraction; the likelihood, because of defendant's professional occupation, that future violations might occur; and the sincerity of his assurances against future violations." *Id.* (quoting *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980)). "A permanent injunction may especially be proper where a violation was founded on systemic wrongdoing rather than isolated occurrence or involved a high degree of scienter." *SEC v. Pedras*, No. C13-7932, 2014 WL 12597332, at *9 (C.D. Cal. April 16, 2014).

The allegations in the FAC establish that Ramani's conduct was repetitive and intentional. He actively attempted to hide his conduct and fled the country to avoid prosecution. Based on this, there is no indication that he has shown any signs of remorse or regret. The FAC also shows that Ramani is a sophisticated trader, skilled at using anonymous accounts and foreign trading platforms, among other means, to avoid detection. Future violations appear to be likely. The Court will therefore enter an injunction prohibiting Ramani from future violations.

2.      **Civil Penalties**

The Exchange Act authorizes the SEC to seek, and the Court to impose, civil penalties of up to three times the profits gained from insider trading. 15 U.S.C. § 78u-1(a)(2). In calculating a

penalty, "the statute makes the amount of financial liability to which a violator of the insider

trading laws may be exposed directly proportional to the amount of the profit gained or the loss

avoided from the purchase or sale of a security." *SEC v. Sabrdaran*, 252 F. Supp. 3d 866, 904

(N.D. Cal. 2017) (quoting *SEC v. Rosenthal*, 650 F.3d 156, 162 (2d Cir. 2011)).

Here, while the SEC could have requested a penalty of three times the profits gained

(15 U.S.C. § 78u-1(a)(2)), it only requests a civil penalty of twice the amount of proceeds

Ramani is calculated to have gained from the identified illicit trades, for a total of $1,635,204.

The Court may impose civil penalties on the same basis as an injunction. *Sabrdaran*, 252 F.

Supp. 3d at 904. Thus, for similar reasons, the Court finds that the requested civil penalty is

appropriate here.

   3.  **Disgorgement**

The SEC also seeks disgorgement of the identified proceeds, $817,602, which Ramani

earned from trading tokens on the confidential information he received from Ishan.

In 2021, the Exchange Act was amended to directly authorize disgorgement as

appropriate relief for securities violations. 15 U.S.C. § 78u(d)(3)(A)(ii), (7); *see also* William M.

(Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-

283, § 6501, 134 Stat 3388 (2021). Prior to amendment, the disgorgement remedy was available

through the provision generally authorizing equitable relief at the Court's discretion. *See* 15

U.S.C. § 78u(d)(5). That provision was interpreted as requiring an examination of general

equitable principles and a finding that the requested relief is "appropriate or necessary for the

benefit of investors." *Liu v. SEC*, 140 S. Ct. 1936, 1946 (2020). In *Liu*, the SEC requested that

the disgorged proceeds be paid to the U.S. Treasury since it was "infeasible to distribute the

collected funds to [specific] investors." *Id.* at 1948. The Court concluded that "on remand, the

lower courts may evaluate in the first instance whether [such an] order would indeed be for the

benefit of investors as required by § 78u(d)(5) and consistent with equitable principles." *Id.*
at 1949. Since *Liu* was issued, Congress has amended the Exchange Act to directly authorize
disgorgement as a distinct remedy and does not appear to have included the "for the benefit of
investors" limitation previously imposed by the Supreme Court. *See* 15 U.S.C. § 78u(d)(7);[4]
*accord SEC v. Brenda Christine Barry/Bak W., Inc.*, No. C15-2563, 2023 WL 4491724, at *2
(C.D. Cal. July 12, 2023).

Here, the Court has found that the SEC's FAC sufficiently establishes that Ramani's
insider trading violates securities laws. *Supra* Section III.A.2. As in *Liu*, Plaintiff here requests
any disgorged funds go to the U.S. Treasury because it is infeasible to identify specific investors
directly impacted by Ramani's illicit trades, due in large part to the secretive and anonymous
nature of the relevant cryptocurrency ecosystems. Dkt. No. 118 at 26. The SEC has shown that
Ramani used multiple accounts and wallets, transferred and converted his proceeds, and
specifically took steps to obscure and conceal his trading. Dkt. No. 27 ¶¶ 41, 93–96. Further,
Ramani appears to have fled the country to avoid prosecution and has done nothing to assist the
SEC in identifying potential victims. Dkt. No. 27 ¶¶ 17, 99. Thus, it would be extremely difficult
and costly for Plaintiff to identify specific victims harmed by Ramani's illicit trades. The Ninth
Circuit has not yet weighed in on whether, and to what extent, the decision in *Liu* applies post-
amendment of the Exchange Act. That said, the *Liu* Court concluded that ordering disgorgement
to be paid to the U.S. Treasury under similar circumstances was within a lower court's
discretion. 140 S. Ct. 1948–49; *cf. Barry/Bak W.*, 2023 WL 4491724, at *2 ("[E]ven under *Liu*,

---

[4] *Compare* 15 U.S.C. § 78u(d)(5) ("In any action or proceeding brought or instituted by the Commission under any
provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief
that may be appropriate or necessary *for the benefit of investors*.") (emphasis added), *with* 15 U.S.C. § 78u(d)(7)
("In any action or proceeding brought by the Commission under any provision of the securities laws, the
Commission may seek, and any Federal court may order, disgorgement.").

1    disgorgement is well within the Court's discretion in this case."). The Court therefore finds that

2    disgorgement of the identified proceeds, to be paid to the U.S. Treasury, is an appropriate

3    remedy as authorized by the Exchange Act, as amended.

4        4.    **Prejudgment Interest**

5        The SEC also seeks prejudgment interest on the disgorged funds. The Court considers

6    several factors in deciding whether to impose prejudgment interest, including "(i) the need to

7    fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness

8    and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/o(iv)

9    such other general principles as are deemed relevant by the court." *Id.* at *3 (quoting *SEC. v.*

10   *First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996)). The SEC only argues that

11   prejudgment interest is appropriate "to ensure that the wrongdoer does not profit from the illegal

12   activity."[5] Dkt. No. 118 at 27 (internal quotation marks omitted).

13       In considering the relevant factors, the Court finds that prejudgment interest is not

14   appropriate here. As to the first factor, Plaintiff admits that no specific victims have been

15   identified who require full compensation. Instead, the disgorged funds will be paid to the U.S.

16   Treasury. As to the remaining factors, the Court finds that the large size of the total monetary

17   penalty—which essentially amounts to three times the amount of proceeds Ramani gained from

18   the illicit trades—is both fair and equitable, as well as sufficiently remedial and consistent with

19   the purposes of the relevant statutes. *See, e.g.*, 15 U.S.C. § 78u-1(a)(2) (authorizing a maximum

20   of "three times the profit gained" in civil penalties for insider trading).

21

22

23

24

---

[5] For this argument, the SEC includes a quotation from a source indicated by an "*id.*" cite that does not appear to relate to the previously-cited authority in the briefing. As such, the Court is unable to identify the relevant authority in order to consider its applicability.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANT SAMEER RAMANI - 19

### IV.   CONCLUSION

Accordingly, it is hereby ORDERED:

(1)   Plaintiff's Motion for Default Judgment against Defendant Ramani (Dkt. No. 118) is GRANTED IN PART and DENIED IN PART. The Court GRANTS all of Plaintiff's requested relief except that it DENIES Plaintiff's request for prejudgment interest.

(2)   The Court FINDS that Defendant Ramani has violated Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) and ENTERS JUDGMENT as to all claims against Defendant Ramani.

(3)   Defendant Ramini is PERMANENTLY RESTRAINED AND ENJOINED from committing any further violations, directly or indirectly, by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

    a.   to employ any device, scheme, or artifice to defraud;

    b.   to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    c.   to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

As provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this

1   Order and/or the final judgment entered in this case by personal service

2   or otherwise: Defendant's officers, agents, servants, employees,

3   attorneys, and other persons in active concert or participation with

4   Defendant or with anyone described in herein.

5   (4)   The Court FINDS Defendant Ramini is liable for disgorgement of $817,602

6   in ill-gotten gains resulting from the conduct alleged in the FAC and

7   supported by the additional evidence that the SEC has submitted in

8   support of its Motion for Default Judgment. The Court further IMPOSES a

9   civil penalty in the amount of $1,635,204 upon Defendant Ramini,

10   pursuant to Section 21A of the Exchange Act (15 U.S.C. § 78u-1(a)(2)).

11   a.   Defendant SHALL SATISFY HIS OBLIGATION by paying the amounts

12   owed to the SEC **within thirty (30) days** after entry of final

13   judgment. Defendant may transmit payment electronically to the

14   Commission, which will provide detailed ACH transfer/Fedwire

15   instructions upon request. Payment may also be made directly from

16   a bank account via Pay.gov through the SEC website at:

17   http:/www.sec.gov/about/offices/ofm.htm. Defendant may also pay

18   by certified check, bank cashier's check, or United States postal

19   money order payable to the Securities and Exchange Commission,

20   which shall be delivered or mailed to:

21   Enterprise Services Center
    Accounts Receivable Branch

22   6500 South MacArthur Boulevard
    Oklahoma City, OK 73169

23

24

and shall be accompanied by a letter identifying the case title, civil

action number, and name of this Court; Defendant's name as a

defendant in this action; and specifying that payment is made

pursuant to the final judgment entered in this case.

b.  Defendant SHALL simultaneously TRANSMIT photocopies of

evidence of payment and case identifying information to Plaintiff's

counsel in this action. By making this payment, Defendant

relinquishes all legal and equitable right, title, and interest in such

funds and no part of the funds shall be returned to Defendant.

c.  Plaintiff SHALL HOLD the funds until further order of this Court.

The SEC may propose a plan to distribute the funds subject to the

Court's approval, and the Court shall retain jurisdiction over the

administration of any distribution of the funds.

d.  The SEC may enforce the Court's judgment for disgorgement and

civil penalties by using all collection procedures authorized by law,

including, but not limited to, moving for civil contempt at any time

**after thirty (30) days** following entry of final judgment.

Defendant SHALL PAY post-judgment interest on any amounts due

**after thirty (30) days** of entry of final judgment pursuant to 28

U.S.C. § 1961.

(5)   The Court SHALL RETAIN JURISDICTION of this matter for the purposes of

enforcing the terms of the final judgment.

(6)     Plaintiffs' counsel is DIRECTED to serve a copy of this Order, and the final

judgment entered herewith, on Defendant Ramani by email:

      a.   to his criminal defense counsel at david.kornblau@dentons.com;

         and

      b.   to Ramini at samyramani@gmail.com.


Dated this 1st day of March 2024.

 

Tana Lin
United States District Judge